# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

:    Case No. 17-cr-00684-ER

v.                    :

:    ECF Case

LAMONT EVANS            :
EMANUEL RICHARDSON, a/k/a "Book,"  :
ANTHONY BLAND, a/k/a "Tony,"  :
CHRISTIAN DAWKINS, and    :
MERL CODE,            :

:

    Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## JOINT MOTION TO DISMISS THE INDICTMENT

**NEXSEN PRUET LLC**
William W. Wilkins
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211
*Attorneys for Defendant Merl Code*

**HANEY LAW GROUP PLLC**
Steven A. Haney
3000 Town Center Drive, Suite 2570
Southfield, Michigan 48075
(248) 414-1470
*Attorneys for Defendant Christian Dawkins*

**BARNES AND THORNBURG, LLP**
William R. Martin
1717 Pennsylvania Ave
Suite 500
Washington, DC 20006
(202) 465-8422
*Attorneys for Defendant Lamont Evans*

**LAW OFFICES OF JEFFREY LICHTMAN**
Jeffrey B. Einhorn
Jeffrey Lichtman
11 E. 44th Street, Ste. 501
New York, New York 10017
(212) 581-1001
*Attorneys for Defendant Anthony "Tony" Bland*

**MORDOCK BARBER, LLC**
Craig J. Mordock
7611 Maple Street, Suite A3
New Orleans, Louisiana 70118
(504) 304-2335
*Attorneys for Defendant Emanuel "Book" Richardson*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 4

    The Defendants ........................................................................................................ 4

    The NCAA ............................................................................................................... 6

    The Alleged "Schemes" in the Indictment.............................................................. 7

        Oklahoma State University & the University of South Carolina........................... 7

        The University of Arizona ..................................................................................... 9

        The University of Southern California ................................................................. 10

    The Government's Theories ................................................................................... 13

LEGAL STANDARD....................................................................................................... 14

ARGUMENT .................................................................................................................... 15

    I.      THE INDICTMENT DOES NOT ALLEGE A FEDERAL FUNDS BRIBERY SCHEME. ........................................................................................................... 15

    II.    THE INDICTMENT DOES NOT ALLEGE A TRAVEL ACT CONSPIRACY.18

    III.   THE INDICTMENT DOES NOT ALLEGE AN HONEST SERVICES WIRE FRAUD. ............................................................................................................... 19

    IV.   FEDERAL FUNDS BRIBERY AND HONEST SERVICES WIRE FRAUD ARE UNCONSTITUTIONAL AS APPLIED...................................................... 21

    V.    THE WIRE FRAUD CONSPIRACY CHARGE IS UNTENABLE.................... 26

        A.   The Indictment Does Not Allege a Scheme to Defraud the Universities. ............ 27

        B.   The Indictment's Wire Fraud Theory Violates Due Process. ............................... 30

CONCLUSION................................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Dunn v. United States*,
442 U.S. 100, 112 (1979) ........................................................................................ 30

*Dupre v. United States*,
No.04-CR-267 (DLC), 2012 WL 2953970, at *2 (S.D.N.Y. July 20, 2012) .......................... 27

*Jones v. United States*,
526 U.S. 227, 232 (1999) ........................................................................................ 14

*McCormick v. United States*,
500 U.S. 257 (1991) ................................................................................................ 22

*McNally v. United States*,
483 U.S. 350, 358 (1987) ........................................................................................ 27

*Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Emps. Rest. Emps. Union*,
215 F.3d 923, 926 (9th Cir. 2000) .......................................................................... 29

*Skilling v. United States,*
561 U.S. 358, 407 (2010) ................................................................................ passim

*St. John's Univ. N.Y. v. Bolton*,
757 F. Supp. 2d 144, 168 (E.D.N.Y. 2010) .............................................................. 20

*U.S. v. Mallas*,
762 F. 2d 361, 363 (4th Cir. 1985) .......................................................................... 31

*U.S. v. Nardello*,
393 U.S. 286, 289-96 (1969) .................................................................................... 18

*U.S. v. Roselli*,
432 F.2d 879, 885 (9th Cir. 1970) .......................................................................... 18

*United States v. Autuori*,
212 F.3d 105,115 (2d Cir. 2000) ........................................................................ 27, 28

*United States v. Bahel*,
662 F.3d 610,626 (2d Cir. 2011) .............................................................................. 15

*United States v. Baldinger*,
838 F.2d 176, 180 (6th Cir. 1988) .......................................................................... 29

*United States v. Bank of N.Y. Mellon*,
   941 F. Supp. 2d 438, 465 (S.D.N.Y. 2013) ............................................................ 28

*United States v. Binday*,
   804 F.3d 558, 569 (2d Cir. 2015) .......................................................................... 27

*United States v. Critzer*,
   498 F.2d 1160, 1162 (4th Cir. 1974) ..................................................................... 31

*United States v. Davis*,
   No. 13-CR-923 (LAP), 2017 WL 3328240, at *8 (S.D.N.Y. Aug. 3, 2017) ..................... 27, 30

*United States v. deVegter*,
   198 F.3d 1324, 1328-29 (11th Cir. 1999) .............................................................. 20

*United States v. Elgawhary*,
   No. 14-CR-068 (D. Md. Oct. 30 2017), EFC No. 98 ................................................ 24

*United States v. Frega*,
   933 F. Supp. 1536, 1542-43 (S.D. Cal 1996) .................................................... 21, 22

*United States v. Frost*,
   125 F.3d 346,366 (6th Cir. 1997) ......................................................................... 20

*United States v. Goodwin*,
   141 F.3d 394, 401 (2d Cir. 1997) .......................................................................... 15

*United States v. Guadagna*,
   183 F.3d 122, 129 (2d Cir. 1999) .......................................................................... 28

*United States v. Halloran*,
   664 F. App'x 23 (2d Cir. 2016) ............................................................................. 19

*United States v. Harper*,
   No. 13-CR-601 (RJD), 2015 WL 6029530, at *3 (E.D. N.Y. Oct. 15, 2015) ................. 19

*United States v. Lanier*,
   520 U.S. 259, 266 (2005) ..................................................................................... 31

*United States v. Litvak*,
   No. 13-CR-19 (JHC), 2013 WL 574091, at *2 (D. Conn. Oct 21, 2013) ..................... 14

*United States v. Males*,
   459 F.3d 154, 158 (2d Cir. 2006) .......................................................................... 29

*United States v. McDonnell*,
  136 S. Ct. 2355 (2016) ........................................................................ 23, 24, 25, 31

*United States v. Pirro*,
  212 F.3d 86, 91 (2d Cir. 2000) .................................................................. 14, 15

*United States v. Regan*,
  713 F. Supp. 629, 637 (S.D.N.Y. 1989) ................................................................ 29

*United States v. Rybicki*,
  354 F.3d 124 (2d Cir. 2003) .................................................................. 25, 30

*United States v. Sabri*,
  541 U.S. 600 (2004) ................................................................................ 16

*United States v. Silver*,
  864 F.3d 102, 116 (2d Cir. 2017) ................................................................ 24

*United States v. Smith*,
  985 F. Supp. 2d 547, 590 (S.D.N.Y. 2014) ............................................................ 19

*United States v. Sun-Diamond Growers of California*,
  526 U.S. 398 (1999) ................................................................................ 22

*United States v. Velastequi*,
  199 F3d 590, 593 (2d Cir. 1999) ................................................................ 31

*United States v. Walters*,
  997 F.2d 1219 (7th Cir. 1993) .................................................................. 28, 29

*United States v. Whitfield*,
  590 F.3d 325, 344-45 (5th Cir. 2009) ...................................................... 15, 17, 18

*World Wrestling Entm't, Inc. v. Jakks Pac, Inc.*,
  530 F. Supp. 2d 486, 502 (S.D.N.Y. 2007) ............................................................ 19

**Statutes**

18 U.S.C. § 1343 .................................................................................... 26, 30

18 U.S.C. § 1346 .................................................................................... 19

18 U.S.C. § 1952 .................................................................................... 18

18 U.S.C. § 201 ..................................................................................... 22, 24

18 U.S.C. § 666.................................................................................................................. passim

18 U.S.C. §§ 1341 ................................................................................................................. 30

**Rules**

Rule 12(b)(3)(B)(v)............................................................................................................... 14

Pursuant to Federal Rules of Criminal Procedure ("FRCP") 12(b)(1) and (b)(3)(B)(v), and pursuant to the Due Process Clause of the United States Constitution, Defendants Lamont Evans, Emanuel Richardson a/k/a "Book," Anthony Bland a/k/a "Tony," Christian Dawkins, and Merl Code (collectively "Defendants") respectfully submit this memorandum of law in support of their joint motion to dismiss the Indictment.

## PRELIMINARY STATEMENT

Every year, the NCAA adjudicates thousands of violations of its rules regulating college athletes. Usually, these violations are based on conduct that would be routine and entirely permissible in any other context. In this case, the Government has singled out certain alleged NCAA rules violations as "corrupt" and decided to prosecute them as federal crimes. As explained below, the Indictment should be dismissed because the allegations fail to support a conviction under any viable theory of criminal liability. To the contrary, each of the Government's charges is predicated on a novel theory that is inconsistent with the relevant statutory language and would impermissibly extend the boundaries of federal criminal law well beyond constitutional limits.

According to the Indictment, Defendants were charged with criminal activities related to the influence of money on coaches and student-athletes who participate in intercollegiate basketball governed by the NCAA. Ind. ¶ 1. However, because the NCAA is a private organization governed by its own rules and regulations, violations such as these have never been prosecuted under any theory of criminal law. Despite this lack of precedent, the Indictment alleges that Defendants "facilitated" payments to certain college basketball players and their families and that those payments resulted in NCAA rules violations.

The government asserts four principal bases of criminal liability based on these alleged NCAA violations. First, that the payments facilitated by Mr. Dawkins, Mr. Code, and others to

Mr. Evans, Mr. Richardson, and Mr. Bland constituted federal funds bribery under 18 U.S.C. § 666; second, that Mr. Evans, Mr. Richardson, and Mr. Bland's acceptance of payments in exchange for steering athletes to use, among others, Mr. Dawkins' services[1] if they later became professional basketball players constituted honest services fraud; third, that payments to players in violation of NCAA rules constituted a wire fraud conspiracy, with the Universities[2] as the intended victims, because Mr. Evans, Mr. Richardson, Mr. Bland, and the players certified annually that there were no rules violations. Fourth, that the aforementioned conduct, when combined with the fact that Defendants traveled across state lines, constituted a Travel Act conspiracy. None of these theories is valid.

The bribery and honest services fraud charges are unsustainable. Each of the applicable statutes specifically requires that the alleged *quid pro quo* involve an act by Mr. Evans, Mr. Richardson, and Mr. Bland, using their authority as employees of their respective Universities. But such an act was never contemplated and did not happen. Neither Mr. Dawkins nor Mr. Code had any business with the Universities and were not seeking any advantage in a transaction with the Universities. Recommending financial advisors for players to use after they joined the NBA was not among Mr. Evans, Mr. Richardson, or Mr. Bland's duties as college basketball coaches, nor were their respective Universities in the business of making such recommendations. Thus, Mr. Evans, Mr. Richardson, and Mr. Bland did not act as an agents of their respective

---

[1] Mr. Code was alleged to have been willing to accept bribe payments in exchange for steering student-athletes to retain the services of the company Mr. Dawkins was forming with CC-1 and UC-1.

[2] "Universities" collectively refers to the University of South Carolina, Oklahoma State University, the University of Arizona, and the University of Southern California.

Universities when they allegedly did so, nor did they violate any fiduciary duty they owed to their employers.

The Government's attempt to use the NCAA rules as the source of Mr. Evans, Mr. Richardson, and Mr. Bland's agencies or duties is misplaced. On this faulty theory, their otherwise lawful conduct was transformed into a federal criminal offense because it allegedly gave rise to NCAA rules violations. As discussed below, the Government's overbroad theories of commercial bribery and honest services fraud are not supported by the relevant statutes and run afoul of recent Supreme Court decisions, which have demanded a narrowing of circumstances in which these statutes apply.

The Government's wire fraud and Travel Act conspiracy theories are equally flawed. In charging this conduct as a scheme to defraud the Universities, the Government is overstepping its hand. The purpose of the alleged payments was ***not*** to dupe the Universities into awarding scholarships to any players on false pretenses, as would be required for wire fraud. Instead, as the Indictment makes clear, those payments were intended to induce players to use, among others, Mr. Dawkins' financial advisory services if those players made it into the NBA. Here again, the Government impermissibly strains the boundaries of the wire fraud statute by pointing to the coaches' and players' annual certifications that they were not aware of any NCAA rules violations. This interpretation, whereby an undisclosed NCAA rules violation coupled with a false certification equals wire fraud, would criminalize nearly every NCAA rules violation, even where, as here, those violations had nothing to do with the Universities' scholarship decisions. Under such a theory, an 18-year-old gymnast at a Division I school who accepts $1,000 from a booster and later certifies that there were no rules violations has committed federal wire fraud. So too has the 19-year-old swimmer at the same school if a booster pays for her parents to attend

an important swim meet. This is not the law.[3] Simply put, under applicable Supreme Court precedent, the Government cannot turn the NCAA rulebook into an appendix of Title 18 of the United States Code.

# BACKGROUND

## *The Defendants*

Mr. Evans is a 41-year old husband and father. Although Mr. Evans is a native of the Bahamas, he came to the United States at the age of four and settled in Deerfield Beach, Florida. After playing high school basketball at Hallandale High School, Mr. Evans played college basketball at Seminole Junior College, St. Catharine College, and Drake University. After college, Mr. Evans played seven years of professional basketball in the United States Basketball League, Slovenia, Germany, Finland, Belgium, and Venezuela. Mr. Evans began his coaching career at Kansas State University in 2008, where he served as a student assistant. In 2009, after earning a bachelor's degree in social science from Kansas State, Mr. Evans served as a graduate manager before being promoted to assistant coach in 2011. From 2012-2016, Mr. Evans served as an assistant coach at the University of South Carolina before accepting a position at Oklahoma State University, where he was promoted to Associate Head Coach in 2017.

Mr. Richardson is a 45-year old husband and father of two.  He grew up in Harlem and the South Bronx and played high school basketball at Riverside Church and St. Raymond High School for Boys. After high school, Mr. Richardson played collegiate basketball at several schools, including Florida Atlantic University, Monroe College, and the University of Pittsburgh at Johnstown, where he ultimately graduated in 1998 with a degree in business marketing and

---

[3]     Furthermore, since this is not the law, Defendants' interstate travel could not give rise to a violation of the Travel Act.

management. After graduation, Mr. Richardson became the associate head coach at the University of Pittsburgh at Johnstown before furthering his career as an assistant coach at Monroe College, Marist College, Xavier University, and the University of Arizona.

Mr. Bland, a 38-year old husband and father of four, grew up in Los Angeles, California. After high school, Mr. Bland played collegiate basketball at Syracuse University before transferring to San Diego State University. Following college, Mr. Bland played in the United States Basketball League before signing a contract with the Sacramento Kings for the 2004 preseason. Mr. Bland went on to play in Russia, the NBA Development League, and Europe. In 2008, Mr. Bland returned to San Diego State University to serve as the team's head manager and ultimately completed his degree in social science. After serving as an assistant coach at San Diego State University for the 2012 and 2013 basketball seasons, Mr. Bland accepted an assistant coaching position at the University of Southern California in 2013 before being promoted to Associate Head Coach in 2014.

Mr. Code is a 43-year old resident of Greenville, South Carolina. He is a husband, a father of two young children, and former college basketball star at Clemson University. After college, he spent most of his career working for Nike before accepting a consultant position for Adidas in approximately October of 2016. While working as a consultant for Adidas, Mr. Code also served as an advisor to one of the company's amateur basketball teams in South Carolina. After Mr. Code was arrested on these charges in 2017, he was cut off by Adidas.

Mr. Dawkins is a 25-year old high school graduate from Saginaw, Michigan. Before Mr. Dawkins began the process of establishing his own sports management business in May of 2017, he was employed for several years as a "runner" for a sports agency that was responsible for recruiting athletes as clients and maintaining relationships. Mr. Dawkins' partner in his new

enterprise was Mr. Sood (CC-1), who hoped, through his association with Mr. Dawkins' new venture, to add NBA players to his roster of clients.

**The NCAA**

The basketball programs at each of the Universities named in the Indictment are governed by the NCAA—a *private*, non-profit member-led organization that regulates athletics for more than 1,000 colleges and universities. Ind. ¶ 17. Each year, the NCAA publishes a manual setting out the organization's constitution and operating bylaws (the "Bylaws"). Ind. ¶ 19. Hundreds of rules govern the conduct of college players and coaches. Among other things, the rules strictly prohibit certain player conduct such as: wagering on other collegiate or professional sports (Bylaw 10.3); consuming many common drugs, including tobacco products (Bylaws 18.4.1.4, 31.2.3.1, 11.1.4); advertising for any brands in exchange for payment (Bylaw 12.5.2.1); and communicating with college coaches prior to specific dates (*see, e.g.*, Bylaw 13.1.1.1).

One sub-set of the Bylaws requires players to remain amateur athletes in order to be "eligible for intercollegiate competition." *See* Bylaw 12.1.2; Ind. ¶ 19. Amateurism prohibits, among other things, players receiving benefits or financial assistance from others, including agents or financial advisors. Ind. ¶ 20. In addition, players are required to certify annually their compliance with the Bylaws. Ind. ¶ 24.

The Bylaws also contain hundreds of rules governing the conduct of coaches, including prohibitions on: attending more than one offseason "practice" per week (Bylaw 17.1.1.2(a); affiliating or advertising for camps not associated with their University (Bylaw 13.12.2.3.3); consuming tobacco products while coaching (Bylaw 11.1.4); or participating in any sports wagering concerning any intercollegiate, amateur or professional athletics competition (Bylaw

10.3). Coaches are further prohibited from "(i) facilitating contact between student-athletes and agents or financial advisors; and (ii) receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes." Ind. ¶ 23; *see also* Bylaws 10.1, 11.3. Like their players, coaches must certify annually "that they had reported to their university any knowledge of violations of NCAA rules involving their institution." Ind. ¶ 26.

The NCAA has a "Committee on Infractions," the purpose of which is to "uphold integrity and fair play among the NCAA membership, and to prescribe appropriate and fair penalties if violations occur." Bylaw 19.01.1. The NCAA conducts its own investigations into potential violations and has the authority to impose sanctions on schools, players and coaches.[4] Each year the NCAA reports thousands of rules violations. Indeed, in 2016, the Committee on Infractions processed more than 5,000 cases, none of which were ever prosecuted as criminal charges.

### The Alleged "Schemes" in the Indictment

#### Oklahoma State University & the University of South Carolina

The Indictment generally alleges that from 2016 and into 2017, Mr. Evans solicited and accepted "at least $22,000 in bribes" from, among others, CW-1 in exchange for Mr. Evans agreeing to "exert his official influence over certain student-athletes that [he] coached, first at the University of South Carolina, and then at Oklahoma State University, so that they would retain

---

[4]      *See, e.g.*, *Division I Committee on Infractions*, NCAA.ORG, http://www.ncaa.org/governance/committees/division-i-committee-infractions (last visited November 26, 2018) ("the [committee on infractions] has authority to address prehearing procedural matters, set and conduct hearings or reviews, find facts, conclude violations of NCAA legislation, prescribe appropriate penalties and monitor institutions on probation to ensure compliance with penalties and terms of probation, as well as conduct follow-up proceedings as may be necessary").

CW-1's business management services." Ind. ¶ 29. The Indictment further alleges that Mr. Dawkins first introduced CW-1 and CC-1 to Mr. Evans for the purpose of allowing CW-1 and CC-1 to make the aforementioned "bribe payments" to Mr. Evans. Ind. ¶ 30.

Specifically, on or about December of 2015, Mr. Dawkins allegedly spoke to CW-1 by telephone and informed him that CW-1 would be expected to pay Mr. Evans $25,000 in exchange for Mr. Evans' agreement to "steer multiple specific student-athletes to retain CW-1." Ind. ¶ 31. Thereafter, from approximately April of 2016 through July of 2017, Mr. Evans received payments from CW-1 and CC-1 via cash and wire transfers. *Id.* Furthermore, the Indictment alleges that Mr. Evans, as a result of those "bribe payments," arranged for CW-1 to meet with a student-athlete from the Oklahoma State University men's basketball team in approximately February of 2017. Ind. ¶ 32. During that meeting, Mr. Evans allegedly "touted CW-1's ability to help the student-athlete, and pressured the student-athlete to use CW-1's services." *Id.* After the meeting, Mr. Evans received $2,000 from CW-1. *Id.*

The Indictment also alleges that Mr. Evans arranged to introduce CC-1 to the mother of a different student-athlete that Mr. Evans had previously coached at the University of South Carolina "for the purpose of pressuring the mother to retain CC-1." Ind. ¶ 33. In a later meeting, Mr. Evans allegedly informed CW-1 that he would direct to CW-1 a high-caliber student-athlete who Mr. Evans believed would be joining the Oklahoma State University men's basketball team in 2017, and further promised CW-1 that he would use his influence over his student-athletes for CW-1's benefit. *Id.* Lastly, the Indictment alleges that Mr. Evans "solicited additional funds" from CW-1 for the purpose of funneling the funds to a high school basketball recruit so that the recruit would commit to attending Oklahoma State University. Ind. ¶ 34.

*The University of Arizona*

As to Mr. Richardson, the Indictment generally alleges that from February of 2017 through September of 2017, Mr. Richardson solicited and accepted "at least $20,000 in bribes" from Mr. Dawkins, CC-1, and UC-1 in exchange for Mr. Richardson agreeing to exert "his official influence over certain student-athletes that [he] coached at the University of Arizona so that they would retain the business management and financial advisory services" of a new sports management company being formed by Mr. Dawkins, CC-1, and UC-1 "once the athletes eventually entered" the NBA. Ind. ¶¶ 1, 35-36. The Indictment further alleges that Mr. Richardson solicited the payments from Mr. Dawkins, CC-1, and UC-1 for the purpose of making direct payments to a high school basketball recruit and/or his family so that the recruit would commit to attending the University of Arizona. Ind. ¶ 35.

After, as the Indictment alleges, Mr. Dawkins introduced CC-1, CW-1 and UC-1 to Mr. Richardson, they discussed making the aforementioned payments to Mr. Richardson through meetings and telephone conversations. Ind. ¶ 36.   Specifically, on or about June 20, 2017, Mr. Richardson attended a meeting, which was allegedly arranged by Mr. Dawkins, with CC-1, CW-1, UC-1, and UC-2 in Manhattan.  Ind. ¶ 37.   During that meeting, Mr. Richardson accepted $5,000 from UC-1. *Id.*   In addition, on or about July 20, 2017, the Indictment alleges that Mr. Richardson received $15,000 in cash from UC-1, which he allegedly intended to provide to a high school basketball prospect and/or his family so that the basketball prospect would commit to attending the University of Arizona. Ind. ¶ 38.

Lastly, the Indictment alleges that on or about August 30, 2017, Mr. Richardson met with Mr. Dawkins, CC-1, and UC-2 in Arizona. Ind. ¶ 39. During that meeting, Mr. Richardson informed them that a relative of a student-athlete that Mr. Richardson coached would be the

primary decision-maker with respect to which advisors that student-athlete would ultimately retain, and further informed them that he (Mr. Richardson) would steer the student-athlete to retain the services of Mr. Dawkins and CC-1. *Id.* Later that day, Mr. Dawkins, CC-1, and UC-2 met with the student-athlete's relative and discussed, among other things, that the student athlete was inclined to retain Mr. Dawkins and CC-1's services. *Id.*

### *The University of Southern California*

With respect to Mr. Bland, the Indictment generally alleges that from approximately July of 2017 into September of 2017, Mr. Dawkins, CC-1, and UC-1 paid "at least $13,000 in bribes" to Mr. Bland in exchange for Mr. Bland's agreement to "exert his official influence over certain student-athletes that [he] coached to retain" the services of Mr. Dawkins and CC-1 once those student-athletes entered the NBA. Ind. ¶ 40. In addition, the Indictment generally alleges that, at Mr. Bland's direction, Mr. Dawkins, CC-1, and UC-2 "paid and/or facilitated payment of an additional $9,000" to the families or close confidantes of student-athletes at the University of Southern California.

Specifically, on or about June 20, 2017, Mr. Dawkins, Mr. Code, CC-1, CW-1, and UC-1 allegedly met in Manhattan, New York so that Mr. Dawkins could introduce Mr. Code to CC-1, CW-1, and UC-1. Ind. ¶ 41. During the meeting, they allegedly discussed Mr. Code's utility to the "scheme to make bribe payments to college basketball coaches," along with how Mr. Code could use his affiliation with Company-1 (Adidas) in order to assist Mr. Dawkins, CC-1, CW-1, and UC-1 in developing relationships with college basketball coaches. *Id.* Mr. Code allegedly informed them that he "frequently interacted with college basketball coaches" and "agreed to identify coaches that would be willing to accept bribe payments in exchange for steering their

student-athletes to retain the services of the company" that was being formed by Mr. Dawkins, CC-1, and UC-1. *Id.* At the conclusion of the meeting, UC-1 allegedly paid Mr. Code $5,000. *Id.*

Thereafter, on or about July 7, 2017, Mr. Dawkins and Mr. Code allegedly discussed, via telephone, that Mr. Code could introduce UC-1 to Mr. Bland. Ind. ¶ 42. During the call, Mr. Code allegedly stated that he expected to be paid $5,000 for each men's college basketball coach that he introduced to UC-1. *Id.* During a subsequent call on or about July 8, 2017, Mr. Dawkins and Mr. Code allegedly discussed a list of coaches, including Mr. Bland, with whom Mr. Code would arrange meetings during an upcoming trip to Las Vegas. *Id.*

On or about July 29, 2017, the Indictment alleges that Mr. Bland, Mr. Dawkins, UC-1, and CW-1 attended a meeting in a Las Vegas hotel room, which Mr. Code allegedly arranged. Ind. ¶ 43. During the meeting, Mr. Bland "confirmed that he would use his influence to steer student-athletes at the University of Southern California to retain the new sports management company being formed by [Mr.] Dawkins, CC-1, and UC-1." *Id.* The Indictment further alleges that Mr. Bland confirmed his ability to exert significant influence over his athletes with respect to which agents and advisors to retain. *Id.* After the meeting, Mr. Dawkins provided $13,000 to Mr. Bland. *Id.*

After Mr. Bland received the $13,000, he allegedly "orchestrated a meeting" between Mr. Dawkins, CC-1, UC-2, and "a family member and/or close family friend of a current student-athlete on the University of Southern California's men's basketball team, as well as a family member of a rising freshman that would be joining the . . . team." Ind. ¶ 44. During those meetings, the aforementioned family members and/or close family friends received payments from Mr. Dawkins, CC-1, and UC-2. *Id.* Lastly, the Indictment alleges that on or about August 31, 2017, Mr. Bland met in person with Mr. Dawkins, CC-1, and UC-2. Ind. ¶ 45. During that

meeting, Mr. Bland allegedly informed them that as long as they continued funding payments to family members of certain players and recruits, he would ensure that his student-athletes at the University of Southern California retained the services of Mr. Dawkins and CC-1 once they entered the NBA. *Id.*

*   *   *

As to each scheme, the Indictment generally alleges that the aforementioned introductions and payments to players and/or their family members resulted in NCAA rules violations, which caused the players to become ineligible. In addition, the Indictment further alleges that on some unspecified date, Mr. Evans, Mr. Richardson, Mr. Bland, and the players provided false certifications regarding their compliance with the NCAA rules. This allegedly resulted in the Universities being deprived of their rights to control their scholarship dollars and exposed them to tangible economic harm, such as monetary and other penalties imposed by the NCAA.

However, while the Indictment suggests that Mr. Evans, Mr. Richardson, and Mr. Bland were going to use their "official positions" to steer players to retain the services of Mr. Dawkins and others, the scheme involved no acts by Mr. Evans, Mr. Richardson, and Mr. Bland in their capacities as employees of their respective Universities. Indeed, absent from the Indictment is any allegation, for example, that Mr. Dawkins or Mr. Code had any business with the Universities or were considering doing any business with them. Nor is there any allegation that recommending financial advisors for players to use (if they entered the NBA) was part of Mr. Evans, Mr. Richardson, and Mr. Bland's jobs as coaches.

Moreover, no conduct is alleged to have taken place on the Universities' premises or during official activities at the Universities; nor did any conduct require the use of the

Universities' property or involve a financial or other transaction relating to the Universities. To the contrary, the Indictment indicates that Mr. Evans, Mr. Richardson, and Mr. Bland's efforts to introduce players to Mr. Dawkins and others took place outside of any official University event, and while they were off duty. Lastly, the Indictment contains no allegation that Mr. Evans, Mr. Richardson, and Mr. Bland paid money to any players or their families, or that any of the Universities' property was used in any way.

### The Government's Theories

The Indictment sets forth four theories of criminal liability.

First, the Indictment charges that Defendants committed federal funds bribery under 18 U.S.C. § 666 (and conspiracy to do the same) because, as "agents" of institutions that receive federal funds, Mr. Evans, Mr. Richardson, and Mr. Bland improperly received payments from, among others, Mr. Dawkins in exchange for steering players to use the services of Mr. Dawkins and others.

Second, the Indictment charges that Defendants committed honest services fraud (and conspiracy to do the same) by depriving the Universities of their intangible rights to Mr. Evans, Mr. Richardson, and Mr. Bland's honest services. Under this theory, Mr. Evans, Mr. Richardson, and Mr. Bland's acceptance of payments in exchange for "persuad[ing] and pressur[ing] student-athletes to retain services of" Mr. Dawkins and others ran contrary to fiduciary duties Mr. Evans, Mr. Richardson, and Mr. Bland owed to their respective employers. Ind. ¶ 63.

Third, the Indictment charges that Defendants engaged in a criminal wire fraud conspiracy by "facilitating and concealing bribe payments to student-athletes at [the Universities], and/or their families." Ind. ¶ 66. According to the Indictment, these payments

"caus[ed] the [Universities] to provide or agree to provide athletic scholarships to student-athletes who . . . were ineligible to compete as a result of the bribe payments" and those continued scholarships were made "under false pretenses." *Id.* Thus, the scheme allegedly deprived the Universities of "the right to control the use of its assets, including the decision of how to allocate a limited number of athletic scholarships[.]" Ind. ¶ 67.

Finally, the Indictment charges that Defendants committed a Travel Act conspiracy by "travel[ing] in interstate commerce . . . with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on and facilitate" the unlawful activity. Ind. ¶ 70. Under this theory, the aforementioned conduct, when combined with the fact that Defendants traveled across state lines, was in furtherance of an unlawful activity and, therefore, constituted a Travel Act conspiracy.

**LEGAL STANDARD**

Under Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure a defendant may move to dismiss an indictment for "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v). This is because under the Fifth and Sixth Amendments "[a] criminal defendant is entitled to an indictment that states the essential elements of the charge[s] against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones v. United States*, 526 U.S. 227, 232 (1999)).  When an indictment fails to contain an essential element, a defendant suffers the risk that the "grand jury may not have understood the elements of the crime and the evidence necessary to support the indictment." *Id.* at 95.  Thus, "[a]charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged." *United States v. Litvak*, No. 13-CR-19 (JHC), 2013 WL 574091, at *2 (D. Conn. Oct 21, 2013). Additionally, "[t]he timing of the defendant's objection is important to the level of scrutiny

employed; a defendant who objects to the indictment before trial . . . is entitled to a more exacting review of the indictment." *Pirro*, 212 F.3d at 92 (citing *United States v. Goodwin*, 141 F.3d 394, 401 (2d Cir. 1997)).

## ARGUMENT

### I. THE INDICTMENT DOES NOT ALLEGE A FEDERAL FUNDS BRIBERY SCHEME.

In Counts One through Four, the Indictment charges Defendants under 18 U.S.C. § 666(a)(1)(B) and § 666(a)(2) based on Mr. Evans, Mr. Richardson, and Mr. Bland's employment at institutions that receive more than $10,000 in federal funds each year. As applied in the context of a federally funded organization, § 666 requires that the defendant was an "agent" of the organization and was acting within the scope of his agency when committing the crime. *See United States v. Whitfield*, 590 F.3d 325, 344-45 (5th Cir. 2009). Section 666 broadly defines "agent" as a "person authorized to act on behalf of another person or a government and a partner, director, officer or manager and representative." 18 U.S.C. § 666(d)(1).[5] Moreover, federal funds bribery also requires that the defendant was influenced or rewarded "in connection with any business, transaction or series of transactions of [the] organization." *United States v. Bahel*, 662 F.3d 610,626 (2d Cir. 2011).

Under the express terms of the statute, there must be a demonstrable connection between the defendant's conduct and the employer's affairs. Yet the sole allegation regarding how Mr. Evans, Mr. Richardson, and Mr. Bland's actions related to their jobs is the conclusory statement that they agreed to accept bribe payments, which varied in amounts, from Dawkins and others in

---

[5]     In *U.S. v. Phillips,* 219 F.3d 404, 411 (5th Cir. 2000), the Fifth Circuit held that for an individual to be an "agent" for the purposes of § 666, he must be authorized to act on behalf of the agency with respect to its funds. 219 F.3d 404, 411 (5th Cir. 2000).

exchange for using their official positions at their respective Universities to steer student-athletes on their men's basketball teams to retain the services of Dawkins and others. Ind. ¶ 48. The facts actually alleged, however, do not support the government's position in this regard. As in *Phillips*, Mr. Evans, Mr. Richardson, and Mr. Bland were not acting as agents of their respective Universities in recommending Mr. Dawkins' services to the players, nor was their conduct connected to any business or transaction of the Universities.

The Indictment attempts to satisfy the statutory agency requirement by alleging that Mr. Evans, Mr. Richardson, and Mr. Bland were "basketball coaches" at their respective Universities, and that they used "their official positions as an NCAA Division I men's basketball coaches" in connection with the scheme. Ind. ¶ 2. This is an impermissibly broad conception of agency. Mr. Evans, Mr. Richardson, and Mr. Bland had no control over the federal funds that were distributed to the Universities. Indeed, they are not alleged to have controlled any of the Universities' funds at all. In *United States v. Sabri*, 541 U.S. 600 (2004), the Supreme Court concluded that while § 666 by its terms did not require a nexus between the alleged activity and the federal funds, particular applications of the statute might run afoul of constitutional limitations because it would be used to prosecute conduct that did not implicate a federal interest. *Id.* at 613-14 (Thomas, J. concurring). This is just such a case. Indeed, it is hard to imagine what federal interest is at stake in enforcing ***a private, non-profit organization's*** (the NCAA) amateur rules.

Assuming *arguendo* that Mr. Evans, Mr. Richardson, and Mr. Bland's roles as basketball coaches made them "agents" of federally funded organizations for purposes of § 666, the Indictment still fails to allege that they were acting within the scope of their agency when they recommended to players that they use Mr. Dawkins' financial advisory services if and when they

entered the NBA. There is no allegation that recommending financial advisors to players was part of their role as employees of their respective Universities. The Indictment seems to suggest that the agency element is satisfied because Mr. Evans, Mr. Richardson, and Mr. Bland were acting as coaches when they exerted "influence over student-athletes under their control." *See* Ind. ¶ 1. But it cannot be that every interaction a famous coach has with his players is within the scope of his agency as an employee of the university. There must be a boundary between Mr. Evans, Mr. Richardson, and Mr. Bland as university employees and Mr. Evans, Mr. Richardson, and Mr. Bland as individuals. The Indictment seems to suggest, however, that a college coach's agency is limitless so long as the conduct relates in some way to the player's sport.

Similarly, the Indictment's theory that anything related to men's basketball involved the "business or transaction" of the university is deeply flawed. *Whitfield*, 590 F.3d at 346, explains why the statute does not support such a broad definition. In *Whitfield*, Mississippi state court judges were accused of accepting bribes from a litigant in connection with their campaigns for reelection. The Government argued that because the defendants were sitting judges, they were agents of the Mississippi Administrative Office of the Court ("MAOC"), a federally funded entity. *Id.* at 344. MAOC's business was limited, however, to "assisting the efficient administration of the ***nonjudicial business*** of the courts of the state." *Id.* The Fifth Circuit held that the judges were not guilty of federal funds bribery because the payments were made to influence ***judicial*** business thus were not "in connection with any business, transaction or series of transactions of" the MAOC. *Id.* at 346. In this regard, even if the judges were agents of the MOAC, "their role as such had nothing to do with their capacity as judicial decisionmakers." *Id.*

The conduct alleged in the Indictment was similarly outside the mission of the Universities. The Government complains that Mr. Evans, Mr. Richardson, and Mr. Bland were

"corrupt" because the reason they recommended Mr. Dawkins and others to their players was that they were getting paid to do so. As with the judges in *Whitfield*, this conduct may have violated private rules governing Mr. Evans, Mr. Richardson, Mr. Bland, and the players. However, because the Universities are not in the business of recommending financial advisors for basketball players to use when they enter the NBA, the conduct alleged in the Indictment is not a crime.

Therefore, the bribery charges (Counts One through Four) should be dismissed.

## II.   THE INDICTMENT DOES NOT ALLEGE A TRAVEL ACT CONSPIRACY.

The Travel Act, 18 U.S.C. § 1952, applies to "[w]hoever travels in interstate commerce or uses any facility in interstate commerce with intent to (1) distribute proceeds of an unlawful activity; or (2) commit any crime of violence to further any unlawful activity; (3) or promote, manage, establish, carry on or facilitate the promotion, management or carrying on, of any unlawful activity."  This statute is written in general terms and makes criminal the prescribed conduct without regard to the status or ultimate objectives of the person engaging in it. *See, e.g.*, *U.S. v. Roselli*, 432 F.2d 879, 885 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S. Ct. 883, 27 L.Ed.2d 828 (1971) (Travel Act).

In this case, there is little if any risk that the crimes charged in the Indictment would involve the federal government in policing activities of a private non-profit organization. The congressional purpose as stated in *U.S. v. Nardello*, 393 U.S. 286, 289-96 (1969) was to assist local law enforcement officials in combating interstate activities of organized crime which violates state laws.  Although Mr. Evans, Mr. Richardson, and Mr. Bland may have violated private rules governing coaches and players, clearly they were not involved in any organized crime or other criminal activity.

As argued above, the conduct alleged in Counts One through Four did not involve criminal activity. Accordingly, Count Nine of the Indictment should be dismissed.

### III. THE INDICTMENT DOES NOT ALLEGE AN HONEST SERVICES WIRE FRAUD.

In Counts Five through Seven of the Indictment, the government charges Defendants with honest services wire fraud under 18 U.S.C. § 1346, which requires:

> (1) a scheme or artifice to defraud; (2) for the purpose of knowingly and intentionally depriving another of the intangible right of honest services as thus defined; (3) where the misrepresentation (or omissions) made by the defendants are material in that they have a natural tendency to influence or are capable of influencing the employer to change its behavior; and (4) use of the mails or wires in furtherance of the scheme.

*World Wrestling Entm't, Inc. v. Jakks Pac, Inc.*, 530 F. Supp. 2d 486, 502 (S.D.N.Y. 2007) (internal quotations and citations omitted), *aff'd*, 328 F. App'x 695 (2d Cir. 2009). In *Skilling v. United States,* 561 U.S. 358, 407 (2010), the Supreme Court described the "solid core" of the honest services doctrine as "involve[ing] offenders who, ***in violation of a fiduciary duty,*** participated in bribery or kickback schemes." 561 U.S. 358, 407 (2010) (emphasis added). "Courts have construed the *Skilling* decision as stating that honest services fraud includes a fiduciary duty requirement." *United States v. Harper*, No. 13-CR-601 (RJD), 2015 WL 6029530, at *3 (E.D. N.Y. Oct. 15, 2015); *see also United States v. Smith*, 985 F. Supp. 2d 547, 590 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (holding that *Skilling* determined that honest services wire fraud "requires the violation of fiduciary duty").

Here, the Indictment alleges only that Mr. Evans, Mr. Richardson, and Mr. Bland are "basketball coaches" at their respective Universities. Ind. ¶ 2. It does not allege what their duties were in that capacity, and it is far from clear that Mr. Evans, Mr. Richardson, and Mr. Bland

were fiduciaries to their respective Universities. Mr. Evans, Mr. Richardson, and Mr. Bland had no control over their Universities' resources and had not been entrusted to exercise any discretion regarding how to direct those resources. *See St. John's Univ. N.Y. v. Bolton*, 757 F. Supp. 2d 144, 168 (E.D.N.Y. 2010).

But even assuming that Mr. Evans, Mr. Richardson, and Mr. Bland owed some sort of "duty" to their respective Universities (fiduciary or otherwise), the Indictment fails to allege facts supporting the theory that they were acting within the scope of that duty when they recommended financial advisors to players. It is not enough to allege that Mr. Evans, Mr. Richardson, and Mr. Bland were "coaches" and that their conduct related to "players," or that they were simply disloyal to their employers. The Eleventh Circuit has specifically cautioned against such a broad concept of duty:

> [F]or a private sector defendant to have violated the victim's right to honest services, it is not enough to prove the defendant's breach of loyalty alone. Rather, as is always true in breach of loyalty by a public official, the breach of loyalty by a private sector defendant must in each case contravene – by inherently harming – the parties relationship.

*United States v. deVegter*, 198 F.3d 1324, 1328-29 (11th Cir. 1999) (emphasis added); *see also United States v. Frost*, 125 F.3d 346,366 (6th Cir. 1997).

The purpose of Mr. Evans, Mr. Richardson, and Mr. Bland's relationship with their Universities was for Mr. Evans, Mr. Richardson, and Mr. Bland to assist in coaching the men's basketball teams. Their duties presumably included things like running practices, developing team strategies, and instructing players in their skills and techniques. The fact that Mr. Evans, Mr. Richardson and Mr. Bland, on their downtime and away from the Universities' premises, recommended a financial advisor to players – who would use that advisor only if and when they left the Universities and played in the NBA – is conduct well outside the purpose of Mr. Evans,

Mr. Richardson, and Mr. Bland's employment relationship with their respective Universities. Accordingly, Counts Five through Seven of the Indictment should be dismissed.

## IV. FEDERAL FUNDS BRIBERY AND HONEST SERVICES WIRE FRAUD ARE UNCONSTITUTIONAL AS APPLIED.

Even assuming *arguendo* that the Indictment sufficiently alleged federal funds bribery and honest wire fraud charges as a matter of statutory interpretation, those charges should still be dismissed because it would violate due process to permit the Government to proceed with a criminal case against Defendants based on the facts here. For the past several decades, the Supreme Court has decided numerous cases involving anti-corruption laws and has repeatedly narrowed their reach to ensure that these otherwise broad laws are consistent with constitutional requirements. Those decisions provide important background for evaluating the charges in this case.

In *United States v. Frega*, 933 F. Supp. 1536, 1542-43 (S.D. Cal 1996) *aff'd in part, rev'd on other grounds*, 179 F.3d 793 (9th Cir. 1999), an attorney and two state judges were charged with violating § 666 through a scheme in which the attorneys allegedly bribed the judges in exchange for favorable rulings in cases pending in their courts. *Id.* at 1538. The district court dismissed the § 666 count because it failed to allege that federal funds were corruptly administered, were in danger of being corruptly administered, or even could have been corruptly administered. *Id.* at 1543. Here, when Mr. Evans, Mr. Richardson, and Mr. Bland allegedly accepted money from Mr. Dawkins and others to use their influence to steer student-athletes to Mr. Dawkins and others' services, no federal funds were corruptly administered or in danger of being corruptly administered. Mr. Dawkins and others used their own funds to allegedly make payments to Mr. Evans, Mr. Richardson, and Mr. Bland. As the court in *Frega* observed, "*§ 666*

***was intended to protect the integrity of federal funds, not as a general anti-corruption statute.***"
*Id.* at 1542 (emphasis added).

Moreover, in *McCormick v. United States*, 500 U.S. 257 (1991), the Supreme Court held that making campaign contributions can constitute criminal extortion under the Hobbs Act only when made pursuant to an explicit *quid pro quo* agreement. 500 U.S. at 274. As defined by the Supreme Court, this requires that the payment be "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273. This "official act" requirement was read into the statute specifically to protect against prosecutions based on conduct long thought to be lawful.

Several years later, in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), the Supreme Court adopted a narrow definition of "official act" in the context of 18 U.S.C. § 201, the federal bribery statute. 526 U.S. at 414. There, the Supreme Court addressed the question of whether a "conviction under the illegal gratuity statute requires any showing beyond the fact that a gratuity was given because of the recipient's official position." *Id.* at 400. The Supreme Court held that the statute did require something more, namely a "link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414. In so holding, the Supreme Court noted that if an official's position were sufficient to convict, the line between illegal and legal gift giving would be indiscernible. *Id.* at 408-11. The Supreme Court again stressed the potential over-criminalization that could occur if the anti-corruption statute were not narrowly construed.

In 2010, the Supreme Court significantly restricted the honest services fraud statute in *Skilling* by allowing only conduct involving bribes or kickbacks to be prosecuted. 561 U.S. at 408-09. Absent such a limitation, the statute would raise due process concerns given the

potentially wide range of conduct it could conceivably cover. *Id.* Thus, honest services fraud also requires a *quid pro quo* in order to "preserve the statute without transgressing constitutional limitations." *Id.*

The Supreme Court tackled the "official act" definition again in 2016, when it decided *United States v. McDonnell*, 136 S. Ct. 2355 (2016). As this court is aware, that case involved a public corruption case against former Virginia Governor Robert McDonnell and stemmed from McDonnell's relationship with a Virginia businessman, Jonnie Williams, who sought state universities' help in researching health benefits from a tobacco-based supplement his company had developed. *Id.* at 2361-62. From 2009 to 2012, McDonnell accepted more than $175,000 from Williams in the form of payments, loans, and gifts. *Id.* at 2364. During that same time period, McDonnell helped Williams in numerous ways, including by hosting events and arranging meetings with state officials. *Id.* at 2365-66. The trial court broadly defined official acts as "acts that a public official customarily performs, including as in furtherance of long-term goals or in a series of steps to exercise influence or achieve an end." *Id.* at 2358 (internal quotation marks omitted). McDonnell was convicted of honest fraud and extortion and the Fourth Circuit affirmed. *Id.*

The Supreme Court unanimously vacated McDonnell's conviction, concluding that such a broad definition of official act raised "significant constitutional concerns" because it could cover "routine" conduct that encompassed "nearly anything a public official does" on behalf of constituents, including arranging and attending meetings, expressing support for policies and speaking with other officials. *Id.* at 2372. Under *McDonnell*, then, to comply with due process, an "official act" that could form the basis of bribing a public official has two elements. First, it "must involve a formal exercise of governmental power that is similar in nature to a lawsuit

before a court, a determination before an agency, or a hearing before a committee." *Id.* This must be "something specific and focused that is pending or may be brought before a public official." *Id.* (internal quotation marks omitted). Second, the public official must make a decision or take action on that "question, matter, cause, suit proceeding or controversy" or agree to do so. *Id.*

While the honest services fraud statute does not define the scope of "services" that are implicated in a public corruption context, the government had agreed in McDonnell's case to tie the honest services fraud to the federal bribery statute, such that an "official act" was required for both. *Id.* at 2365. Thus, in the wake of *McDonnell*, both honest services fraud and bribery in the public corruption context have been dramatically limited to a narrowly defined universe of "official acts." The Second Circuit has since confirmed that in the wake of *McDonnell*, public-sector honest services fraud requires an official act. *United States v. Silver*, 864 F.3d 102, 116 (2d Cir. 2017).

The question this case presents is how to follow *Skilling*'s and *McDonnell*'s teaching in the context of federal funds bribery and private-sector services fraud. The Government will undoubtedly argue, as it has in other recent cases, that *McDonnell* is irrelevant in cases involving private-sector honest services fraud.[6] Even if some of the rationales underlying public corruption cases do not apply here (*e.g.*, federalism concerns), the central issue at stake in *Skilling* and *McDonnell* is the need to limit bribery and honest services fraud statutes so that they are not unconstitutionally vague. Just as "official act" § 201 needed to be narrowed, the element of "the business, transaction or series of transactions" in § 666 should be circumscribed as well. And

---

[6] *See, e.g.*, Brief of Government at 10-18, *United States v. Elgawhary*, No. 14-CR-068 (D. Md. Oct. 30 2017), EFC No. 98.

just as public-sector honest services fraud required the official act limitation, so too does private-sector honest services fraud need to be circumscribed.

In this case, the *quid pro quo* allegation is that Mr. Dawkins and others gave Mr. Evans, Mr. Richardson, and Mr. Bland money in exchange for Mr. Evans, Mr. Richardson, and Mr. Bland using their "influence" to steer players to use Mr. Dawkins and others' services (the *quid* was money, the *quo* was steering the players). But this raises the question: what "acts" by an employee or agent should be subject to federal funds bribery and honest services fraud prosecutions? The Indictment seems to suggest that any act of disloyalty by an employee is sufficient as long as harm to the employer was foreseeable, even if such harm was collateral to the offense. The broad notion of an employee's duty is deeply problematic and is wholly inconsistent with *Skilling* and *McDonnell*.[7] It is also inconsistent with limitations that the Second Circuit has imposed in the private-sector honest services fraud context. In *United States v. Rybicki,* 354 F.3d 124 (2d Cir. 2003), for example, the Second Circuit catalogued a host of such prosecutions. 354 F.3d 124 (2d Cir. 2003). The limiting principle of each case is the existence of a business relationship between bribor and the employer. We are not aware of any case – in this circuit or elsewhere – upholding a prosecution where, as here, the bribor was not seeking to obtain any benefit relating to the bribor's business relationship with the employer.

The unconstitutional vagueness problem is not solved by the Indictment's theory that the NCAA rules are the source of Mr. Evans, Mr. Richardson, and Mr. Bland's duty. This would impose a potentially limitless duty on college coaches (and other college employees) not to

---

[7] In his separate concurrence in *Skilling*, Justice Scalia specifically criticized the "hopelessly undefined" nature of an employee's duty of loyalty. *Skilling*, 561 U.S. at 418 (Scalia, J., concurring).

violate these private rules.[8]  Further, it is beyond dispute that NCAA rules violations occur

frequently and the conduct the rules prohibit often is routine.  Each year the NCAA identifies

thousands of violations across many schools, and documents recently published from a related

case charged in this District indicate that dozens of college basketball players received payments

from one sports marketing agent over a fairly short period of time.[9]  Given that this was just one

college sport (basketball) and just one agency (ASM), it is not unreasonable to characterize these

sorts of rules violations as more routine than the Government's recent indictments would

suggest.

Under these circumstances, it would run afoul of the due process requirements to permit

Defendants to be prosecuted for federal funds bribery and honest services fraud.

### V.    THE WIRE FRAUD CONSPIRACY CHARGE IS UNTENABLE.

In Count Eight, the Indictment charges in that Defendants participated in an unlawful

wire fraud conspiracy in violation of 18 U.S.C. § 1343.  The object of the conspiracy was to

"defraud the [Universities] by facilitating and concealing bribe payments to prospective and

current student-athletes at those universities, and/or their families . . . thereby causing the

[Universities] to provide or agree to provide athletic scholarships to student-athletes who, in truth

and in fact, were ineligible to compete as a result of the bribe payments." Ind. ¶ 66.  These

---

[8]    This is not to say that the alleged conduct would be without consequences. The NCAA can investigate and impose penalties based on violations of its rules. The Universities too can investigate and, as happened here, terminate the employment of a coach whose conduct was inconsistent with the Universities' expectations.

[9]    Pat Forde & Pete Thamel, *Exlusive: Federal documents detail sweeping potential NCAA violations involving high-profile players, schools*, YAHOO SPORTS (Feb. 23 2018), https://sports.yahoo.com/exclusive-federal-documents-detail-sweeping-potential-ncaa-violations- involving-high-profile-players-schools-103338484.html (last visited November 26, 2018).

undisclosed NCAA rules violations allegedly harmed the Universities in two ways: first, they supposedly deprived the Universities of the right to control their assets; and second, they supposedly exposed the Universities to potential economic harm, such as penalties that might be imposed by the NCAA. As discussed below, however, defrauding the Universities is not the "scheme" alleged in the Indictment. Moreover, even if it were the alleged scheme, allowing wire fraud charges under these circumstances would violate constitutional requirements of due process. Accordingly, for the reasons set forth below, Count Eight of the Indictment should be dismissed.

### A.   The Indictment Does Not Allege a Scheme to Defraud the Universities.

Wire fraud requires: "(1) a scheme to defraud, (2) money or property [of the victim] as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Davis*, No. 13-CR-923 (LAP), 2017 WL 3328240, at *8 (S.D.N.Y. Aug. 3, 2017) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). The defendant must have acted with an intent to defraud and must have used a material misrepresentation as part of the scheme. *United States v. Autuori*, 212 F.3d 105,115 (2d Cir. 2000). The plan must be "to deprive a person 'of something of value by trick, deceit, chicanery or overreaching'" *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987). Thus, the typical fraud case involves a defendant "[lying] to her victims to convince them to give her ***their money***." *See Dupre v. United States*, No.04-CR-267 (DLC), 2012 WL 2953970, at *2 (S.D.N.Y. July 20, 2012) (emphasis added).

In this case, the Government has attempted to plead a fraud on the Universities by alleging undisclosed NCAA rules violations coupled with false certifications, supposedly leading to scholarship decisions based on these false pretenses. Nothing in the Indictment remotely supports the idea that Mr. Evans, Mr. Richardson, and Mr. Bland's intent was to inflict such

harm on their respective Universities. Rather, the alleged scheme was for Mr. Evans, Mr. Richardson, and Mr. Bland to accept money from Mr. Dawkins and others in exchange for steering players to use Mr. Dawkins and others' services if and when those players were drafted into the NBA. *See* Ind. ¶ 1. Thus, Mr. Evans, Mr. Richardson, and Mr. Bland's intent, according to the Indictment, was to obtain money from Mr. Dawkins and others, not their Universities. *See id.* ¶ 3. Mr. Dawkins' intent was to profit if and when those players were drafted into the NBA, *id.*, and the players apparently wanted payments as well.

It is not enough that the alleged conduct included violations of NCAA rules that resulted in players becoming ineligible. Even if a defendant realizes the scheme "has the capacity to cause harm," that does not equate to an intent to defraud the supposed victim. *Autuori*, 212 F.3d at 116 (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). Instead, the defendant must have "intended some harm **to the property rights of the victim.**'' '' *Id.* (emphasis added). As Judge Preska instructed the jury in *Davis*, wire fraud requires that the scheme be enacted "with the specific purpose of causing some financial harm or deprivation of property to the [victim]." Case no. 13-923, Dkt. 88, Tr. Of Jury Charge, at 1135:10-14 (S.D.N.Y. Aug. 10, 2016). Moreover, "[t]he victim's loss of money or property [must have] supplied the defendant's gain, with one the mirror image of the other." *Skilling*, 561 U.S. at 400. In other words, the scheme must have been intended "to injure another to his own advantage by withholding or misrepresenting material facts." *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 465 (S.D.N.Y. 2013). Defrauding the Universities is simply not the scheme alleged in the Indictment.

*United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), is instructive. Walters was a sports agent who signed 58 college players to contracts in violation of the NCAA rules. *Id.* at

1221.  The theory of prosecution was identical to this case: the supposed deceit came in the form

of the players' false certifications regarding compliance with the NCAA rules.  *Id.*  The Seventh

Circuit flatly rejected the Government's position.  Since the whole point of the scheme was for

Walters to profit when the players became professional athletes, the scheme was not designed to

enrich anyone at the expense of the universities.  *Id.* at 1227; *see also United States v. Males*, 459

F.3d 154, 158 (2d Cir. 2006) (citing *Walters* for the proposition that "[b]oth the 'scheme or

artifice to defraud' clause and the 'obtaining money or property' clause of Section 1343

contemplate a transfer of some kind. . . . A deprivation is a necessary but not a sufficient

condition of mail fraud.").  That the universities may have been harmed by unwittingly providing

scholarships to ineligible players is irrelevant since that was not the object of the scheme.  "The

money or property deprivation must be a goal of the plot, not the inadvertent consequence of it."

*United States v. Regan*, 713 F. Supp. 629, 637 (S.D.N.Y. 1989); *see also Monterey Plaza Hotel

Ltd. P'ship v. Local 483 of Hotel Emps. Rest. Emps. Union*, 215 F.3d 923, 926 (9th Cir. 2000)

(the "purpose of the mail fraud and wire fraud proscriptions is to punish wrongful transfers of

property from the victim to the wrongdoer"); *United States v. Baldinger*, 838 F.2d 176, 180 (6th

Cir. 1988) (the wire fraud statute only "reach[es] schemes that have as their goal the transfer of

something of economic value to the defendant") (internal quotation marks omitted).

Just as in *Walters*, the scheme alleged in this case was unrelated to the Universities'

decisions to award (or not to award) scholarships to their men's basketball players.  As

repeatedly alleged in the Indictment, the object of the scheme was for Mr. Evans, Mr.

Richardson, Mr. Bland, and the players to get money from Mr. Dawkins and others and for Mr.

Dawkins and others to get money from the players after they had been drafted into the NBA.

*See, e.g.*, Ind. ¶ 1.  In this regard, the Indictment provides no connection between the "false and

fraudulent certifications" to the alleged scheme, which did not depend on the false certifications for its completion. *See Davis*, 2017 WL 3328240, at *8 ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter transactions they would otherwise avoid—which do not violate mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.") (citations and quotations omitted). The supposed false statements were thus not "in furtherance" of any deceptive scheme. *See Rybicki*, 354 F.3d at 127-128 ("[T]he mail- and wire-fraud statutes criminalize the use of the mails and wires in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses.'") (quoting 18 U.S.C. §§ 1341, 1343).

## B. The Indictment's Wire Fraud Theory Violates Due Process.

Even if the Indictment properly alleged a scheme to defraud the Universities, the wire fraud charge should be dismissed because such a theory of prosecution stretches the statute beyond any reasonable limitation. Indeed, the Indictment suggests that a university is defrauded any time there is a NCAA rules violation coupled with a false certification. The notion of wire fraud is virtually limitless in the context of college athletics since all coaches and players are required to certify annually "that they had reported to their university any knowledge of violations of NCAA rules involving their institution." Ind. ¶ 26. It would, quite literally, turn the 414-page NCAA manual into a catalogue of federal crimes for any NCAA rules violation. This cannot be the law.

Due process insists that the federal criminal laws have some reasonable limits. Fundamental principles of constitutional fair warning mandate "that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States*, 442

U.S. 100, 112 (1979). A statute must "give fair warning of the conduct that it makes a crime."

*United States v. Velastequi*, 199 F3d 590, 593 (2d Cir. 1999) (internal quotation marks omitted),

Otherwise, there is fear of encouraging arbitrary and discriminatory enforcement. "The

touchstone inquiry is 'whether the statute, either standing alone or as construed, made it

reasonably clear at the relevant time that the defendant's conduct was criminal.'" *Id.* (quoting

*United States v. Lanier*, 520 U.S. 259, 266 (2005).

Furthermore, "[i]t is settled that when the law is vague or highly debatable, a defendant –

actually or imputedly – lacks the requisite intent to violate it." *United States v. Critzer*, 498 F.2d

1160, 1162 (4th Cir. 1974) Because only willful conduct is criminal, and because willfulness

requires a voluntary, intentional violation of a known duty, "the duty involved must be

knowable." *U.S. v. Mallas*, 762 F. 2d 361, 363 (4th Cir. 1985). Here, there is no way that

Defendants would have known that the conduct they were engaged in was in violation of any

federal statute.

Permitting wire fraud prosecutions based on NCAA rules violations coupled with false

certifications would criminalize "routine" conduct and would present a risk of selective

prosecution. *McDonnell*, 136 S. Ct. at 2366. The NCAA rules prohibit all sorts of conduct that

no one would consider criminal. Indeed, just the subset of "amateurism" violations is

overwhelming. Players are prohibited from accepting any benefit, no matter how small,

including groceries, clothing and transportation to practice. *See, e.g.*, Bylaw 12.3.1.3, 13.2.

Players are also prohibited from being compensated for providing lessons of instruction in their

sport on campus (Bylaw 12.4.2.1(a)), establishing their own business that uses their name or

reputation to promote such business (Bylaw 12.4.5), or receiving payment for using their name

or picture to advertise any commercial product or service (Bylaw 12.5.2.1(a)). Outside the

context of the NCAA rules, these activities are not remotely considered unlawful.  Under the Government's wire fraud theory, they would be.  This is just the sort of limitless concept of criminal liability that due process forbids.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Indictment be dismissed in its entirety.

*[SIGNATURE PAGE FOLLOWS]*

Dated:  New York, New York
       December 3, 2018

Respectfully submitted,

**NEXSEN PRUET LLC**

By: /s/ Mark. C. Moore_____
William W. Wilkins
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211
*Attorneys for Defendant Merl Code*

**HANEY LAW GROUP PLLC**

By: /s/ Steven A. Haney_____
Steven A. Haney
3000 Town Center Drive, Suite 2570
Southfield, Michigan 48075
(248) 414-1470
*Attorneys for Defendant Christian Dawkins*

**BARNES AND THORNBURG, LLP**

By: /s/ William R. Martin_____
William R. Martin
1717 Pennsylvania Ave
Suite 500
Washington, DC 20006
(202) 465-8422
*Attorneys for Defendant Lamont Evans*

**LAW OFFICES OF JEFFREY LICHTMAN**

By: /s/ Jeffrey B. Einhorn_____
Jeffrey B. Einhorn
Jeffrey Lichtman
11 E. 44th Street, Ste. 501
New York, New York 10017
(212) 581-1001
*Attorneys for Defendant Anthony "Tony" Bland*

**MORDOCK BARBER, LLC**

By: /s/ Craig J. Mordock_____
Craig J. Mordock
7611 Maple Street, Suite A3
New Orleans, Louisiana 70118
(504) 304-2335
*Attorneys for Defendant Emanuel "Book"*
*Richardson*