ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :

      - v. -                              :    **SUPERSEDING INDICTMENT**

CHRISTIAN DAWKINS, and                  :    S1 17 Cr. 684 (ER)
MERL CODE,

                    :

          Defendants.                :

- - - - - - - - - - - - - - - - - - x

## Overview

1.    The  charges  in  this  Indictment  stem  from  a  scheme
involving the payment of thousands of dollars in bribes, by, and
as directed by, CHRISTIAN DAWKINS and MERL CODE, the defendants,
to  assistant  men's  basketball  coaches  at  various  National
Collegiate Athletic Association ("NCAA") Division I universities,
in exchange for the coaches' exerting their influence over the
student-athletes at their schools to retain the services of the
bribe  payors,  including  DAWKINS,  and  his  sports  management
business  ("Dawkins's  Company"),  once  the  student-athletes
eventually  entered  the  National  Basketball  Association  (the
"NBA").

2.    Among  those  that  were  bribed  in  connection  with  the
scheme  were  Lamont  Evans  ("Evans"),  an  assistant  coach  at  the
University  of  South  Carolina  and  later  at  Oklahoma  State
University;  Emanuel  Richardson,  a/k/a  "Book"  ("Richardson"),  an

assistant coach at the University of Arizona; Anthony Bland, a/k/a "Tony" ("Bland"), an assistant coach at the University of Southern California; an assistant coach ("Coach-1") at a NCAA Division I university based in Nebraska ("University-1"); and an assistant coach ("Coach-2") at a NCAA Division I university based in Texas ("University-2").

3.   By virtue of their official positions at NCAA Division I universities, these coaches had the ability to provide sports agents, financial advisors, business managers and others with access to the student-athletes whom they coached.  In addition, these coaches had influence over the student-athletes at their schools, including with respect to guiding those student-athletes through the process of selecting agents and other advisors when they prepared to leave college and enter the NBA.  In exchange for the bribes made and facilitated by CHRISTIAN DAWKINS and MERL CODE, the defendants, among others, these coaches exercised that influence by agreeing to steer and/or steering student-athletes and their families to retain particular advisors.

4.   The corrupt arrangements described in this Indictment were valuable both to the NCAA Division I men's basketball coaches who received cash bribes to deliver players to an agent or advisor, and to those paying and facilitating the bribes, including CHRISTIAN DAWKINS, the defendant, and Dawkins's Company, for whom

2

securing a future NBA player as a client could prove profitable, and MERL CODE, the defendant, who received thousands of dollars per month from Dawkins's Company, in exchange for CODE's assistance in facilitating the scheme to bribe NCAA Division I coaches so that they would steer student-athletes to retain DAWKINS and Dawkins's Company's services.

### The Defendants and Relevant Individuals and Entities

5. From in or about 2015 until in or about May 2017, CHRISTIAN DAWKINS, the defendant, worked for Sports Management Company-1 ("SMC-1"), which was a sports agency firm that specialized in the representation of professional basketball players. DAWKINS was not a registered sports agent. DAWKINS's work at SMC-1 primarily consisted of recruiting athletes as clients and maintaining client relationships for SMC-1. In or about May 2017, SMC-1 terminated DAWKINS. Beginning in at least May 2017, DAWKINS endeavored to start his own sports management business (referred to herein as Dawkins's Company), which DAWKINS co-founded with a corrupt financial advisor, Munish Sood ("Sood"), among others. Dawkins's Company worked to attract new clients by, among other things, paying bribes to coaches at NCAA Division I universities so that they would steer student-athletes under their control to retain Dawkins's Company's services.

6. At all relevant times, MERL CODE, the defendant, was a

3

consultant for an international athletic apparel company ("Apparel Company-1"), focused on its high school and college basketball programs. In that capacity, CODE worked directly with high school and college basketball coaches and players. Prior to working as a consultant for Apparel Company-1, CODE had worked for another athletic apparel company ("Apparel Company-2"). At all relevant times, Apparel Company-2 was the athletic sponsor for the men's basketball teams at various universities, including Oklahoma State University, the University of Arizona, the University of Southern California, University-1, and University-2. In addition, and as detailed further herein, beginning in at least June 2017, CODE began working directly with CHRISTIAN DAWKINS, the defendant, and Dawkins's Company, whereby CODE received thousands of dollars of payments per month from DAWKINS and Dawkins's Company, in part, in exchange for his assistance leveraging his relationship with college coaches, who were receiving bribes to steer student-athletes to retain Dawkins's Company's services.

7.    At all relevant times, Sood was a registered investment advisor and the founder of an investment services company in New Jersey. In or about June 2017, Sood helped CHRISTIAN DAWKINS, the defendant, found Dawkins's Company, and he had a minority ownership interest in Dawkins's Company.

8.    "CW-1," as referred to herein, is an individual who ran

4

a business management firm that primarily serviced professional athletes, as well as a registered investment advisory firm that provided investment related services to CW-1's clients, including athletes.  At all relevant times, CW-1 was cooperating with the Government in the investigation of CHRISTIAN DAWKINS, MERL CODE, the defendants, and others.  As such, CW-1's activities described in this Indictment were conducted at the direction of law enforcement.

9.   From in or about 2012 through in or about April 2016, Evans served as an assistant coach for the NCAA Division I men's basketball program at the University of South Carolina.   In or about April 2016, Evans was hired by Oklahoma State University as the associate head coach for its Division I men's basketball program.

10.  At all relevant times, Richardson served as an assistant coach for the NCAA Division I men's basketball program at the University of Arizona.

11.  At all relevant times, Bland served as an assistant coach for the NCAA Division I men's basketball program at the University of Southern California.

12.  At all relevant times, Coach-1 served as an assistant coach for the NCAA Division I men's basketball program at University-1 in Nebraska.

13.   At all relevant times, Coach-2 served as an assistant coach for the NCAA Division I men's basketball program at University-2 in Texas.

14.   In each year relevant to this Indictment, the University of South Carolina, Oklahoma State University, the University of Arizona, the University of Southern California, University-1, and University-2 received funds from the federal government in excess of $10,000 under a federal program, and fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball teams.

### Background on the NCAA and Relevant NCAA Rules

15.   The NCAA is a non-profit organization, which regulates athletics for over 1,000 colleges and universities, conferences, and other associations.   NCAA member schools are organized into three separate Divisions: Division I, Division II, and Division III.   Each of the universities referred to in this Indictment was, at all relevant times, in NCAA's Division I, which is the highest level of intercollegiate athletics sanctioned by the NCAA. Division I schools typically have the biggest student bodies, manage the largest athletics budgets and offer the most athletic scholarships.

16.   At all times relevant to this Indictment, Division I member schools had to comply with the NCAA's rules.   Among the

6

NCAA's core principles for the conduct of intercollegiate athletics was that student-athletes should be protected from exploitation by professional and commercial enterprises. An institution found by the NCAA to have violated the NCAA's rules is subject to disciplinary and corrective actions by the NCAA.

17. At all relevant times, NCAA Division I coaches and other team staff at NCAA Division I schools were required to comply with NCAA rules, including prohibitions on (i) facilitating contact between student-athletes and agents or financial advisors; and (ii) receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes. At all relevant times, NCAA Division I coaches and staff members were required to report to their university any knowledge of violations of NCAA rules involving their institution.

18. In addition, violations of NCAA rules by a university or a coach may lead to penalties imposed by the NCAA, including, but not limited to, financial penalties, limitations on post-season play, limitations on athletic scholarships, and recruiting restrictions.

### DAWKINS Facilitated Bribes to Evans

19. Beginning in at least 2016, and continuing into 2017, CHRISTIAN DAWKINS, the defendant, paid thousands of dollars in bribes to Evans, and also facilitated Evans's receipt of at least

7

an additional $22,000 in bribes from, among others, CW-1, in exchange for Evans agreeing to exert his official influence over certain student-athletes that Evans coached, first at the University of South Carolina, and then at Oklahoma State University, so that they would retain the services of those paying bribes to Evans. In exchange for the bribes DAWKINS paid and/or facilitated, DAWKINS and others expected that Evans would steer certain student-athletes that Evans coached to Dawkins's Company.

20. CHRISTIAN DAWKINS, the defendant, first introduced CW-1 and Sood to Evans in or about March 2016 and in order to facilitate bribe payments from CW-1 and Sood to Evans. These bribe payments were made in exchange for Evans using his official position with the University of South Carolina to influence student-athletes that he coached to retain the services of CW-1, Sood, and DAWKINS, who at the time, still worked for SMC-1. On or about March 3, 2016, during a discussion on a car trip after meeting Evans, DAWKINS explained to CW-1 and Sood that coaches such as Evans exerted significant control over student-athletes, and could direct the athletes to retain certain athlete advisors while keeping other advisors from gaining access to the athletes. DAWKINS also explained that Evans previously had solicited and accepted bribes from DAWKINS in connection with Evans's role as a Division I men's basketball coach.

21.    In   or   about   December   2015,   CHRISTIAN   DAWKINS,   the
defendant,  spoke  to  CW-1  by  telephone  and  informed  him  that,  based
on  his  discussions  with  Evans,  CW-1  would  be  expected  to  pay  Evans
$25,000   in   exchange   for   Evans's   agreement   to   steer   multiple
specific  student-athletes  to  retain  CW-1.    From  in  or  about  April
2016  to  in  or  about  July  2017,  Evans  received  bribes  from  CW-1  and
Sood,  in  cash,  via  check  and  via  wire  transfers  to  an  account
controlled  by  Evans.

22.    As   a   result   of   the   bribe   payments   facilitated   by
CHRISTIAN  DAWKINS,  the  defendant,  in  or  around  February  2017,  Evans
arranged  for  CW-1  to  meet  with  a  student-athlete  on  the  NCAA
Division  I  men's  basketball  team  at  Oklahoma  State  University  in
connection  with  Evans's  attempt  to  influence  the  student-athlete
to  retain  CW-1.    During  the  meeting,  Evans  repeatedly  touted  CW-
1's  ability  to  help  the  student-athlete,  and  pressured  the  student-
athlete  to  use  CW-1's  services.    Evans  did  not  disclose  to  the
student-athlete  that  he  had  received  bribes  from  CW-1  in  exchange
for  directing  the  athlete  to  retain  CW-1.    After  the  student-
athlete  left  the  meeting,  CW-1  made  a  $2,000  bribe  payment  to
Evans.

23.    Moreover,  in  or  around  spring  of  2017,  Evans,  arranged
to  introduce  Sood,  who  previously  had  made  a  bribe  payment  to
Evans,  to  the  mother  of  a  different  student-athlete  that  Evans  had

9

previously coached at the University of South Carolina for the purpose of influencing the mother to retain Sood.

### DAWKINS Facilitated Bribes to Richardson

24. Beginning in or about at least February 2017, and continuing through September 2017, CHRISTIAN DAWKINS, the defendant, facilitated the payment of at least $20,000 in bribes to Richardson, another Division I assistant coach. As a result of the bribes that were paid to Richardson, DAWKINS and CODE expected that Richardson would steer the student-athletes that he coached at the University of Arizona so that they would retain the services of Dawkins's Company, as well as the financial advisory services of Sood.

25. CHRISTIAN DAWKINS, the defendant, introduced Sood, CW-1, and an undercover law enforcement agent ("UC-1") to Richardson. UC-1 was posing as an individual who could provide financing to DAWKINS's new business endeavor, and UC-1 held a minority interest in Dawkins's Company, after it was formed. During meetings and telephone conversations in or about May 2017 and June 2017, DAWKINS, Sood, CW-1, and UC-1 discussed making bribe payments to Richardson in exchange for Richardson using his official position with the University of Arizona to steer and influence the student-athletes that Richardson coached to retain the services of Dawkins's Company.

10

26. On or about June 20, 2017, CHRISTIAN DAWKINS, the defendant, arranged a meeting with Richardson, Sood, CW-1, UC-1, and another undercover law enforcement agent posing as UC-1's business partner ("UC-2"), among others, in Manhattan, New York. During the meeting, Richardson agreed that he would steer the student-athletes that he coached at the University of Arizona to retain the services of Dawkins's Company. In return, and at the end of the meeting, Richardson accepted a $5,000 cash bribe payment from UC-1.

27. In or about July 2017, CHRISTIAN DAWKINS, the defendant, Sood, and UC-1, agreed to pay Richardson an additional $15,000 bribe, which Richardson represented that he intended to provide to a high school basketball prospect and/or his family so that this recruit would commit to attending the University of Arizona. On or about July 20, 2017, Richardson met with Sood and UC-1 at Sood's office in New Jersey and during the meeting received the $15,000 payment in cash from UC-1.

28. On or about August 30, 2017, CHRISTIAN DAWKINS, the defendant, met in Arizona with Richardson, as well as Sood and UC-2. During the meeting, Richardson stated that a relative of one of the student-athletes that Richardson coached would be the primary decision-maker with respect to which athlete advisors that student-athlete would ultimately retain. Richardson assured

11

DAWKINS, Sood, and UC-2 that Richardson would steer this student-athlete to retain the services of DAWKINS and Sood. Later that day, DAWKINS, Sood, and UC-2 met with the relative of the aforementioned student-athlete and discussed, among other things, that Richardson had sought to steer the student-athlete to retain DAWKINS and Sood, and that the student-athlete was inclined to retain the services of DAWKINS and Sood.

### DAWKINS and CODE Work Together to Bribe Other Coaches, including Bland and Coach-1

29. On or about June 20, 2017, CHRISTIAN DAWKINS and MERL CODE, the defendants, met with Sood, CW-1, and UC-1 in Manhattan, New York. The purpose of the meeting was for DAWKINS to introduce CODE to Sood, CW-1, and UC-1, and to discuss potential business opportunities, including identifying assistant coaches who would be willing to accept bribe payments in return for steering players under their control to Dawkins's Company. In particular, during this meeting, DAWKINS, CODE, Sood, CW-1, and UC-1 discussed, among other things, CODE's ability to identify such coaches and connect DAWKINS, Sood and UC-1 to them, including how CODE could use his affiliation with Apparel Company-1, and his former affiliation with Apparel Company-2, in order to assist DAWKINS, Sood, CW-1, and UC-1 in developing relationships with corrupt college basketball coaches. During the meeting, CODE stated, among other

12

things, that, due to his involvement in an amateur high school basketball league sponsored by Apparel Company-1, he frequently interacted with college basketball coaches. CODE also indicated that he knew coaches that would be open to participating in the bribery scheme described above and thus helpful to DAWKINS, Sood, and UC-1. During the meeting, CODE specifically touted his close relationship with Richardson, as well as his close relationships with other NCAA Division I coaches. In return, and at the end of the meeting, UC-1, on behalf of DAWKINS and Dawkins's Company, provided CODE with a $5,000 payment.

30.   On or about July 7, 2017, CHRISTIAN DAWKINS and MERL CODE, the defendants, discussed by telephone, among other things, specific corrupt men's college basketball coaches that CODE could introduce to DAWKINS and UC-1 as part of the scheme, including, among others, Bland, and Coach-1. During the call, CODE stated that he expected to be paid $5,000 for each corrupt men's college basketball coach that he introduced to DAWKINS and UC-1. CODE and DAWKINS further discussed an upcoming trip to Las Vegas, Nevada, during which CODE would facilitate introductions to multiple men's basketball coaches who would be willing to accept bribes in order to steer student-athletes under their control to retain the services of DAWKINS, Sood, and UC-1.

31.   During a subsequent call on or about July 8, 2017,

13

CHRISTIAN DAWKINS and MERL CODE, the defendants, discussed a list of coaches with whom CODE would arrange meetings in Las Vegas, including, among others, Bland and Coach-1.

32. As detailed further below, beginning in or around July 2017, and continuing into September 2017, CHRISTIAN DAWKINS, the defendant, with the assistance of MERL CODE, the defendant, paid bribes to Bland, in exchange for Bland's agreement to steer student-athletes that Bland coached to retain Dawkins's Company, and Sood's financial advisory services once those athletes entered the NBA. In addition, and as part of the scheme, DAWKINS, Sood, and UC-2 paid and/or facilitated the payment of additional monies directly to the families and/or close confidantes of student-athletes at the University of Southern California at Bland's direction.

33. On or about July 29, 2017, MERL CODE, the defendant, arranged a meeting for CHRISTIAN DAWKINS, the defendant, with Bland, as well as UC-1 and CW-1, in a hotel room in Las Vegas, Nevada. During the meeting, Bland confirmed that he would use his influence to steer student-athletes at the University of Southern California to retain Dawkins's Company. Bland also confirmed that, by virtue of his position as a coach for the University of Southern California's basketball team, he exerted influence over his athletes in deciding which agents and advisors to retain. At

14

the end of the meeting, in the presence of Bland, DAWKINS confirmed with UC-1 that UC-1 brought bribe money that Bland had solicited from DAWKINS. DAWKINS then provided some of that money to Bland outside the hotel room.

34. Following that bribe payment, Bland facilitated meetings among CHRISTIAN DAWKINS, the defendant, Sood, UC-2, and an associate of a then-current student-athlete on the University of Southern California's men's basketball team, as well as another meeting with a family member of a different student-athlete who at the time was a rising freshman planning to join the University of Southern California's men's basketball team the following season. During the meetings, DAWKINS, Sood, and UC-2 provided payments directly to the associate and the family member of the aforementioned student-athletes, as facilitated by Bland.

35. During an in-person meeting on or about August 31, 2017, in California, Bland informed CHRISTIAN DAWKINS, the defendant, Sood, and UC-2 that if they continued to fund payments to the family members of University of Southern California men's basketball players and recruits, then Bland would ensure that those student-athletes retained DAWKINS's and Sood's services once the athletes entered the NBA.

## Allegations Relating to Bribes Paid to Coach-1

36. As discussed above, on or about July 7, 2017, MERL CODE,

the defendant, and DAWKINS discussed by telephone, among other things, specific corrupt men's college basketball coaches that CODE could introduce to DAWKINS and UC-1 during an upcoming trip to Las Vegas, Nevada, including, among others, Coach-1, who was an assistant coach at University-1.  On or about July 25, 2017, CODE sent DAWKINS a text message containing a list of meetings that CODE had scheduled for DAWKINS, CW-1, and UC-1 in Las Vegas, Nevada, which included a meeting with Coach-1.

37.  On or about July 28, 2017, CHRISTIAN DAWKINS, the defendant, UC-1, and CW-1, met with Coach-1 in a hotel room in Las Vegas as arranged by MERL CODE, the defendant.  During the meeting, DAWKINS, CW-1 and UC-1 paid a $6,000 bribe to Coach-1, in exchange for Coach-1's agreement to steer certain student-athletes that Coach-1 coached to retain DAWKINS and the services of Dawkins's Company, once those athletes entered the NBA.

## Allegations Relating to Bribes Paid to Coach-2

38.  On or about July 28, 2017, CHRISTIAN DAWKINS, the defendant, UC-1, and CW-1, met with Coach-2, the University-2 assistant coach, in a hotel room in Las Vegas.  During the meeting, DAWKINS, UC-1, and CW-1 paid a $6,000 bribe to Coach-2, in exchange for Coach-2's agreement to steer certain student-athletes that Coach-2 coached to retain DAWKINS and the services of Dawkins's Company, once those athletes entered the NBA.

16

39.   On or about September 16, 2017, CHRISTIAN DAWKINS, the defendant, spoke by telephone with Coach-2 about arranging a meeting between DAWKINS and one of Coach-2's current players, after official practices start for the men's basketball team.   During the telephone call, DAWKINS and Coach-2 discussed that the player was likely to be drafted in the NBA draft, and that it would be a "layup" for DAWKINS to sign the player as a client.

## COUNT ONE
### (Conspiracy To Commit Bribery)

The Grand Jury charges:

40.   The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

41.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHRISTIAN DAWKINS, and MERL CODE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, violations of Title 18, United States Code, Sections 666(a)(2).

42.   It was a part and an object of the conspiracy that CHRISTIAN DAWKINS and MERL CODE, the defendants, and others known and unknown, corruptly would and did give, offer, and agree to

17

give something of value to a person, with intent to influence and reward an agent of an organization, in connection with business, transactions, and series of transactions of such organization involving a thing of value of $5,000 and more, while such organization was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(2), to wit, DAWKINS, CODE, and others, agreed to offer, pay, and facilitate the payment of bribes to NCAA men's college basketball coaches, intending to influence and reward those coaches in connection with the business of their universities.

### Overt Acts

43.   In furtherance of this conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about March 3, 2016, in South Carolina, CHRISTIAN DAWKINS, the defendant, Evans, Sood, and CW-1 met, during which meeting Evans, DAWKINS, Sood, and CW-1 discussed, in sum and substance, that Evans could direct and influence certain student-athletes that Evans coached at the University of South Carolina to retain the services of DAWKINS, Sood and CW-1.

18

b.   On or about June 20, 2017, a meeting that had been arranged for by DAWKINS occurred in Manhattan, New York between Richardson, Sood, CW-1, and UC-1, among others, during which Richardson received a cash bribe of $5,000.

c.   On or about June 20, 2017, MERL CODE, the defendant, DAWKINS, Sood, CW-1, and UC-1, among others, met in Manhattan, New York, during which meeting CODE received a cash payment of $5,000 and agreed to identify and make introductions to certain corrupt men's college basketball coaches that would be willing to accept bribe payments in exchange for steering certain of their student-athletes to retain the services of the company being formed by DAWKINS, Sood, and UC-1.

d.   On or about July 29, 2017, a meeting arranged by CODE occurred in Las Vegas, Nevada between DAWKINS, Bland, CW-1, and UC-1, among others, during which Bland discussed steering student-athletes under his control to retain the services of the company being formed by DAWKINS, Sood, and UC-1, and after which DAWKINS paid Bland a cash bribe.

e.   On or about July 28, 2017, a meeting arranged by CODE occurred in Las Vegas, Nevada between DAWKINS, Coach-1, CW-1, and UC-1, among others, during which Coach-1 discussed steering student-athletes under his control to retain the services of Dawkins's Company, and UC-1 paid Coach-1 a $6,000 cash bribe.

f.   On or about July 28, 2017, DAWKINS, Coach-2, CW-1, and UC-1, among others, met in a hotel room in Las Vegas, Nevada to discuss Coach-2's steering of student-athletes under his control to retain the services of Dawkins's Company.   During the meeting, UC-1 paid Coach-2 a $6,000 cash bribe.

(Title 18, United States Code, Section 371.)

### COUNT TWO
**(Payments Of Bribes And Gratuities To An Agent Of A Federally Funded Organization – CHRISTIAN DAWKINS and MERL CODE)**

The Grand Jury further charges:

44.   The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

45.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHRISTIAN DAWKINS and MERL CODE, the defendants, corruptly did give, offer, and agree to give a thing of value to a person, with intent to influence and reward an agent of an organization, in connection with business, transactions, and series of transactions of such organization involving a thing of value of $5,000 and more, while such organization was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to

wit, DAWKINS offered and paid bribes to multiple NCAA men's college basketball coaches, including as facilitated by CODE, intending to influence and reward those coaches in connection with the business of their universities.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT THREE
### (Conspiracy To Commit Honest Services Wire Fraud)

The Grand Jury further charges:

46.   The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

47.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHRISTIAN DAWKINS and MERL CODE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346.

48.   It was a part and an object of the conspiracy that CHRISTIAN DAWKINS and MERL CODE, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive Evans's, Richardson's, Bland's, Coach-1's, and Coach-2's respective

21

employers of their intangible right to their employees' honest services, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, DAWKINS and CODE, and others, through telephone and email communications, and wire transfers of funds, among other means and methods, agreed to and did deprive Evans's, Richardson's, Bland's, Coach-1's and Coach-2's, respective employers of their honest services by soliciting and receiving bribes from DAWKINS and Sood, among others, at least some of which were facilitated by CODE, in exchange for which Evans, Richardson, Bland, Coach-1 and Coach-2 agreed to and did exercise their influence as coaches at their respective universities to persuade and pressure student-athletes to retain the services of DAWKINS and Sood, among others.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR
(Honest Services Wire Fraud – The University of South Carolina and Oklahoma State University)

The Grand Jury further charges:

49.  The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

22

50.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHRISTIAN DAWKINS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the University of South Carolina and Oklahoma State University of their respective intangible rights to Evans's honest services, and attempting to do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, DAWKINS, among others, through telephone and email communications, and wire transfers of funds, among other means, agreed to and did deprive Evans's employers of his honest services by soliciting and receiving bribes, in exchange for which Evans agreed to and did exercise his influence as a coach at the University of South Carolina and Oklahoma State University to persuade and pressure student-athletes to retain the services of DAWKINS, Sood, and CW-1, among others.

(Title 18, United States Code, Sections 1343, 1346, 1349 and 2.)

### COUNT FIVE
### (Honest Services Wire Fraud – The University of Arizona)

The Grand Jury further charges:

51.   The allegations set forth in paragraphs 1 through 39 of

this Indictment are repeated and realleged as if fully set forth herein.

52.   From at least in or about March 2017, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHRISTIAN DAWKINS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the University of Arizona of its intangible right to Richardson's honest services, and attempting to do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, DAWKINS, among others, through telephone and email communications, and wire transfers of funds, among other means, agreed to and did deprive Richardson's employer of his honest services by soliciting and receiving bribes, in exchange for which Richardson agreed to and did exercise his influence as a coach at the University of Arizona to persuade and pressure student-athletes to retain the services of DAWKINS and Munish Sood, among others.

(Title 18, United States Code, Sections 1343, 1346, 1349 and 2.)

## COUNT SIX
### (Travel Act Conspiracy)

The Grand Jury further charges:

24

53.   The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

54.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHRISTIAN DAWKINS and MERL CODE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, a violation of Title 18, United States Code, Section 1952.

55.   It was a part and object of the conspiracy that CHRISTIAN DAWKINS and MERL CODE, the defendants, and others known and unknown, willfully and knowingly would and did travel in interstate commerce, and use and cause to be used the mail and facilities in interstate and foreign commerce, with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, the offering by DAWKINS, Sood, and CW-1, and others known and unknown, of commercial bribes and the acceptance by Evans, of commercial bribes, in violation of S.C. Code Ann. § 16-17-540 and 21 Okl. St. Ann. § 380, the acceptance by Richardson of commercial bribes, in violation of A.R.S. § 13-2605, and the acceptance by Bland, of

commercial bribes, in violation of Cal. Penal Code § 641.3, thereafter would and did perform and attempt to perform an act to distribute the proceeds of said unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

## Overt Acts

56. In furtherance of this conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about March 3, 2016, in South Carolina, CHRISTIAN DAWKINS, the defendant, Evans, Sood, and CW-1 met, during which meeting Evans, DAWKINS, Sood and CW-1 discussed, in sum and substance, that Evans could direct and influence certain student-athletes that Evans coached at the University of South Carolina to retain the services of DAWKINS, Sood and CW-1.

b. On or about June 20, 2017, a meeting that had been arranged for by DAWKINS occurred in Manhattan, New York between Richardson, Sood, CW-1, and UC-1, among others, during which Richardson received a cash bribe of $5,000.

c. On or about June 20, 2017, MERL CODE, the defendant, DAWKINS, Sood, CW-1, and UC-1, among others, met in Manhattan, New

26

York, during which CODE received a cash payment of $5,000 and agreed to identify and make introductions to certain corrupt men's college basketball coaches that would be willing to accept bribe payments in exchange for steering their student-athletes to retain the services of the company being formed by DAWKINS, Sood, and UC-1.

        d.   On or about July 29, 2017, a meeting that had been arranged for by CODE occurred in Las Vegas, Nevada between DAWKINS, Anthony Bland, CW-1, and UC-1, among others, during which Bland discussed steering student-athletes under his control to retain the services of the company being formed by DAWKINS, Sood, and UC-1, and after which DAWKINS paid Bland a cash bribe.

        e.   On or about July 28, 2017, a meeting arranged for by CODE occurred in Las Vegas, Nevada between DAWKINS, Coach-1, CW-1, and UC-1, among others, during which Coach-1 discussed steering student-athletes under his control to retain Dawkins's Company, and UC-1 paid Coach-1 a $6,000 cash bribe.

        f.   On or about July 28, 2017, DAWKINS, Coach-2, CW-1, and UC-1, among others, met in a hotel room in Las Vegas, Nevada to discuss Coach-2's steering of student-athletes under his control to retain the services of Dawkins's Company.  During the meeting, UC-1 paid Coach-2 a $6,000 cash bribe.

        (Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

57.   As a result of committing the offenses charged in Counts One, Three, and Six of this Indictment, CHRISTIAN DAWKINS, and MERL CODE, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

58.   As a result of committing the offense charged in Count Two of this Indictment, CHRISTIAN DAWKINS and MERL CODE, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

59.   As a result of committing the offense charged in Count Four of this Indictment, CHRISTIAN DAWKINS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States

28

Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

60. As a result of committing the offense charged in Count Five of this Indictment, CHRISTIAN DAWKINS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

<u>Substitute Asset Provision</u>

61.   If any of the above described forfeitable property, as a result of any act or omission of the defendants:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the Court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981,
Title 21, United States Code, Section 853, and
Title 28, United States Code, Section 2461.)


_____
FOREPERSON


_____
GEOFFREY S. BERMAN
United States Attorney


30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

CHRISTIAN DAWKINS, and
MERL CODE

Defendants.

SUPERSEDING INDICTMENT

S1 17 Cr. 684 (ER)

(18 U.S.C. §§ 371, 666, 1343, 1346,
1349, and 2.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

Foreperson.

March 7, 2019
Filed first Superseding Indictment.
U.S.M.J. Debra Freeman