# EXHIBIT A

J275wooC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                           18 Cr. 212 (RWS)

 5    TYRONE WOOLASTON,

 6                  Defendant.

 7    ------------------------------x

 8                                           February 7, 2019
                                             12:10 p.m.
 9

10    Before:

11                       HON. ROBERT W. SWEET,

12                                           District Judge

13

14                           APPEARANCES

15    GEOFFREY S. BERMAN
           United States Attorney for the
16         Southern District of New York
      BY:   ALISON G. MOE
17         THANE REHN
           Assistant United States Attorneys
18
      SHEARMAN & STERLING, LLP
19         Attorneys for Defendant
      BY: CHRISTOPHER L. LaVIGNE
20    BY: BRIAN CALANDRA

21

22

23

24

25
```

J275wooC                         conference

1          (Case called)

2          THE COURT:  You may be interested to know that you

3    have interrupted the trial on the question of the trademarks

4    that you can get for marijuana.  So, if you don't think that a

5    federal judge has to have a degree of flexibility, you are

6    wrong.

7          Let me hear from the defense with respect to its

8    motion.  Where are we?  I think a lot has been resolved.

9    Parenthetically, thank you very much.  You all are good lawyers

10   and know what you are doing and I am grateful for that.

11         So, what do I have to deal with?

12         MR. LAVIGNE:  I think there are a couple issues, your

13   Honor.

14         THE COURT:  Yes.

15         MR. LAVIGNE:  We have the pending motions.  I think

16   the biggest issue on the motions is the government has filed a

17   motion to preclude us from raising an entrapment defense.  We,

18   obviously, vigorously oppose that.

19         THE COURT:  Well, look.  You are not going to put on

20   anything in the government's case; you are going to cross

21   examine or whatever.  So, there is nothing that is coming in,

22   whatever is going to come in on the government's case is going

23   to come in, right?  And that either will or will not be some

24   evidence that one can -- we will see after it comes in -- what

25   follows from that.

J275wooC                        conference

1          I don't see a problem as far as the government's case

2     is concerned, do you?

3          MR. LAVIGNE:  Judge, this is one of the issues I have

4     spoken about with the government.

5          Essentially, they're going to have two principal

6     witnesses.  They're going to have a confidential informant who

7     made a number of recordings and they're going to have a

8     cooperating witness.  For entrapment, it is obviously our

9     burden to establish inducement.  We intend to do that, in part,

10    by crossing the informant and asking him questions about a

11    number of recordings which the government is not going to

12    introduce.

13         So, I think --

14         THE COURT:  Well, and what's the relevance of those

15    recordings?  Those are the evidence of the inducement,

16    according to you?

17         MR. LAVIGNE:  Yes, Judge; in part.

18         THE COURT:  Okay.  I understand your view.  Anything

19    else?  It is the cross of the cooperator.  Anything else?

20         MR. LAVIGNE:  In terms of how we are going to satisfy

21    our burden?

22         THE COURT:  Well, we are not going to worry about that

23    at this time I don't think, are we?  I mean, that may come up

24    in a question as to whether or not you have adequately

25    established an affirmative defense.

J275wooC                          conference

1           MR. LAVIGNE:  Absolutely.

2           THE COURT:  In terms of evidence, which is all I want

3    to deal with at this point, it is just a question of the cross

4    of the cooperator, right?

5           MR. LAVIGNE:  It is a question of the -- well, I

6    understand your Honor's question and I guess the issue is the

7    government moved to prevent any argument about entrapment.

8           THE COURT:  Well, you are certainly not going to worry

9    about what we are going to argue in the closing or the opening.

10   There won't be any discussion of it in the opening.

11          MR. LAVIGNE:  Of entrapment.

12          THE COURT:  Yes.  That's clear.  It is an affirmative

13   defense, yes?

14          MR. LAVIGNE:  Right.

15          THE COURT:  So I don't think it is going to come up in

16   the openings.  Am I correct?

17          MR. LAVIGNE:  Your Honor, what our defense is going to

18   be is that he was -- the government superseded in this case

19   three weeks ago and they went from 2013 to 2018.  We got the

20   3500 Monday night.  Our defense on Count One is going to be

21   entrapment with respect to the sting, and to the extent there

22   is cooperator testimony about what happened before that, the

23   case is not proven.

24          So, I understand the Court's concern before me

25   affirmatively raising entrapment but I do want to at least

J275wooC                        conference

1   explain to the jury that the evidence they're going to show is

2   that our client was picked up on these recordings, our client

3   allegedly did this, allegedly did that, but at the end of the

4   day this was entirely set in motion by the government and that

5   the government is not going to be able to meet their burden at

6   the end of the day.

7          But, our central defense to Count One is going to be

8   entrapment.

9          THE COURT:  Let me hear from the government.  Anything

10  else you want to add?

11         MR. LAVIGNE:  Yes.

12         That's the issue with entrapment but I think at the

13  end of the day the cases we cite in our brief make very, very

14  clear that these motions are not granted.  I don't know of one

15  case where the defense has been precluded from ever putting on

16  any evidence from ever raising entrapment so I think their

17  motion is definitely premature.

18         The other issue is the guns.  The government is

19  seeking to introduce evidence of prior gun purchases that my

20  client was allegedly involved in from years before.  They're

21  claiming that those are direct evidence of the conspiracy.  We

22  don't think that's a close question.  It is not inextricably

23  intertwined.

24         THE COURT:  The guns in the safe?

25         MR. LAVIGNE:  There are two issues.  One is that our

J275wooC                    conference

1    client was involved in an illegal gun purchase years before.

2    They're trying to introduce that from an unlicensed firearm

3    dealer and that the firearm itself was stolen.  I don't think

4    that has any direct relevance to this case at all.  It

5    certainly is not direct evidence, it is not inextricably

6    intertwined.  Under 404(b) I don't believe it meets that

7    standard either for the reasons we laid out.  I think that is

8    clear.  Purchase from unlicensed dealer or stolen firearm, I

9    think the answer is very clear in the papers.

10           On the guns found in the safe, they are also seeking

11   to introduce that as direct evidence and I don't believe it is

12   direct evidence.  It is not inextricably intertwined, this is a

13   narcotics conspiracy.  The allegation is not that this is a

14   drug-and-gun-type relationship or that the house where

15   Mr. Williams lived is a drug den or that is coterminous.  On

16   404(b) I don't believe they have met their burden either.

17   There wasn't notices for 404(b) and, in any event, there is

18   going to be law enforcement testimony that they saw my client

19   with the gun.  The wiretap was not suppressed, there was going

20   to be wire evidence, my client is talking about.  I think

21   taking these guns in a safe not directly connected to those

22   events is highly prejudicial so as a back top it would be on

23   Rule 403 grounds.

24           THE COURT:  Okay.

25           MR. LAVIGNE:  I think there were -- one other issue,

J275wooC                       conference

1   the government moved to preclude us from introducing background

2   evidence like my client's employment, very unspecific, and I

3   believe a ruling on that is premature.  We are going to seek to

4   introduce evidence of the fact that my client worked at the

5   fire department.  That's going to be independently relevant to

6   the case when the informant is trying to get my client involved

7   and when he is trying to ensure that my client will be a

8   participant, he refers to him as fire.  There is going to be

9   evidence about the fire house.  And, I think my client's

10  locations at certain places will be relevant, the fact that he

11  was a full-time employee at the fire department and at United

12  Airlines is going to be highly relevant to whether he is a

13  member of a narcotics conspiracy.

14          The government moved to preclude us from referencing

15  the mandatory minimum sentence that my client faces.  I was not

16  going to affirmatively elicit that, Judge.

17          We got voluminous 3500 material from the government

18  Monday night at about midnight which we have been going

19  through.  We are looking at how it potentially could be

20  relevant to an entrapment issue because one of the case agents

21  says at one point, *We have to make this five keys so he will*

22  *get 10 years.*  Now, I noticed this very recently so I haven't

23  looked at the law.  I don't want to overstate my position but

24  just say I'm not conceding it.

25          Another issue I am happy to talk about or after the

J275wooC                         conference

1    government responds to the motions has to do with discovery and

2    3500 production because there are some issues there that I need

3    to raise with the Court.

4                    THE COURT:  Okay.

5                    MR. LAVIGNE:  Whatever the Court prefers.

6                    THE COURT:  Let me hear from the government.

7                    MS. MOE:  Thank you, your Honor.

8                    Let me first begin with the entrapment issue which is

9    the first issue Mr. Lavigne raised today.

10                   To clarify, our concern really goes to opening

11   statements to the jury.  It seems clear that the scope of this

12   issue, up until the government rests, will be limited to

13   cross-examination of government witnesses.  So, to answer the

14   Court's question about what our concern is at trial, at this

15   point it's that the defense be precluded from arguing in

16   opening statements that the defendant was entrapped, that he

17   was set up, or any similar language that tries to signal to the

18   jury that that's a defense because I think, as the Court has

19   indicated, unless and until there is a basis for that in the

20   record, it is not appropriate for the defense to argue that to

21   the jury.

22                   Our concern, in particular --

23                   THE COURT:  Well, but their position is, if I

24   understand it, is that the record will establish grounds for an

25   entrapment defense.  Now, they may be wrong about that but

J275wooC                          conference

1    that's their position.

2              MS. MOE:  Yes, your Honor.

3              THE COURT:  We can't -- I don't see any grounds --

4    well, you tell me.  Are there grounds for limiting the

5    cross-examination of the cooperating witness?

6              MS. MOE:  Your Honor, if I could clarify?

7              What we are talking about here is precluding opening

8    arguments.

9              THE COURT:  I understand that, but that turns on the

10   evidence and it's their position that that cross-examination is

11   going to elicit what they believe will be the grounds for the

12   entrapment -- if I understand it correctly.

13             MS. MOE:  I think the defense motion signals that they

14   think that that cross-examination may elicit facts that may

15   support an entrapment defense and that their brief essentially

16   signaled that we should see where this goes.

17             THE COURT:  Well, of course.  If they argue this and I

18   conclude that there is no basis and strike it at the close of

19   whenever I guess it would be at the government's case, I don't

20   know when, that's a risk for them, obviously, to a degree.  But

21   I don't think I can limit the cross.  And once the cross comes

22   in, their position is that they believe that will establish the

23   grounds for entrapment.

24             MS. MOE:  So, our position would be that it would be

25   appropriate at trial for the defense to cross-examine

J275wooC                          conference

1    government witnesses about the circumstances under which this

2    transaction occurred and if at the close of the government's

3    case they believe there is a factual predicate for presenting a

4    defense case on entrapment or pursuing that further either

5    through a jury instruction or in closings, that that's an issue

6    that we would address at that juncture.

7                 THE COURT:  Yes.

8                 MS. MOE:  But for purposes of determining what would

9    be an appropriate argument in an opening statement to the jury,

10   our concern is statements like, and I think Mr. Lavigne just

11   indicated that he was thinking of saying something like the

12   government won't meet its burden of proof because the evidence

13   will establish that the government initiated this transaction.

14   That, of course, isn't the standard for entrapment.  It is

15   confusing to the jury, especially given that, as the Court

16   noted, entrapment is an affirmative defense.  So, we are

17   concerned about the defense being able to plant sort of an

18   entrapment seed in the jury's mind before there is any evidence

19   in the record that would support it, especially given that that

20   kind of argument --

21                 THE COURT:  Well, we can certainly deal with that in

22   the sense that the word "entrapment" won't be used but how

23   about the government "initiating the case?"

24                 MS. MOE:  Your Honor, our view would be that

25   "initiating the case" isn't a basis for an entrapment defense

1    and would be confusing to the jury.

2              THE COURT:  All right.  So.

3              MS. MOE:  We think it would be confusing to the jury

4    to suggest otherwise.  To suggest at the outset of the case

5    that the fact that the government is initiating a drug

6    transaction is entrapment or is a basis for an acquittal is

7    very confusing and would be prejudicial to the government.

8              THE COURT:  The purchase of the gun is how far back?

9              MS. MOE:  Your Honor, we anticipate that the testimony

10   would be that it was in approximately 2013, which is the

11   beginning of the charged conspiracy in this case -- I

12   apologize, your Honor -- 2015.

13             THE COURT:  And the relevance?

14             MS. MOE:  Your Honor, we think this relevance goes to

15   show --

16             THE COURT:  By the way, what is this evidence?

17             MS. MOE:  The evidence would be cooperating witness

18   testimony that the defendant wanted to purchased illegal

19   firearms, and that on one occasion he arranged a transaction to

20   buy illegal firearms and did so in a property that the

21   cooperating witness had control of because he needed a place to

22   meet the arms dealer.  And, there would be further testimony

23   that over the years there were similar such conversations.

24             We don't anticipate calling a law enforcement witness

25   to talk about the serial number of the firearms and whether

J275wooC                    conference

they were reported stolen or whether there were other

indicators but we think that given that this testimony would

come from a cooperating witness who was speaking to his

long-standing relationship with the defendant over the course

of a criminal conspiracy and given that the charges in this

case involve carrying a firearm in furtherance of a narcotics

conspiracy, that that's appropriate.  It also would rebut any

argument from the defense that this firearm was carried for a

lawful purpose.

        So, for example, if the defense intends to argue that

the reason the defendant had a firearm on the date that law

enforcement officers intended to apprehend him was because he

generally carried one for personal security, I think the

circumstances under which he purchased that firearm, speak to

that issue.

        More broadly, in our motion, our focus was on the

evidence that was recovered from the safe.  We think this is

direct proof of the charged conspiracy for a number of reasons.

First and foremost, that evidence was recovered the same day

that law enforcement agents tried to apprehend the defendant.

It was the same day that, in approaching him, he had been

carrying and reached for a Glock .40 caliber pistol which he

threw to the ground and fled.

        We anticipate that cooperating witness testimony would

establish that the safe, which was recovered from that

J275wooC                          conference

cooperating witness' residence that same day, belonged to the

defendant.  That is, as we indicated in our papers,

corroborated by text messages between the cooperator and

defendant talking about that safe, that it was the defendant's.

        The evidence recovered from the safe is intertwined

with the evidence relating to the seizure of the firearm that

day in Secaucus, New Jersey, for a number of reasons.  The

first is the magazine that was fitted into the Glock that the

defendant threw to the ground was the wrong type of magazine.

The correct type of magazine was in his safe.

        So, it goes to complete the picture, it shows the

relationship between Mr. Williams and Mr. Woolaston, that he is

letting him store these items in the basement of his residence,

that he has these items.  The sheer volume of ammunition, I

think, and the fact that there is a speed-loading magazine

again rebuts any inference that the reason he had that firearm

was for a lawful purpose and not in furtherance of the

conspiracy.

        We also think that this evidence, in addition to sort

of explaining the firearms evidence recovered from where the

defendant threw it to the ground on February 11th, we think it

is important to tell the story ever how this transaction

happened and that's because the night before the defendant went

to Secaucus, New Jersey, to complete this transaction, he went

to the house of the cooperating witness.  They met there, they

J275wooC                          conference

1    talked about the drug transaction, and the defendant brought

2    the sham drugs.

3           We anticipate that cooperating witness would establish

4    that during the conspiracy the defendant put some of the

5    deposit that the confidential informant had provided for this

6    transaction in that safe and that that night, when they were

7    talking about the transaction the next day, Mr. Williams saw

8    Mr. Woolaston go to the back where the safe was and his

9    understanding was that he was storing the sham drugs there as

10   well.

11          In other words, the fact that the defendant had this

12   safe in the cooperating witness' basement, the fact that he was

13   storing these items there, it is all part and parcel of the

14   same proof.

15          THE COURT:  Yes.

16          MR. LAVIGNE:  May I respond briefly?

17          THE COURT:  Sure.

18          MR. LAVIGNE:  Let me respond on the entrapment issue.

19          The government's motion was clear.  I mean it read, *It*

20   *should be precluded to offer any type of entrapment defense.*

21   That was our real concern, that is why we responded the way

22   that we did.  In terms of the burden on cross, I think it is

23   going to be highly inefficient and confusing for jurors if the

24   government puts on the informant, you know, the government

25   rests, and then we cross the informant afterwards.

J275wooC                        conference

1          So, I think it is really critical, just logistically,

2     that we be permitted to ask the informant questions that could

3     form the basis to meet our burden on inducement.  I don't

4     understand the government to be objecting to that.

5          Now, if at the close of government's case your Honor

6     still has questions, we obviously can put on our own case to

7     shore that up.  I think the main thing is I don't want to be

8     limited in what I am arguing to the jury about what our theory

9     is going to be.  That's a real concern.

10         THE COURT:  Well, but what is your argument on opening

11    going to be?

12         MR. LAVIGNE:  The argument on opening is going to be,

13    you know, without previewing my defense, but it is shortly

14    before trial, is essentially going to be this case is about a

15    sting.  This case is about a sting.  That's it.  It is a sting

16    from 2017 to 2018.  An informant went in, he was tasked by the

17    United States government to try to ferret out stuff in Newark.

18         THE COURT:  Well, all right.  That's fine.  Whether

19    that is going to amount to entrapment or not is something that

20    comes up later, right?

21         MR. LAVIGNE:  I think what I am going to say is 2017

22    and 2018, this is a scenario where it was set in motion by the

23    United States government and our client, under the law, is not

24    a conspirator, he was not a member of the conspiracy, and

25    everything else is a product of that.  You are also going to

J275wooC                          conference

1   hear evidence before 2018 which is one witness, and that

2   witness' testimony can't be trusted.

3          THE COURT:  It seems to me that that statement of that

4   kind is appropriate.

5          Let me ask the government.

6          MS. MOE:  Your Honor, the government would agree that

7   if the statements were limited to, *Here is how this transaction*

8   *were set up,* along the lines that Mr. Lavigne previewed --

9          THE COURT:  Use of the word "sting" is fine.

10         MS. MOE:  Yes, your Honor.  Our concern --

11         THE COURT:  And that this was initiated by the

12  government.  That's fine.

13         MS. MOE:  Yes, your Honor.

14         Where we would seek to draw the line is that defense

15  counsel not go a step further and make statements to the jury

16  like, *Because the government set up this transaction, the*

17  *defendant is not guilty.*  Because that's an inaccurate

18  statement of the law as it applies to an entrapment defense and

19  would be misleading.

20         THE COURT:  I agree.  I agree.  Thank you.

21         Are we clear on that then?

22         MR. LAVIGNE:  It sounds like what the Court's ruling

23  is is -- I mean I can't argue to the jury in opening that

24  because this was initiated by the government our position, at

25  that end of the case, is he is going to be not guilty?  That is

J275wooC                         conference

1  our position.

2          THE COURT:  I think you can say that.

3          MR. LAVIGNE:  And the Judge will instruct you on the

4  law and you have to listen to the Judge?  I won't use the word

5  "entrapment."  I think I should be permitted to but if the

6  Court's ruling is premature, I will abide by that.

7          THE COURT:  I think so.  Yes.

8          MR. LAVIGNE:  On the guns, Judge, can I --

9          THE COURT:  What?

10          MR. LAVIGNE:  On the gun issue, can I respond?

11          THE COURT:  Yes.

12          MR. LAVIGNE:  Briefly.

13          So, Mr. Woolaston is not on trial for possessing a

14  gun.  He is on trial for possessing a gun in February 2018 in

15  connection with this narcotics conspiracy.

16          THE COURT:  Right.  Right.

17          MR. LAVIGNE:  So, the idea that simply because there

18  was a gun in a safe means he had a gun on that day, it is not

19  relevant.  They're linked to one another and there is not going

20  to be evidence.

21          THE COURT:  There are two gun issues; there is the

22  safe gun issue and then there is the testimony about the

23  illegal purchase.

24          MR. LAVIGNE:  Right.  And I submit the illegal

25  purchase, as we laid out in our brief, is way too attenuated

J275wooC                       conference

1      and it is not direct evidence under 404(b).

2                  THE COURT:  Right.  Yes.

3                  MR. LAVIGNE:  On the safe though, Judge, this is a

4      gratuitous offering by the government to essentially show that

5      because there was a lot of stuff in this safe you should find

6      Mr. Woolaston guilty.  There is ample evidence of his

7      possession of the gun.  There is not evidence, from what I have

8      seen in the cooperator 3500 and 302s I have received, that at

9      this safe it was coextensive with a wide-ranging narcotics

10     conspiracy.  This really seems like a one-off deal between the

11     two of them over the course of their relationship, one of maybe

12     three.

13                  So, it is not like the stash house cases.  I have

14     cited a case in my brief where this has been held in, I forget

15     the name of the case, it is in my opening brief, I think it is

16     distinguishable and I don't think they can meet their burden.

17                  THE COURT:  Okay.

18                  I tell you where we -- well, I think we have been

19     around and we have settled the opening issue, I hope.  The 2015

20     gun purchase, I think 404(b) risk is too high and I don't see

21     that it is really related to the charges here so that's out.

22     But, the safe and the ownership of the safe and the contents of

23     the safe, I think, are in as evidence relating to the

24     conspiracy, the charged conspiracy.  The fact that the

25     defendant is in the fire department certainly is going to come

J275wooC                       conference

1    out because I don't see any problem with that.

2              MR. LAVIGNE:  Sorry, Judge.  The fire department is

3    not -- I can't introduce evidence of that?

4              THE COURT:  No.  I say there is no problem about that.

5              MR. LAVIGNE:  Oh okay.  Okay.

6              MS. MOE:  Your Honor, may I be heard briefly on that

7    topic?

8              THE COURT:  Well, it explains the references in the

9    testimony.

10             MS. MOE:  Yes, your Honor.

11             We certainly anticipate that there will be testimony

12   at trial that the defendant worked at a fire department.

13             THE COURT:  Yes.

14             MS. MOE:  In fact one of the meetings about the

15   transaction was at the fire department.

16             THE COURT:  Isn't that what we are talking about?

17             MS. MOE:  Our concern is that that evidence be limited

18   to the fact that he worked there and that it was at that

19   location.

20             THE COURT:  What more is there?

21             MS. MOE:  We heard defense counsel, I believe, in

22   context of another proceeding in this case, talk about the

23   defendant's work going into burning buildings, that he saved

24   people and those type of things.  That's our concern.

25             THE COURT:  Well, if he testifies, that's a horse of a

J275wooC                          conference

1  different color.

2              MR. LAVIGNE:  Right.

3              MS. MOE:  Yes, your Honor.

4              THE COURT:  Otherwise, it is not going to come in only

5  the government's case.

6              MS. MOE:  Certainly, your Honor, and we would hope not

7  in opening statements either.

8              THE COURT:  Yes.  Agreed.  No burning buildings in the

9  openings.

10             MR. LAVIGNE:  Right.  I will definitely abide by that,

11 Judge.

12             THE COURT:  No mandatory minimums.

13             Now, there was an issue on discovery?

14             MR. LAVIGNE:  Yes.  There are a few issues, your Honor

15 and I don't want to burden the Court with these issues.  As I

16 have said before, we have been trying to work these out with

17 the government.

18             THE COURT:  Well, that's fine.  I don't want to create

19 a problem if there is none.

20             MR. LAVIGNE:  Well, I need to at least make a record.

21             Here is one issue that is very, very live.  The

22 government is going to call a confidential informant to

23 testify.  That confidential informant was a cooperating witness

24 for the U.S. Attorney's office for the Southern District of

25 Florida in 2004.  The confidential informant got sentenced in

J275wooC                       conference

2002 for narcotics offenses; post-plea, post-sentencing

cooperated, got a Rule 35, and his sentence went from 70 months

to 30 months.  I have not gotten anything relating to that

cooperation.  Okay?  I got the 3500 Monday night at midnight.

        I have asked the government about it.  They've sent me

one document that was filed.  I don't have the cooperation

agreement.  I don't have any of the proffers.  I don't have any

of that.

        The government's position, and I know the law on this,

I can speak to the Court, the government's position is because

it is a different district's cooperator and with the DEA,

they're not going to ask the office for that information.  They

may have made some inquiries, but as of last night and even

this morning, my understanding is I'm not going to get that.

        That's a problem.  That's a real problem.  And I will

give some concrete examples.

        Number one, after the confidential informant

testified, a DEA agent found out that the informant lied.  He

lied in 1998.  The DEA agent sent that lie to the prosecutor at

the trial where the informant testified.  The prosecutor then,

I believe, sent a letter to the defense lawyer, and there was

an appeal and it went to the Eleventh Circuit and it was

ultimately affirmed.

        In the 3500 I have seen they asked the informant about

that and he basically doesn't have a recollection.  It was a

1  statement he made in 1998 about his son.  At the end of the day

2  I am not on a fishing expedition but if there is a cooperating

3  witness for the United States government, even if he is an

4  informant now, I am entitled -- I am entitled -- to the

5  information the government had back in 2004 when he was

6  cooperating with them.  And I think that is just consistent

7  with the law, it is consistent with good practice, and it

8  limits my cross-examination of the informant.

9         So, I think that's one issue.

10         THE COURT:  What would you have me do?

11         MR. LAVIGNE:  I would -- I mean, I am finding out

12  about this four days before trial.  I would have you direct the

13  government to get me the file and -- right now I feel limited

14  in my ability to cross the informant.  I don't have the whole

15  picture.  And we know how cooperators go.  They come in and say

16  a whole bunch of stuff.  There could be a whole set of issues

17  around their credibility.

18         THE COURT:  Yes, yes, yes.

19         Let's hear from the government on this.

20         MS. MOE:  Your Honor, just to sort of clarify the

21  backdrop, this witness is a confidential informant.  He is not

22  a cooperating witness in this district.  He was previously a

23  cooperating witness in the Southern District of Florida in

24  2002, and testified in 2003, and sentenced in 2004.  That case

25  was run by a different prosecutor's office and different law

J275wooC                        conference

1   enforcement agency.  We think that the law is clear that those

2   members are not members of the prosecution team.

3           What we have produced to defense counsel are the

4   public filings related to that case and, critically, we have

5   produced the cooperating witness' testimony at a trial.  That

6   was part of the cooperation that he provided.  So, defense

7   counsel has a full trial transcript of the cooperating witness'

8   testimony detailing his prior bad acts and his

9   cross-examination by able defense counsel in that case.

10          The issue the defense counsel raised was something

11  about a lie that happened before and I just want to explain

12  what that was about.

13          So, after the trial in that case, the DEA noticed that

14  they had a report related to an administrative seizure of drugs

15  in 1997.  What happened is that the DEA seized a suitcase from

16  this witness' son in a New York airport in 1997, and in

17  connection with that seizure of that suitcase of money, they

18  called the person who is now the cooperating witness.  It was

19  in the file that they didn't credit that person's statement in

20  1997 that the money was legitimate.  So, in an abundance of

21  caution, the DA gave that to the prosecutor, they turned that

22  over to the defense, that issue was litigated in the District

23  Court and the Court of Appeals, and the issue was affirmed.

24          So, what we are talking about is whether someone

25  remembers something they said on a phone call to the DEA in

J275wooC                         conference

1    1997.

2              MR. LAVIGNE:  Right.

3              MS. MOE:  And all of that has been disclosed to

4    defense counsel.

5              We don't see an issue here.  We have no reason to

6    believe that there are materials here that are at issue.

7    Critically, this witness is not a cooperating witness so the

8    kinds of things that would accord to defense here don't really

9    apply.  We understand the defense has a right to seek to

10   impeach this witness but, for example, their role as a

11   cooperator really isn't at issue in this case.  This person is

12   a confidential informant.  So, questions about *Did you disclose*

13   *all of your criminal history to us?*, those aren't really at

14   issue.  *Are you complying with the terms of a cooperation*

15   *agreement?  Have you done so before?*  Those aren't at issue in

16   this trial.

17             We think this is both factually distinct, very removed

18   in time.  As a practical matter, the agent from the DEA who

19   handled that case, we understand, is deceased.  We have reached

20   out to the prosecutor, who is no longer in that office, he is

21   working at another U.S. Attorney's office.  And, this is a case

22   that is about 14 years old at this juncture so we think the law

23   is clear that we have met and exceeded our disclosure

24   obligations.

25             MR. LAVIGNE:  Judge, I respectfully disagree.  This is

J275wooC                         conference

1   why I moved for early production for 3500 and Giglio materials

2   two weeks before trial.  Ms. Moe is right, I got the trial

3   transcript.  I got the trial transcript an hour and a half ago.

4   You know, it is wrong -- it is wrong to say that because

5   somebody is an informant they're not a government witness and

6   the United States government has, in its possession, files

7   relating to that witness.  I don't even have the cooperation

8   agreement.  I am asking for the file.  It is not about this

9   1997 issue.

10          I don't understand why this is such a central witness

11  and if he is collateral, this diligence wasn't done sufficient

12  in time to get me any of this stuff.  I think it is a problem.

13  I think the informant's credibility is going to be an issue.

14          We have evidence now from the 3500 that he was

15  constantly communicating with the case agent, that he was

16  constantly attempting to reach out to Xavier Williams.  It is

17  absolutely going to be an issue.  He is going to have to

18  testify from recollection about certain conversations because

19  he didn't record them.

20          So, it is definitely a live issue.  It is definitely a

21  live issue and I think his credibility, as the Court knows from

22  countless trials, the informant's credibility is always an

23  issue and --

24          THE COURT:  Well, what is it that the government --

25  granted a different office -- has that you want that you think

J275wooC                     conference

1   relates to the witness' credibility?

2           MR. LAVIGNE:  Sure.

3           So, three things.  There are sealed documents on the

4   docket and I emailed the assistant U.S. Attorney about that two

5   days ago when we found it and we learned the identity of this

6   witness.  I strongly suspect they relate to the informant's

7   cooperation.  We have made efforts through my office, my

8   investigators, to try and get those.  They're sealed, I can't

9   get access to them.  That is an easy thing the U.S. Attorney's

10  office could get.

11          THE COURT:  Not so easy.  I take it they're sealed in

12  Florida.

13          MR. LAVIGNE:  They're sealed in Florida.  They're

14  sealed in Florida but I think the U.S. Attorney's office in

15  Florida could easily get them unsealed because they relate to a

16  material witness.  And then the U.S. Attorney's office in the

17  Southern District of Florida has a file for the cooperator.

18          What it has, Judge, to put meat on the bones, the

19  proffer agreement, the proffer notes --

20          THE COURT:  Well, I don't think I can order that.

21          Now, whether or not the government has adequately, if

22  they want to stand or fall on this issue I don't think I can

23  order it, can I?

24          MR. LAVIGNE:  I think you can, your Honor.  If I can

25  give some examples?  Just in the CIPA context, Classified

J275wooC                          conference

1    Information Procedures Act --

2            THE COURT:  Practically speaking, today is Thursday.

3    And Monday?  So, it's unreal.  It's unreal.  From a practical

4    point of view, right?

5            MR. LAVIGNE:  Unless the Court adjourns the trial.

6            THE COURT:  Well, yes.  But this is so tangential --

7    when I say so tangential, the issue of his credibility is it

8    has been explained is debatable -- debatable -- as to how it

9    all comes out.  So, I would not adjourn the trial on this

10    issue.  That I would not do.

11            And, practically speaking, I don't think I, if I said

12    to the government -- will say make your best effort, but I

13    don't think it will work.

14            MR. LAVIGNE:  I think, for the record, the Court

15    should order the U.S. Attorney's office, as a matter of Rule 16

16    and 3500, this is subsumed and the government needs to make

17    their best efforts to get it, and I think if the U.S.

18    Attorney's office actually reaches out to the U.S. Attorney's

19    office in the Southern District of Florida, I think something

20    will emerge.  From past practice I am confident of that.  I

21    have been in situations were these things happen and files are

22    at the office.  Somebody at least needs to make a phone call.

23            THE COURT:  Okay.  I will direct the U.S. Attorney to

24    make the best efforts to obtain these materials.

25            MS. MOE:  Your Honor, just so we understand the scope,

J275wooC                    conference

I think Mr. Lavigne is talking about sealed ECF entries and so

we think the appropriate relief, if the defense wants to

investigate this on their own, again, it is our view that this

is not a Giglio or 3500 issue because these materials are not

in the possession of the prosecution team.  But if defense is

separately making an application saying that they wish to

investigate this witness and they wish for the sealed ECF

entries in the Southern District of Florida's court records to

be unsealed, they're free to make an application to that Court.

This office certainly won't oppose that application.  I think

that would be the appropriate procedure in this case.

         THE COURT:  Well, I think all of that is -- I think

you may be right but there is the problem of the timing --

         MS. MOE:  Yes, your Honor.

         THE COURT:  -- and there isn't time for that.

         MS. MOE:  Your Honor --

         THE COURT:  And so, that's why I say I would ask you

to use your best efforts to obtain this material through the

U.S. Attorney's office in Florida, and if they can't do it they

can't -- it won't be done and there it is.

         MS. MOE:  Your Honor, we certainly respect that.  I

would just add --

         THE COURT:  Let's be clear about what we are talking

about -- Ye gods and little fishes!  Are we talking about just

the sealed documents?  Are we talking about something more?

J275wooC                        conference

1          MR. LAVIGNE:  Your Honor, what I am looking for is the

2     U.S. Attorney's office and its case agents had a file for this

3     informant.  They had a cooperation agreement.  They have notes

4     of --

5          THE COURT:  You don't get the government's file.

6          MR. LAVIGNE:  I don't want the government's file.

7          THE COURT:  You don't get the government's file.  You

8     may get statements by the witness.

9          MR. LAVIGNE:  That's what I am looking for.

10         What I am looking for is the cooperation agreement --

11    I'm sorry.  If I am speaking too broadly, your Honor, it is my

12    fault.  What I want is information that bears on the

13    informant's credibility, his cooperation agreement, his Rule 35

14    letters and statements he made in his proffers about his prior

15    bad acts.  That's all I am looking for.  I think I am entitled

16    to it and the U.S. Attorney's office has it -- in the Southern

17    District of Florida.  That's all I'm looking for.

18         THE COURT:  All right.

19         MS. MOE:  Your Honor, it is our position that the

20    government has no obligation to seek from another prosecutors

21    office, in an unrelated case, a complete copy of all of their

22    3500 material and productions from 2004.

23         THE COURT:  No, no.  He is not asking for that.

24         MS. MOE:  Your Honor, I believe he has asked for all

25    of the proffer notes from back in 2003 and 2002 and all related

J275wooC                          conference

paperwork.  We think that far exceeds any reasonable

interpretation of the government's discovery obligations in

this case.

          MR. LAVIGNE:  I am looking for information that bears

on his credibility and one example is he was proffered -- and,

again, I raised this early to avoid a scenario like this --

information that bears on his credibility.

          He was asked by one of the assistants during a recent

meeting about information surrounding this 1998 lie and he

doesn't remember.  And in 2004 he met with the government

multiple times and he said information about his prior bad acts

and he lied about it to them.  The fact that he lied to DEA and

a DEA agent felt it necessary to inform the prosecutor who

informed the trial defendant, it is significant.  It is

significant.  It is lying to a federal agent and I can't cross

examine him if he says he don't remember.  I want to impeach

him.  What I am looking for is that information.  And the idea

that the United States attorney's office for the Southern

District of New York won't each out to another U.S. Attorney's

office, honestly, I don't think that's right.  I know there is

no monolithic government --

          THE COURT:  Look.

          MS. MOE:  Your Honor, on that issue, just to clarify?

          The reports relating to that witness' statements in

1997 to a DEA agent on a phone call have been produced to the

J275wooC                    conference

 1    defense, they're publicly filed on the docket.  So, the defense

 2    has all of the DEA reports about that issue.  We think a report

 3    about a statement in 1997 on a phone call about a bag is so

 4    tangentially removed from the issue in this case and certainly

 5    beyond the scope of materials possessed by this prosecution

 6    team --

 7            THE COURT:  Okay.  Difficult.  I am sorry it has taken

 8    so long.  I apologize.  My fault.

 9            It is where it is and that's the end of the story.

10    Practically speaking there is nothing, I think, that I could do

11    that would produce anything meaningful but, leaving that aside,

12    there is the whole problem of the timing and the extent of the

13    government's obligation, etc., etc.  And so, the record is what

14    it is.

15            MR. LAVIGNE:  I'm sorry.  I didn't catch your Honor's

16    ruling.

17            THE COURT:  So I'm not going to do anything and I'm

18    not going to put over the trial because I think the issue is

19    tangential.  It does bear on -- it may -- it may -- might bear

20    on credibility.  I'm not sure, from what I have heard, that it

21    does.  I don't know how it comes out but -- so.

22            MR. LAVIGNE:  Okay.  There are two other issues I had.

23            THE COURT:  Okay.

24            MR. LAVIGNE:  I'm sorry, your Honor.

25            THE COURT:  That's all right.

J275wooC                        conference

1          MR. LAVIGNE:  Again, I got this stuff late.  I am

2     trying to work through it.

3          THE COURT:  That's fine.

4          MR. LAVIGNE:  I am trying to make my record.

5          THE COURT:  That's fine.  That's part of the problem.

6          MR. LAVIGNE:  Well, that's why I moved for early

7     disclosure of a lot of these materials and requests of the

8     government.

9          The other issue is the government superseded to go

10    back to 2013, advised us that we had all communications between

11    our client and Xavier Williams and the alleged informants.

12    That universe was from 2015 to 2018.  We now see agent

13    memoranda in the 3500 material that says multiple informants

14    were injected into this alleged DTO in 2013 and 2014.

15         We haven't been given any of that.  I have raised this

16    with the government.  They said they looked at it.  They said

17    they haven't found anything.  A concern I have is there were

18    two different agencies investigating this in 2013 and 2014 and

19    if there were informants who generated information or even

20    sources, and the sources or informants didn't identify my

21    client, I think we are entitled to that.  And, it could bear on

22    entrapment.

23         I have raised this for the government and understand

24    what they say for the record but --

25         MS. MOE:  Your Honor, as we have explained to defense

J275wooC                      conference

1    counsel, our opinion is that the only two confidential

2    informants who had interaction were Xavier Williams or the

3    defendant, at the direction of law enforcement, are the two who

4    are identified to defense counsel.

5            It was the case during the course of this case that

6    the agents had other sources of information but in terms of

7    individuals who contacted these individuals, the universe of

8    that material has been disclosed.

9            THE COURT:  I'm not sure what you are telling me.  You

10   are saying there were additional informants in that period?

11           MS. MOE:  Yes, your Honor, in that the agents had

12   contact with other informants.  But as sources of information

13   to the government, not as informants who were having

14   interactions with Xavier Williams or other individuals at the

15   direction of law enforcement related to this case.

16           MR. LAVIGNE:  I think we are entitled to know if those

17   sources identified our client or not.

18           MS. MOE:  For the one who did, we have produced all of

19   those materials.

20           THE COURT:  Yes.  Yes.

21           MS. MOE:  We have produced material of a witness who

22   said that he was recruited to participate in this conspiracy by

23   the defendant.  Notes of those interviews and reports have been

24   disclosed to the defense.

25           THE COURT:  Okay.  All right.  I think that's the end

J275wooC                        conference

1    of that.  Okay, anything else?

2              MR. LAVIGNE:  The final point, your Honor, is on --

3    two days ago we got a toll record from the government that

4    allegedly shows our client speaking with Xavier Williams about

5    this August 15th delivery.  Your Honor, in his opinion, noted

6    that the government has never been able to establish that our

7    client was linked to this alleged August 2015 delivery.  We

8    have been given recordings where our client wasn't identified.

9    They got this toll and they said they got it from a trial

10   subpoena and we literally got it two days ago.

11             In the 3500 material again, not isolated or referenced

12   as Brady or anything in the last page of a thousand pages, it

13   says United Airlines identified a third-party as a suspect in

14   connection with this August 2015 sting.  We think we are

15   entitled to have all the information that the agents and United

16   identified about this supposed suspect.

17             THE COURT:  Well, the agents, yes.  I think you are

18   entitled to anything that the agents have.  I don't know about

19   United.

20             MR. LAVIGNE:  I am not asking for United.  I am asking

21   for any and all information that the agents generated about

22   this person.  I am going to leave their name out of the record.

23             MS. MOE:  Your Honor, I think what defense counsel is

24   referring to is one or two law enforcement reports from that

25   time period that indicate that other individuals are suspects,

J275wooC                          conference

1    that are suspected of working at United and having been the

2    insider link at the time of that transaction.  Those memorandum

3    have been disclosed to the defense.  We have conferred with the

4    agents and our understanding is they were suspects based on a

5    variety of factors but that evidence has been produced to the

6    defense.  We think, candidly, that it is a misidentification,

7    that they were canvassing various different links between

8    individuals and trying to surmise whom it might have been at

9    United Airlines.  But I think the agent's thoughts about who it

10   might be, that of course has been disclosed to the defense that

11   that is sort of all of that, that's where that goes.  We of

12   course know now that it was the defendant based on that phone

13   record but in terms of other individuals who are suspected of

14   being involved, that has been disclosed to the defense.

15        I would also add that it has been the government's

16   theory throughout this case that it was a group of individuals

17   working at United.  So, the fact that other members of the

18   conspiracy might be culpable is certainly not exculpatory in

19   this context and we think we have satisfied our discovery

20   obligations on that topic.

21        MR. LAVIGNE:  Let me just try to -- the line says HSI

22   Newark suspected that UA security manager X alerted Williams to

23   this operation.  So, somebody at the United States Department

24   of Homeland Security generated something that gave him or her a

25   basis to say that.  We are asking for that information and we

J275wooC                     conference

1    don't have it.  That's what we are asking for.  That's

2    exculpatory, highly exculpatory.  I don't know what it is.  The

3    office says it is a mistake but I think I am entitled to more

4    information relating to that.

5               THE COURT:  But I don't know that there is.  Is there

6    any more information?

7               MS. MOE:  We can speak to our case agent again to

8    confirm and will certainly do that.  Our understanding, from

9    our conversation about this specific issue, is that it is a

10   hunch based on pattern of travel records and individuals who

11   were working together at certain times and that there is

12   nothing beyond that.

13              THE COURT:  If there is any record of any other

14   investigation other than suspect or hunch, that, I think,

15   should be turned over.

16              MS. MOE:  Yes, your Honor.  And we will again confer

17   with the agents about what records were disclosed about the

18   specific issue.

19              THE COURT:  What else?  Don't tell me.

20              MR. LAVIGNE:  I think that's it.

21              In terms of the trial days, your Honor, my

22   understanding is it will be Monday to Friday?

23              THE COURT:  I guess so.  Yes.

24              MR. LAVIGNE:  Okay.  That's obviously our request.

25              THE COURT:  Sure.

J275wooC                    conference

MR. LAVIGNE:  Just given other scheduling issues.

THE COURT:  That's the plan.

MS. MOE:  Your Honor, on the topic of scheduling, we had estimated that this would be a one-week trial.  We just wanted to bring to the Court's attention our estimate of the length of the government's case depends, in part, on understanding with defense counsel that they are likely to stipulate to a series of records custodians' testimony.  And so, in terms of the projection of how long this trial will take, we are hopeful to work that out with defense counsel.  He had indicated he is willing to stipulate to those items.  Those stipulations have not yet been signed so we wanted to bring, to the Court's attention, our working understanding of the length of the trial depends on that assumption so that if, for example, there weren't a stipulation to phone records, authenticity and the like --

THE COURT:  Assuming rationality and the best case, what is the shortest estimate?

MS. MOE:  I think if those records custodians aren't needed to testify and there are stipulations for those witnesses, our estimate would be that we would rest on Wednesday or Thursday of next week.

THE COURT:  Okay.

MS. MOE:  If seven or so different witnesses need to testify, I think it would be considered longer.

J275wooC                          conference

1              THE COURT:  Okay.

2              Anything else?

3              MR. LAVIGNE:  No, your Honor.  I think that the

4      timing -- can I have one moment?

5              THE COURT:  Sure.

6              (Counsel conferring)

7              MR. LAVIGNE:  Oh, yes.  I'm sorry, Judge.

8              THE COURT:  That's all right.

9              MR. LAVIGNE:  I don't want to step on any toes.

10             We have an instruction on manufactured venue.  I had

11     planned on -- you know what?  I will withdraw that.  I think we

12     can deal with that down the road.

13             THE COURT:  Okay.

14             Thank you, all.

15                                  o0o

16

17

18

19

20

21

22

23

24

25