**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 23, 2019

**BY ECF**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

  Re: <u>United States</u> v. <u>Christian Dawkins and Merl Code</u>, S1 17 Cr. 684 (ER)

Dear Judge Ramos:

  The Government writes in connection with certain issues that the defendants attempted to explore in cross-examination of the Government's first witness, Christopher Miller, a compliance officer from the University of South Carolina. In particular, through Mr. Miller, the defendants sought to elicit irrelevant and prejudicial information inappropriately focused on NCAA rules violations by persons not on trial, and the business of college sports. These questions were not only beyond the scope of Mr. Miller's direct examination and irrelevant, but also targeted issues that the defense specifically stated they would avoid during the final pre-trial conference on April 19, 2019. *See* April 19, 2019 Transcript ("Tr.") at 30 ("COURT: I received representations from counsel that they will not be going into these matters [that were the subject of the Government's motion *in limine* to preclude putting the NCAA and NCAA rules on trial]. MR. HANEY: Your Honor, that is correct."). As a result, and for the reasons explained below, the Government respectfully requests that the Court (1) preclude any further questioning about rules violations by other individuals not associated with this case (or other questions supporting a so-called "everybody's doing it" defense), (2) strike from the record certain of the defense's questions and Mr. Miller's answers, and (3) give a curative instruction at the beginning of the trial day.

  In advance of trial, the Government moved *in limine* to:

> [P]reclude the defendants from repeating their attempts to inject irrelevant issues into the case. As the Government noted, in *United States v. Gatto*, the defendants attempted to make arguments about the unfairness of rules that that precluded college athletes from being paid; they sought to offer evidence that the schools profited off of these young athletes; that the players did not have a lot of money; that coaches were paid large salaries; and they sought to

>offer evidence that the rule breaking by other individuals was common (in what Judge Lewis Kaplan routinely referred to as the "everybody's doing it defense," which he held inadmissible.

(Dkt. 189 at 21).  In *Gatto*, Judge Kaplan correctly precluded all of these lines of argument and virtually all of this evidence, finding that it "risked distracting the jury from the issues in this case. . . . [;] eliciting the sympathy of the jury for student-athletes who suffered adverse consequences by reason of the enforcement of NCAA rules . . . [; and] suggested to the jury that the 'equitable' result would have been to overlook any deception of the Victim Universities – in other words, to decide the case 'on an improper basis, commonly [and in this case in part] . . . an emotional one.'" (*United States v. Gatto*, 17 Cr. 686 (LAK) (Dkt. 279 at 8 (order denying introduction of defense's expert testimony)).[1]

On April 19, 2019, at the final pre-trial conference, in response to the Government's motion *in limine*, the Court noted that the defense counsel had represented that they would not go into those matters, and defense counsel confirmed the same.  (4/19/19 Tr. at 29-30).  Nonetheless multiple questions asked on cross-examination today violated that agreement.  While the Court sustained many of the Government's contemporaneous objections, a few such questions were answered.  These include the following:

### A. Selection of Objectionable Questions Going to the Business of College Basketball

>Q.  And would you also agree with me that that Final Four appearance of the University of South Carolina, the first one in school history, resulted in hundreds of thousands of dollars of revenue for South Carolina?
>
>MR. BOONE:  Objection.
>
>THE COURT:  Sustained.
>
>Q.  Would you agree that if a college basketball team Division I goes to the Final Four there will be a lot of revenue generated?
>
>MR. BOONE:  Objection.
>
>THE COURT:  Sustained.

(Trial Tr. at 142).

>Q.  University of South Carolina generates a tremendous amount of revenue from their athletics department, correct?

---

[1] A copy of the order from *Gatto* is annexed hereto as Exhibit A.

MR. BOONE: Objection.

THE COURT: Sustained.

Q. You would agree with me, Mr. Miller, that South Carolina is paid directly by the company Under Armour to sponsor the athletics department?

MR. BOONE: Objection.

THE COURT: Overruled.

THE WITNESS: We do receive -- we have a contract with Under Armour and receive compensation from Under Armour, yes.

Q. How much money annually do you receive from Under Armour?

MR. BOONE: Objection. Relevance.

THE COURT: Sustained.

Q. Part of your arrangement with Under Armour is that they pay you compensation in exchange for your student athletes wearing their brand?

A. It's in exchange to provide our student athletes with apparel and then also to have the staff members and the coaches wear sideline apparel as well too.

Q. So your testimony today is that Under Armour does not get an advertising benefit from your student athletes wearing their apparel?

MR. BOONE: Objection. Misstates.

THE COURT: Sustained.

Q. In addition to the advertising benefit that Under Armour receives, they also receive an advantage in recruiting talented pro level student athletes from the University of South Carolina?

MR. BOONE: Objection.

THE COURT: Sustained as to the form.

> Q. You would agree with me, Mr. Miller, that Under Armour, in exchange for the money they are providing University of South Carolina, reaps a benefit to themselves in the form of advantages in recruiting top talent that comes out of the University of South Carolina?
>
> MR. BOONE: Objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: In terms of what Under Armour views as a benefit, I don't know. We receive the benefit of having apparel provided and compensation provided by Under Armour to the athletics department.
>
> Q. To be clear, you don't just get apparel. You also get monetary compensation, right?
>
> A. Yes. We do, yes.
>
> Q. To the tune of millions of dollars?
>
> MR. BOONE: Objection.
>
> THE COURT: Sustained.

(Trial Tr. at 145-47).

Consistent with the Court's ruling sustaining each of these objections, the Government respectfully submits that these subjects – subjects the defendants agreed prior to trial that they would not explore – are completely irrelevant. As Judge Kaplan similarly noted in *Gatto*:

> [H]ighlighting the economic benefits that NCAA Division I universities generally reap from college sports – even taking into account NCAA penalties for violations of its rules – would have been likely to turn the jury's focus to the wisdom or fairness of the NCAA rules that were violated. There would have been a substantial risk that the jury would have concluded that the NCAA rules were unreasonable and that it therefore should overlook the payments that defendants facilitated to the families of the student-athletes. Defendants of course could not properly have made this argument explicitly.

(*United States v. Gatto*, 17 Cr. 686 (LAK) (Dkt. 279 at 18)). The Government would thus request the Court direct the defendants to refrain from similar questioning with future witnesses.

### B. Selection of Objectionable Questions Going to NCAA Rule-Breaking By Others

> Q. Would you agree with me your experience that you've testified to that runners would also pay players on campus?
>
> MR. BOONE: Objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: In my experience I have seen runners that have paid or that have been alleged to have paid student athletes.
>
> Q. That's not unfamiliar to you at all, is it?
>
> A. No. During my time at the NCAA I did see that.
>
> Q. In fact, wouldn't you agree that perhaps you investigated hundreds of occasions where runners were paying student athletes on campuses?
>
> A. No. Not hundreds.
>
> Q. Numerous?
>
> A. A few, yes.
>
> Q. Give me your best estimation of how many.
>
> A. Ten to fifteen.

(Trial Tr. at 138-39).

> Q. While you were at the NCAA enforcement division isn't it true you heard Andy Miller was violating NCAA rules, didn't you?
>
> MR. BOONE: Objection.
>
> THE COURT: Sustained.

(Trial Tr. at 141).

> Q. But isn't it also true that the Rice Report revealed that compliance NCAA amateurism rules is, in fact, the exception and not the rule?

       MR. BOONE:  Objection.

       THE COURT:  Overruled.

       THE WITNESS:  Can you repeat the question?

       Q.  Isn't it true, Mr. Miller, that the Rice Report actually revealed that compliance with NCAA amateurism rules at large universities is the exception and not the general rule?

       A.  I don't remember seeing that in the Rice Report.  I can't specifically refer to that.

       Q.  You would agree with me that on cross-examination by Mr. Haney you had testified to multiple instances of runners paying student athletes with university knowledge?

       MR. BOONE:  Objection.

       THE COURT:  Overruled.

       THE WITNESS:  In my investigations at the NCAA I did see either agents or runners or people associated with them provide impermissible benefits to student athletes.

       Q.  Not just that they provided those benefits, but your investigations revealed that those universities knew that that conduct was occurring?

       MR. BOONE:  Objection.

       THE COURT:  Sustained.

(Trial Tr. 147-48).

      For the reasons set forth in the Government's original motion, the Government respectfully submits these questions were improper.  As an initial matter, questions about potential misconduct by others unrelated to this case is irrelevant.  The critical issue here, as the defendants' opening aruguments put in stark relief, is the defendants' actions and state of mind; and this line of questioning has no bearing on either of these matters.  That is particularly true where the alleged misconduct – runners paying student athletes, for example – is not the criminal conduct at issue in this trial.  Moreover, some of the questions were plainly intended to elicit hearsay.  The findings of the Rice Commission,[2] for example, are not only irrelevant to this trial,

---

[2] In response to the federal investigations leading to this case and the related cases, among others, the NCAA established the Commission on College Basketball chaired by Dr. Condoleezza Rice

but would be hearsay if offered by the defendants, and it is similarly improper for the defendants to seek to elicit the substance of those findings through a witness. That is especially true where, as here, the witness had no involvement in generating the Rice Commission's Report.

Given that these matters were irrelevant and were already the subject of a motion *in limine*, the Government requests that the questions and answers set forth above be stricken and that a curative instruction be given. A proposed curative instruction is included below:

> The purpose of this trial is not to determine whether the NCAA rules are fair or wise, or whether they are fairly or evenly enforced. Any views or opinions on such matters have no bearing on this case whatsoever and should not be considered by you in any respect.[3]

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Robert L. Boone/Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys
(212) 637-2208/2473/2431

cc: Defense counsel (by ECF)

---

(the "Rice Commission") to "fully examine critical aspects of Division I men's basketball" and "identify bold legislative, policy and structural modifications to improve the integrity of our processes and the well-being of our student athletes." NCAA, Commission on College Basketball Charter § 1, available at http://www.ncaa.org/governance/commission-college-basketball-charter (last visited April 23, 2019). The Rice Commission published its report and recommendations in April 2018, in which it called the state of men's college basketball "deeply troubled."

[3] This curative instruction is adapted from a longer jury instruction given by Judge Kaplan in *United States v. Gatto*, 17 Cr. 686 (LAK) (Trial Tr. at 1833-34).