UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA           :

   -v.-                                               :    17 Cr. 684 (ER)

LAMONT EVANS,                               :

                   Defendant.           :

------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York

Robert L. Boone
Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA          :

   -*v.*-                                          :        17 Cr. 684 (ER)

LAMONT EVANS,                              :

                Defendant.         :

------------------------------------------------------------x

## PRELIMINARY STATEMENT

The Government writes in advance of the sentencing of defendant Lamont Evans, which is currently scheduled for June 7, 2019, at 11:00 a.m., and in response to the defendant's sentencing submission dated May 21, 2019.  On January 30, 2019, the defendant pled guilty to conspiracy to commit federal funds bribery in violation of Title 18, United States Code, Section 371.  The defendant pled guilty pursuant to a plea agreement, which contained a stipulated Guidelines range of 18 to 24 months' imprisonment.  For the reasons discussed below, the Government respectfully submits that a sentence falling within that range is sufficient but not greater than necessary to promote the legitimate ends of sentencing.

## BACKGROUND

**A. The Defendant's Offense Conduct**

As detailed in the Presentence Investigation Report and at the trial of Evans's co-defendants, Christian Dawkins and Merl Code, Evans abused his position as a college basketball coach at two universities, the University of South Carolina and Oklahoma State University, by accepting bribes from certain athlete agents and advisors in exchange for agreeing to steer players he coached to retain the services of those agents and advisors.  Evans participated in the charged scheme from in or about 2016 to in or about September 2017, and received

1

approximately $22,000 in bribes. In exchange for the bribe money, Evans, did several things: (1) Evans arranged for the Government's cooperating witness, Martin Blazer, posing as a financial advisor in the scheme, to meet with Jeffrey Carroll, a player from Oklahoma State University, in connection with Evans's attempt to influence that player to retain Blazer; (2) Evans provided Christian Dawkins with Jeffrey Carroll's contact information in connection with Evans's attempt to influence Carroll to retain Dawkins's sports management company; and (3) Evans arranged for co-defendant Munish Sood to meet the mother of P.J. Dozier, a player from the University of South Carolina, in connection with Evans's attempt to influence Dozier to retain Sood as a financial advisor.

Evans's participation in the scheme began in or about 2016, at which time he was an assistant men's basketball coach at the University of South Carolina. On or about March 3, 2016, Dawkins, Blazer, and Sood traveled to South Carolina to meet with Evans near the campus of the University of South Carolina. (Tr. 264.)[1] The purpose of the meeting was for Dawkins, an aspiring agent, to introduce Evans to Blazer and Sood so they could begin making bribe payments to Evans. (Tr. 261-263.) Prior to the meeting, Dawkins had informed Blazer that he had been paying Evans approximately $2,500 per month in an effort to influence Evans to steer a particular player at the University of South Carolina, P.J. Dozier, to sign with the sports agency Dawkins was working for at the time. (Tr. 261-263, 299.) Dawkins proposed that Blazer take over the monthly payments he had been making to Evans and, in exchange, Evans would steer Dozier and other players he coached to retain Blazer to perform financial advisory related work. (Tr. 261-263.) Blazer informed Sood, a former business partner of Blazer's, of the opportunity

---

[1] Unless otherwise noted, transcript references are to the trial transcript of the trial *United States v. Christian Dawkins and Merl Code*, (S1) 17 Cr. 684 (ER).

to make bribe payments to Evans, as Sood had previously expressed interest in retaining professional basketball players as financial advisory clients. (Tr. 264.)

After meeting with Evans in South Carolina, Blazer and Sood agreed to take over Dawkins's bribe payments. (Tr. 301.) At trial, Blazer testified that he paid Evans approximately $2,000 at least every other month, that he would pay Evans either in cash or through a wire transfer, and that he traveled to several cities to pay Evans, including New York, Atlanta, Orlando, Miami, and Las Vegas. (Tr. 319-320, 301-302.) Blazer further testified that even after Evans decided to leave South Carolina in the Spring of 2016 to take a job as an assistant men's basketball coach at Oklahoma State University, their payment arrangement remained the same. (Tr. 322.) Indeed, in informing Blazer about his new job, Evans told Blazer that his position at Oklahoma State University was a "better job" because it was "[b]etter players, more, more, more business." (Compl. ¶ 53.)

Numerous recordings demonstrate Evans's insatiable desire to get as much bribe money for himself as possible. For example, on April 29, 2016, a little over a month after meeting Blazer for the first time, Evans sought assurances that Blazer would pay Evans. (Compl. ¶ 55a.) On a recorded phone call from that day, Evans proposed that Blazer "come up with something" and that they "go through it" because "at the end of the day it's [a] negotiation and it's nothing we're gonna kill each other over. We're friends before we did any business so I'm telling you, trust me, it's not too low not too high." (*Id.*) Evans added that he "just want[ed] to be able to scratch my back, scratch yours, and help each other with different things and . . . at the same time get compensated and then . . . just go from there." (*Id.*) Evans noted that their agreement was just "generating more wealth," and that there could be "another situation down the road for everybody . . . for [you] to get certain guys." (*Id.*)

On a telephone call recorded on May 3, 2016, Blazer informed Evans that he would agree to pay Evans $2,000 per month. (Compl. ¶ 55b.) Evans then turned the conversation to a specific student-athlete he was coaching at Oklahoma State University that he wanted to connect with Blazer. (*Id.*) Evans informed Blazer that "I've got a kid right now that I want you guys to get involved with early on in the process. When we get him, I want to just have him – you guys – meet with him ASAP before anybody does." (*Id.*) Evans added, "let me know when we need to start it," and Blazer confirmed to Evans that he would "get it rolling." (*Id.*)

After Blazer confirmed that he would be making monthly payments to Evans, Evans asked Blazer if he would be able to make occasional separate payments to Evans that he could provide to high school prospects he was recruiting to Oklahoma State University, clarifying, however, that any money that Blazer provided to Evans to assist him with recruiting players would be "totally separate" from the $2,000 monthly payments that they had previously discussed. (Compl. ¶ 56.)

On a telephone call recorded on August 3, 2016, Evans expressed concern to Blazer that although Blazer would be able to pay his portion of the monthly bribes to Evans, he was not sure if Sood would "take care of his part." (Comp. ¶ 57.) Blazer assured Evans that Sood would pay his share. Evans later added that he "just want[ed] to make sure we're squared away on the dollar amount" and requested that Blazer pay him "in small a bills as possible." (*Id.*)

The next day, on August 4, 2016, Evans and Blazer met in person in Miami, Florida. During their meeting, Evans discussed specific players that Evans could direct to sign with Blazer as future clients, including a player who Evans anticipated would be joining Oklahoma State University's basketball team for the 2017-2018 season. (Compl. ¶ 58a.) In particular, Evans stated, "Every guy I recruit and get is my personal kid . . . All right . . . The . . . 7'1" kid

4

coming in next year, you guys going to get [him]." (*Id.*) Evans went on to explain that there would be "no buffer" between the basketball players at Oklahoma State University and Sood and Blazer. Evans further promised that he would use his influence over the athletes to say "hey guys, this is what you do," referring to retaining Sood and Blazer, and added that "the parents believe in me and what I do . . . That's why I say, if I need X, so if I do take X for that, it's going to generate [business] toward you guys." (*Id.*)

Finally, in a recorded telephone conversation between Blazer and Evans that occurred on August 5, 2016, Evans emphasized how he would ensure that his players would retain Blazer and Sood. He stated, "That's why I'm like, the two grand a month, that's like what you guys going to get from me, that's, like, the guys that I recruit, even if you don't know them, they're going to be locked in regardless . . . when they say, oh, you got a . . . financial, you know, I'm . . . It's not referable to six guys. It's going to be one. And anybody else that come along . . . I'm going to bury them." (Gx. 413T.)[2]

Evans ultimately followed through on his promise to connect Blazer, Dawkins, and Sood with players he coached. With respect to Blazer, Evans arranged for him to meet Jeffrey Carroll, a player Evans coached at Oklahoma State University. The meeting occurred on February 3, 2017 in a hotel room in West Virginia, where Oklahoma State was in town for a game. (Tr. 322-323.) During the meeting, Evans vouched for Blazer, telling Carroll that "I'm so comfortable [with Blazer] that we hang out together. We coordinate meeting in Miami, meet in Arizona, meeting in California . . . . He just opened a restaurant in Pittsburgh. I just haven't been up there yet, you know what I mean." (Compl. ¶ 65c.) Blazer had not, in fact, opened a restaurant in

---

[2] Unless otherwise noted, GX references are to Government Exhibits admitted into evidence in the trial of *United States v. Christian Dawkins and Merl Code*, (S1) 17 Cr. 684 (ER).

Pittsburgh, and the extent of Blazer's relationship with Evans was that he paid him bribes at the direction of law enforcement.  Evans further touted Blazer's ability to help Carroll and instructed Carroll that Blazer would "handle [his] business advisory services when he turned pro."  (Tr. 323.)  After the meeting, Evans accepted another $2,000 cash bribe from Blazer and a pair of expensive headphones Evans had previously requested.  (Tr. 321-323.)

In regards to Dawkins,  Evans provided Christian Dawkins with Jeffrey Carroll's contact information in connection with Evans's attempt to influence Carroll to retain the sports management company Dawkins was forming at the time.  (*See* Gxs. 3, 3T, and 1627E.)

Finally, with respect to Sood, Evans arranged for Sood to meet the mother of  P.J. Dozier, a player from the University of South Carolina, in connection with Evans's attempt to influence Dozier to retain Sood as a financial advisor.  Indeed, Sood testified at trial that a few weeks prior to the 2017 National Basketball Association ("NBA") draft, Evans arranged for Sood to meet Dozier's mother in Columbia, South Carolina.  (Tr. 731.)  At that meeting, Sood talked with Dozier's mother about what he could do to help her son once he entered the NBA.  (Tr. 732.)  For facilitating Sood's meeting with Dozier's mother, Evans requested that Sood pay him $10,000.  (Tr. 733.)  Sood refused to pay Evans $10,000, but ultimately paid him $2,000.  (*Id.*)

### B. The Charges and The Defendant's Guilty Plea

Indictment 17 Cr. 684 (ER) charged Evans, Dawkins, Merl Code and two other coaches in multiple counts with participation in the bribery scheme described above.  On January 30, 2019, the defendant pleaded guilty to Count One of the Indictment, which charged conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and he also agreed to forfeiture of $22,000.  On May 8, 2019, after a two and half week trial, a jury found co-defendants Dawkins and Code guilty of conspiracy to commit bribery, and Dawkins guilty of the substantive crime of bribery.

### C. The Applicable Guidelines

As set forth in the parties' plea agreement and by the Probation Office, the base offense level is 12; a two level increase is warranted pursuant to U.S.S.G. § 2C1.1(b)(1) because the offense involved more than one bribe; a four-level increase is warranted pursuant to § 2C1.1(b)(2) because the value of the payments made to Evans exceeded $15,000 but was less than $40,000; and a three-level decrease is warranted pursuant to U.S.S.G. § 3E1.1(a) and (b) due to the defendant's acceptance of responsibility, resulting in a total offense level of 15. (PSR ¶ 66-77).  The defendant has zero criminal history points and is in Criminal History Category I. (PSR ¶ 80).  Accordingly, the applicable Guidelines range is 18 to 24 months' imprisonment. (PSR ¶ 23).

## DISCUSSION

As the Court is aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id*. at 49. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to protect the public from further crimes of the defendant.  *Id*. at 50 & n.6.

Here, a Guidelines sentence is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and

7

characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

   A. The Nature and Seriousness of the Offense

With respect to the nature and circumstances of the offense, the defendant's conduct was serious. At its core, it involved a blatant disregard for the trust placed in Evans by his employers and his players. For thousands of dollars and the promise of more, Evans was willing to take actions that were in direct conflict with his duties as an NCAA Division 1 men's basketball coach; could subject his universities to significant penalties; and, most importantly, reflected a wanton disregard for the well-being of the very student-athletes he was charged with supervising. Indeed, in exchange for the bribe money, Evans was willing to instruct his players to hire a financial advisor who had been publicly accused by the United States Securities and Exchange Commission of misappropriating his clients' money. (*See* Tr. 324-325.) Receiving any single bribe payment in itself is serious and merits punishment. In this case, Evans received multiple bribes, over time, as part of an ongoing corrupt arrangement in which he was expected to – and manifested a clear willingness to – pressure his players to retain unsavory advisors. That conduct, and the cavalier ease with which Evans engaged in it – merits more than token punishment.

Tellingly, Evans does not directly address the seriousness of his conduct in his sentencing submission. Instead, Evans merely highlights the fact that he has lost his job as a result of his conviction and that his co-defendants, Christian Dawkins and Merl Code, were both sentenced to six months in prison after having been convicted in a separate case related to basketball

corruption, *United States* v. *Gatto et al*, 17 Cr. 686 (LAK). (Def.'s Br. 11-12.) But the fact that the defendant lost his job for committing a federal crime, especially one against his former employer, is unremarkable, undistinguishable from nearly every other case, and only supports the idea that his conduct was indeed serious. And the fact that Evans's co-defendants, Dawkins and Code, received a sentence of six months for committing a different crime in a different case is of no moment and says nothing of the seriousness of the crime at issue here. Indeed, while the conduct exposed in the *Gatto* trial was egregious in its own right, none of that conduct involved the charged defendants themselves pocketing bribes. By contrast, here, Evans and the other charged coaches were fiduciaries of the universities and students entrusted to their care and shamelessly abused their duties for their own personal profit.

For the same reason, Evans's argument that "the organizers of this bribery scheme were Christian Dawkins and Merl Code" (Def.'s Br. 11) is unpersuasive. It is true that Dawkins and Code attempted to bribe multiple coaches. But it was Evans and the other coaches – not Dawkins or Code – who broke duties and breached relationships of trust. At least in that respect – though not necessarily in all respects – Evans's conduct was more egregious than that of Dawkins and Code.

  B.  <u>Deterrence</u>

With respect to deterrence, in imposing a Guidelines sentence, the Court will send a clear message that taking bribes as a college basketball coach of a university receiving federal funding is not only wrong, but will carry significant consequences. The series of cases, this one among them, charged by the Government in 2017 makes clear that such a message is necessary if the justice system is to have any impact on corruption in college athletics. And it is particularly necessary to deter coaches from taking bribes to sell out their players. The non-incarceratory

sentence sought by the defendant would have a substantially diminished deterrent impact on an industry in need of one.

The defendant claims, in sum and substance, that the mere fact that he was prosecuted, required to pay restitution, lost his "credit worthiness," and lost his ability to coach at an NCAA school is adequate deterrence to other individuals engaging in similar conduct. (Def.'s Br. 13.) To be sure, the collateral consequences white-collar defendants oftentimes face as a result of their convictions should be enough to deter others from committing similar crimes. But they rarely are. Indeed, the collateral consequences the defendant cites are no different than those typically associated with those found guilty of participating in a federal funds bribery conspiracy, and yet Evans himself was not deterred from participating in one. Something more is required to adequately deter others from committing conduct similar to that of the defendant. The Government submits that a Guidelines sentence would be sufficient but not greater than necessary to create such a deterrent effect.

## CONCLUSION

For the aforementioned reasons, the Government respectfully submits that a Guidelines sentence is appropriate.

Dated: New York, New York
May 31, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: s/ Robert L. Boone
Robert L. Boone
Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys
(212) 637-2208/2473/2431