```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          17 CR 684 (ER)

 5   CHRISTIAN DAWKINS AND MERL
     CODE ,
 6                                                Trial

 7              Defendants.
     ------------------------------x

 8                                      New York, N.Y.
                                        May 3, 2019
 9                                      9:00 a.m.

10   Before:

11                    HON. EDGARDO RAMOS

12                                      District Judge

13                         APPEARANCES

14   GEOFFREY S. BERMAN
          United States Attorney for the
15        Southern District of New York
     ROBERT L. BOONE
16   NOAH D. SOLOWIEJCZYK
     ELI J. MARK
17        Assistant United States Attorneys

18   HANEY LAW GROUP PLLC
          Attorney for Defendant Dawkins
19   BY:  STEVEN A. HANEY, SR.

20   CHANEY LEGAL SERVICES, LLC
     BY:  DAVID A. CHANEY, JR.
21               -and-
     NEXSEN PRUET, LLC
22   BY:  ANDREW A. MATHIAS
          MARK C. MOORE
23        Attorneys for Defendant Code

24   ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
                     YOLANDA BUSTILLO, Paralegal Specialist USAO
25                   EMILY GOLDMAN, Paralegal Specialist USAO
```

1    (Trial resumed; jury not present)

2    THE COURT:  Good morning, everyone.  It's 9 o'clock.

3    The only bit of news that I have is that we received a

4    telephone call from Alternate No. 2 indicating that her train

5    was delayed.  She said she hoped to be here by 9:30, but

6    couldn't promise that she'd be here exactly at 9:30.

7    Any business from either side?

8    MR. BOONE:  Not from the government.

9    MR. HANEY:  No, your Honor.

10   MR. CHANEY:  No, Judge.

11   THE COURT:  That is the right answer at this stage.

12   So we'll await the jury.

13   (Recess)

14   THE COURT:  We're waiting on one juror.

15   MR. MOORE:  Your Honor, could I put one thing on the

16   record while we wait?

17   THE COURT:  Sure.

18   MR. MOORE:  I very much appreciate, as does Mr. Code,

19   your excusing me from deliberations.  I would just put on the

20   record that also present, although not sitting at counsel table

21   with us, is Mr. Code's father.  Mr. Code's father is a seasoned

22   attorney, more seasoned than I, and he will be here during

23   deliberations for strategic and other decisions.  I just

24   thought I should put that on the record.

25   THE COURT:  And I think Mr. Code Sr. is counsel of

1    record as well.

2         MR. MOORE:  He is, yes, sir, your Honor, he was.

3         MR. CODE SR.:  Yes, sir, when I heard Mark might have

4    to go back to deliberate, I thought I may be able to do the

5    closings.  I was disappointed.

6         THE COURT:  Will you be ready this afternoon?

7         (Jury present)

8         THE COURT:  Everyone please be seated.

9         Good morning, ladies and gentlemen.  I trust you all

10   had a pleasant evening, and thank you, as always, for being so

11   prompt.

12        What we're going to do now, and this is actually a

13   little bit nontraditional, rather than having the lawyers'

14   summations first followed by the instructions, the parties have

15   agreed that I provide the instructions first in this case

16   because there are some issues that will -- the parties believe

17   will help you understand the arguments that they make that will

18   be in the instructions.

19        Now, you each have a copy of the instructions in the

20   binder that was put on your chairs.  I don't believe that you

21   will need the larger binder with the transcripts.  So if you

22   want to make yourselves more comfortable, you can put those to

23   the side.

24        The jury instructions are a very important part of any

25   trial.  The words that are actually used are very important to

1   your determination as to what the outcome of the case will

2   ultimately be, and therefore, it is traditional that the charge

3   is read to the jury by the judge.

4          You have a copy of it.  A couple of things about that.

5   You will also have a copy of the instructions when you

6   deliberate, so there's no need for you to try to memorize

7   anything or take notes on anything else, of course, you want

8   to.  Also, you don't have to read along as I read it.  You can

9   if you wish, but if you just want to sit and listen, that's

10  fine.

11         The other thing is the instructions themselves are 64

12  pages.  If history is a guide, I will likely be finishing

13  somewhere between an hour and a half to two hours.

14         Also, you should be aware that I believe sincerely

15  that I have a lovely lilting, mellifluous voice.  However, I

16  understand that is subject to great disagreement, which is to

17  say that if, as I am reading, you grow weary of my droning on,

18  I will not take offense if you stand up and stretch.

19         With that, members of the jury, we have almost reached

20  that point where you're about to begin your final function as

21  jurors which, as you all appreciate, is one of the most

22  important duties of citizenship in this country.

23         My instructions to you will be in four parts.  First,

24  I will give some introductory instructions about the role of

25  the Court and of the jury and about the presumption of

innocence and the government's burden of proof.  Second, I will

describe the charges and the law governing those charges, which

you will apply to the facts as you find them to be established

by the proof.  Third, I will give you instructions concerning

the evaluation of evidence.  And the fourth and final section

of these instructions will relate to your deliberations.

I will first describe the role of the Court and of the

jury.

It is my duty to instruct you as to the law, and it is

your duty to accept these instructions of law and apply them to

the facts as you determine them.  If an attorney stated a legal

principle different from any that I state to you in my

instructions, it is my instructions you must follow.  You

should not single out any instruction as alone stating the law,

but you should consider my instructions as a whole when you

retire to deliberate.  You should not be concerned about the

wisdom of any rule that I state.  Regardless of any opinion

that you may have about what the law may be or ought to be, it

would be a violation of your oath to base your verdict on any

view of the law other than that which I give you.

You, the members of the jury, are the sole and

exclusive judges of the facts.  You pass on the evidence,

determine the credibility of witnesses, resolve such conflicts

as there may be in the testimony, draw whatever reasonable

inferences you decide to draw from the facts as you determine

them, and determine the weight of the evidence.  In doing so,

remember that you took an oath to render judgment impartially

and fairly, without prejudice or sympathy or fear, based solely

on the evidence and the applicable law.

The fact that the prosecution is brought in the name

of the United States of America entitles the government to no

greater consideration than that given to any other party to

this litigation.  By the same token, the government is entitled

to no less consideration.

The defendants, Christian Dawkins and Merl Code, have

pleaded not guilty and have denied every charge against them.

That means the government has the burden to prove them guilty

beyond a reasonable doubt.  That burden of proof never shifts

to Mr. Dawkins or Mr. Code.  A defendant in a criminal case

never has the burden to call any witnesses or produce any

evidence.  Even though Mr. Dawkins and Mr. Code have presented

evidence in their defense, it is not their burden to prove

themselves not guilty.  It is always the government's burden to

prove each of the elements of the crimes charged beyond a

reasonable doubt.

In other words, Mr. Dawkins and Mr. Code start with a

clean slate.  They are presumed innocent of all the charges

against them, and they must be presumed innocent by you

throughout your deliberations until such time, if ever, that

you as a jury unanimously find that the government has proven

them guilty beyond a reasonable doubt.  The presumption of
innocence alone requires you to acquit Mr. Dawkins and Mr. Code
if the government fails to prove them guilty beyond a
reasonable doubt.

        Since, in order to convict the defendants of a given
charge, the government is required to prove that charge beyond
a reasonable doubt, the question is what is a reasonable doubt?
The words almost define themselves.  It is a doubt based upon
reason.  It is doubt that a reasonable person has after
carefully weighing all the evidence.  It is a doubt that would
cause a reasonable person to hesitate to act in a matter of
importance in his or her personal life.  Proof beyond a
reasonable doubt must, therefore, be proof of a convincing
character that a reasonable person would not hesitate to rely
upon in making an important decision.

        A reasonable doubt is not caprice or whim.  It is not
speculation or suspicion.  It is not an excuse to avoid the
performance of an unpleasant duty.  The law does not require
that the government prove guilt beyond all possible doubt.
Proof beyond a reasonable doubt is sufficient to convict.

        If, after fair and impartial consideration of the
evidence, you have a reasonable doubt as to the defendant's
guilt with respect to a particular charge against him, you must
find the defendant not guilty of that charge.  On the other
hand, if, after a fair and impartial consideration of all the

evidence, you are satisfied beyond a reasonable doubt of the
defendant's guilt with respect to a particular charge against
him, you should find the defendant guilty of that charge.

Let us now turn to the specific charges in the
indictment.  I remind you that the indictment itself is not
evidence.  It merely describes the charges made against the
defendants, Christian Dawkins and Merl Code.  It is an
accusation.  It may not be considered by you as any evidence of
the guilt of either defendant.  Each charge is called a count.
Before you begin your deliberations, you will be provided with
a copy of the indictment.  I will summarize the offenses
charged in the indictment and then explain in detail the
elements of each offense.

The indictment contains six counts.  Each count must
be considered separately.

Count One charges that Mr. Dawkins and Mr. Code
engaged in a conspiracy to give and offer bribes or gratuities
to agents of a federally funded organization -- specifically,
certain men's college basketball coaches employed by federally
funded universities -- in violation of Title 18, United States
Code, Section 371.

Count Two charges that Mr. Dawkins and Mr. Code
committed the substantive crime of giving and offering bribes
or gratuities to agents of federally funded organizations --
specifically, certain men's college basketball coaches employed

1 by federally funded universities -- in violation of Title 18 of

2 the United States Code, Sections 666(a)(2) and 2.

3       Count Three charges Mr. Dawkins and Mr. Code with

4 participating in a conspiracy to commit honest services wire

5 fraud, in violation of Section 1349 of Title 18 of the United

6 States Code, in connection with their alleged participation in

7 a scheme to make bribe payments to men's college basketball

8 coaches employed by certain universities with the intent to

9 deprive those universities of the honest services of these

10 coaches.

11       Count Four applies to Mr. Dawkins alone and charges

12 that he committed the substantive crime of honest services wire

13 fraud, in violation of Title 18, United States Code, Section

14 1343, 1346, 1349, and 2, in connection with his alleged

15 participation in a scheme to make bribe payments to a men's

16 college basketball coach, Lamont Evans, with the intent to

17 deprive the University of South Carolina and Oklahoma State

18 University, respectively, of their right to honest services of

19 its employees.

20       Count Five applies to Mr. Dawkins alone and charges

21 that he committed the substantive crime of honest services wire

22 fraud, in violation of Title 18, United States Code, Section

23 1343, 1346, 1349, and 2, in connection with his alleged

24 participation in a scheme to make bribe payments to a men's

25 college basketball coach, Emanuel Richardson, with the intent

1  to deprive the University of Arizona of its right to the honest

2  services of its employee.

3        Count Six charges Mr. Dawkins and Mr. Code with

4  participating in a conspiracy to violate the Travel Act by

5  traveling in interstate commerce or using facilities in

6  interstate commerce to promote, manage, establish, carry on,

7  and facilitate commercial bribery, in violation of Section 371

8  of Title 18 of the United States Code, in connection with their

9  alleged participation in a scheme to pay bribes to certain

10  men's college basketball coaches employed by certain

11  universities.

12        Both defendants have pleaded not guilty to these

13  charges.

14        The indictment contains a total of six counts.  Each

15  count charges at least one defendant before you with a crime.

16  However, not every defendant is charged in every count.  You

17  must, as a matter of law, consider each count and each

18  defendant separately, and you must return a separate verdict on

19  each defendant for each count in which he is charged.

20        Whether you find one defendant guilty or not guilty as

21  to an offense should not affect your verdict as to the other

22  defendants charged with the same offense.  In reaching your

23  verdict, bear in mind that guilt is personal and individual.

24  Your verdict of guilty or not guilty must be based solely on

25  the evidence about each defendant.  The case against each

defendant on each count stands or falls upon the proof or lack

of proof against that defendant alone, and your verdict as to

any defendant on any count should not control your decision as

to any other defendant or any other count.  No other

considerations are proper.

As I just mentioned, some counts of the indictment

charge the defendants with the crime of conspiracy.  Other

counts charge what we call substantive crimes.  Though I will

give more detail later, let me briefly summarize the difference

now.

A conspiracy count is different from a substantive

count.  A conspiracy charge, generally speaking, alleges that

two or more persons agreed to accomplish an unlawful objective.

The focus of a conspiracy count, therefore, is on whether there

was an unlawful agreement.  There can be no conspiracy unless

at least two people reached such an agreement, whether express

or implied.

A substantive count, on the other hand, charges a

defendant with the actual commission or with aiding and

abetting or causing the actual commission of an offense.  A

substantive offense, therefore, may be committed by a single

person, and it need not involve any agreement with anyone.  A

conspiracy to commit a crime is an entirely separate and

different offense from a substantive crime, the commission of

which may be an object of the conspiracy.  Since the essence of

1    the crime of conspiracy is an agreement or understanding to

2    commit a crime, it does not matter if the crime, the commission

3    of which was an objective of the conspiracy, was ever

4    committed.  In other words, if a conspiracy exists and certain

5    other requirements are met, it is punishable as a crime even if

6    its purpose is not accomplished.  Consequently, in a conspiracy

7    charge, there is no need to prove that the crime or crimes that

8    were the objective or objectives of the conspiracy actually

9    were committed.  To give you a simple example, if two people

10   agree to hold up a liquor store and do something to put the

11   agreement into motion, they have committed the crime of

12   conspiracy to commit robbery even if they never robbed the

13   liquor store.

14          By contrast, conviction on a substantive count

15   requires proof that the crime charged actually was committed or

16   attempted, but does not require proof of an agreement.  To take

17   the liquor store example, there can be no substantive crime of

18   robbery unless the liquor store actually is robbed.  Of course,

19   if a defendant both participates in a conspiracy and commits

20   the crime or crimes that were the object or objects of the

21   conspiracy, that defendant may be guilty of both the conspiracy

22   and a substantive crime or crimes.

23          Of the six counts in this indictment, three of them

24   are substantive counts and three are conspiracy counts.

25          You will note that the indictment alleges that certain

1   acts occurred on or about various dates.  It is not necessary,

2   however, for the government to prove that the alleged crimes

3   were committed on exactly those dates.  The law requires only

4   that the government prove beyond a reasonable doubt a

5   substantial similarity between the dates and months alleged in

6   the indictment and the dates and months established by the

7   evidence.

8           It is also not essential that the government prove

9   that the charged crimes started and ended at those times

10  specified in the indictment.  It is sufficient if you find that

11  the conspiracies and substantive crimes charged existed for

12  some of the time within the period set forth in the indictment.

13          Count Two:  Bribery

14          Let us now turn to the charges against Mr. Dawkins and

15  Mr. Code.  As I noted earlier, Count One charges the defendants

16  with conspiracy to commit bribery, but we will first discuss

17  Count Two, which charges the defendants with the substantive

18  crime of bribery, as this will simplify our subsequent

19  discussion of the conspiracy count.  Count Two charges

20  defendants Dawkins and Code with paying bribes and illegal

21  gratuities in connection with a federally funded program.

22  Specifically, in Count Two, the defendants are charged with

23  paying bribes and gratuities to men's college basketball

24  coaches intending to influence and reward those coaches in

25  connection with the college basketball programs of the

university that he employed them.

To meet its burden of proof as to Count Two, the government must establish beyond a reasonable doubt each of the following elements:

First, that between in or about 2016 and in or about September 2017, the defendant you are considering gave, offered, or agreed to give a thing of value to a men's college basketball coach or to a person designated by that men's college basketball coach;

Second, when the defendant you are considering did so, he acted corruptly, with the intent to influence or reward the men's college basketball coach with respect to the business or transaction or series of transactions of the university that employed that men's college basketball coach;

Third, that the value of the business or transaction to which the payment related was at least $5,000;

Fourth, that during the time period alleged in the indictment, that is, in or about 2016 to September 2017, any men's basketball coach who allegedly received payments from, or as facilitated by, the defendant you are considering was, in fact, an agent of his university; and

Fifth, that within a one-year period between in or about 2016 and in or about September 2017, the university that employed any men's college basketball coach who allegedly received payments from, or as facilitated by, the defendant you

1    are considering, received federal funds in excess of $10,000.

2         Now, some of the words and phrases you just heard have

3    special meanings under the law.  I will now go through each of

4    these elements in more detail to help explain what each element

5    means, including the words with specialized meaning.  When you

6    are applying the elements I just listed, you must use the

7    definitions of the words I instructed you to use.

8         The first element that the government must prove

9    beyond a reasonable doubt is that the defendant you are

10   considering gave, offered, or agreed to give a thing of value

11   to the men's college basketball coach as alleged in the

12   indictment.

13        The statute makes no distinction between giving,

14   offering, or agreeing to give a thing of value.  It is not

15   necessary that the payment have been made directly to the men's

16   college basketball coach.  Rather, it is sufficient that the

17   payment was made to a third party at the men's college

18   basketball coaches direction and for that men's basketball

19   coach's benefit.

20        The second element the government must prove beyond a

21   reasonable doubt is that the defendant you are considering,

22   knowing that the relevant men's basketball coach was an agent

23   of his university, gave, offered, or agreed to give something

24   of value corruptly with the intent that the men's college

25   basketball coach be influenced or rewarded in connection with

1    some business or transaction of that coach's university.

2         Let me define some of these terms, because they have

3    particular legal meanings.

4         To act corruptly means to act voluntarily and

5    intentionally with an improper motive or purpose to influence

6    or reward an agent of an organization in connection with some

7    business or transaction of that agent's organization, here, the

8    universities.  This involves conscious wrongdoing, or as it has

9    sometimes been expressed, a bad or evil state of mind.

10        The business or transaction that the defendant you are

11   considering sought to influence does not have to relate to

12   federal funding.  In other words, while you must find that the

13   university that employed the relevant men's basketball coach

14   received more than $10,000 in federal benefits, the defendants

15   need not have paid, offered, or agreed to offer bribes as to

16   any business or transaction having to do with the federal

17   funding.  Further, the phrase "business or transaction" is not

18   limited to transactions or to commercial business of the

19   universities, but includes intangible aspects of the business

20   of the organization.  Allow me to give you a concrete example.

21   If an individual was charged with paying bribes to a prison

22   guard at a federally funded facility in exchange for that

23   prison guard allowing otherwise impermissible conjugal visits,

24   these payments could be intended to influence the prison guard

25   in connection with some business or transaction of the prison

1  facility because enforcement of prison rules was a component of

2  the business of the prison.

3         Here, the government argues that the defendants

4  offered or agreed to give something of value corruptly with the

5  intent that the men's college basketball coach be influenced or

6  rewarded in connection with some business or transaction of

7  that coach's university, namely, the operation and

8  administration of the university's men's basketball program.

9         The party giving a thing of value may have a different

10 intent from the party receiving it.  Therefore, you must decide

11 the intent of the giver separately from the intent of the

12 recipient.  In considering this element, remember that it is

13 the defendant's intent at least in part to influence the

14 relevant men's college basketball coach's action which is

15 important, not the subsequent actions of the men's college

16 basketball coach.  Thus the government does not have to prove

17 that the relevant men's college basketball coach accepted the

18 bribe offer or that the bribe actually influenced him in

19 connection with some business or transaction of his university.

20 It is not a defense if the men's college basketball coach that

21 received the payment would have lawfully performed the action

22 in question even without having accepted the thing of value.

23 It is not even necessary that the men's college basketball

24 coach who received the payment had the authority to perform the

25 act which the defendant you are considering sought.  Also, if

1   you find that the defendant you are considering acted with the

2   intent to reward the relevant men's college basketball coach

3   for a decision already made, it does not matter that the

4   payment was not made or offered until after the business or

5   transaction occurred.

6          I have just said that the government must prove beyond

7   a reasonable doubt that the defendant must have intended the

8   men's college basketball coach he gave money to be influenced

9   or rewarded.  There is an important distinction between the

10  intent to influence and the intent to reward, although each is

11  a theory under which the government can satisfy its burden of

12  proof on this element.  The intent to influence is known as a

13  bribery theory.  The intent to reward is known as a gratuity

14  theory.  Let me explain how they are different.

15         To satisfy its burden of proof under a bribery theory,

16  the government must prove that the defendant you are

17  considering intended to engage in a *quid pro quo*, i.e., "this

18  for that."  Specifically, the government must prove that the

19  defendant you are considering gave, offered, or agreed to give

20  a thing of value to the men's college basketball coach in

21  exchange for the promise or performance of an act in connection

22  with some business of the university that employed that coach.

23  The government does not have to prove that at the time the

24  defendant you are considering gave, offered, or agreed to give

25  a thing of value to the coach that the coach promised to

1  perform a particular act.  It is sufficient if the defendant

2  intended that the coach would, in exchange for the payment, be

3  influenced in connection with some business or transaction of

4  his university as specific opportunities arose.

5       By contrast, to satisfy its burden of proof under a

6  gratuity theory, the government must prove that the defendant

7  you are considering gave, offered, or agreed to give a thing of

8  value as a reward for some future or past action.

9       Under a gratuity theory, the government does not need

10  to show that the defendant intended a *quid pro quo* -- a "this

11  for that" -- but there must still be a link between the thing

12  of value that was paid and the specific act for which, or

13  because of which, the thing of value was paid.  Put

14  differently, even under a gratuity theory, it is not sufficient

15  to show that a payment was given to a coach just because he

16  generally had authority over a matter in which the payer had an

17  interest.  Instead, the government must prove that there was a

18  link between the payment and a specific act was taken or to be

19  taken by the coach.

20       Under the gratuity theory, if you find that the

21  defendant you are considering gave, offered, or agreed to give

22  a payment as a reward for an act that had already been

23  completed, it does not matter that the payment was offered,

24  given, or agreed to be given after the act occurred.

25  Similarly, under this theory, if you find that the payment was

given, offered, or agreed to be given as a reward for an act that would be completed in the future, it does not matter that the payment was given, offered, or agreed to be given before the act was to occur.

In sum, to convict on a bribery theory, you must find beyond a reasonable doubt that the defendant you are considering had the intent to influence the men's college basketball coach in connection with some business or transaction of that coach's university. To convict on a illegal gratuities theory, you must find beyond a reasonable doubt that the defendant you are considering had the intent to reward the men's college basketball coach in connection with some business or transaction of that coach's university.

The government can satisfy this element under either a bribery theory or a gratuity theory. It need not prove both. You must, however, be unanimous on the same theory in order to find that this element has been proven.

The third element that the government must prove beyond a reasonable doubt is that the value of the business or transaction to which the corrupt payment related was at least $5,000. This element does not require that the government prove that the defendant you are considering gave or offered at least $5,000. It is the value of the business or transaction which the payment related to that is important for this element, although you may consider evidence of the value of the

1   payment offered in determining the value of the business or

2   transaction.

3          The fourth element the government must prove beyond a

4   reasonable doubt is that at the time alleged in the indictment,

5   in or about 2016 to in or about 2017, any men's college

6   basketball coach who received a payment from, or as facilitated

7   by, the defendant you are considering was, in fact, an agent of

8   the university that employed him.

9          An agent is a person who is authorized to act on

10   behalf of his organization.  Employees are considered agents of

11   the organizations that employs them.

12          The fifth element the government must prove beyond a

13   reasonable doubt is that the university that employed any men's

14   basketball coach who received a payment from, or as facilitated

15   by, the defendant you are considering received federal funds in

16   excess of $10,000 within a continuous one-year period.  That

17   one-year period must begin no more than 12 months before the

18   defendant you are considering committed the offense and end no

19   more than 12 months after he committed the offense.

20          In this case, there is no dispute that the

21   universities at issue received federal funds in excess of

22   $10,000 within a continuous one-year period.  I therefore

23   instruct you that the fifth element is satisfied.

24          I will now turn to Count One of the indictment which

25   charges both Mr. Dawkins and Mr. Code with participating in a

conspiracy to pay bribes or illegal gratuities to men's college

basketball coaches employed by various universities.

A conspiracy is a kind of criminal partnership, a

combination or agreement of two or more persons to join

together to accomplish some unlawful purpose.  The crime of

conspiracy to pay bribes or illegal gratuities as charged in

Count One of the indictment is an offense independent from the

offense of actually paying bribes or illegal gratuities.  That

is, a conspiracy to violate a law is separate and distinct from

the actual violation of any specific federal laws.  The actual

violation of any specific federal laws is referred to as a

substantive crime.  Count Two, which I just described moments

ago, is a substantive crime.

Congress has deemed it appropriate to make

conspiracies, standing alone, a separate crime, even if the

object of the conspiracy is not achieved.  This is because

collective criminal activity is believed to pose a greater

threat to the public safety and welfare than individual conduct

and increases the likelihood of success of a particular

criminal venture.

The defendants are both charged with both conspiracy

to pay bribes or illegal gratuities and with the substantive

crimes of paying bribes or illegal gratuities.  Given that a

conspiracy and a substantive crime are distinct and independent

offenses, you may find that the defendant you are considering

guilty of the crime of conspiracy even if you find that he

never actually committed the substantive crime that was the

object or goal of the conspiracy.  By the same token, you can

find the defendant guilty of committing the substantive crime

or crimes with which he is charged, here, paying bribes or

illegal gratuities, even if you find him not guilty of

conspiracy to pay bribes or illegal gratuities.

In order for you to find the defendant guilty of the

conspiracy charged in Count One, the government must prove

beyond a reasonable doubt the following elements:

First, the existence of the conspiracy charged, that

is, an agreement or understanding to violate certain laws of

the United States;

Second, that the defendant you are considering

knowingly and willfully became a member of the conspiracy

charged; and

Third, that any of the conspirators -- not necessarily

the defendant you are considering, but rather any member of the

conspiracy -- knowingly committed at least one overt act in

furtherance of the conspiracy during the life of the

conspiracy.

Some of the words or phrases you have just heard have

special meanings under the law.  I will now go through each of

these elements in more detail to help explain what each element

means, including the words with specialized meaning.  When you

1    are applying the elements I just listed, you must use the

2    definitions of words I instruct you to use.

3          The first element that the government must prove

4    beyond a reasonable doubt is the existence of the conspiracy.

5    Simply defined, a conspiracy is an agreement by two or more

6    persons to violate the law.  The object of the conspiracy is

7    the illegal goal the coconspirators agree or hope to achieve.

8    In this case, the unlawful object of the conspiracy charged in

9    Count One is paying bribes or illegal gratuities to men's

10   college basketball coaches intending to influence and reward

11   those coaches in connection with the business of their

12   respective universities.  I have previously instructed you on

13   the elements of paying bribes or illegal gratuities in

14   describing Count Two, and you should apply those definitions

15   here in considering whether the government has proved beyond a

16   reasonable doubt that the conspiracy charged in Count One

17   existed.

18          As I have just stated, a conspiracy is an agreement by

19   two or more persons to violate the law.  To establish a

20   conspiracy, the government is not required to show that two or

21   more persons sat around a table and entered into a solemn pact,

22   orally or in writing, stating that they have formed a

23   conspiracy to violate the law and setting forth all the details

24   of the plans and the means by which the unlawful object is to

25   be carried out or the part to be played by each conspirator.

Indeed, it would be extraordinary if there were such a formal

document or specific oral agreement.  When people agree to

enter into a criminal conspiracy, much is left to unexpressed

understanding.  Since conspiracy, by its very nature, is

characterized by secrecy, it is rare that a conspiracy can be

proven by direct evidence of that explicit agreement.  Express

language or specific words are not required to indicate assent

or attachment to a conspiracy.  Nor is it required that you

find that any particular number of alleged coconspirators

joined in the conspiracy to find that a conspiracy existed.

Instead, you may infer the existence of a conspiracy

from the circumstances of this case, including all of the

evidence of the acts, conduct, and statements of the alleged

coconspirators and the reasonable inferences to be drawn from

such evidence.  Often, the only evidence available is that of

disconnected acts that, when taken together in connection with

each other, show a conspiracy or agreement to secure a

particular result as satisfactorily and conclusively as more

direct proof.  You may also consider acts and conduct of the

alleged coconspirators that are done to carry out an apparent

criminal purpose.  Proof concerning the accomplishment of the

objects of the conspiracy may be evidence of the existence of

the conspiracy itself.

However, it is not necessary that the conspiracy

actually succeeded in its purpose in order for you to conclude

that the conspiracy existed.  As I said, the essence of the crime of conspiracy is the unlawful combination or agreement to violate the law.  The actual success of the conspiracy, or the actual commission of the crime that is the object of the conspiracy, is not material to the question of guilt or innocence of the coconspirator, for a conspiracy is a crime entirely separate and distinct from the substantive crime that may be the goal of the conspiracy.

In order for a defendant to be guilty of a conspiracy, he must have conspired with at least one true coconspirator. It is not enough for the government to show that the defendant you are considering agreed only with an undercover agent or government informant to commit the underlying offense, for there is no agreement on a common purpose in such cases.  Some other person who was not an undercover agent or government informant must have entered into the unlawful agreement with the defendant in order for a conspiracy to exist.

The second element that the government must prove beyond a reasonable doubt is that the defendant you are considering knowingly and willfully became a member of the conspiracy charged.

To act knowingly means to act intentionally and voluntarily and not because of ignorance, mistake, accident or carelessness.

To act willfully means to act voluntarily and with a

1 | wrongful purpose.

2 | Therefore, in deciding whether the defendant you are

3 | considering became a member of the conspiracy, you must

4 | consider whether the defendant intentionally and voluntarily

5 | joined a conspiracy knowing its unlawful purpose and with the

6 | intent of furthering the conspiracy's objective.

7 | You must determine whether the defendant you are

8 | considering had the required knowledge and willfulness based on

9 | the facts proved during the trial. To knowingly and willfully

10 | become a member of the conspiracy, the defendant you are

11 | considering need not have known the identities of each and

12 | every other member, nor need he have been apprised of all of

13 | their activities. Moreover, the defendant you are considering

14 | need not have been fully informed as to all the details or the

15 | scope of the conspiracy in order to justify an inference of

16 | knowledge on his part. The defendant must, however, have

17 | agreed to participate in a conspiracy charged with knowledge of

18 | its object. Here, as I stated, the object of the alleged

19 | conspiracy was to pay bribes or illegal gratuities to men's

20 | college basketball coaches employed by various universities.

21 | The extent of a defendant's participation has no

22 | bearing on the issue of a defendant's guilt. A conspirator's

23 | liability is not measured by the extent or duration of his

24 | participation. Indeed, each member may perform separate and

25 | distinct acts and may perform them at different times. Some

1  conspirators play major roles, while others play minor parts in

2  the scheme.  An equal role is not what the law requires.  In

3  fact, even a single act may be sufficient to draw a defendant

4  within the ambit of the conspiracy.  If you determine that the

5  defendant you are considering became a member of the

6  conspiracy, the duration and extent of the defendant's

7  participation has no bearing on the issue of the defendant's

8  guilt.  He need not have joined a conspiracy at the outset.  He

9  may have joined it at any time -- at the beginning, in the

10 middle, or at the end.

11         However, I want to caution you that a person's mere

12 association with a member of the conspiracy does not make that

13 person a member of the conspiracy, even when that association

14 is coupled with knowledge that a conspiracy is occurring.  In

15 other words, knowledge of a conspiracy without agreement to

16 participate in it is not sufficient.  What is necessary is that

17 a defendant participated in the conspiracy with knowledge of

18 its unlawful purpose and with an intent to aid in the

19 accomplishment of its unlawful purpose.

20         The third element is the requirement of an overt act.

21 To sustain its burden of proof with respect to the conspiracy

22 charged in Count One of the indictment, the government must

23 show beyond a reasonable doubt that at least one overt act was

24 committed in furtherance of that conspiracy by at least one of

25 the coconspirators, not necessarily the defendants.  Please

keep in mind that undercover agents are not coconspirators to a

conspiracy, and their conduct cannot satisfy the overt act

element of this charge.

        An overt act is any outward, objective action intended

to help achieve the object of the conspiracy.  An overt act

itself can be entirely innocent and legal, but it must

contribute to the goals of the conspiracy.

        Count One of the indictment contains a section

entitled "Overt Acts."  These overt acts are examples of

conduct alleged to have been undertaken by members of the

conspiracy to promote the illegal objectives of the conspiracy.

The overt acts are alleged are as follows:

        Now, ladies and gentlemen, I will read from the

indictment.  You will have the indictment during your

deliberations.

        Paragraph 43:  In furtherance of this conspiracy, and

to effect the illegal objects thereof, the following overt

acts, among others, were committed in the Southern District of

New York and elsewhere:

        A.  On or about March 3, 2016, in South Carolina,

Christian Dawkins, the defendant, the defendants Evans, Sood,

and CW-1 met, during which meeting Evans, Dawkins, Sood, and

CW-1 discussed, in sum and substance, that Evans could direct

and influence certain student athletes that Evans coached at

the University of South Carolina to retain the services of

Dawkins, Sood, and CW-1.

B.   On or about June 20, 2017, a meeting that had been arranged for by Dawkins occurred in Manhattan, New York, between Richardson, Sood, CW-1, and UC-1, among others, during which Richardson received a cash bribe of $5,000.

C.   On or about June 20, 2017, Merl Code, the defendant, Dawkins, Sood, CW-1, and UC-1, among others, met in Manhattan, New York, during which meeting Code received a cash payment of $5,000 and agreed to identify and make introductions to certain corrupt men's college basketball coaches that would be willing to accept bribe payments in exchange for steering certain of their student athletes to retain the services of the company being formed by Dawkins, Sood, and UC-1.

D.   On or about July 29, 2017, a meeting arranged by Code occurred in Las Vegas, Nevada, between Dawkins, Bland, CW-1, and UC-1, among others, during which Bland discussed steering student athletes under his control to retain the services of the company being formed by Dawkins, Sood, and UC-1, and after which Dawkins paid Bland a cash bribe.

E.   On or about July 28, 2017, a meeting arranged by Code occurred in Las Vegas, Nevada, between Dawkins, Coach-1, CW-1, and UC-1, among others, during which Coach-1 discussed steering student athletes under his control to retain the services of Dawkins' company, and UC-1 paid Coach-1 a $6,000 cash bribe.

1    F.   On or about July 28, 2017, Dawkins, Coach-2, CW-1,

2  and UC-1, among others, met in a hotel room in Las Vegas,

3  Nevada, to discuss Coach-2's steering of student athletes under

4  his control to retain the services of Dawkins' company.  During

5  the meeting, UC-1 paid Coach-2 a $6,000 cash bribe.

6        In order for the government to satisfy this element,

7  it is not required that all of the overt acts alleged in the

8  indictment or even any of the overt acts contained in the

9  indictment be proven.  You may find that another overt act that

10  is not described in the indictment was committed.  As a jury,

11  you need not reach unanimous agreement on whether a particular

12  overt act was committed in furtherance of the conspiracy; you

13  just need to all agree that at least one overt act was so

14  committed.

15        The overt act need not have been committed at

16  precisely the times alleged in the indictment.  It is

17  sufficient if you are convinced beyond a reasonable doubt that

18  it occurred at or about the time and place stated, as long as

19  it occurred while the conspiracy was still in existence.

20        Now, indictment alleges that the conspiracy in Count

21  One existed from at least in or about 2016, up to and including

22  about September 2017.  It is not essential that the government

23  prove that the conspiracy alleged started and ended within the

24  specific time period.  Indeed, it is sufficient if you find

25  that a conspiracy was formed and that it existed for some time

1    within the period set forth in the indictment.

2              Counts Four and Five:  Honest Services Wire Fraud

3              Counts Four and Five charge Mr. Dawkins with engaging

4    in the substantive crime of honest services wire fraud with

5    respect to two different college coaches.  Counts Four and Five

6    are not against Mr. Code.  They are against Mr. Dawkins only.

7    Specifically, Count Four charges Mr. Dawkins with engaging in a

8    scheme to defraud the University of South Carolina and Oklahoma

9    State University in connection with Dawkins' participation in a

10   scheme to deprive the University of South Carolina and later

11   Oklahoma State University of their respective intangible rights

12   to the honest services of Lamont Evans by offering and paying

13   bribes to Evans in exchange for his taking certain actions in

14   violation of his duties to the respective universities.  Count

15   Five charges Dawkins with engaging in a scheme to deprive the

16   University of Arizona to the intangible rights of the honest

17   services of Emanuel Richardson by offering and paying bribes to

18   Richardson in exchange for his taking certain actions in

19   violation of his duties to the university.

20             I will explain to you in detail the law relating to

21   honest services wire fraud in a moment, but I want to provide

22   you now a brief explanation of the term "honest services" and

23   how an employer can be deprived of an employee's honest

24   services.  When an employee of a business or organization takes

25   an action on behalf of a person or entity at least in part

because of a concealed bribe, the employee has breached his

duty to his employer.  Thus, the employer is not receiving what

it expects and is entitled to, namely, its right to its

employee's honest and faithful services.  I will discuss this

concept in more detail in a few minutes.

          The crime of honest services wire fraud has the

following elements:

          First, that there was a scheme or artifice to defraud

the relevant university of its intangible right to its coach's

honest services through bribery;

          Second, that Dawkins knowingly and willfully

participated in the scheme or artifice with knowledge of its

fraudulent nature and with the specific intent to defraud; and

          Third, that in execution of that scheme, Dawkins used

or caused the use by others of interstate or foreign wires.

          Some of the words and phrases you have just heard have

specific meanings under the law.  I will now go through each of

these elements in more detail to help explain what each element

means, including the words with specialized meaning.  When

you're applying the elements just listed, you must use the

definitions of words I instruct you to use.

          The first element the government must prove beyond a

reasonable doubt is the existence of a scheme or artifice to

defraud the relevant university of its intangible right to the

honest services of its employee through bribery.  As I

explained, with respect to Count Four, it is alleged that the

University of South Carolina and later Oklahoma State

University were deprived of their respective right to the

honest services of their employee, Lamont Evans.  With respect

to Count Five, it is alleged that the University of Arizona was

deprived of its right to the honest services of its employee,

Emanuel Richardson.

         Let me first explain what a scheme or artifice to

defraud means.  A scheme or artifice to defraud is any plan to

accomplish some object by means of false or fraudulent

statements, representations, or promises reasonably calculated

to deceive persons of average prudence.  A statement,

representation, or document is false if it is untrue when made

and was then known to be untrue by the person making it or

causing it to be made.  A statement, representation, or

document is fraudulent if it was made falsely with the

intention to deceive.  The false or fraudulent statements,

representations, or promises must regard a material fact.  A

fact is material if the fact is one which would reasonably be

expected to be one of concern to a reasonable and prudent

person in making a decision.  Deceitful statements of

half-truths or the concealment of facts and the expression of

an opinion not honestly entertained may also constitute false

or fraudulent statements.

         The deception need not be premised upon spoken or

written words alone.  The arrangement of the words or the

circumstances in which they are used may convey the false and

deceptive appearance.  For example, the deceit may consist of

the concealment of a bribe that the employee has solicited or

received or the employee's implicit false representation to his

employer that he has not solicited or obtained bribes in

exchange for taking actions on behalf of the person or entity

providing the bribes.  If there is deception, the manner in

which it is accomplished is irrelevant.

It does not matter whether any of the individuals or

entities involved might have discovered the fraud had they

probed it further.  If you find that a scheme or artifice

existed, it is irrelevant whether you believe that any

individual or entity involved was careless, gullible, or even

negligent.

Having just explained what a scheme or artifice to

defraud is, let me now explain what it means to defraud a

university of its intangible right to honest services.  An

employee owes a fiduciary duty, that is, a duty of honest and

faithful services, to his employer.  When an employee is bribed

in exchange for actions taken in connection with his employment

on behalf of the person paying him a bribe, he has breached his

duty of honest and faithful service to his employer.  The

government alleges that there was a scheme to defraud the

relevant university of the intangible rights of the honest

services of its employee -- Lamont Evans for the University of
South Carolina and Oklahoma State University and Emanuel
Richardson for the University of Arizona.

To prove that the particular scheme to defraud here
existed, the government must prove that Mr. Dawkins paid bribes
to the coaches in a *quid pro quo* exchange. *Quid pro quo* simply
means "this for that." Here, to prove that a bribe occurred,
the government must prove that the relevant men's basketball
coach received a thing of value from or at the direction of
Dawkins or that a third party received a thing of value at the
direction of and for the benefit of that coach, in exchange for
taking or promising to take an act in the course of that
coach's employment at his university and in violation of his
fiduciary duty to the university. This definition of bribery
may differ from your understanding of bribery in Counts One and
Two. Please ignore the definition of bribery in those counts
with respect to Counts Four and Five.

As I previously explained, when an employee of a
business takes an action on behalf of a person or entity at
least in part because of a concealed bribe, the employee has
breached his duty to his employer. Thus, the employer is not
receiving what it expects and is entitled to, namely, its right
to its employee's honest and faithful services.

A violation of an NCAA rule by itself is not a
violation of the law. This case, however, is not about whether

violations of NCAA rules occurred. Rather, with respect to the

honest services fraud counts, this case is about whether the

universities that employed these coaches were deprived of their

rights to their employee's honest services as a result of these

employees, in exchange for bribe payments, taking actions that

were prohibited under NCAA rules and the university's own

policies. The fact that a coach's conduct violates the rules,

policies, or codes of conduct of the NCAA or his employer does

not necessarily mean that there was a scheme to defraud.

Now, evidence has been admitted relating to NCAA

rules, as well as the rules and policies applicable to men's

college basketball coaches at the relevant universities. The

purpose of this trial is not to determine whether the NCAA

rules are good or bad. During your deliberations, you must

apply my instructions on the law to the facts that you find the

government has proved beyond a reasonable doubt. Any views or

opinions you might have about the wisdom or fairness of any

NCAA rules have no bearing on this case whatsoever and should

not be considered by you in any respect during your

deliberations. You should disregard any arguments made by the

lawyers about the wisdom or fairness of those rules.

To prove that bribery occurred, the government is not

required to show that the relevant coach who received the

payments performed, or promised to perform, an act solely

because of the payment. It is no defense that the relevant

coach may have ultimately chosen to perform the same act even
if he had not received or been promised a bribe.  All that is
required is that the coach performed, or promised to perform,
the act in question at least in part because of a potential
bribe.

Additionally, the government is not required to show
that any acts that the relevant coach performed or promised to
perform were contrary to the university's interest or caused or
were intended to cause financial harm to the university.
Indeed, the actions the coach performed or promised to perform
could have been harmless or even beneficial to the university.
The university did not have to lose money or property on
account of any actions the relevant coach performed or promised
to perform.  Rather, the only intended loss the government must
prove is the relevant university's loss of its intangible right
to its coach's honest services.

However, while the government need not prove that any
actions taken by the coach were contrary to his university's
interests, you are instructed that you may consider the
existence or nonexistence of such evidence in determining
whether the relevant coach took any action at least in part
because of a potential bribe and not exclusively because it was
at the direction or for the benefit of his university.

The second element that the government must prove
beyond a reasonable doubt is that the defendant participated in

the scheme to defraud knowingly, willfully, and with specific

intent to defraud.

To participate in a scheme means to engage in it by

taking some affirmative step to help it succeed.  It is not

necessary for the government to establish that Dawkins

originated the scheme to defraud.  It is sufficient if you find

that a scheme to defraud existed, even if someone else

originated it, and that the defendant, while aware of the

scheme's existence, knowingly and willfully participated in it

with the intent to defraud.  Nor is it required that Dawkins

participated or had knowledge of all of the operations of the

scheme.  Further, the responsibility of the defendant is not

governed by the extent of his participation.  For example, it

is not necessary that the defendant have participated in the

alleged scheme from the beginning.  A person who comes in at a

later point with knowledge of the scheme's general operation,

although not necessarily all of its details, and who

intentionally acts in a way to further the unlawful goals

becomes a participant in the scheme and is legally responsible

for all that may have been done in the past in furtherance of

the criminal objective and all that is done subsequently.

To act knowingly means to act intentionally and

voluntarily and not because of ignorance, mistake, accident, or

carelessness.

To act willfully means to act voluntarily and with a

1 wrongful purpose.

2           Specific intent to defraud means to act knowingly,

3 willfully, and with the specific intent to deceive for the

4 purpose of depriving the relevant university of its right to

5 its coach's honest services.  In addition, the government need

6 not prove that the intent to defraud was the only intent of the

7 defendant you are considering.  A defendant may have the

8 required intent to defraud even if the defendant was motivated

9 by other lawful purposes as well.

10          The question of whether a person acted knowingly,

11 willfully, and with intent to defraud is a question of fact for

12 you to determine like any other fact question.  This question

13 involves one's state of mind.  Direct proof of knowledge and

14 fraudulent intent is almost never available.  It would be a

15 rare case where it could be shown that a person wrote or stated

16 that as of a given time in the past he committed an act with

17 fraudulent intent, and direct proof is not required.  The

18 ultimate facts of knowledge of criminal intent, though

19 subjective, may be established by circumstantial evidence,

20 based upon a person's outward manifestations, his words,

21 conduct, and acts, and all the surrounding circumstances

22 disclosed by the evidence and the rational or logical

23 inferences that may be drawn from them.

24          The third and final element that the government must

25 prove beyond a reasonable doubt is that Dawkins used, or caused

to be used, interstate wires (for example, phone calls, email

communications, or text messages) in furtherance of the scheme

to defraud the relevant universities.

The wire communications must be an interstate wire --

that is, it must pass between two or more states.  The use of

the wire needed -- the use of the wire need not itself be a

fraudulent representation.  It must, however, further or assist

in some way the carrying out of the scheme to defraud.

It is not necessary for the defendant to have been

directly or personally involved in a wire communication, as

long as the communication was reasonably foreseeable in the

execution of the alleged scheme to defraud in which the

defendant is accused of participating.  In this regard, it is

sufficient to establish this element of the crime if the

evidence justifies a finding that the defendant caused the

wires to be used by others.  This does not mean that the

defendant must specifically authorized others to make the

communication.  When one does an act with knowledge that the

use of the wires will follow in the ordinary course of business

or where such use of the wires reasonably can be foreseen, even

though not actually intended, then he causes the wires to be

used.

Finally, if you find that a wire communication was

reasonably foreseeable and that the interstate wire

communication charged in the indictment took place, then this

element is satisfied, even if it was not foreseeable that the

wire communication would cross state lines.

            (Continued on next page)

1    THE COURT:  In Count Three, both Mr. Dawkins and Mr.

2    Code are charged with conspiracy to commit honest services wire

3    fraud.

4         In order to sustain its burden of proof with respect

5    to the conspiracy charged in Count Three, the government must

6    prove beyond a reasonable doubt the following two elements:

7         First, it must prove the existence of the conspiracy

8    charged in Count Three of the indictment; that is, an agreement

9    or understanding to commit honest services wire fraud, and;

10        Second, that the defendant you are considering

11   knowingly and willfully became a member of, and joined in, the

12   conspiracy.

13        I already explained the meaning of each of these two

14   elements to you in instructing you as to Count One, which

15   charges conspiracy to commit robbery.  You will apply those

16   instructions with respect to Count Three.

17        Unlike with respect to Count One, which charges

18   conspiracy to commit bribery, with respect to Count Three,

19   which charges conspiracy to commit honest services wire fraud,

20   the government is not required to prove that an overt act was

21   committed in furtherance of the conspiracy.  The conspiracy

22   charged in Count Three allegedly had one object, that was to

23   commit honest services wire fraud.  I already explained the

24   elements of honest services wire fraud in instructing you as to

25   the substantive offenses charged in Counts Four and Five.  You

will apply those instructions when you consider whether the

government has proven beyond a reasonable doubt that the

conspiracy charged in Count Three existed.  However, because

Count Three charges conspiracy, the government does not need to

prove that anyone committed the substantive crime of honest

services wire fraud.  It need prove beyond a reasonable doubt

only that there was an agreement to do so.

You should also note that Count Three, the conspiracy

count, covers a broad course of conduct and alleges that the

defendant and others agreed to and did deprive multiple

university employers of the honest services of their employees,

including Evans's and Richardson's respective

university-employers, as well as the universities that employed

Anthony Bland, Preston Murphy, and Corey Barker, respectively.

The final count in the indictment, Count Six, charges

both Mr. Dawkins and Mr. Code with conspiring to violate the

Travel Act.

In order for you to find the defendant guilty of the

conspiracy charged in Count Six, the government must prove

beyond a reasonable doubt the following elements:

First, the existence of the conspiracy charged, that

is, an agreement or understanding to violate certain laws of

the United States;

Second, that the defendant you are considering

knowingly and willfully became a member of the conspiracy

charged;

And third, that any of the conspirators -- not necessarily the defendant you are considering, but rather any member of the conspiracy -- knowingly committed at least one overt act in furtherance of the conspiracy during the life of the conspiracy.

I already explained the meaning of each of these three elements to you in instructing you as to Count One, which charges conspiracy to commit bribery. You will apply those instructions with respect to Count Six.

With respect to overt acts, Count Six of the indictment contains a section entitled "overt acts." These overt acts are examples of conduct alleged to have been undertaken by members of the conspiracy to promote the illegal objectives of the conspiracy. The overt acts alleged are as follows:

The government.

In furtherance of this conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

A. On or about March 3, 2016, in South Carolina, Christian Dawkins, the defendant, Evans, Sood and CW-1, met during which meeting Evans, Dawkins, Sood, and CW1 discussed, in sum and substance, that Evans could directly influence

1  certain student-athletes that Evans coached at the University

2  of South Carolina to retain the services of Dawkins, Sood and

3  CW-1.

4          B.  On or about June 20, 2017, a meeting that had been

5  arranged for by Dawkins occurred in Manhattan, New York between

6  Richardson, Sood, CW-1 and UC-1, among others, during which

7  Richardson received a cash bribe of $5,000.

8          C.  On or about June 20, 2017, Merl Code, the

9  defendant, Dawkins, Sood, CW-1, and UC-1, among others, met in

10 New York, during which meeting Code received cash of $5,000 and

11 agreed to identify and make introductions to certain men's

12 college basketball coaches that would be willing to accept

13 bribe payments in exchange for steering certain of their

14 student-athletes to retain the services of the company being

15 formed by Dawkins, Sood and UC-1.

16         D.  On or about July 29, 2017, a meeting arranged by

17 Code occurred in Las Vegas, Nevada between Dawkins, Bland, CW-1

18 and UC-1, among others, during which Bland discussed steering

19 certain student-athletes under his control to retain the

20 services of the company being formed by Dawkins, Sood, and

21 UC-1, and after which Dawkins paid Bland a cash bribe.

22         E.  On or about July 28, 2017, a meeting arranged by

23 Code occurred in Las Vegas, Nevada between Dawkins, Coach-1,

24 CW-1 and UC-1, among others, during which Coach-1 discussed

25 steering student-athletes under his control to retain the

1  services of Dawkins's company and UC-1 paid Coach-1 a $6,000

2  cash bribe.

3          F.   On or about July 28, 2017, Dawkins, Coach-2, CW-1,

4  and UC-1, among others, met in a hotel room in Las Vegas,

5  Nevada to discuss Coach-2's steering of student-athletes under

6  his control to retain the services of Dawkins's company.

7  During the meeting, UC-1, paid Coach-2 a $6,000 cash bribe.

8          As I previously instructed you with respect to Count

9  One, you may find that overt acts were committed that were not

10 alleged in the indictment.  The only requirement is that one of

11 the members of the conspiracy, again not necessarily the

12 defendant, has taken some step or action in furtherance of the

13 conspiracy during the life of that conspiracy.

14         For a conspiracy to exist, there must be an object of

15 that conspiracy.  Here, the object of the conspiracy is the

16 violation of the Travel Act, which makes it a federal crime for

17 anyone to travel in interstate commerce, or use a facility of

18 interstate commerce for the purpose of carrying out certain

19 unlawful activities.  To establish a Travel Act violation, the

20 government must establish the following elements:

21         First, that a coconspirator traveled across state

22 lines or used or caused someone else to use an interstate

23 facility;

24         Second, that this interstate travel or use of

25 interstate facility be done with the intent to promote, manage

JF4CAW2Thar3

1  or establish, or carry on some unlawful activity, here,

2  commercial bribery;

3          And third, that after this interstate travel, or use

4  of an interstate facility, a conspirator perform or attempt to

5  perform an act in furtherance of this same unlawful activity.

6          Some of the words and phrases you just heard have

7  special meaning under the law.  I will go through each of these

8  three elements in more detail to help explain what each element

9  means, including the words with specialized meaning.  When you

10 are applying the elements I just listed, you must use the

11 definition of the words I instruct you to use.

12         The first element of a Travel Act violation is that a

13 defendant or coconspirator travel across state lines or use or

14 cause someone else to use an interstate facility.  An

15 interstate facility is any vehicle or instrument that crosses

16 state lines in the course of commerce.  For example, interstate

17 transfers of money, e-mails, and telephone calls between

18 states, and any use of the United States mail constitutes the

19 use of an interstate facility.  Interstate travel is simply

20 travel between one state and any other state or between the

21 United States and any foreign country.

22         The Travel Act does not require that a defendant

23 himself use an interstate facility or travel interstate.  The

24 Travel Act also applies to a person who causes another person

25 to use an interstate facility or travel interstate.  The

1   government also does not have to prove that the defendant you

2   are considering knew that the interstate travel or use of an

3   interstate facility would occur.  It is sufficient that the

4   unlawful activity agreed to by the defendant are considering

5   would cause the interstate travel or use of an interstate

6   facility.

7         The second element of the Travel Act is that the use

8   of an interstate facility or interstate travel was done with

9   the intent to promote, manage, establish or carry out an

10  unlawful activity –– here, commercial bribery, in violation of

11  the laws of certain states, which I will describe for you

12  momentarily.

13        It is not enough for the government to prove that the

14  defendant you are considering was involved in some unlawful

15  activity and also happened to travel between states or use an

16  interstate facility or simply that the defendant you are

17  considering used an interstate facility and accidentally

18  furthered the unlawful activity.  The defendant you are

19  considering must have intended the advancement of the unlawful

20  activity to result from the use of the interstate facility or

21  from interstate travel.

22        The government does not have to prove that the

23  furtherance of the unlawful activity was the sole purpose in

24  travelling interstate or using an interstate facility.  It is

25  sufficient if the government proves that one of the reasons for

1    the travelling interstate or using an interstate facility was

2    to further the unlawful activity.  Thus, if you find that the

3    defendant you are considering or a coconspirator traveled

4    interstate or used interstate facilities with the intent to

5    facilitate the unlawful activity, and you also find that the

6    defendant you are considering or a coconspirator undertook the

7    same travel or use of interstate facilities for some other

8    reasons that have nothing to do with the unlawful activity, you

9    may still find that the government has met its burden of proof

10   on the second element of the offense.

11           You are thus being asked to look into the mind of the

12   defendant you are considering and to ask what his or the

13   coconspirator's purpose in agreeing to travel interstate or in

14   using the interstate facilities was.  You may determine the

15   intent of the defendant you are considering from all the

16   evidence that has been placed before you, including the

17   statements of the defendant you are considering and his conduct

18   before and after the travel or use of the facilities.

19           As I have instructed you, the government must prove

20   that the defendant intended the interstate travel for the use

21   of interstate facilities to facilitate or further the unlawful

22   activity.  The government does not, however, have to prove that

23   the interstate travel or use of the interstate facilities was

24   essential to the unlawful activity or fundamental to the

25   unlawful scheme, or that the unlawful activity could not have

1  been accomplished without the interstate travel or the use of

2  the interstate facilities.

3          As long as the government prove that is the defendant

4  you are considering agreed to travel interstate or cause

5  interstate travel or to use or cause the use of interstate

6  facilities with the necessary unlawful intent, the government

7  may rely on any interstate travel or use of interstate

8  facilities by any coconspirator that helped accomplish the

9  unlawful activity.

10         The government must prove that the defendant you are

11  considering agreed to travel interstate or use an interstate

12  facility with the intent to facilitate an activity which the

13  defendant you are considering knew was illegal.  The government

14  does not have to prove that the defendant you are considering

15  knew that the travel or use of interstate facilities was

16  illegal.  Thus, if the defendant you are considering agreed to

17  travel interstate or to use the interstate facilities intending

18  to facilitate a business deal, but he did not know that the

19  deal was illegal or involved illegal activity, then you must

20  find the defendant you are considering not guilty.

21         The defendants have been charged with conspiring, that

22  is, agreed with others, to travel in interstate commerce or to

23  use an interstate facility to facilitate the payment or receipt

24  of bribes as charged in the indictment.  The government must

25  prove to you beyond a reasonable doubt that the activities that

1  the defendants you are considering agreed to facilitate were in

2  fact, unlawful under any of the state laws at issue,

3  specifically here the commercial bribery laws of South

4  Carolina, Oklahoma, Arizona, and California.  You need not find

5  the defendant you are considering agreed to the use of an

6  interstate facility or interstate travel with the intent to

7  promote, manage, establish or carry on an activity that

8  violated each of the state commercial bribery laws identified

9  in the indictment; violation of at least one of these

10 commercial bribery statutes is sufficient.

11         I will now describe for you the elements of each of

12 the state commercial bribery statutes that are referenced in

13 the indictment.

14         The South Carolina Commercial Bribery Statute.

15         Under South Carolina law, "any agent, employee or

16 servant who corruptly requests or accepts a gift or gratuity or

17 promises to make a gift or do an act beneficial to himself

18 under an agreement or with an understanding that he shall act

19 in any particular manner in relation to his principal's,

20 employer's, or master's business" is guilty of a crime.  The

21 elements of this offense as applied in the case are:

22         First, that the relevant men's college basketball

23 coach -- here, Lamont Evans -- was an agent of the University

24 of South Carolina during the time period when he requested or

25 accepted a gift or gratuity;

1    Second, that at the time that he requested or accepted

2    a gift or gratuity, he did so with corrupt intent.  I have

3    previously defined corrupt intent in explaining Count Two, and

4    that definition applies here.

5    The Arizona Commercial Bribery Statute.

6    Under Arizona law, "a person commits commercial

7    bribery, if he, while employed by an employer, accepts any

8    benefit from another person, corruptly intending that such

9    benefit will influence his conduct in relation to the

10   employer's commercial affairs."  The elements of this offense

11   as applied to this case are:

12   First, that the relevant men's basketball coach --

13   here, Emmanuel Richardson -- acted with corrupt intent.  Under

14   Arizona law, corrupt in the context of the charge of bribery

15   means being dishonest and being open to bribery or using a

16   position of trust for dishonest gain.

17   Second, while acting as an employee of the University

18   of Arizona, Richardson accepted any benefit from another person

19   so that such benefit would influence Richardson's conduct in

20   relation to the University of Arizona's commercial affairs; and

21   Third, the conduct of Richardson caused economic loss

22   to the University of Arizona.

23   The third element of the Travel Act is that the

24   defendant you are considering conspired to engage in interstate

25   travel or use of an interstate facility that was followed by a

conspirator's performance or attempted performance of an act in

furtherance of an unlawful activity.  This act need not itself

be unlawful.  However, this act must come after the interstate

travel or use of an interstate facility.  Any act that would

happen before the interstate travel or use of interstate

facility cannot satisfy this element.

Liability for Acts and Declaration of Coconspirators.

With respect to the conspiracies charged in Counts

One, Three and Six of the indictment, which are the conspiracy

charges, you will recall that I have admitted at this trial

evidence of the acts and statements of other individuals who

were not present because such acts were committed and such

statements were made by a person who, the government claims,

was also a confederate or coconspirator of the defendants.

The reason for allowing this evidence to be received

against the defendants has to do in part with the nature of the

crime of conspiracy.  As I have said, a conspiracy is often

referred to as a partnership in crime:  As in other types of

partnership, when people enter into a conspiracy to accomplish

an unlawful end, each and every member becomes an agent for the

other conspirators in carrying out the conspiracy.

Accordingly, the reasonably foreseeable acts,

declarations, statements and omissions of any member of the

conspiracy and in furtherance of the common purpose of the

conspiracy are deemed, under the law, to be acts of all of the

1    members, and all of the members are responsible for such acts,

2    declarations, statements and omissions.

3           If you find, beyond a reasonable doubt, that the

4    defendant whose guilt you are considering was a member of any

5    of the conspiracies charged in Count One, Three or Six of the

6    indictment, then any acts done or statements made in

7    furtherance of that conspiracy by persons also found by you to

8    have been members of the conspiracy, may be considered against

9    that defendant.  This is so, even if such acts were done and

10   statements were made in that defendant's absence and without

11   his knowledge.

12          However, before you may consider the statements or

13   acts of a coconspirator in deciding the issue of defendant's

14   guilt, you must first determine that the acts and statements

15   were made during the existence and in furtherance of the

16   unlawful scheme.  If the acts were done or the statements made

17   by someone whom you do not find to have been a member of the

18   conspiracy or if they were not done or said in furtherance of

19   the conspiracy, they may be considered by you as evidence only

20   against the member who did or said them.

21          With respect to Count Two, which charges Dawkins and

22   Code with the substantive offense of offering bribes or

23   gratuities, and Counts Four and Five, which charge solely

24   Dawkins with the substantive offense of honest services wire

25   fraud, these counts also charge the defendant you are

1   considering with having aided and abetted and/or willfully

2   caused another person to commit each of those crimes.

3   If you all agree that the government has proved that

4   the defendant you are considering guilty beyond a reasonable

5   doubt on any of the substantive counts with which he is charged

6   that I just described, then you need not consider these

7   alternate theories of liability as to that specific count.

8   However, if you do not find a defendant guilty beyond a

9   reasonable doubt on any of the substantive counts that I just

10   described, you then will consider whether the government has

11   proven that defendant guilty under the alternative theories of

12   aiding and abetting and willfully causing a crime.  I will take

13   each of those concepts, aiding and abetting and willfully

14   causing a crime, in turn.

15   Aiding and abetting.

16   It is unlawful for a person to aid, abet, counsel,

17   command, induce or procure someone else to commit an offense.

18   A person who does that is just as guilty of the offense as

19   someone who actually commits it.  Accordingly, if a defendant

20   is charged with a substantive count in the indictment, you may

21   find that defendant guilty on that count if you find that the

22   government has proved beyond a reasonable doubt that another

23   person actually committed the crime and that the defendant you

24   are considering aided, abetted, counseled, commanded, induced

25   or procured the commission of that crime.

1          In order to convict the defendant as an aider and

2    abettor, the government must prove beyond a reasonable doubt

3    two elements:

4          First, it must prove that a person other than the

5    defendant you are considering actually committed the crime

6    charged.  Obviously, no one can be convicted of aiding and

7    abetting the criminal acts of someone else if no crime was

8    committed by the other person in the first place.  Accordingly,

9    if the government has not proved beyond a reasonable doubt that

10   a person other than the defendant you are considering committed

11   the substantive crimes charged in the indictment, then you need

12   not consider the second element under the theory of aiding and

13   abetting.  But if you do find that a crime was committed by

14   someone other than the defendant you are considering, then you

15   must consider whether the defendant you are considering aided

16   or abetted the commission of that crime.

17         Second, in order to convict on an aiding and abetting

18   theory, the government must prove that the defendant you are

19   considering willfully and knowingly associated himself in some

20   way with the crime, and that he willfully and knowingly engaged

21   in some affirmative conduct for the specific purpose of

22   bringing about that crime.  I previously explained the meaning

23   of the term, willfully, in instructing you as to Counts Four

24   and Five, and that instruction a applies with equal force here.

25         The mere presence of the defendant you are considering

in the place where a crime is being committed, even coupled

with knowledge that a crime is being committed, is not enough

to make that defendant an aider and abettor.  Similarly, a

defendant's acquiescence in the criminal conduct of others,

even with guilty knowledge, is not enough to establish aiding

and abetting.  An aider and abettor must know that a crime is

being committed and act in a way that is intended to bring

about the success of the criminal venture.

To determine whether the defendant aided and abetted

the commission of the crime, ask yourself these questions:

Did the defendant you are considering participate in

the crime charged as something that the defendant wished to

bring about?

Did he knowingly associate himself with the criminal

venture?

Did he seek by his actions to make the criminal

venture succeed?

If the defendant did, then he is an aider and abettor

and, therefore, guilty of the offense.  If he did not, then the

defendant is not an aider and abettor.

Alternatively, the government may meet its burden by

establishing that the defendant willfully caused another to

commit a crime.  That law provides that whoever willfully

causes an act to be done, if directly performed by him, would

be a criminal offense, is punishable as a principle.

1    What that means is that, even if the defendant you are

2    considering did not commit the particular crime that is

3    charged, the government may meet its burden of proof by:

4          (1) proving that another person actually committed the

5    offense with which the defendant is charged; and

6          (2) providing that the defendant willfully caused that

7    person to commit that crime.

8          In this context, the term willfully means

9    intentionally, rather than through mistake, mere negligence or

10   for some other reason.

11         Thus, if you are persuaded beyond a reasonable doubt

12   that the defendant willfully caused another to commit the

13   particular substantive crime charged, then he is guilty of the

14   crime charged, just as if the defendant himself had actually

15   committed it.

16         There is one critical difference between aiding and

17   abetting and willfully causing another to commit a crime.  With

18   respect to willful causation, the government need not prove

19   that the defendant acted through a guilty person.  Rather, the

20   defendant can be found guilty even if he acted through someone

21   who has no knowledge of the crimes charged in the indictment.

22         I told you earlier that the defendants, in various

23   respects, must have acted knowingly in order to be convicted.

24   In determining whether the defendants acted knowingly with

25   respect to the substantive crimes or the objectives of the

conspiracy, you may consider whether the defendants

deliberately closed their eyes to what otherwise would have

been obvious.  That is what the phrase "conscious avoidance"

refers to.  As I told you before, acts done knowingly must be a

product of a person's conscious intention.  They cannot be the

result of carelessness, negligence or foolishness.  But a

person may not willfully and intentionally remain ignorant of a

fact that is material and important to his or her conduct in

order to escape the consequences of criminal law.  We refer to

this notion of intentionally blinding yourself to what is

staring you in the face as conscious avoidance.

An argument by the government of conscious avoidance

is not a substitute for proof of knowledge; it is simply

another factor that you, the jury, may consider in deciding

what a defendant knew.  Thus, if you find beyond a reasonable

doubt that the defendants were aware that there was a high

probability that a fact was so, but that the defendants

deliberately and consciously avoided confirming this fact, such

as by purposely closing their eyes to it or intentionally

failing to investigate it, then you may treat this deliberate

avoidance of knowledge as the equivalent of knowledge.

With respect to the conspiracy counts, you must also

keep in mind that there is an important difference between

intentionally participating in the conspiracy, on the one hand,

and knowing a specific object or objects of the conspiracy, on

1  the other.  You may consider conscious avoidance in deciding

2  whether the defendants knew the objective or objectives of a

3  conspiracy, that is, whether the defendants reasonably believed

4  that there was a high probability that a goal of the conspiracy

5  was to commit the crimes charged as objects of that conspiracy

6  and deliberately avoided confirming that fact but participated

7  in the conspiracy anyway.

8       But conscious avoidance cannot be used as a substitute

9  for finding that the defendants intentionally joined the

10  conspiracy in the first place.  It is logically impossible for

11  a defendant to intend and agree to join a conspiracy if he does

12  not know it exists.  And that is the distinction I am drawing.

13       In sum, if you find that the defendant you are

14  considering believed that there was high probability that a

15  fact was so, and that the defendant deliberately and

16  consciously avoided learning the truth of that fact, you may

17  find the defendant acted knowingly with respect to that fact.

18  However, if you find that the defendant actually believed that

19  the fact was not so, then you may not find that he acted

20  knowingly with respect to that fact.  You must judge from all

21  the circumstances and all the proof whether the government did

22  or did not satisfy its burden of proof beyond a reasonable

23  doubt.

24       Venue.  The federal law provides rules that govern

25  here, that is, in what district a criminal prosecution may be

1    brought by the government.  These are known as venue rules.

2           In addition, all of the elements that I've just

3    described, you must also decide whether any act in furtherance

4    of each of the charged crimes occurred within the Southern

5    District of New York, which includes all of Manhattan, the

6    Bronx, and Westchester, Rockland, Putnam, Dutchess, Orange, and

7    Sullivan Counties.  This means that, with regard to each count,

8    you must decide whether the crime charged in a particular count

9    or any act committed to further or promote the crime, occurred

10   within the Southern District of New York.

11          I note that on the issue of venue and on this issue

12   alone, the government need not prove its position beyond a

13   reasonable doubt.  It is sufficient if the government proves by

14   a mere preponderance of the evidence.  To prove something by

15   preponderance of the evidence means to prove that it is more

16   likely true than not true.  It is determined by considering all

17   of the evidence and deciding which evidence is more convincing.

18   Thus, the government has satisfied its venue obligations if you

19   conclude that it is more likely than not that the crime

20   charged, or any act in furtherance of the crime you are

21   considering for a particular count, occurred in the Southern

22   District of New York.

23          If you find that the government has failed to prove

24   this venue requirement by a preponderance of the evidence with

25   respect to any of the charges in the indictment, then you must

1    acquit the defendant of that charge.

2           Dual Intent No Defense.

3           During this trial the defendants have contended that

4    their actions were motivated by considerations that were not

5    unlawful.  However, even if true, it is not a defense to any

6    count that the defendant may have been motivated by both proper

7    and improper motives.  A defendant may be found to have the

8    intent even if he possesses a dual intent, that is, an unlawful

9    intent, and also partly a proper or neutral intent.

10          Proof of motive is not a necessary element of any of

11   the crimes with which the defendants are charged.  Proof of

12   motive does not establish guilt, nor does the lack of proof of

13   motive establish that the defendant is not guilty.  If the

14   guilt of a defendant is shown beyond a reasonable doubt, it is

15   immaterial what the defendant's motive for the crime or crimes

16   may be or whether the defendant's motives were shown at all.

17   The presence or absence of motive is, however, a circumstance

18   which you may consider as bearing on the intent of the

19   defendant.

20          Particular investigative Techniques.

21          You have heard reference in the arguments of defense

22   counsel in this case to the fact that certain investigative

23   techniques were or were not used by law enforcement

24   authorities.  There is no legal requirement that law

25   enforcement agents investigate crimes in a particular way or

1   that the government prove its case through any particular

2   means.  While you are to carefully consider the evidence

3   presented, you need not speculate as to why law enforcement

4   used the techniques that they did, or why they did not use

5   other techniques.  The government is not on trial, and law

6   enforcement techniques are not your concern.  Your concern is

7   to determine whether or not, based on the evidence or lack of

8   evidence, the guilt of the defendants has been proven beyond a

9   reasonable doubt.

10          Use Of Evidence Obtained Pursuant To Search And

11   Seizures.

12          You have heard testimony about evidence seized in

13   connection with certain searches or seizures conducted by law

14   enforcement officers, and in particular, of e-mail evidence

15   obtained pursuant to court-approved search warrants.  You've

16   also heard recorded calls and conversations that were offered

17   into evidence during this trial.  I instruct you that all of

18   the evidence in this case, including evidence obtained pursuant

19   to searches and the recorded meetings and conversations played

20   during the trial, was lawfully obtained, and that no one's

21   rights were violated, and that the use of this evidence is

22   entirely lawful.  Whether you approve or disapprove of the

23   recordings of calls or conversations, or the uses of searches

24   to obtain evidence should not enter into your deliberations,

25   because I instruct you that the use of this evidence is

entirely lawful.  Therefore, you must give this evidence your

full consideration, along with all the other evidence in the

case, as you determine whether the government has proved each

defendant's guilt beyond a reasonable doubt.

     As I instructed you earlier in connection with the

recordings, the statements of the undercover law enforcement

agent were admitted not for the truth, but rather to put in

context statements made by the defendants and by

coconspirators.

     Guilty Plea By Government Witness.

     You have heard testimony from a government witness who

pled guilty to charges arising out of the same facts in this

case.  You are instructed that you are to draw no conclusions

or inferences of any kind about the guilt of these defendants

on trial from the fact that a prosecution witness pled guilty

to similar charges.  That witness's decision to plead guilty

was a personal decision about his own guilt.  It may not be

used by you in any way as evidence against or unfavorable to

defendants on trial here.

     Audio Recordings And Transcripts.

     In connection with the recordings that you have heard,

you were given transcripts of the conversations to assist you.

I told you then, and I remind you now, that transcripts are not

evidence.  It is the recordings that are evidence.  The

transcripts were provided as an aid to you while you listened

to the tapes.  It is for you to decide whether the transcripts

correctly represent the conversation as they are heard on the

tapes you have listened to.  If you perceive any difference

between the recording and the transcript, it is the recording

that controls.

In this case you have heard evidence in the form of

stipulations of testimony.  A stipulation of testimony is an

agreement between the parties that, if called as a witness, the

person would have given certain testimony.  You must accept as

true the fact that the witness would have given that testimony.

However, it is for you to determine the effect to be given to

that testimony.

In this case, you have also heard evidence in the form

of stipulations of fact.  A stipulation of fact is an agreement

between the parties that a certain fact is true.  You must

regard such agreed-upon facts as true.

We have, among the exhibits received in evidence, some

documents that are redacted.  Redacted means that part of the

document or recording was taken out.  You are to concern

yourself only with the part of the item that has been admitted

into evidence.  You should not consider any possible reason why

the other part of it has been deleted.

Persons Not On Trial.  You may not draw any inference,

favorable or unfavorable, towards the government or the

defendants, from the fact that any person in addition to the

1   defendants is not on trial here.  You also may not speculate in

2   any way as to the reason or reasons why other persons are not

3   on trial.  Those matters are wholly outside your concern that

4   have no bearing on your function as jurors.

5          Uncalled Witnesses.

6          There are several persons whose names you may have

7   heard during the course of the trial but did not appear to

8   testify.  I instruct you that each party has an equal

9   opportunity, or lack of opportunity, to call any of these

10  witnesses.  Therefore, you should not draw any inferences or

11  reach any conclusions as to what they would have testified to

12  had they been called.  Their absence should not affect your

13  judgment in any way.  You should, however, remember my

14  instruction that the law does not impose on a defendant in a

15  criminal case, the burden or duty of calling any witness or

16  producing any testimony.

17         The defendant in a criminal case never has a duty to

18  testify or to come forward with any evidence.  This is because,

19  as I have told you, the burden of proof beyond a reasonable

20  doubt remains on the government at all times, and the defendant

21  is presumed innocent.  In this case, a defendant did testify

22  and he was subject to cross-examination like any other witness.

23  You should examine and evaluate the defendant's testimony just

24  as you would the testimony of any witness.

25         One defendant did not testify in this case.  Under our

constitution, a defendant has no obligation to testify or to

present any evidence, because it is the government's burden to

prove the defendant guilty beyond a reasonable doubt.  That

burden remains with the government throughout the entire trial

and never shifts to the defendant.  A defendant is never

required to prove that he is innocent.  You may not attach any

significance to the fact that a particular defendant did not

testify.  No adverse inference against him may be drawn by you

because he did not take the witness stand.  You may not

consider this against the defendant in any way in your

deliberations in the jury room.

Now to the evaluation of evidence.

What Is And Is Not Evidence.

You are to consider only the evidence in the case.

The evidence in this case is the sworn testimony of the

witnesses, the exhibits received in evidence, and stipulations

to which the parties have agreed.  Anything that you may have

seen or heard about this case outside the courtroom is not

evidence and must be entirely disregarded.  Exhibits which have

been marked for identification but not received into evidence,

may not be considered by you as evidence.  Only those exhibits

received into evidence may be considered as evidence.  It is

for you alone to decide the weight, if any, to be given to the

testimony and stipulations you have heard and the exhibits you

have seen.  Testimony that I have excluded or stricken is not

1  evidence and may not be considered by you in rendering your

2  verdict.

3      You are not to consider as evidence questions asked by

4  the lawyers.  It is the witnesses' answers that are evidence,

5  not the questions.  Arguments by the attorneys are not evidence

6  because the attorneys are not witnesses.  What they have said

7  to you in their opening statements and what they will say to

8  you in their summations is intended to help you understand the

9  evidence to reach your verdict.  If, however, your reflection

10 of the evidence differs from the statements made by the

11 advocates in their opening statements or summations, it is your

12 recollection that controls.

13     Finally, any statements or rulings that I may have

14 made do not constitute evidence.  Because you are the sole and

15 exclusive judges of the facts, I do not mean to indicate any

16 opinion as to what the facts are or what the verdict should be.

17 The rulings I've made during the trial are not any indication

18 of my views.  Also, you should not draw any inference from the

19 fact that I may on occasion have asked certain questions of

20 witnesses.  These questions were intended only to clarify or

21 expedite, and are not any indication of my view of the

22 evidence.  In short, if anything I have said or done seemed to

23 you to indicate an opinion related to any matter you need to

24 consider, you must disregard it.

25     Now, there are two types of evidence that you may

1    properly use in reaching your verdict.  One type of evidence is

2    called direct evidence.  One kind of direct evidence is a

3    witness's testimony about something he knows by virtue of his

4    or her own senses, something the witness has seen, felt,

5    touched or heard.  Direct evidence may also be in the form of

6    an exhibit.

7         The other type of evidence is circumstantial evidence.

8    Circumstantial evidence is evidence that tends to prove one

9    fact indirectly by proof of other facts.  Here is a simple

10   example of circumstantial evidence:

11        Assume that we came to the courthouse this morning,

12   the sun was shining and it was a nice day.  Assume that the

13   courtroom blinds are drawn and you cannot look outside.  As

14   you're sitting here, someone walks in with an umbrella that is

15   dripping wet.  Somebody else then walks in with a raincoat that

16   is also dripping wet.  You cannot look outside the courtroom

17   and you cannot see whether or not it is raining, so you have no

18   direct evidence of that fact.  But on the combination of the

19   facts that I've asked you to assume, it would be reasonable and

20   logical for you to conclude that, between the time you arrived

21   at the courthouse and the time that these people walked in, it

22   had started to rain.  That is all there is to circumstantial

23   evidence.  You infer on the basis of reason and experience and

24   common sense from an established fact that existed or

25   nonexistence of some other fact.

1       Many facts such as a person's state of mind can rarely

2   be proved by direct evidence.  Circumstantial evidence is no

3   less value than direct evidence.  You are to consider both

4   direct and circumstantial evidence.  The law makes no

5   distinction between the two, but simply requires that before

6   convicting a defendant, you, the jury, must be satisfied of the

7   defendant's guilt beyond a reasonable doubt from all of the

8   evidence in the case.

9       I have used the term "inferred," and the lawyers in

10  their arguments may ask you to draw certain inferences.  When

11  you draw an inference, you conclude from one or more

12  established fact that another fact exists, and you do so on the

13  basis of your reason, experience and common sense.  The process

14  of drawing inferences from facts in evidence is not a matter of

15  guess work, suspicion or speculation.  An inference is a

16  reasoned, logical deduction or conclusion that you, the jury,

17  may draw -- but are not required to draw -- from the facts

18  which have been established by either direct or circumstantial

19  evidence.

20      In considering inferences, you should use your common

21  sense and draw from the facts which you find to be proven

22  whatever reasonable inferences you find to be justified in

23  light of your experience.

24      Now, for the important subject of evaluating

25  testimony.  How do you evaluate the credibility or

believability of the witnesses?  The answer is that you use

your plain common sense.  There is no magic formula by you

which you can evaluate testimony.  You should use the same

tests of truthfulness that you would use in determining matters

of importance in your everyday lives.  You should ask

yourselves:

          Did the witness impress you as honest, open and

candid, or was the witness evasive and edgy, as if hiding

something?

          How did he or she appear -- that is, his or her

bearing, behavior, manner, and appearance while testifying?

          How responsive was the witness to the questions asked

on direct examination and on cross-examination?

          You should consider the opportunity the witness had to

see, hear, and know about the things about which he or she

testified; the accuracy of his or her memory; his or her candor

or lack of candor; his or her intelligence; the reasonableness

and probability of his or her testimony; its consistency or

lack of consistency with other credible evidence; and its

corroboration by other credible evidence.

          In short, in deciding credibility, you should size up

the witness in light of his or her demeanor, the explanations

given, and all of the other evidence in the case.  Always

remember to use your common sense, good judgment and life

experience.

1    Few people recall every detail in the same way.   A

2    witness may be inaccurate, contradictory and untruthful in some

3    respects and yet entirely believable and truthful in other

4    respects.  It is for you to determine whether such

5    inconsistencies are significant or inconsequential.

6    If you find that a witness is intentionally telling a

7    falsehood, that is always a matter of importance you should

8    weigh carefully.  If you find that a witness has willfully

9    testified falsely as to any material fact, that is, as to an

10   important matter, the law permits you to disregard completely

11   the entire testimony of that witness upon the principle that

12   one who testifies falsely about one material fact is likely to

13   testify falsely about everything.  You are not required,

14   however, to consider such a witness as totally unbelievable.

15   You may accept his or her testimony that you deem true and

16   disregard what is feel is false.

17   You are not required to accept testimony, even though

18   the testimony is uncontradicted and the witness's testimony is

19   not challenged.  You may decide because of the witness's

20   bearing or demeanor, or because of the inherent probability of

21   the testimony, or for other reasons sufficient to yourselves

22   that the testimony is not worthy of belief.  On the other hand,

23   you may find because of a witness's bearing and demeanor and

24   based upon consideration of all the other evidence in the case,

25   that the witness is truthful.

1    By the process which I have just described to you,

2    you, as the sole judges of the facts, decide which of the

3    witnesses you will believe, what portions of their testimony

4    you accept, and what weight you will give to it.

5    In deciding whether to believe a witness, you should

6    also specifically note any evidence of bias, hostility or

7    affection that the witness may have towards one of the parties.

8    Likewise, you should consider evidence of any other interest or

9    motive that the witness may have in cooperating or not

10   cooperating with a particular party.  If you find any such

11   bias, hostility, affection, interest or motive, you must then

12   consider whether or not it affected or colored the witness's

13   testimony.

14   You should also take into account any evidence that a

15   witness may benefit or suffer in some way from the outcome of a

16   case.  Such interest in the outcome may create a motive to

17   testify falsely and may sway a witness to testify in a way that

18   advances his or her own interests.  Therefore, if you find that

19   any witness whose testimony you are considering may have an

20   interest in the outcome of this trial, then you should bear

21   that factor in mind when evaluating the credibility of his or

22   her testimony, and accept it with great care.

23   Keep in mind, though, that it does not automatically

24   follow that the testimony is to be disbelieved.  There are many

25   people who, no matter what their interest in the outcome of the

case may be, would not testify falsely.  It is for you to

decide, based on your own perceptions and common sense, to what

extent, if at all, the witness's bias or interest has affected

his or her testimony.  You are not required to disbelieve an

interested witness; you may accept as much as his or her

testimony as you deem reliable and reject as much as you deem

unworthy of acceptance.

Accomplice Or Cooperating Witness Testimony.

You have heard witnesses who testified that they are

actually involved in the crimes charged in the indictment.

Experience will tell you that the government must

frequently rely on the testimony of witnesses who admit

participating in the alleged crimes at issue.  The government

must take its witnesses as it finds them and frequently must

use such testimony in criminal prosecutions because they would

otherwise be difficult or impossible to detect and prosecute

wrongdoers.

The testimony of such accomplices and cooperating

witnesses is properly considered by the jury.  If accomplices

cannot be used, there would be many cases in which there was a

real guilt and conviction should be had, but in which

convictions would be obtainable.  For these very reasons, the

law allows the use of accomplice testimony.  Indeed, it is the

law in federal courts that the testimony of an accomplice may

be enough in itself for a conviction, if the jury believes that

1   the testimony establishes guilt beyond a reasonable doubt.

2          Because of the possible interest an accomplice may

3   have in testifying, the accomplice's testimony should be

4   scrutinized with special care and caution.  The fact that a

5   witness is an accomplice may be considered by you as bearing

6   upon his credibility.  However, it does not follow that simply

7   because a person has admitted to participating in one or more

8   crimes, that he or she is incapable of giving a truthful

9   version of what happened.

10          Like the testimony of any other witness, accomplice

11   witness's testimony should be given such weight as it deserves

12   in light of the facts and circumstances before you, taking into

13   account the witness's demeanor, candor, the strength and

14   accuracy of a witness's recollection, his or her background and

15   the extent to which his or her testimony is or is not

16   corroborated by other evidence.  You may consider whether

17   accomplice witnesses, like any other witnesses called in this

18   case, have an interest in the outcome of the case, and if so,

19   whether it has affected their testimony.

20          You heard testimony from witnesses who have agreements

21   with the government.  I must caution you that it is of no

22   concern of yours why the government made an agreement with a

23   witness.  Your sole concern is whether a witness has given

24   truthful testimony here in this courtroom before you.

25          In evaluating the testimony of accomplice witnesses,

1   you should ask yourselves whether the accomplices would benefit

2   more by lying or by telling the truth.  Was his or her

3   testimony made up in a way because he or she believed or hoped

4   that he or she would somehow receive favorable treatment by

5   testifying falsely?  Or, did he or she believe that his or her

6   interests would be served best served by testifying truthfully?

7   If you believe that the witness was motivated by hopes of

8   personal gain, was the motivation one which would cause him or

9   her to lie, or was it one which would cause him or her to tell

10  the truth?  Did this color his or her testimony?

11          If you find that the testimony was false, you should

12  reject it.  However, if, after cautious and careful examination

13  of the accomplice witness's testimony and demeanor upon the

14  witness stand, you are satisfied that the witness told the

15  truth, you should accept it as credible and act upon it

16  accordingly.

17          You have heard evidence during the trial that

18  witnesses have discussed the facts of the case and their

19  testimony with lawyers before the witness appeared in court.

20  Although, you may consider this fact when you are evaluating

21  the witness's credibility, you should keep in mind that there

22  is nothing either unusual or improper about a witness meeting

23  with lawyers before testifying so that the witness can be made

24  aware of the subjects he will be questioned about, focus on

25  those subjects, and have the opportunity to view relevant

1  exhibits before being questioned about them.  Such consultation

2  may help save your time and the Court's time.  In fact, it

3  would be unusual for a lawyer to call a witness without having

4  had such a consultation beforehand.

5          Again, the weight you give to the fact or the nature

6  of the witness's preparation for his or her testimony, and what

7  inferences you draw from such preparation are matters

8  completely within your discretion.

9          Now, you've heard testimony that a defendant made a

10  statement in which he claimed that his conduct was consistent

11  with innocence and not with guilt.  The government claims that

12  these statements in which the defendant attempted to exculpate

13  himself are false.  If you find that the defendant gave a false

14  statement in order to divert suspicion from himself, you may

15  infer that the defendant believed that he was guilty.  You may

16  not, however, infer on the basis of this alone that the

17  defendant is, in fact, guilty of the crimes for which he is

18  charged.  Whether or not the evidence as to a defendant's

19  statements shows that the defendant believed he was guilty and

20  significance, if any, to be attached to any such evidence, are

21  matters for you, the jury, to decide.

22          Under your oath as jurors, you are to evaluate the

23  evidence calmly and effectively, without sympathy or prejudice.

24  You are to be completely fair and impartial.  And you are to be

25  guided solely by the evidence in this case, and the crucial

bottom-line question that you must ask yourselves as you sift

through the evidence is:

Has the government proven the elements of the crimes

charged beyond a reasonable doubt.

It would be improper for you to consider, in deciding

the facts of the case, any personal feelings you may have about

the race, religion, national origin, sex, disability, or age of

any party or witness, or any other such irrelevant factor.  It

would be equally improper for you to allow any feelings you

might have about the nature of the crimes charged to interfere

with your decision-making process.  All parties are entitled to

the same fair trial.  They stand equal before the law, and are

to be dealt with as equals in this court.  If you let fear or

prejudice or bias or sympathy interfere with your thinking,

then there is a risk that you will not arrive at a true and

just verdict.

If you have a reasonable doubt as to the defendant's

guilt with respect to a particular count, you should not

hesitate to render a verdict of acquittal on that charge.  But,

on the other hand, if you find that the government has met its

burden of proving the defendants' guilt beyond a reasonable

doubt, you should not hesitate to render a verdict of guilty on

that charge.

In determining whether the government has proven the

charges beyond a reasonable doubt, you should not consider the

1    question of possible punishment in the event that you were to

2    find the defendant guilty as charged.  The duty of imposing a

3    sentence rests exclusively upon the Court.  Your function is to

4    weigh the evidence in the case and to determine whether or not

5    the defendant is guilty beyond a reasonable doubt, solely upon

6    the basis of such evidence.

7             Therefore, I instruct you that you cannot allow

8    consideration of the punishment which may be imposed upon a

9    defendant, if he is convicted, to influence your verdict in any

10   way, or enter into your deliberations.

11            Ladies and gentlemen, the last portion of this

12   concerns deliberations.  I will give that portion of the

13   instructions after the parties have given their summations.

14   Okay?

15            So, before we break, let me talk to the attorneys at

16   sidebar.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1      (At side bar)

2      THE COURT:  Was there any misstatement or any

3  objection to the charges?

4      MR. HANEY:  None, your Honor.

5      MR. CHANEY:  The only objection that Defense Code

6  would like to make, is that in the Court's reading of overt

7  acts -- I believe the Court accurately read from the

8  indictment.  However, insofar as overt acts include money paid

9  by UC-1, I think the Court should instruct the jury that, as a

10  matter of law, an act by an undercover is not an overt act in

11  furtherance of a conspiracy because they are not conspirators.

12      MR. MARK:  An instruction like that would be

13  misleading because it wouldn't provide any of the context for

14  the fact that an act caused by a defendant would be such an

15  act, so we would object to that.

16      THE COURT:  The objection is overruled.

17      MR. MARK:  I'm just going to note a couple things

18  non-substantive, just what I saw.

19      THE COURT:  Very well.

20      MR. MARK:  Candidly, we should have caught them

21  before.  I don't think they make a difference.  There was a

22  reference to the commercial bribery laws in the Travel Act

23  conspiracy.  We would remove the charges related to California

24  and Oklahoma.  They still exist on page 38.  I don't think

25  that's material and it doesn't sound like the defense does

1  either.

2          And on page 43, in the willfully causing instruction,

3  your Honor read at the bottom of page 43, the word "provide" as

4  "proving" which I think was correct in one's mind -- as

5  providing, though I think it meant proving.  But I think the

6  intent of the instruction was clear.  Just making a note for

7  the record.

8          THE COURT:  Very well.  Anything else?

9          MR. CHANEY:  No, your Honor.

10          MR. MARK:  No, your Honor.  Thank you.

11          We'll take a fifteen-minute break.

12        (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:  We're going to take our breaks.  It's

3   going to be 15 minutes.  So, please be prepared to come back at

4   20 minutes of the hour.

5        you are still not to discuss the case.

6        (Jury not present)

7        THE COURT:  Fifteen minutes.  Don't be late.

8        MR. MOORE:  Your Honor, I want to discuss this with my

9   client.  But I know Juror No. 3 appeared to be asleep during

10  large portions of your charge.  And I know that she has a copy

11  of it, but that has been a persistent issue throughout this

12  case.

13        MR. MARK:  Your Honor, I mean, I noticed that she had

14  at some times seemed to have her eyes closed, but it didn't

15  necessarily appear to me that she was necessarily asleep, as

16  opposed to just closing her eyes.

17        THE COURT:  Mr. Moore, let me know any application you

18  want to make.

19        MR. MOORE:  Yes, sir.  I need to discuss it with my

20  folks.

21        THE COURT:  All right.

22        (Recess)

23        (Continued on next page)

24

25

1          (Jury not present)

2          MR. SOLOWIEJCZYK:  Your Honor, do you intend to take a

3    break during the summation?

4          THE COURT:  We'll see how --

5          MR. SOLOWIEJCZYK:  I think it's going to be two hours,

6    but, honestly, I'm not positive.  I think about two hours.

7          THE COURT:  Not positive on the high or low?  I'll ask

8    Ms. Bustillo.

9          MR. SOLOWIEJCZYK:  She probably knows better at this

10   point.

11         MS. BUSTILLO:  Perhaps closer to two hours, your

12   Honor.

13         MR. MOORE:  And, your Honor, we're skimming through

14   their slides.  We just got them a few minutes ago.  I doubt

15   that there's going to be anything objectionable, but I'm just

16   skimming them.

17         THE COURT:  I'm sure you'll find something.

18         MR. MOORE:  I really do believe as a general rule --

19         (Jury present)

20         THE COURT:  Everyone, please be seated.

21         Ladies and gentlemen, because the government has the

22   burden of proof, it is traditional that they go first, and so

23   we will begin with the government's opening summation.

24         Mr. Solowiejczyk.

25         MR. SOLOWIEJCZYK:  Thank you, your Honor.

1    Good morning.  Ladies and gentlemen, over the past two

2    weeks you have seen a whole lot of cash change hands in hotel

3    rooms in Las Vegas, in New York, and in between.  Why was

4    Christian Dawkins flying around the country handing out

5    envelopes filled with cash to NCAA men's basketball coaches?

6    Why was Merl Code introducing Dawkins and his new business

7    partners to more and more of these coaches?

8    You know the answer to that question now, and it is

9    simple: to bribe them.  To pay these coaches in return for

10   steering their players to Christian Dawkins and his new

11   company, because getting those top players as clients could

12   mean huge profits for Dawkins.  And the defendants were willing

13   to do anything to reap those rewards, even if it meant paying

14   bribes to the people that the player trusted most, their

15   coaches.

16   You know that none of these coaches were allowed to be

17   taking any of this money, and the defendants knew that too.

18   You know that the defendants paid these bribes to get ahead, to

19   cheat.  The defendants wanted to ensure that the corrupt

20   coaches they were paying manipulated these players.  They

21   didn't care what this meant for the kids themselves, that they

22   would never have the opportunity to make informed choices about

23   one of the most consequential decisions in their lives, which

24   agents and advisers to entrust with their newfound wealth.

25   Thanks to the defendants' bribes, the fix was already in.

1    When these coaches would tell these young athletes

2    that they should go with Dawkins and his associates, it wasn't

3    because they thought they were the right advisers to entrust

4    and safeguard these kids' interests.  No, unbeknownst to these

5    athletes, it was because the coaches were getting paid off.

6    And, ladies and gentlemen, because of all of those things, you

7    know that these defendants are guilty.

8    Now, this is the government's closing argument, and

9    it's our opportunity to walk you through all the evidence that

10   you've heard in this case to show you how, when you take all of

11   that evidence together, it proves that these defendants are

12   guilty beyond a reasonable doubt.  Ladies and gentlemen, the

13   evidence in this case, taken in its entirety, is overwhelming.

14   So here is how I'm going to proceed.  First, I'm going

15   to talk about Christian Dawkins' testimony and why you simply

16   cannot credit a word that he said on that witness stand under

17   oath yesterday and the day before.

18   Second, I'm going to talk to you about all the

19   important reasons why you know that these defendants are

20   guilty.  Almost every single shred of evidence in this case

21   consists of the defendants' own words and their own actions,

22   all of it caught on tape.

23   Third, I'm going to address some of the arguments that

24   have been raised by the defense and why, when you scrutinize

25   those arguments, they simply don't make any sense.

 1              Finally, I'm going to talk to you briefly about the

 2     specific crimes that the defendants are charged with and why,

 3     when you apply the law as Judge Ramos has instructed you on it,

 4     you will find these defendants guilty.

 5              So, ladies and gentlemen, let me start right out of

 6     the gate with the testimony that you heard from Christian

 7     Dawkins who, over the past two days, took that witness stand

 8     and lied to you under oath repeatedly.  Now, ladies and

 9     gentlemen, let me be clear about something.  The defendants in

10     this case, they don't have the burden.  The government has the

11     burden, and we embrace that burden.  But when the defendant

12     chooses to present evidence, when a defendant chooses to

13     testify, you have an obligation to scrutinize that evidence and

14     that testimony.  And when you do that, you are going to quickly

15     realize that what Christian Dawkins told you is simply not

16     credible.

17              You heard a lot from Dawkins when he testified about

18     how really this was all just a big hustle; that he was trying

19     to steal the undercover FBI agent's money, Jeff D'Angelo; that

20     he didn't really pay any coaches with an intent to bribe him.

21     That's the central thrust of Mr. Dawkins' defense, because when

22     you get caught on tape talking about bribing coaches and when

23     you get caught on tape actually paying coaches envelopes full

24     of cash, well, that's all very hard to explain away.

25              But, ladies and gentlemen, when you actually look at

1  the evidence in this case, the things that Christian Dawkins

2  said, the things that Christian Dawkins did when he didn't know

3  anybody was listening, you know that he's lying, because a

4  number of the things Mr. Dawkins said in this courtroom under

5  oath were demonstrable lies, lies both big and small.  The fact

6  that Dawkins was willing to so cavalierly lie to you while

7  testifying under penalty of perjury, it tells you everything

8  that you need to know, because the biggest lie Dawkins told you

9  was that he never paid any college coaches and that he never

10  intended to bribe them.

11        Now, I'm not going to walk through all of the lies

12  that Mr. Dawkins told you over the past two days.  I'm just

13  going to talk about two, two demonstrable lies, two of the most

14  egregious.  When you consider those lies, you're going to

15  quickly realize you can't credit a word that Christian Dawkins

16  said.

17        So let me start with the first lie, the Preston Murphy

18  story.  You heard during this trial about a series of meetings

19  that took place in Las Vegas in which Christian Dawkins, Jeff

20  D'Angelo, and Marty Blazer met with a series of men's college

21  basketball coaches, and you saw on tape that they went ahead

22  and paid a bunch of them, right?  You heard and you saw those

23  two lies that Preston Murphy got paid on tape, right?  You saw

24  the envelope in his hands.  That was a meeting on July 28,

25  2017.

 1      This evidence is a big problem for Christian Dawkins

 2  because it clearly shows him -- he's right there, right -- on

 3  camera right as his new business partners and he are handing a

 4  cash bribe to a coach who's literally wearing a shirt with his

 5  university's name on it.  And in that conversation, you'll

 6  recall, Murphy's talking about a player that he's going to be

 7  able to steer to them in exchange for this money.

 8      So what does Christian Dawkins do?  Well, ladies and

 9  gentlemen, if you look at a transcript of the recording of this

10  meeting, there's a discussion of a player named Marcus

11  Phillips.  Dawkins sees this transcript and he senses an

12  opportunity.  You see, Dawkins knows that there is no player

13  named Marcus Phillips that played on the Creighton team.  So

14  what does he do?  He makes up a story to explain away the fact

15  that he got caught on tape paying Preston Murphy.

16      This is what he told you under oath, ladies and

17  gentlemen:

18      "We had a conversation, and then we were going to act

19  like we were having meetings, act like we were going to be

20  funding coaches, but in turn really get the money back from the

21  coaches and keep it in the company."

22      And to support his tale, Dawkins told you a very

23  specific lie.  He told you that in advance of the Preston

24  Murphy meeting, he prepared Preston Murphy about what to say,

25  and they agreed that they were going basically make up a player

1    because these bozos, Jeff D'Angelo and Marty Blazer, who didn't

2    know a thing about basketball, they weren't going to know the

3    difference anyway.  So they could have said the name of any

4    player.

5              This is what Dawkins told you:

6              "You indicated during the meeting that Marcus Phillips

7    was a potential NBA player, didn't you?  And you were

8    projecting Marcus Phillips was going to be the perfect future

9    client for Loyd Management, right?"

10             THE COURT:  Mr. Solowiejczyk, could I ask you to slow

11   down when you read.

12             MR. SOLOWIEJCZYK:  Sorry.  My apologies, your Honor.

13             "Mr. Dawkins, who is Marcus Phillips?

14             "He was just a random person who he made up.  Marcus

15   Phillips has never played for Creighton."

16             You remember this testimony.  Dawkins didn't stop

17   there, though.  During his direct testimony, he told you more

18   specifics about the supposed conversation, more details about

19   what he claimed went down in Las Vegas.  He said that he and

20   Preston Murphy had a conversation in advance in which he told

21   them:  Hey, Preston, listen, just come in here, help me out.  I

22   told them because they were supposed to give me a payment for

23   25,000; 6,000 for Preston was allocated, just say whomever.

24   Preston just happened -- he said, We can use any name?  And I

25   said, Yes.  He said Marcus Phillips, and they bought it.

1     According to Dawkins, even though you saw with your

2  very own eyes Preston Murphy getting money, this wasn't

3  actually a bribe because as he told you afterwards, supposedly,

4  he met with Preston Murphy in the bathroom:

5     "What happened after Preston left the hotel room with

6  the $6,000?

7     "Well, went down to the casino floor, went in the

8  bathroom of the casino.  He handed me the money back in the

9  stall.

10     "Were you guys laughing?

11     "Yeah.  Yeah, it was pretty funny."

12     Pretty great story.  Pretty entertaining too, Dawkins

13  running a clever hustle on his supposed financial backer who,

14  it turns out, was actually an undercover FBI agent.  And

15  Dawkins, when he took the stand under oath, he certainly told

16  it to you in convincing fashion.  He definitely sold it.

17  Here's the problem, ladies and gentlemen.  It's not true.  He

18  made the whole thing up.

19     What really happened?  Dawkins' entire story hinges on

20  the fact that he and Preston Murphy met beforehand and agreed

21  that, as part of their hustle, they were just going to make up

22  the name of a fake player because, of course, if Dawkins is

23  actually caught on tape talking about a real player with

24  Preston Murphy in the same breath that he was paying Preston

25  Murphy, well, that would be a pretty big problem for Christian

1  Dawkins, wouldn't it?

2         But here's the problem.  Dawkins and Murphy didn't

3  make up a player in the meeting.  The transcript that Dawkins

4  relied on in order to concoct this entire story, it's

5  incorrect; it's wrong.  As you heard from Judge Ramos a few

6  minutes ago, the transcripts are an aid, but it is the

7  recordings that ultimately you must rely on as the evidence.

8         So who did Dawkins and Murphy actually talk about in

9  that meeting?  Not Marcus Phillips.  No, they spoke about a

10 player named Marcus Foster.  Let's listen to the actual

11 recording that is in evidence.

12         (Audio played)

13 MR. SOLOWIEJCZYK:  The audio is a little rough, ladies

14 and gentlemen, but it's clear that they said Marcus Foster, not

15 Marcus Phillips.  When you're in that jury room, you can

16 request to listen to this audio.  You can request headphones

17 and put them up at full volume and hear for yourselves.  And we

18 respectfully submit that when you do that, it's going to be

19 very clear that they said Marcus Foster, not Marcus Phillips.

20        Well, Dawkins' story begins to fall apart from there,

21 doesn't it?  Because if they were talking about a real player

22 when Murphy got paid, this whole thing is very, very

23 incriminating.  Because who is Marcus Foster?  He was actually

24 on the Creighton team in the summer of 2017, and Dawkins

25 admitted this on cross-examination:

1    "Now, it's your understanding that there's a player --

2   or there was a player on Creighton's team named Marcus Foster?

3    "There was a Marcus Foster, yes.

4    "Marcus Foster, correct?

5    "Correct."

6    So what about that conversation with Preston Murphy

7   that he told you about where they supposedly agreed to make up

8   a fake player and how they laughed about it afterwards?  None

9   of it ever happened.  It's a lie.  It's all entirely premised

10   on an error in the transcript.

11    What's really interesting about the way Christian

12   Dawkins lied to you about the Preston Murphy meeting is that he

13   tried to concoct a story that he thought was most to his

14   advantage.  He saw an opportunity in the transcript, a name of

15   a player that he knew didn't exist, and he tried to use that to

16   his maximum benefit.  He tried to talk his way out of this.

17   That's what he does.  He cheats and he lies to get ahead.  When

18   he told you that he was really in Vegas to hustle Jeff

19   D'Angelo, in reality, he was just trying to hustle you by lying

20   about what happened under oath.

21    But, ladies and gentlemen, that's not the only lie

22   that Christian Dawkins told you when he took the witness stand.

23   He told another really big, really significant lie about Las

24   Vegas, and this one, it totally wrecks this fantastical tale

25   that he wove for you on that witness stand under oath.

1    According to Dawkins, even although he saw Preston

2    Murphy, Corey Barker, and Tony Bland get bribed on tape, that

3    isn't what really happened.  Your eyes deceived you.  What

4    really happened, according to Dawkins, is Preston Murphy got

5    $6,000, they met in a bathroom, and Dawkins and him exchanged

6    the $6,000 back, and they had a good laugh.

7    Let me just note something, ladies and gentlemen,

8    because this is a commonsense argument.  You all know from this

9    trial that these coaches, if they get caught taking this money,

10   they can get fired.  Use your common sense.  Do you really

11   think they were all going to put their jobs in jeopardy to help

12   Christian Dawkins run a little scam on his new business

13   partner?  It makes no sense.  But I'm about to prove to you

14   it's a total lie.

15   So he says, 6,000 for Preston Murphy.  Then he says,

16   6,000 for Corey Barker, yeah, you saw that on tape, but it

17   didn't happen.  We met and he gave me the money back.  And then

18   Tony Bland, 13,000, yeah, you saw that on video.  Well, you saw

19   the envelope, and then they went out of the room, but the

20   reality is, yeah, basically, I kept all that money.  I gave

21   Tony Bland $2,000.  I kept the rest; I kept the 11,000.

22   I'm just going to show you this testimony on this very

23   briefly, ladies and gentlemen:

24   "Did you ever give Tony Bland that 13,000?

25   "No, I did not.

1         "How much money did you give Tony Bland?

2         "Tony Bland got between a thousand and $2,000, I

3    believe.  It wasn't more than 2,000 for sure.  So the rest of

4    the money, I didn't give Tony; I deposited in my bank account,

5    the Loyd Inc. bank account."

6         That's what he told you.  Then, ladies and gentlemen,

7    as you recall, Mr. Haney walked Mr. Dawkins through the bank

8    statements for the Loyd account.  As you recall, Mr. Haney

9    focused on three deposits: a counter credit of $5,000 on

10   July 28; an ATM deposit of $8,900, and it was actually on

11   July 29, even though it says 7/31, if you look at the line

12   item, it was July 29 in Las Vegas; and then a counter credit of

13   $8,000 on August 3, 2017.

14        During his direct testimony, Dawkins told you that

15   when you total up these three deposits -- well, let me take a

16   step back.  First of all, Dawkins told you that he personally

17   made these three deposits.  He told you that under oath, that

18   these three deposits happened in Las Vegas, that he made these

19   three deposits.  This is what he said:

20        "So would you agree with me that in the period of six

21   days, you deposited $21,900 or $21,900 in credits to your bank

22   and Bank of America out in Las Vegas?

23        "Yes."

24        So he told you, I made these deposits.  Then Dawkins

25   compared these deposits against what he said each of the three

1   coaches had given him back, and the upshot of that testimony

2   under oath was that the deposits in the Bank of America account

3   basically match up almost perfectly with the amount of money

4   that Dawkins told you that Murphy, Barker, and Bland had handed

5   back to him as part of this supposed hustle.

6          He said the payments were 13,000 for Bland, 6,000 for

7   Murphy, 6,000 for Barker.

8          "So you would agree that if you gave Tony Bland 2,000,

9   11,000, 6,000, and the 6,000 would equal 23,000, almost exactly

10  the amount of the deposits reflected on the bank statement in

11  Las Vegas around the end of July and early August, correct?

12          "Correct."

13         This was the crux of Dawkins' story, that he was just

14  taking these fools' money out in Las Vegas, that he actually

15  had gotten back the money handed off to the coaches and

16  deposited it into the Loyd account, and that there was $23,000

17  that went to the coaches and $21,900 that went into the bank

18  account.

19         There's just one problem.  This story, it doesn't

20  stand up to even the most basic scrutiny because what Dawkins

21  did here, it's actually very, very similar to what he did in

22  lie number 1, the Preston Murphy lie.  You see, Dawkins looked

23  at the bank statements that showed the deposits, but he never

24  bothered to look at the underlying bank records.  And those

25  underlying bank records, they prove that he's lying.  You

1  should take a close look at these bank records when you

2  deliberate, they're Government Exhibit 1401E, because when you

3  do, it blows a giant hole in Dawkins' story.  That $8,000

4  deposit on August 3 that Dawkins told you under oath he made in

5  Las Vegas, huh-uh, it's a check from Preston Advisory Group

6  from Munish Sood.  It's not cash.  Dawkins didn't deposit it in

7  Las Vegas.  Pretty big lie, but he wasn't done yet.

8          He lied again about the bank records.  This one's an

9  even bigger lie.  Then he told you under oath that the $25,000

10 reflected on the August 1 Loyd bank statement, let's just --

11 that's there, right?  He saw the bank statement.  What lie is

12 he going to concoct now?  Let's look at the testimony:

13          "Now, on this same bank record we see $25,000 deposit,

14 correct?

15          "Correct.

16          "Very top?

17          "What was your understanding that was for?

18          "So, obviously, Jeff had, you know, expressed that he

19 wanted to pay coaches.  That was the way he wanted to run the

20 business.  I wasn't so sure that he was going to actually give

21 me the money.  So for protection, I set up three meetings where

22 money would be transferred, one for 13,000, one for six, one

23 for -- another for six.  It equals 25 -- which equals to be

24 25,000.  On the first, August 1, I actually did get 25,000.  I

25 was assuming for -- for actually fulfilling my

1    responsibilities.  It went into recruiting expenses and

2    everything like that.  But they actually did come through with

3    the number that they were supposed to give me."

4              Then he went on:

5              "Were you working anywhere other than with Loyd

6    Management?

7              "No.

8              "Was there any other money that you had coming in from

9    any other works that you were performing?

10             "No.

11             "Would there be any other reason why your bank or the

12   Loyd Management account would reflect those deposits other than

13   what you're testifying to today?

14             "No.  Everything that was deposited was given to me

15   from the government."

16             That's what he said.

17             Yet again, he was lying.  His elaborate explanation

18   about how this $25,000 deposit was Jeff D'Angelo coming through

19   with what he had promised, the whole thing is just a lie.  The

20   counter credit of $25,000 on August 1, it wasn't a deposit at

21   all from D'Angelo.  As you saw during Mr. Boone's

22   cross-examination of Mr. Dawkins, this was, in fact, a check

23   for $25,000 from a fellow named Ricky Robertson in consulting

24   fees.  And as you saw from text messages that Mr. Boone showed

25   Mr. Dawkins during cross-examination, it was Merl Code, not the

1   government, that had caused that deposit into Dawkins' Loyd

2   account.   There are text messages between them at Government

3   Exhibit 102T2 relating to this, and you can look at them in the

4   jury room.

5          Indeed, as Dawkins acknowledged under

6   cross-examination, that $25,000 check from Ricky Robertson

7   related to an entirely separate scheme to send this guy named

8   Brian Bowen to the University of Louisville.   This is what

9   happened:

10         "Do you know the name Ricky Robertson?   You've heard

11   in a name before?

12         "Yes.

13         "Ricky Robertson doesn't for the FBI, right?

14         "No.

15         "He doesn't work for the U.S. Attorney's Office?

16         "No.

17         "He's a grassroots basketball coach, correct?

18         "Yes.

19         "Coaches a team called Caroline Chaos, right?

20         "It's your understanding that the bank account of the

21   Carolina Chaos was used in the Brian Bowen --

22         "It was.

23         "-- situation?

24         "Yes.

25         "That's what led to your previous conviction?

1            "Yes."

2            So that $25,000 deposit that Dawkins told you was from

3    his new business partners that later he realized were

4    undercover FBI agents, that wasn't true either.  Think about

5    the audacity of this lie, ladies and gentlemen.  It is

6    staggering.  Mr. Dawkins under oath tried to say that a deposit

7    that's actually related to a separate fraud conviction was

8    instead a deposit from the government that bolstered his

9    defense in this case.  Bottom line, you can't trust a word that

10   Christian Dawkins said to you over the past two days, not a

11   word of it.

12           Ladies and gentlemen, it's no surprise that Christian

13   Dawkins lied because, as you heard, Dawkins has been convicted

14   of wire fraud previously, an offense that involves lying.  That

15   was directly related to his activities in the world of college

16   basketball.

17           All right.  So now let's get to the meat of it, the

18   biggest lie of all of them.  When Dawkins said this under oath:

19           "Mr. Dawkins, lastly, based on the evidence that we've

20   seen, the bank records, your testimony, did you ever pay a cash

21   bribe to any of the coaches you are charged with in this case?

22           "I never paid a coach with the intent of bribing or

23   influencing him to do anything for me."

24           That's a lie too.  Now, to be clear, ladies and

25   gentlemen, no one here is saying that Dawkins thought paying

coaches was the end-all and be-all of recruiting players.  The

evidence clearly shows that Dawkins sometimes thought it made

sense to pay coaches and sometimes he thought it made sense to

pay other people who were close to the player.  He certainly

didn't want to spread the money around to coaches, as he put

it, idiotically.  He wanted to be strategic.  But when

Christian Dawkins got on the stand and told you that his

legitimate business model was to pay anyone and everyone --

players, families, handlers, uncles, aunts -- everyone except

coaches, that's not credible.  It's not credible on its face.

It's not credible from such a demonstrable liar, and it's

contradicted by the evidence in this case, and it's

contradicted by your common sense as well, ladies and

gentlemen.

          So let me walk you through that evidence now step by

step.  It's going to take a little while, I'll warn you,

because there's a lot of it.  Let me start by talking about the

four main reasons why you know Christian Dawkins and Merl Code

are both guilty.

          So, basically, everything that I'm going to talk about

during this section is the defendants' own words and actions.

All of it, paying the coaches, seeking that they do something

in return, it's all on tape.  And there's really no dispute

here that everybody knew in this case, and these defendants

certainly knew, that paying coaches was not something they were

1    allowed to be doing and that the coaches were going to be fired

2    if they were ever found out.  I'll turn back to that a little

3    later.

4           But keep in mind, as I go through this, I'm just

5    quoting the defendants' own words.  I'm just telling you about

6    their own actions, that's it.

7           So let me start with a very straightforward point, but

8    it's an important one.  We know, you know that the coaches got

9    paid.  You know that Christian Dawkins made some of these

10   payments himself, and you know that he caused other people to

11   make certain of the other payments.  So let me start right

12   here, right up front.  The two payments that I'm going to talk

13   about first, when Christian Dawkins got on the stand, he had no

14   credible explanation for these payments, and the payments I'm

15   referring to are the payments that were going to Lamont Evans

16   and the $15,000 payment to Emanuel Richardson.  Those two

17   payments, among many, many other payments I'm going to talk

18   about, but those two payments especially, are devastating

19   evidence of Christian Dawkins' guilt, and you can convict him

20   on all of the counts in this case just based on those two

21   payments.

22          Ladies and gentlemen, you know why Dawkins made these

23   payments.  The evidence is clear.  Dawkins fed money to these

24   coaches to get players as clients in return.  Let me start with

25   the Lamont Evans.  Back in late 2015 and early 2016, as you

1    heard, Christian Dawkins had never met Marty Blazer yet; he

2    never met Jeff D'Angelo yet.  What was Christian Dawkins

3    already doing?  He was bribing coaches, namely, Lamont Evans of

4    the University of South Carolina.  How do you know this?  It's

5    very straightforward.  Christian Dawkins told you himself in

6    his own words on recording after recording in this case that he

7    paid Evans.  Not paying Evans for his health, not paying Evans

8    for kicks, paying Evans to get one of his players as a client.

9            And one of the very first times that Christian Dawkins

10   spoke to Marty Blazer, he laid the entire thing out for him.

11   Dawkins set up an in-person meeting for Blazer and his business

12   associate Munish Sood with Lamont Evans so they could talk

13   about these payments that were going to happen.  And you

14   listened to a lengthy recording of that meeting.  It's

15   Government Exhibit 501A through 501F.  When you go back in the

16   jury room, you should focus on these exhibits because when you

17   do, it's going to be plain as day to you that Christian Dawkins

18   was bribing coaches well before he ever met Marty Blazer or

19   Jeff D'Angelo.

20           So what does Dawkins say after they meet with Lamont

21   Evans that day in South Carolina?  He tells Marty Blazer and

22   Munish Sood in the car ride back, in significant detail, how he

23   has been paying Lamont Evans in recent months.  He says:  I

24   mean, I know I was giving him 2,500 a month for a couple of

25   months.  He was needing shit when the kid first got here.  I

1    was just coming to do the drop down here.  Or you know, Lamont

2    recruit in the Atlanta.  See him in Atlanta, go to the bank,

3    give him the 2500.  He ain't gonna do shit like that now, on no

4    paper, no paper and shit.

5           That's what he said when he didn't think nobody was

6    listening.  That's actually the entire reason he was talking to

7    Marty Blazer.  He wanted Blazer to take over the payments that

8    he had been making to Evans.  That's exactly -- what Christian

9    Dawkins asked what happened, did Blazer take over paying Evans,

10   that is exactly what happened.  That all happened at Christian

11   Dawkins' direction and behest.  So from the outset the idea to

12   pay coaches belonged to one person, and one person alone, in

13   this case:  Christian Dawkins.

14          And Dawkins wasn't just saying that he was paying

15   Evans to Blazer and Sood.  If you look at some documents that

16   we put into evidence from his old employer, ASM Sports, this is

17   an email from Christian Dawkins to Andy Miller who, as you

18   know, was a major sports agent who was his boss.  And in this

19   email, he mentions that he's looking for a favor.  The other

20   favor is for Lamont Evans from South Carolina, the guy who has

21   PJ Dozier, and he's asking Andy Miller to pay for a flight that

22   Lamont Evans is asking him to pay for.  And he also

23   acknowledges in this email that Lamont Evans is controlling the

24   PJ Dozier situation.  That's an important point, ladies and

25   gentlemen.

1    So you know that Dawkins' payment to coaches did not

2    stop there.  That was actually just the beginning.  As you saw,

3    what Dawkins set in motion with Lamont continued.  Marty Blazer

4    took over these payments, and he testified about how he was

5    making payments to Lamont periodically from 2016 through 2017.

6    Blazer and Dawkins didn't talk for a while, as you heard,

7    because Blazer was having some troubles that came out with the

8    SEC, as he testified to, that he had stolen well over a million

9    dollars of his client's money, and Dawkins kept his distance.

10    But then, as you heard, Dawkins got fired from ASM

11    Sports.  And as you heard during cross-examination, the NBA

12    Players Association did an investigation of Dawkins, and they

13    issued a memo indicating that he had run up charges on Uber

14    without a client's permission.  And you heard that this memo

15    went out to all NBA players and all NBA agents.

16    So now Dawkins no longer had the backing of the big

17    sports agency, and he needed to find some funding to stay in

18    the business.  So he went in search of new money.  He

19    reconnected with Blazer and the new potential business partner

20    named Jeff D'Angelo.  What did Dawkins tell -- excuse me, what

21    did Blazer tell Dawkins on the very day that they signed the

22    shareholder agreement to create Loyd Inc.?

23    I never stopped.  When you set that into motion with

24    him and doing what he needed to have done, I never backed away

25    from that.  He was referring to Lamont Evans, as you recall.

1    Blazer told Dawkins straight out:  We're still paying

2    Lamont Evans.  And then he even went on to tell him the

3    specific amount they were paying him per month, $4,000 per

4    month.

5    So what was Christian Dawkins' response to all this

6    when he heard it?  Did he say, Hey, I think you guys shouldn't

7    be paying coaches?  Hey, Marty, I think this is idiotic?  No,

8    of course not.  Because by this point Christian Dawkins has

9    already paid coaches in the past, and he understands that there

10   can be some value in paying coaches.

11   What did does he say?  He says:  You guys are paying

12   the wrong coaches.  Let me tell you who we should really be

13   paying, the elite, elite dudes, guys like Emanuel "Book"

14   Richardson of the University of Arizona, because guys like him,

15   they've got access to top ten draft picks every year, unlike

16   Lamont Evans.  He wanted to make it smarter and get the most

17   bang so everybody can make money.

18   These are the words of Christian Dawkins, ladies and

19   gentlemen.  It's Christian Dawkins' idea to pay Book Richardson

20   because he knows Book Richardson can steer him some of the best

21   top talent in college basketball.  And all of this, this

22   conversation, this all predates Dawkins' supposed pivotal

23   decision to run some kind of hustle on the FBI agent.

24   On June 6 when this conversation happened, Dawkins had

25   spoken to Jeff D'Angelo a handful of times.  So what did

1   Dawkins do?  He wasn't just talking about this.  He then went

2   ahead and made the payments to Richardson happen.  He set up a

3   meeting with Richardson a few weeks later in New York at the

4   Conrad hotel.  And as you saw in the video of that meeting,

5   Richardson got paid $5,000.

6          Now, a few weeks later, Richardson reached back out to

7   Dawkins, and he said he needed $15,000.  Why did Richardson

8   need $15,000?  Well, Christian Dawkins told Munish Sood why.

9   It was to land a recruit that he wanted to get to come to the

10  University of Arizona, a kid named Jahvon Quinerly.  And

11  Dawkins said to Sood, Book needs 15, but what he's saying is

12  that's going to close the deal for him with the kid he's trying

13  to get.  That gets it done.

14         And then you know that after this Dawkins spoke to

15  Richardson as well, and he told Richardson -- mind you, this is

16  a conversation where there are no -- there's no Jeff D'Angelo

17  around.  There's no Marty Blazer around.  This is just between

18  the two of them, when they don't think anybody's listening.  So

19  this is very crucial evidence, Government Exhibit 114T.

20         Dawkins:  Real quick, so Jeff can do this 15.  You

21  cool with that supplemental, like three months, basically?

22         Checks with D'Angelo.  He's like:  Can I get the

23  15,000?  D'Angelo eventually says yes.  And he tells

24  Richardson, I'm going to get you the $15,000 that you need.

25         I'll return to talk about this more, ladies and

1    gentlemen, but you should pay particular attention to 142 and

2    114 because those are two particularly devastating pieces of

3    evidence of Christian Dawkins' guilt.  These exhibits show you

4    that the self-serving explanations that Christian Dawkins

5    provided to you over the past few days, they don't hold up when

6    you actually consider what Dawkins was doing and what he was

7    saying in real time to people like Emanuel Richardson, not to

8    people like Jeff D'Angelo or Marty Blazer.

9         In these calls, Dawkins is adamant that Jeff D'Angelo

10   should pay this money to Richardson, and he's very, very clear

11   about the reason why he thinks Jeff D'Angelo should pay.  He's

12   pushing and prodding because he wants to get a player out of

13   this.  That's what's in it for him.  He's not a booster for the

14   University of Arizona.  He's a businessman.

15        Dawkins caused $20,000 in cash payments to Richardson.

16   All -- this is all Christian Dawkins' doing.  It's all his

17   idea.  He's the one who suggests Richardson when they tell him

18   that they've been paying Lamont Evans.  He's the one that ups

19   the ante and makes the $15,000 payment happen.  What Dawkins

20   was trying to do was find the best coaches to pay, and Book

21   Richardson fit the bill because he had access to the top

22   players in college basketball, and that's why Christian Dawkins

23   got Book Richardson paid.

24        Christian Dawkins wasn't done paying coaches yet.  Now

25   he enlisted some help to expand the network of coaches that

would be paid.  He brought in Merl Code so that Merl Code could

help make introductions to yet more coaches.  Every

conversation, every cash payment in Vegas, it's all caught on

tape.  And I already went over this in responding to the

various lies that Christian Dawkins told you, but just to

remind you briefly, Preston Murphy got $6,000, Corey Barker got

$6,000, and Tony Bland of USC got $13,000.  And some of the

coaches in Las Vegas that were on the schedule that Merl Code

sent, they didn't get paid, but some of them did, Preston

Murphy of Creighton and Tony Bland of the University of

Southern California.  Those are both meetings that are on the

schedule that Merl Code sent to Christian Dawkins in advance of

the Las Vegas meetings in late July.

          Now, ladies and gentlemen, this is another important

point.  All these payments to coaches that were going on, Merl

Code knew all about them.  By the time Merl Code teamed up with

Christian Dawkins, he knew exactly who he was dealing with.  He

knew that Christian Dawkins bribed coaches.  He knew that Jeff

D'Angelo and his business associates did too.  Let me just

point you to a couple of pieces of evidence that show you this.

          When it comes to Lamont Evans, Merl Code told Munish

Sood when he didn't think anybody was listening that he knew

Christian had given Lamont Evans money for a kid in the past.

Merl Code was aware of that.  What about Book Richardson from

Arizona?  Merl Code knew that Christian Dawkins and his

1    business associates had paid Emanuel Richardson.  Indeed, Merl

2    Code knew that Emanuel Richardson got paid $5,000 hours before

3    Merl Code met with Jeff D'Angelo and Marty Blazer and Christian

4    Dawkins on June 20 in New York.  You know this because Dawkins

5    told Code himself in an intercepted telephone call:

6            How'd it go with Book?

7            Book, I'm pretty sure Book got like five g's because

8    he hit me saying everything was good.

9            And Code says:  We didn't discuss numbers, because I'm

10   not even sure if he wanted me to know.

11           Code acknowledges the same thing when he sits down

12   with D'Angelo and Blazer and Dawkins at the meeting on June 20.

13   They're talking about the Book meeting:

14           I'm pretty sure he left happy, so -- that's what

15   D'Angelo says.

16           And Code says:  He was happy.

17           He knew he got the $5,000.  What did Merl Code do at

18   that point?  He started accepting money in exchange for

19   introducing these gentlemen to more coaches, lots of coaches.

20   And surprise, surprise, some of those coaches got paid too,

21   including Preston Murphy and Tony Bland.

22           I'll talk about all of that and how all of the other

23   evidence proves beyond a reasonable doubt that Merl Code is

24   guilty later on in this closing statement.

25           What's the second reason that you know these

defendants are guilty?  It's the reason that the defendants

were making the payments in the first place.  Because, ladies

and gentlemen, make no mistake, the driving purpose behind

these payments was exactly what your common sense tells you it

is, to get the coaches to steer the players to the guys making

the payments.

And I just want to note one thing here, and Judge

Ramos already instructed you on it, but it's important.  At

bottom, the charges in this case turn on the fact that these

defendants intended for these coaches to do something in return

for the money they were provided.  You already heard about the

details of that from Judge Ramos.  That's exactly what happened

here.  These defendants clearly intended to get something in

return from these coaches, namely, that the coaches would use

their influence and power to steer their players to Dawkins and

his new company.

So let's talk about some of the evidence that tells

you that this is the case.  Dawkins made no secret about why he

was paying coaches.  He said it actually explicitly over and

over again, straight to the faces of the coaches that he was

paying.  He said it to D'Angelo.  He said it to Sood.  He said

it to Code.  He said it to coaches when nobody else was around.

He said it to everyone.

So let's start with Lamont Evans.  March 3, 2016,

meeting with Lamont Evans in South Carolina.  Christian Dawkins

1    lays the whole thing out at that meeting.  It's devastating

2    evidence of his guilt, open and shut.  At that meeting, right

3    in front of Lamont Evans, the coach that he has been paying, he

4    tells Marty Blazer and Munish Sood why he's being paying Evans.

5    He says:  You gotta get the college coaches too, because if I'm

6    coming to talk to him about PJ well, F, you need to be talking

7    to him.

8            He's telling them right up front, if you want to get

9    PJ Dozier, you need to work with Lamont Evans.

10           And then he went on.  He explained that Lamont Evans

11   would be in a position, because he was the coach, to block out

12   the competition, to block out the other agents, because he was

13   with PJ Dozier every day.  You need to get in bed with somebody

14   like him now so you've got complete access to the kid.  He can

15   control who else comes in this bitch, because if the coaches

16   say, yo, can't nobody come around, can't nobody F'ing come

17   around.

18           He said all of that in front of Lamont Evans at that

19   meeting.  He summed it up right there:  This is why I'm paying

20   coaches.  This is what I expect in return from them.  This

21   evidence shows that Dawkins is guilty.

22           Now, Dawkins said the same thing in front of numerous

23   other coaches that he either paid himself or caused his

24   business associates to pay.  Let's talk about Emanuel

25   Richardson for a minute.  When Dawkins went out to Arizona with

1  Jill Bailey and Munish Sood to meet with Emanuel Richardson in

2  late August, they had the following exchange.  They were

3  talking about a kid named Rawle Alkins:

4          Yeah, he's fucking clueless, clueless, but that's good

5  for us, because I showed him a breakdown of everything, if he

6  can -- I think he'll do what you tell him to do.

7          Richardson:  He will.

8          I think he'll do exactly.  You have to be very

9  specific with him, very clear-cut, like to the point where

10  you're almost talking to, like, a three-year-old.

11          That's how Christian Dawkins talks about these

12  athletes who he wants to land as clients, and he's telling Book

13  Richardson in this meeting, this is what you need to do, Book,

14  because we're paying you.  You need to tell him very

15  specifically, in a very straightforward fashion, you're going

16  with Dawkins.  He said it right there.

17          How about Tony Bland?  Well, Dawkins had substantially

18  the same conversation with Tony Bland, and Bland told Dawkins

19  and his new business partners that he was going to get them the

20  players.  He offered to put them in the lap of you guys.  Why?

21  Because Dawkins was giving him money.  He was offering to help

22  Bland recruit.  He was offering to finance Bland's future

23  needs, and they talk about this.  They talked about the fact

24  that there was a gold mine over here and that Bland saw an

25  opportunity, too, because now he was getting money from

1    somebody that he trusted.

2              Ladies and gentlemen, he said the same thing to the

3    various coaches that rolled through those Las Vegas meetings,

4    whether those coaches got paid or the other conversations that

5    you heard with coaches where they talked about potentially

6    paying them in the future to help them recruit.

7              You saw this exchange with Corey Barker:

8              We gonna be able to provide you something, you know,

9    to make sure the kids you involved with, we get them back.

10             Right.

11             Pretty clear statement of this for that, ladies and

12   gentlemen.

13             Now, through his testimony, Dawkins has, of course,

14   suggested you can't credit any conversation that happened in

15   front of any of these undercovers or Marty Blazer; that all of

16   those conversations are this hustle.  But here's the problem

17   with that.  Dawkins wasn't just telling the coaches what he

18   expected in return from them in front of FBI agents or in front

19   of Blazer.  In the one-on-one conversations with the coaches,

20   he's saying the same thing.  The coaches that supposedly are in

21   on the hustle with him, when you actually look at the telephone

22   conversations between Christian Dawkins and these coaches, it's

23   clear that this is a bribe, that there is a *quid pro quo* going

24   on here.  Let me just go through a couple of examples of that.

25             The same Corey Barker who received an envelope of

1    $6,000 in Las Vegas, this is a phone conversation they had:

2    This is a layup for you.  It's a layup.

3         Ladies and gentlemen, you learned a lot about the

4    underworld of college basketball over the last two weeks.  A

5    layup is the easiest shot in basketball; meaning, I'm going to

6    serve this kid up to you on a platter.

7         It's a slam dunk, and that will be our two or three.

8    This was the conversation that Christian Dawkins and Corey

9    Barker are having when they think nobody else is listening.

10   Dawkins had substantially the same conversation with Tony

11   Bland, another coach that he had paid and he was offering to

12   finance in the future:

13        So we can just get it done and over.  Like, can we do

14   this to get it done and over with, T?

15        And Bland says:  And this is about to be my layup.

16        Dawkins then says:  I can get F'ing Elijah Stewart?

17        Bland:  No question.  No question.

18        Here's another point that's worth considering, ladies

19   and gentlemen.  All of these coaches that Christian Dawkins is

20   now suddenly getting to steer him players, as you heard from

21   the cross-examination by Mr. Boone, none of them had ever

22   previously steered a player successfully to Christian Dawkins.

23   The reason they were offering to do it now was because he was

24   paying them.

25        Dawkins and Code and the other members of this

conspiracy also spoke openly about what they expected from

these coaches amongst themselves.  When it came to Lamont

Evans, Christian Dawkins couldn't have been any more clear with

his coconspirators.  Take a look at this exchange.

          Well, one in South Carolina, he told Blazer and Sood

that this is what Evans was going to do for them.  He was going

to block everybody from coming around and give you access.

When the time is right, like, everything will be lined up

because that's his job too, meaning Evans' job.

          Later on, when Dawkins heard that Evans had been paid

over a period of many months by Marty Blazer and then Jeff

D'Angelo and Dawkins wasn't seeing results, Evans hadn't

steered them Jeffrey Carroll on Oklahoma State yet, what was

Dawkins saying?  He was saying, where's the return on

investment?  Well, first of all, it's clear that they knew that

when Jeff D'Angelo paid Lamont Evans, it was to their benefit.

          This is an exchange between Munish Sood and Christian

Dawkins:

          Jeff's funding him, so we may as well take advantage

of it.

          Dawkins:  Will do.  I like Lamont.

          When Lamont wasn't actually giving them anything in

return for this, here's what Dawkins said to Jeff D'Angelo:

          I was giving Lamont resources prior to knowing you

guys.

1        Again, another admission that he had paid Lamont Evans

2   in the past.

3        I've helped Lamont with numerous things, and he got a

4   kid right now that I want.

5        If you gonna give him the money every month, like what

6   are we talking about?  What else -- what else are we doing it

7   for?

8        Christian Dawkins laid it out again pretty simply

9   there.  If we're going to pay Lamont Evans, he better be

10  sending us players in return, this for that.  Dawkins told

11  Munish Sood the same thing.  If we're paying this F'ing guy and

12  we don't get Jeffrey Carroll, like what the F are we doing this

13  for?  This for that.  118, 119, devastating proof of Christian

14  Dawkins' guilt.

15       Now, when Christian Dawkins and Merl Code learned that

16  Lamont Evans wasn't just taking money from them and their guys,

17  that it turned out he'd been taking money from another agent

18  named Seth Cohen, what was their response to this?  Don't pay

19  Lamont Evans another nickel.  Why?  Because the entire point of

20  paying Lamont Evans was so that he could steer his players only

21  to them.

22            (Continued on next page)

23

24

25

1          MR. SOLOWIEJCZYK:  When they found out Seth Cohen was

2     also paying this guy, the payments wouldn't make any sense

3     because it would ruin the quid pro quo, for this for that.

4          Here's a call between Merl Code and Munish Sood on

5     this subject:

6          Seth has been giving him money, you know what I'm

7     saying?  Or had been.  And Christian had been giving him money

8     for a kid.  So at some point in time it becomes you just using

9     me rather than it being a necessity for the business.

10         Merl Code:  The kid is okay, but the kid isn't good

11    enough to be going through all that shit.

12         That's a pretty important conversation, ladies and

13    gentlemen, because Merl Code isn't telling Munish Sood, don't

14    ever pay any coaches.  What he's telling him is, Don't pay

15    Lamont Evans because he's taking from multiple guys and he

16    isn't delivering anything in return.

17         Because Merl Code also understands that this is a

18    "this for that."

19         Now, ladies and gentlemen, there's another common

20    sense point that tell you that these were bribes, and that's

21    that Dawkins and his new company, they had no business

22    whatsoever managing these kids' money, doing any type of

23    service for them, acting as any type of adviser for these young

24    athletes.  So, to succeed, they needed to cheat, they needed to

25    bribe, because they were never going to get any clients if they

1  didn't.

2       As you heard when Dawkins testified, he was in his

3  early 20s with no experience as an agent or manager.  He never

4  had taken care of any services for anybody.  He was just a

5  runner.  No one in their right mind would let him manage their

6  professional careers.  And that's why Dawkins needed to bribe

7  coaches.  That's why he needed to pay all these people to

8  manipulate these kids to go with him, because if this was on

9  the merits, no way Christian Dawkins was ever going to win.

10      So for this to work, they had to get an angle.  And

11  the angle was:  Let's pay these coaches; they've got a lot of

12  influence; they're going to tell these kids to go with us.  And

13  unbeknownst to these kids, the coaches are getting paid off.

14  That's what's happening here, ladies and gentlemen.

15      And Dawkins had particular problems in his ability to

16  land clients, because as you heard when he testified, he was

17  accused of using players' money without their permission,

18  running of up these Uber charges.  That was out there publicly;

19  okay?  And you heard on the cross-examination, I think on

20  direct too, literally every NBA player and their agent got a

21  memo about this.  Right?

22      And who else was Dawkins working with?  Who did he at

23  least bring to some of these meetings?  He brought Marty

24  Blazer.  And as you know, Marty Blazer, by this point -- it was

25  publicly out there -- had stolen north of a million dollars

1    from his clients, had misappropriated their money and publicly

2    settled with the SEC about this.

3           So, this team that included Christian Dawkins and

4    Marty Blazer, didn't have a chance of actually getting any of

5    these clients, unless they cheated.  And one of the ways they

6    cheated was paying bribes to coaches.

7           Let's turn to the third reason.  Ladies and gentlemen,

8    this wasn't just talk.  These coaches actually started to do

9    something in return for this money.  And even though, as you

10   heard, the defendants got arrested in 2017 and weren't able to

11   see all of this all the way through, even by then, many of the

12   coaches they were paying were starting to take action on their

13   behalf in return.

14          Let me just give you a couple of examples.

15          Lamont Evans.  When the news came out that Christian

16   Dawkins had been terminated from ASM Sports and was accused at

17   least of stealing clients' money, Lamont Evans had a phone call

18   with Munish Sood.  And in that call, Lamont Evans acknowledged

19   that various parents had been calling him, parents that he had

20   introduced Christian Dawkins to, because they were concerned

21   about the fact that Lamont Evans had set them up with Dawkins.

22          Why was Evans introducing Dawkins to these family

23   members of players?  Simple.  Because he had been paying Evans,

24   as he admitted on tape repeatedly.  And he had set up Evans

25   with Marty Blazer to continue those payments.  It didn't stop

1    there, though.  As you heard, Evans also, once he started

2    getting paid by Marty Blazer, set up an actual meeting between

3    Blazer and Jeffrey Carroll in West Virginia, and later on

4    during his testimony, told you what happened during that

5    meeting, which is that Lamont Evans talked him up to the player

6    and said:  You should go with this guy.  And then finally, as

7    you heard, Lamont Evans got paid $4,000 in Las Vegas by the

8    group.  Marty Blazer told you about that.

9            What did Lamont Evans do days after those Las Vegas

10   meetings?  He started trying to steer Jeffrey Carroll to

11   Dawkins and his business associates.  Take a look at the text

12   messages between Dawkins and Lamont Evans:

13           Can I get with JC tonight?

14           Evans, supposed to be hitting you.  Asked for your

15   number.

16           Dawkins:  What's his number?

17           Evans, he sends the contact information for Jeffrey

18   Carroll.

19           Ladies and gentlemen, this text message was on

20   August 3rd, 2017, and August 7, 2017, mere days after Christian

21   Dawkins, Marty Blazer and Jeff D'Angelo paid Lamont Evans in

22   Las Vegas.

23           You know what else is true, ladies and gentlemen?

24   Christian Dawkins knows that coaches have influence over

25   players.  Why is he reaching out to Lamont Evans to get in

1   touch with Jeffrey Carroll if he thinks dealing with coaches

2   is, in his words, idiotic?

3          What about Book Richardson of Arizona?  Well, as you

4   heard from Munish Sood, when they went out to Arizona in late

5   August to meet with Book Richardson, Book Richardson set up a

6   meeting for the group with a guy named Rodney.  And Rodney is

7   what is known in the business as a handler, a guy who was a

8   relative of Rawle Hawkins and had some influence over him.  And

9   they talked about Richardson in advance of meeting Rodney, why

10   Rodney was important.  And they specifically discussed that if

11   they had Rodney's support, he would be helpful for them landing

12   Rawle Hawkins as a client, because this guy, Rawle Hawkins,

13   really trusted him.

14          And then Jill Bailey thanked Emmanuel Richardson at

15   the end of that meeting for setting up the meeting with Rodney.

16   And what was Richardson's response?  It was pretty telling:  I

17   did my job.  Because, his job, in exchange for the money they

18   were giving him, was to start steering his players to Dawkins

19   and his new company.

20          And Sood told you about what happened at the meeting

21   with Rodney.  And as Mr. Sood testified, Rodney indicated

22   during that meeting that Book Richardson had recommended to him

23   and Rawle Hawkins that they should go with Christian Dawkins.

24   What did Rodney tell you Richardson had said to him, if

25   anything?  That we're good people and he would direct Rawle to

1    meet with us and potentially work with us.  That's another

2    example of how Book Richardson, a coach that got paid $20,000,

3    thanks to Christian Dawkins, was doing things in return for

4    that money.

5         What about Tony Bland?  They went to California the

6    next day, August 31st.  And as we know, Bland facilitated

7    meetings for the group with a recruiter named -- the father of

8    a recruit named Taeshon Cherry, and a relative of a player

9    named D'Anthony Melton.  Munish Sood, during his testimony,

10   told you about those meetings.

11        Why was Tony Bland setting up meetings for Dawkins and

12   his guys with the parents of handlers and top players?  Because

13   he was getting paid, and because Dawkins had offered to pay him

14   in the future and help him land top recruits.  And as you saw

15   earlier, there are phone calls between Bland and Dawkins when

16   no one else is around, when they talk about the fact that Bland

17   is going to keep sending them his top players.

18        Now, let me just make a point about the law here, that

19   Judge Ramos instructed you on, but it's an important one in

20   this case.

21        If Bland or any of these coaches in this case directed

22   Dawkins to make payments to third-party parents of players,

23   families of players, the fact that either the coach got the

24   money and then he intended to give it to somebody, or that he

25   was just directing Dawkins and his guys to send it straight to

1    wherever this person was, as long as that money was being sent

2    to the direction of the coach and was ultimately for the

3    coach's benefit, then that's a bribe too under the law.  And

4    Judge Ramos already instructed you about that, and you can read

5    those instructions in the jury room.

6         And Munish Sood explained to you -- and there was a

7    lot of discussions and lots conversations about why helping

8    these coaches out with money that they needed to try to recruit

9    kids to their team by paying handlers and family members and

10   all those sorts of people, how it helped the coaches.  Because,

11   as Sood told you, if these guys weren't financing them, the

12   coaches often would have to use their own personal funds to do

13   this recruiting.  And you may recall, Book Richardson described

14   in a rather colorful fashion how for years he had been draining

15   his TIAA-CREF retirement account to pay to land all of these

16   recruits.

17        In addition, as you know, and as was discussed in many

18   of the recordings, these assisting coaches had a vested

19   interest in trying to fill the best team possible, because, as

20   was discussed in numerous meetings and calls, that's how they

21   get ahead.  That's how they ultimately become head coaches.

22   So, getting top recruits is for these coaches' benefit.

23        Now, when you look at the calls between Bland and

24   Dawkins, it's very clear that Bland knew all about the payments

25   and was directing the payments that Dawkins was going to be

1   making.  This is a call between Dawkins and Bland:

2          Dawkins tells him the bread that we got to give F-ing

3   charity and then Peeple and Elliot.

4          He's talking about Jill Bailey, why she wants to talk

5   to Bland:  Making sure that the investment that we provide,

6   shit gets done.

7          Then he says:  Whatever may come in the future,

8   anything that's needed, like, you know, we can facilitate

9   everything, basically.

10         It's clear from this call that Tony Bland was well

11  aware of the bread, the money, that Dawkins was going to be

12  handing out to Taeshon Cherry's family and the associate of

13  D'Anthony Melton.

14         And equally important, Dawkins is telling Bland that

15  he and his new business partners are going to be able to make

16  payments in the future to help out Bland.

17         Does it sound like Christian Dawkins thinks assistant

18  coaches like Tony Bland have no influence over which agents and

19  advisers the players are going to sign with?  Absolutely not.

20         Let's turn to the fourth reason that you know these

21  defendants are guilty.

22         THE COURT:  Before we get to the fourth reason,

23  Mr. Solowiejczyk, would this be a good time to break?

24         MR. SOLOWIEJCZYK:  Yes, your Honor.

25         THE COURT:  Let's take a fifteen-minute break.  We'll

1    bring you back out at 1 o'clock.  Don't discuss the case.

2              (Jury not present)

3              THE COURT:  Do you still anticipate finishing in

4    another hour or so?

5              MR. SOLOWIEJCZYK:  Yes.  I will be done, I think, in

6    an hour, your Honor.  Possibly a little less but probably about

7    an hour.

8              THE COURT:  As long as we don't go past 2:30.

9              MR. SOLOWIEJCZYK:  I don't anticipate that.

10             MR. MOORE:  Your Honor, can I make one point?

11             We are going to make an application to the Court to

12   excuse Juror No. 3 and replace her with the alternate because,

13   not only today, but sort of the cumulative effect of her

14   sleeping or appearing to be sleeping, it would appear to be

15   vast portions of this trial.

16             MR. MARK:  Your Honor, we've acknowledged what our

17   personal observations are.  If we may have an opportunity to

18   discuss that before we respond to their application.

19             THE COURT:  Very well.

20             (Recess)

21             (Jury not present)

22             MR. HANEY:  Your Honor, may we address one thing

23   before the jury comes in?

24             THE COURT:  Yes.

25             MR. HANEY:  Let me know when you're ready, your Honor.

```
 1              THE COURT:  I'm ready now.

 2              MR. HANEY:  Your Honor, I would just note that the

 3    Second Circuit's pretty clear that, you know, excessively

 4    referencing a defendant as a liar, repeatedly, over and over

 5    and over, there's case law that that's not appropriate, that if

 6    it's to be referenced on one occasion or twice.  But I submit

 7    to the Court that clearly constantly referring to Mr. Dawkins

 8    as excessively being a liar, there's case law right on point

 9    that that's not appropriate in a closing argument.

10              THE COURT:  Anyone?

11              MR. HANEY:  I can cite the case, your Honor.

12              THE COURT:  No.  I'm familiar with the case law.

13              MR. HANEY:  Thank you.

14              MR. MARK:  I would say, given the fact that we all

15    were here while Mr. Dawkins testified, and there were countless

16    lies that came out, to not be able to tell the jury that these

17    are all lies would unnecessarily answer the --

18              MR. HANEY:  That's not the point.  The point is he's

19    saying:  He's a liar, he's a liar, he's a liar, he's a liar.

20    It can be taken as mischaracterizing.  There are other words he

21    can use that are not as inflammatory.  They know what the case

22    is.  They're hopefully being tongue-in-cheek by making that

23    comment.

24              THE COURT:  You can deal with that in your closing

25    argument.
```

1            MR. HANEY:  Thank you, your Honor.

2            MR. MOORE:  Your Honor, has the government made a

3    decision about Juror No. 3 and what position they want to take?

4            MR. MARK:  I mean, we've been here.  Our observations

5    were -- yeah, were there points in time when she closed her

6    eyes?  Yes, there were.  Did it seem like she was not aware of

7    what was going on or sleeping?  That was not clear to the

8    government by our own observation.  She's been quite attentive

9    throughout the closing argument.  For many days, we've seen her

10   nothing but attentive, so we don't see the basis.

11           MR. MOORE:  She has been attentive at times.  I'm not

12   telling your Honor that she hasn't.  And I know your Honor has

13   watched as well, because I've called it to your attention.

14           I will tell you that on a number of occasions, it's

15   not just eye-closing.  When I see eye-closing and

16   head-dropping, that to me is indicative of sleeping.  And I've

17   seen it more from her than I've seen it from most jurors in

18   most of the cases that I've tried.  It does seem to be a

19   regular routine problem.

20           And I realize I'm in a better vantage point than the

21   government.  But I'll tell you that everyone at the table has

22   seen it on multiple repeated occasions.  I think your Honor has

23   seen it at times.

24           THE COURT:  I have.  And I was concerned early on in

25   the trial.  But I thought that she rebounded.  And I actually

1    have a better vantage point perhaps even than the defense

2    table.  And there are times that, because the screens are below

3    eye level, I see her sometimes, and she appears to be looking

4    at the screen.  I see the pen in her hand.  I see the pen

5    moving.  And although if you were to look at her straight on,

6    you would think she was sleeping.  And I have noticed that she

7    has been very attentive today.  So --

8            MR. MOORE:  Except for at some points during

9    your Honor's charge.

10           THE COURT:  At that point I obviously wouldn't know.

11           MR. MOORE:  I understand that.  And I did think

12   your Honor was being mellifluous, so certainly, she should have

13   been paying better attention.  But there was not only

14   eye-closing, but there was some dropping of the head.

15           THE COURT:  Bassed on my observations and the

16   government's observations, the application will be denied.

17           MR. MOORE:  Yes, sir.

18           MR. MARK:  Your Honor, I just want to note on the

19   discussion about what Mr. Haney was saying, that the government

20   was characterizing Mr. Dawkins as liar.  I think if we were to

21   look at the transcript -- and I know this all goes quite

22   quickly -- the point was that he was telling lies and he told

23   lies from the witness stand, not so much characterizing him as

24   a character of a liar.  I think there's going to be continued

25   repeated references to the fact that he has told lies and going

1  through and demonstrating more and more what those lies are.

2  So we would hope that we won't hear objections constantly

3  during the closing.

4       MR. HANEY:  My only brief response to that would be is

5  that, I understand what he's saying, but characterizing

6  somebody and calling them names is a different thing.  And

7  that's clear.  I don't think there's any distinction.

8       THE COURT:  Well, Mr. Solowiejczyk, I'm sure, will

9  make the appropriate adjustments.

10       MR. MOORE:  The only point that I would make,

11  your Honor, is I just don't believe in objecting during

12  people's closing arguments.

13       The statement that gave me concern particularly as it

14  relates to Mr. Code is when Mr. Solowiejczyk was referring to

15  fact that he was convicted of an offense that involved lying.

16  Well, fraud doesn't always involve lying, as we know.  The

17  *Gatto* case involved a right to control issue, which the

18  government well knows.  They well-briefed it.  We fought that

19  instruction, and we lost that instruction.  And I was concerned

20  when Mr. Boone did it on his cross-examination and I objected

21  then.  And so, if there's another reference to that conviction

22  involving lying, I will be forced to object at that point.

23       THE COURT:  I'm sorry.  Is the jury ready?

24       Bring them out.

25       (Jury present)

1           THE COURT:  Mr. Solowiejczyk.

2           MR. SOLOWIEJCZYK:  Ladies and gentlemen, I'm now going

3    to talk about the fourth reason why you know these defendants

4    are guilty.  And that reason is that the defendants knew this

5    was wrong.  And, ladies and gentlemen, you know that because

6    they said as much over and over again in recorded

7    conversations.

8           Remember when Dawkins testified under oath that he

9    believed he was running a legitimate business?  That's simply

10   not credible, ladies and gentlemen.

11          Both of the compliance officers from the universities

12   who've testified made it abundantly clear -- and I don't think

13   there's any dispute in this case about the fact that these

14   coaches weren't allowed to be taking this money, that it

15   implicated NCAA rules.  It implicated the coaches' employment

16   agreements and that the coaches would be fired if these

17   payments were discovered.  There's no question that the

18   defendants knew all of this.

19          And just to give you a couple of examples, at that

20   first March 3rd, 2016, meeting in South Carolina, Christian

21   Dawkins said the following:

22          Everything will be lined up because that's his job

23   too.  That's what almost got him by the balls, so to speak.

24          And he went on to say:

25          The one thing I didn't say in front of him -- meaning

1   Lamont Evans -- You can never get caught up because his job is

2   on the line too, because if he gets caught, if shit doesn't get

3   done, what he did is wrong too by the NCAA rules, so he's not.

4          Merl Code knew the same thing.  The very first time he

5   spoke with Christian Dawkins and his new business partners,

6   Code emphasized repeatedly that the coaches they were going to

7   be dealing with needed to be cautious because the coaches could

8   be fired if anybody found out about what they were doing.  He

9   talked about how in this business if he gave somebody money and

10  they didn't do what you wanted them to do, you would have no

11  recourse.  And he also talked about coaches, being nervous and

12  hesitant, reluctant to meet new folks who aren't in the

13  basketball space, because there is so much stuff that goes on,

14  these guys are snapped-finger away from not having a job.

15         So both defendants knew that what they were up to,

16  they weren't supposed to be doing it; it was wrong.

17         Why was Merl Code at this meeting talking about the

18  fact that coaches needed to be cautious, that they could only

19  work with people that they trusted?  Because Code knew very

20  well that the coaches weren't allowed to be taking money, and

21  that the conversation he was having with Dawkins, D'Angelo and

22  Blazer that day, was about paying coaches; it wasn't about

23  merely having a series of introductions or meet-and-greets.

24         But the other way that you know that the defendants

25  knew that what they were doing was wrong is the steps, the

1    extensive efforts that they took to conceal what they were

2    doing.  And they did that in multiple ways.  And the reason

3    they did that is simple, because if these payments were

4    discovered, ladies and gentlemen, this whole plan would go out

5    the window, the coaches would get fired, whatever players they

6    were hoping to get from these coaches, it wasn't going to

7    happen, and they weren't going to reap the big profits on the

8    back end.  So they knew they had to be careful.  They knew that

9    they had to keep things under wraps.

10             Let me give a couple of examples that very, very, very

11   clearly demonstrate that the defendants were taking steps to

12   conceal what they were doing.

13             When Dawkins was talking to Tony Bland about what

14   their arrangement was going to be going forward, he talked

15   about how things needed to be clean.

16             Bland said:  I don't want to touch nothing.  I want it

17   all to go through you

18             And Dawkins responded:  You need to be as clean as

19   possible.

20             They went on.  Why are they having this conversation?

21   Because Dawkins knows -- he's saying it right there.  Bland

22   can't get caught taking this money from Dawkins, because if he

23   does get caught, all of Dawkins' well-laid plans are ruined.

24             What else did they do to conceal this?  Well, first of

25   all, as you saw repeatedly, they paid in cash.  And it's an

1  obvious point, ladies and gentlemen, but it's an important one.

2  Why didn't they just send them a wire or write them a check?

3  It's simple, because when you pay people that way, it's

4  traceable.  And Dawkins said as much in the very first meeting

5  he ever had with Marty Blazer and Munish Sood:  "He ain't going

6  to do shit like that now on no paper."

7         The reason these payments are all in cash -- all of

8  the payments we're talking about in this case -- is because the

9  defendants knew that for their scheme to succeed they needed to

10  make sure they didn't get caught.  And paying in cash was one

11  of the ways that they did that.

12        Here's another way.  They tried to make sure that they

13  never put anything in writing.  And you heard about a call --

14  and also that they kept the conversations in a closed circle of

15  just the people that needed to know.

16        And you heard some conversations and some testimony

17  from Munish Sood about this as well, that when Merl Code had

18  that three-way phone call with Munish Sood, Jeff D'Angelo and

19  Merl Code, he had some concerns.  And he actually sent a text

20  message to Christian Dawkins that read:

21        Jeff made me a little uneasy today.  I'll explain.

22        And you then saw that Dawkins and Sood had a telephone

23  call where they discussed the fact that Merl was upset because

24  Jeff D'Angelo had apparently been talking to somebody else in

25  the background during their conversation, and Merl Code didn't

1    like that, because that was somebody outside the circle of

2    trust.

3            As Dawkins said:  Yeah, it's just stupid.  I mean,

4    definitely, if you're going to call him, you don't have to meet

5    him in person or anything, but don't call him and like be in

6    the background talking to somebody else.

7            Now, Christian Dawkins had big concerns about putting

8    things in writing too.  And you heard a call towards the end of

9    the government's case when he spoke to Munish Sood by phone.

10   And that call occurred right before Christian Dawkins was going

11   to send an e-mail.  And that e-mail laid out in writing some of

12   the payments that Dawkins wanted to make going forward.  And,

13   ladies and gentlemen, some of the payments that he wanted to

14   make -- not all of them, but some of them -- were to coaches:

15   Preston Murphy, Shane Heron, Kenny Hunter.  These were all

16   payments that Dawkins was proposing in December of 2017.

17           Dawkins was concerned about sending this e-mail that

18   laid out in writing what he was doing to Jeff D'Angelo's

19   business partner, Jill Bailey.  And what did Dawkins say about

20   this?  Well, in this call with Munish Sood before he sent the

21   e-mail, he talked about the fact that:  There's numbers, names,

22   it's everything.

23           And then he said:  "My concern is what if someone that

24   we don't know is investigating her and goes into her e-mail?

25   You know, I'm just always paranoid."

1    Why is Dawkins so concerned?  He says it in the call
2    himself.  He's worried that if somebody somehow gets access to
3    Jill Bailey's e-mails and sees these secret payments that he's
4    outlined, oh, he's going to get in big trouble, because he
5    knows that these payments are wrong and illegal; they got to be
6    kept hidden.

7    Dawkins took other elaborate steps to try to hide what
8    he was doing.  You saw this cryptic text message that he sent
9    to Jill Bailey, outlining various payments, but using a
10   combination of letters rather than actually saying who the
11   payments were for.  References like:  DTCTB, CKH, ADP.  If you
12   just saw this text message, you wouldn't be able to know what
13   Dawkins was specifically talking about.  And then Dawkins
14   called Jill Bailey and he decoded this cryptic text message for
15   her on the phone.  And in so doing, he described, among other
16   payments, payments to coaches and he described that one of the
17   payments was to Merl Code as well, his monthly retainer.

18   And then he said:  "We've got to put funding out and
19   some of the money can't be completely accounted for on paper
20   because some of it, whatever you want to call it, illegal,
21   against NCAA rules or whatever."

22   Just another example of the ways that Christian
23   Dawkins tried to hide what he was doing and an acknowledgment
24   that Christian Dawkins knew it was wrong.

25   You also had heard a call between Christian Dawkins

1    and Merl Code, where they talked about all of their suspicions

2    of Dawkins's new business partners, Jeff D'Angelo and Jill

3    Bailey.  And Code talked about specifically that they needed to

4    protect themselves:  "Like, I need you and I to protect

5    ourselves, man.  I'm just saying this just as a guy who's real

6    skeptical about this shit."

7            Protect themes?  Protect themselves from what?  From

8    other people finding out what they were doing.

9            Then Code went on.  He talked about digging in,

10   looking into these people:  Your name is going to be tied to

11   it.  My name's going to be tied to it.  You got to be extra

12   cautious about who you're associating with.

13           And then he said:  "Look, they ain't cutting me no

14   checks for shit.  They're going to pay you, and you're going to

15   pay me."

16           Why all the concerns about Jeff and Jill?  Why the

17   talk about hiring private investigators to look into these

18   people?  Why doesn't Code want to be paid directly by Dawkins's

19   business partners?  Because they know that the payments that

20   they're engaged in making, they're not actually a legitimate

21   business.  They're wrong.  And they're very, very concerned

22   about who they include in that circle of trust.

23           When Dawkins took the stand and told you again and

24   again yesterday that he was trying to conduct a legitimate

25   business, do you seriously believe that?  Does any of this

1    sound like the way a legitimate business is conducted?  If

2    Dawkins and Code were engaged in what they considered to be

3    just merely legitimate business venture, would they be so

4    concerned about other people finding out?  Would they be

5    talking about hiring private investigators?  Would Merl Code be

6    talking about how he doesn't want to get paid directly by Jeff

7    and Jill?  If Merl Code was just being paid to merely provide

8    introductions to some coaches, and it had nothing to do with

9    paying any of them, then why would he have to be so nervous?

10         And just in case it wasn't clear enough, there was

11   this call between Christian Dawkins and Emmanuel Richardson

12   that you heard.  And they couldn't have put it more bluntly.

13   They were talking about money going to a recruit.  They were

14   talking about money going to recruit players at the University

15   of Arizona and trying to get Dawkins to ultimately land those

16   players.

17         Dawkins said:  The funny thing is, they want to talk

18   to you about the money.

19         Richardson:  Uh-huh.

20         Dawkins:  You know, but then we all get indicted

21   together.  I'm like, Ah, it's too high for me, bro.  You

22   talking on the phone about shit and everything.

23         Who talks about all getting indicted together?  Who

24   talks about their conduct being illegal?  Who sends cryptic

25   coded text messages that have to be decoded by phone call?

1    Who's so concerned about somebody getting into your e-mail?

2    People who are trying to hide what they're doing because they

3    know it's wrong.  People who break the law.  Guilty men.

4            Now, ladies and gentlemen, when you take all the

5    evidence that I've walked through, it's simply overwhelming

6    proof of the defendant's guilt in this case, both Christian

7    Dawkins and Merl Code.

8            Now, during the defense's case, you heard testimony

9    from Dawkins.  You heard some recordings played.  You heard

10   some questioning of witnesses during this trial by the defense

11   attorneys.  And you've heard through all of that, the defense

12   advance a number of arguments.

13           I'll remind you again, the government has the burden.

14   We know that.  We embrace the burden.  But when the defense

15   presents evidence to you and makes arguments to you, you're

16   entitled to, and you should, scrutinize that evidence and those

17   arguments.  And when you do that and you use your common sense,

18   you will realize that none of these arguments hold any water.

19           So, I'm going to walk through now, a couple of the

20   defense's primary arguments and why they don't make sense.

21           So, the first argument you heard -- and I've already

22   addressed it in some detail in talking about Mr. Dawkins's

23   testimony, so I'll try to be brief -- is that this is all a

24   hustle.  Dawkins and Code don't want to bribe anybody.  It's

25   actually this elaborate shell game and con on Jeff D'Angelo.

1    So, there's lots of reasons why that doesn't make sense.  Let

2    me just point out a few.

3          First of all, this entire concoction of a hustle

4    happened after the Lamont Evans's conduct.  It doesn't explain

5    away what Christian Dawkins did with Lamont Evans, even if for

6    some reason you believe this fantastic tale.

7          And you know that for many reasons.  One of the most

8    primary is that Dawkins talked over and over again about the

9    fact that he had paid Evans in the past -- really bassed on the

10   evidence, there's no way to dispute that at this point -- and,

11   second of all, that he expected something in return.  I've

12   already shown you those calls, so I'm not going to rehash

13   everything again.  So pay attention to them, because that's

14   really important evidence that Dawkins is guilty even before he

15   starts Loyd Management.

16         Now, what about the Emmanuel Richardson scheme?  Well,

17   it doesn't explain the $15,000 payment that Dawkins was urging

18   D'Angelo to provide to Emmanuel Richardson, so Richardson could

19   land Javon Quinerly as a recruit.  The purpose of that payment

20   was simple.  Dawkins wanted to get the money to Richardson so

21   Richardson could get the recruit for Arizona, and then

22   Richardson could steer that player back to him when he turned

23   pro.  And if you look at the text messages and communications

24   between Richardson and Dawkins around this time, it shows you

25   that.

1    This is a text from June 26, 2017:

2    Dawkins asks:  How did the Quinerly visit go?

3    Richardson says:  Well, Moms needed some extra

4    blessings.  That's why I tried to call you.  Supposed to make

5    it public, just to take care of moms.

6    Ladies and gentlemen, you've heard enough about the

7    world of college basketball, the underworld and the recruiting

8    process and the way money changes hands to know what this

9    means.  We're talking about the fact Richardson is telling

10   Dawkins, the mom wants some money.

11   And then there was this call between Richardson and

12   Dawkins on June 26, 2017.  And Richardson described the

13   conversation he had had with the mom.  And he told him, among

14   other things, that the mom had said:  And maybe can you help me

15   with 20 to $25,000?  That's late June 2017.

16   And then Dawkins responded:  So she wants or thinks

17   that she wants seven grand a year.

18   And he asked:  How did she want it?

19   Soon after this call, Dawkins made the ask of D'Angelo

20   for the $15,000.  And he spoke to Munish Sood about that ask.

21   And he told him:  Book needs his 15, but what he's

22   saying is that's going to close the deal for him with the kid

23   he's trying to get.  Like, that gets it done.

24   And when D'Angelo finally agreed to fork over the

25   15,000 dollars, Dawkins spoke to Richardson again, and he told

1   him:  Jeff can do this supplemental like three months.

2          And as you heard, that related to a monthly fee they

3   were going to be paying Richardson.  He told him:  I'm going to

4   get you that 15 grand.

5          So that's the context, ladies and gentlemen.  the

6   context that leads up to all of that is Richardson tells

7   Dawkins:  I need money to sort out this Quinerly situation.

8          And then Dawkins goes and gets the money from

9   D'Angelo.  That's what happens.

10          And I would remind you again that, as Judge Ramos

11  instructed you on the law, even if Richardson didn't intend to

12  keep that money in his pocket, he intended to give it to

13  somebody else, so long as that money was for Richardson's

14  benefit, and this was done at Richardson's direction, that

15  still can be bribery.  Guilty on both Richardson, guilty on

16  Lamont Evans.

17          So, ladies and gentlemen, whatever Christian Dawkins

18  said on these phone calls you heard about, his frustration with

19  Jeff D'Angelo at times.  None of that explains Lamont Evans,

20  Emmanuel Richardson or Tony Bland, for that matter.  As to each

21  of these coaches, the evidence is simply overwhelming that

22  Dawkins directed bribes be paid to these coaches, that he

23  expected something in return, that he spoke to the coaches

24  about giving him something in return, and, indeed, that the

25  coaches began to take actions to steer their players to him.

1    Whatever frustrations that Christian Dawkins had with Jeff

2    D'Angelo, they don't explain this.

3            And continuing with that point, the second defense

4    argument is that Dawkins and Code thought the coach's model was

5    idiotic.  You heard Dawkins repeatedly say it was idiotic on

6    the stand.  You heard about it on the calls we played too.

7            This is what the defendants would have you believe,

8    that they affirmatively never wanted to pay coaches, that

9    coaches were so utterly useless to them, to their ultimate game

10   of getting players as clients and making money off them, that

11   you would never ever pay a college basketball coach.  This

12   argument makes no sense for a number of reasons.

13           First -- as I mentioned before -- the defendants

14   readily acknowledge in calls and in the testimony of Mr.

15   Dawkins -- you heard it too -- many places, that they're

16   willing to pay lots of people who have influence over these

17   players.  They're willing to pay handlers, family members, AAU

18   coaches, uncles, aunts, every one, except college coaches.

19           And Dawkins had this to say on cross-examination on

20   this point:

21   "Q.  You don't pay college basketball coaches, right?

22   "A.  No.

23   "Q.  So if a youth basketball coach gets promoted to college,

24   then you cut off the payments, right?

25   "A.  It's a good yes question.

1    "Q.  Yes or no?

2    "A.  Ask --

3    "Q.  A youth basketball coach gets evaluated to becoming a

4    college basketball coach; is that when you implement your

5    policy of paying no college coaches?

6    "A.  Correct.

7         Ladies and gentlemen, you know this testimony doesn't

8    make any sense.  The reality is that Dawkins and Code were

9    willing to pay whoever they needed to pay who had influence

10   over the players.  Sometimes that was the handler; sometimes

11   that was an AAU coach; and sometimes it was a college coach.

12   And when it was a college coach, the reason they paid these

13   coaches is because they would steer the players back to them.

14   It's part of the overall dirty business that Dawkins and Code

15   were engaged in.

16        Now, the defendants played a couple of telephone calls

17   of their own.  And Dawkins, when he testified, gave you his

18   interpretation of some of those calls.  And the point of that

19   testimony was to show you that Dawkins and Code, they thought

20   the coach's model was idiotic, they didn't want to ever pay

21   coaches in any situation.

22        I'm not going to go through all these calls now.  I'm

23   just going to take a couple and point out some things to you

24   about these calls.  So, when you actually examine the texts of

25   these calls -- and you should listen to them in the jury room

1    -- you'll realize Dawkins's testimony about what happened on

2    these calls, it's not the whole story.

3            Let's talk about Defendant's Exhibit 3 in detail.  And

4    you saw Mr. Code's counsel, in particular, ask Dawkins a number

5    of questions about this June 26, 2017, call between Dawkins and

6    D'Angelo.  And Dawkins said this call was about him trying to

7    get D'Angelo not to pay any college coaches and instead to pay

8    Merl Code.

9            And Dawkins said:  "So, for us to put all the focus on

10   a college coach, if you think about it realistically, it just

11   doesn't make common sense.  I'm trying to explain to Mr.

12   D'Angelo here to get the players as early as possible, build a

13   real relationship with them, and hopefully one day sign them."

14           When you review the call, that's not the whole story.

15   Let's go through it together.

16           So, first of all, Dawkins said during this call that

17   Book Richardson wanted $5,000 a month.  That's Christian

18   Dawkins' affirmatively saying:  We need to get Book paid.

19   That's not Jeff D'Angelo proposing that.  That's Christian

20   Dawkins proposing that in the call where he supposedly was

21   telling Jeff D'Angelo that they needed to get off the coach's

22   model.

23           And Dawkins also acknowledged the following.  He said:

24           The fact of the matter is this, Jeff, the coaches have

25   a level of influence.

 1          That's Christian Dawkins telling Jeff D'Angelo that

 2   coaches do have influence.  Of course, they do.

 3          Now, was Dawkins saying that coaches are the only ones

 4   with influence on this call?  No, he wasn't.  There are other

 5   people with influence.  But he wasn't saying coaches have no

 6   influence.  He was saying:  You need to be strategic Jeff.  You

 7   can't just pay coaches.  You got to take the situation as it

 8   comes.  And Dawkins acknowledged that during this call.

 9          Then Dawkins talked about Merl Code, his close friend.

10   And he testified that the point with Merl Code was not what he

11   brought to the table when it came to college coaches, that the

12   point of paying Code was influenced with high school and NBA.

13   But he conveniently skipped over college.  That doesn't make

14   any sense either.  And he said:  If you have a situation where

15   all the Adidas-sponsored schools and you have all the people

16   who you have a relationship with from a Nike perspective.

17          What's he talking about there?  He's talking about the

18   Merl Code has got relationships at the college level that he

19   brings to the table.  And that was discussed in significant

20   length at the June 20th meeting, when they all first met.

21          Then they talked about:  What has Merl done for you

22   this month?  This is Dawkins.  He said:  Listen, he introduced

23   me to this kid.  When we talked, we talked with his coach.

24   We're doing X, Y, Z.  Because there's always something that

25   we're doing.

1    That's Christian Dawkins saying that there are

2   different things that needed to be done to recruit different

3   kids.  And one of those things that Merl Code brought to the

4   table was working with coaches.

5    And finally, he spoke about how it made sense to pay

6   certain guys, not to pay others.  And the two guys he listed

7   was:  You should pay a guy like a Merl or a Book.  Pay them,

8   and at the end of the day, you don't have to deal with the guy

9   at A&M or F-ing Kansas.

10    So what's he saying?  Pay lead coaches like Book

11   Richardson, pay guys like Merl Code, don't pay guys who are at

12   schools that don't have top players or are at schools that are

13   so blue blood that they already got established agency

14   relationships that we can't break into.

15    (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. SOLOWIEJCZYK:   (Continued) Because these guys with

2     their upstart company, they weren't going to break into a

3     school like Kansas, and they acknowledged that.

4          So, yes, in this call Christian Dawkins has a very

5     subtle understanding about how all of this works, and it's not

6     as simple as every situation you always pay a college coach,

7     but he's not saying you never pay a college coach.  He's saying

8     you pay a college coach in the right situation.  And as you saw

9     from his actions and his words, Book Richardson certainly was

10    such a situation.  Christian Dawkins drove the bus on that

11    entire thing.

12         Let me talk about one more call, Government

13    Exhibit 104.  This was a call between Christian Dawkins and

14    Munish Sood.  And this was the call where, after Emanuel

15    Richardson got the first $5,000, they were laughing at Jeff

16    D'Angelo for paying him.  And you remember Mr. Sood spoke about

17    this during his testimony, and he acknowledged they were making

18    fun of him.  And what he said was, the reason they were making

19    fun of him is he gave Richardson $5,000, and I wasn't sure why

20    he gave the money to him.

21         And in that call they also said:  I think Jeff is

22    high.  We don't want to wake him up.  He's dying.  And Dawkins

23    says:  Oh, I know, trust me.  I'm not gonna say anything.

24         Yes, they are laughing at Jeff D'Angelo in this call

25    for paying Richardson because, from their perspective, as guys

1 who want to get players and make money on business, they're not

2 really sure why he's just giving him $5,000 without it being

3 clear what they're going to receive in return.

4       But Sood explained to you that there was a distinction

5 between the $5,000 payment that D'Angelo made to Richardson and

6 the $15,000 payment that followed.  And that distinction, in

7 his mind and Dawkins' mind, was the $15,000 payment was to get

8 a recruit for Richardson.  It had a purpose, and there was

9 something specific that they were going to get in return for

10 it.  If you look at the calls between Dawkins and Sood, when it

11 comes to the $15,000 payment, they're clearly supportive of

12 making that payment.  They are not laughing at Jeff D'Angelo

13 about considering making that payment.  Quite the opposite,

14 they're both saying Jeff should make this payment to

15 Richardson.

16       So that's the distinction, and it's an important one

17 because, yes, these guys don't want to just throw money in the

18 wind.  They want to pay when it makes sense, and they don't

19 want to pay when they think it's idiotic.

20       Let me talk about another defense argument -- I'll be

21 brief on this -- the notion that if the coaches weren't going

22 to keep the money, that that would somehow would be a defense.

23 That the money's going to recruits.  I've discussed that at

24 length, ladies and gentlemen.  You've heard Judge Ramos'

25 instructions on the law.  That is no defense to the charges in

1    this case.  Whether or not the coaches intended to keep the

2    money in their own pocket or intended to use it to get

3    recruits, at the end of the day, that's not relevant.  They're

4    both bribes as long as it was at the coach's direction for the

5    coach's benefit.

6           Let me talk about another, the fourth defense

7    argument.  This one is that the coaches were just Dawkins' and

8    Code's friends and that they were going to send them all these

9    kids as clients anyway.  Basically, that they didn't need to

10   pay any coaches because all these coaches were going to be

11   steering all these players to them.

12          Now, ladies and gentlemen, for a number of reasons

13   that I've laid out during this closing statement, that doesn't

14   make any sense.  All of the evidence in this case has shown you

15   time and time again that these assistant coaches will steer

16   their players to whoever is willing to pay them, and in this

17   case it was Christian Dawkins and Merl Code.  You heard Dawkins

18   say a number of times that as to Book Richardson, he was going

19   to send them players anyway.  That argument doesn't hold any

20   water because, as you heard in cross-examination, none of these

21   coaches before Christian Dawkins started paying them had ever

22   sent him any players or ever offered to send him any players.

23          Let me deal with a defense argument that relates

24   specifically to Merl Code, and this is a very important

25   argument that we're going to take head on.  This is the notion

1     that Merl Code got paid -- it's clear he did get paid by Loyd

2     Inc. just for making introduction to coaches, but then Merl

3     Code never intended for any coaches to get bribed.  I'm going

4     to spend a few minutes now telling you why, when you consider

5     all the evidence, that doesn't make any sense.

6              So, first, I mentioned this before, Merl Code knew

7     Dawkins, D'Angelo, Blazer, the guys he was dealing with, they

8     paid coaches.  He knew they had paid Book Richardson hours

9     before he first met with them to talk about how they would work

10    together, and he knew that Dawkins had paid Lamont Evans in the

11    past.  So going into this whole thing, he knows who he's

12    dealing with.  He's dealing with guys that pay coaches.

13             Let's talk about the June 20 meeting that you saw the

14    video of between Merl Code, Dawkins, D'Angelo, Bailey, Blazer,

15    Sood, and a couple other people.  I just want to walk you

16    through some of the things that Merl Code said during that

17    meeting when he didn't know anybody was listening.

18             By the way, in advance of that meeting, he

19    acknowledged that Book Richardson -- he knew Book Richardson

20    had gotten $5,000.  He talked about -- you can skip ahead,

21    Ms. Bustillo.  OK.  You can skip ahead of this one too.  You

22    can skip that one.

23             All right.  So one of the first things he talked about

24    at the June 20 meeting was that this was a corrupt space where

25    everybody was cheating, that it was messy.  There was a lot of

money involved, and then he talked about the fact that

assistant coaches or college coaches would take a kid when they

came to their school, and they'd put them with their people.

What was Code saying here?  He was saying that sometimes an AAU

coach or handler would send players to a particular school

thinking that they would still control them, but that the

coaches would take control of them and send them to the agents

that they had relationships with.  That's important because

Merl Code's acknowledging there that he knows coaches have

important influence in this process.

          And they talked about specific situations.  They

talked about this Brian Bowen situation.  And Code said that

there were certain schools that he wouldn't want Brian Bowen to

go to because if Brian Bowen went to those schools with those

coaches, they would never get him back.  Why wouldn't they get

him back?  Because those coaches were going to steer that

player to their own relationships.  Again, Merl Code knowing

the college coaches have influence and are a very important

part of the process in determining who a player will ultimately

sign with.

          Now, Code didn't just explain why college coaches were

important.  He talked about in specifics why it makes sense to

pay certain coaches, how you should pay them, and how they

could steer players back to the company.  Let's walk through a

couple of the things he said.

1      So Dawkins said that they wanted to use Code as like a

2   *consiglieri* type, payroll, whatever the case may be.  Then

3   Dawkins said:  So, like, we talked about identifying, you know,

4   a group of kids early so if we can, if we can bring Merl in

5   from the Adidas side, or you could bring us, that's value.

6   Then he mentioned:  It will help some of the coaches that we're

7   involved with.

8      It's very clear Dawkins is saying it outright, Merl

9   Code's going to help us identify coaches that we can work with,

10   and then Dawkins and his team will help some of the coaches.

11   What help are they going to provide?  How could some real

12   estate investor in New York help NCAA men's college basketball

13   coaches?  Money, that's the help that these guys can provide.

14   Money that greases everything in the corrupt underbelly of

15   college basketball.

16      What does Code offer to do in that meeting?  He's

17   going to start introducing them to coaches.  This is what Code

18   said:  Well, I think we need to prep them in terms of what

19   the -- the ask or what they're requiring, what are the

20   expectations in terms of what are we expecting of them as

21   coaches.

22      What Code says about these coaches, we need to prepare

23   them about what we're asking of them, what they're requiring,

24   what are they requiring?  Money, resources.  And in the next

25   breath he talks about what they're expecting from them.  This

1   for that.

2          You know that Code's talking about money because he

3   goes on to talk about the fact that these coaches need to be

4   really careful, that they're nervous, and that they could lose

5   their jobs:  A lot of college coaches, they're nervous,

6   hesitant, reluctant to meet new folks who aren't in the

7   basketball space.  There's so much stuff that goes on, and

8   these guys are a snapped finger away from not having a job.

9          Christian Dawkins then went on to explain to the

10  group, right in front of Code, how this was going to work:

11         I think that the key is to identify guys who we -- who

12  think how we think, and then we activate them as it comes

13  because it could be, like I told you, everybody doesn't need to

14  be like on a retainer-type monthly-type deal.

15         Well, come to me, then, because I don't want to keep

16  giving you something just throwing money down the drain.

17         And he talks about a specific example where you have a

18  coach who is trying to recruit a hypothetical player, and they

19  need 20 grand to figure it out.  And what they're going to do

20  is say, come to me, and we'll give you the money.  That's

21  actually exactly what happened with Jahvon Quinerly, by the

22  way.

23         And Code says:  That's our value to you guys, is to

24  make sure you aren't just randomly spending money.

25         This entire conversation is premised on the notion

1  that they are going to be spending money, giving money

2  ultimately to coaches to assist them.  Read the transcript.

3  It's the Government Exhibit 510A and B series.  Ladies and

4  gentlemen, respectfully, there is no other way to understand

5  this conversation when you use your common sense.

6         So what is after this meeting where they've laid out

7  the fact that they're going to pay coaches?  There's some

8  discussion about how we're going to do it, when they're going

9  to do it, why they're going to do it, but they're going to pay.

10 What does Code do next?  Well, he agrees to set up a series of

11 meetings for them in Las Vegas with various coaches that he has

12 connections with, and he ultimately sends, after a series of

13 back and forth with Christian Dawkins, a list of coaches and a

14 schedule of meetings for Las Vegas.  It's got lots of coaches

15 on it.  As I mentioned before, some of the coaches on the list

16 got paid.  As you heard, Code is getting paid for setting up

17 these meeting.  There was a call between Dawkins and Code where

18 he asked him how many he's going to set them up to meet, and

19 Code responded:  I mean, how many you paying me for?  Because

20 that's the better question.  Code wants to get paid for doing

21 this, that's clear.

22        So what did Merl Code tell Jeff D'Angelo going into

23 these meetings?  You've heard some arguments and some

24 questioning regarding the fact that Merl Code told Jeff

25 D'Angelo not to bribe any coaches, not in Las Vegas, not ever.

1    But when you scrutinize the evidence and you examine what Merl

2    Code actually said, that's not what happened.  Merl Code was

3    experienced in the business.  He'd been doing this for years.

4    He was smart, and he knew that you don't just go around handing

5    out envelopes of cash to coaches that you've met for the first

6    time.  You needed to be careful because these coaches weren't

7    allowed to be taking this money.  If you just showed up at the

8    first meeting with a big envelope of cash, you were going to

9    spook the coaches; you were going to harm Merl Code's

10   relationship with them.

11        Let's look at exactly what Merl Code told Jeff

12   D'Angelo in advance of the Las Vegas meetings, Government

13   Exhibit 301:

14        And like -- like I told you, just so you have a very

15   clear understanding, like, these guys, these guys are not going

16   to -- I want you to understand how to approach this.  They're

17   not going to accept or take anything from you because they

18   don't know you.  But what they will do is say, Hey, look, I'm

19   here because of our relationships with a Christian or Merl, and

20   so there may be some scenarios or situations where I may need

21   your help, because most of these guys don't need anything on a

22   monthly basis.  And that's like I told you, we're going to save

23   you money.  So there will be some scenarios or situations with

24   particular kids where, yes, we'll need some assistance, but the

25   majority of them will be like, nah, you know, you know, if I

1  need something, then I'll holler at those guys, because, again,

2  they don't know who to trust.  They don't know who they can

3  talk to and who they can't talk to.

4       This conversation is critically important, ladies and

5  gentlemen.  Merl Code knows these guys want to pay coaches.

6  That's clear from the conversation, number one.  What is he

7  specifically telling Jeff D'Angelo going into the Las Vegas

8  meetings?  Yes, he's telling him, don't just show up with an

9  envelope of cash and throw it on the table.  He doesn't want

10 his coaches to get spooked.  He says they don't know who to

11 trust.

12      But that's not all that he's saying, ladies and

13 gentlemen.  He's telling D'Angelo what the script is.  You

14 offer to help these coaches out in the future when they need

15 something for a specific situation, a recruiting need,

16 something like the Jahvon Quinerly situation that I spoke about

17 earlier.  Bribe the coaches in the right way at the right time.

18 Don't just show up with a big envelope of cash.  That's what

19 Code laid out there.  But he's not telling Jeff D'Angelo,

20 you're never going to pay these coaches.  He's telling them,

21 have the initial conversation.  Let them know you're here for

22 them, and down the road, they'll come back to you, and they'll

23 ask for money, once the trust is established.

24      That's, ladies and gentlemen, what Merl Code did,

25 plain and simple.  And I would take Government Exhibit 301 and

1    respectfully just -- it's a very important exhibit when it

2    comes to Merl Code.  Examine it closely.  When you use your

3    common sense and you take a look at what Merl Code actually

4    said to Jeff D'Angelo, he is laying out that down the road

5    D'Angelo is going to pay these coaches, just not right out of

6    the gate.

7            And, ladies and gentlemen, he also said the same thing

8    to Christian Dawkins.  This is Government Exhibit 116.  He's

9    talking about these upcoming meetings:

10           Like, listen, don't come in here with, we're going to

11   put some money in your pocket, I'm going to hand you an

12   envelope, no.  Look, I'm here because of my relationship with

13   Merl.  He told me that you guys have access to a couple of

14   different things going into the recruiting space and that if

15   and when I need you, I'll call you.

16           What does that mean, if and when I need you, I'll call

17   you?  How would these coaches need Jeff D'Angelo, some random

18   real estate investor from New York?  What need would they have

19   for this guy?  One need and one need only:  Money.

20           So that's what Merl Code actually said, and that's

21   entirely consistent, ladies and gentlemen, if you look at what

22   happened in many of these Las Vegas meetings with many of the

23   coaches that were on Merl Code's list.  That's entirely

24   consistent with the conversations that took place during those

25   meetings because, as you heard from Marty Blazer, not every

coach got paid in Las Vegas.  Some did and some didn't, but the
ones who didn't had a conversation in almost every instance
with the group about how they could work together in the
future, and that conversation was about money.  And you have
those recordings and you have those transcripts.  That's what
was talked about.

So what happened at those meetings was exactly what
Merl Code said should happen:  Build trust with the coaches,
offer to give them money in the future as they needed it,
exactly as Code told them that they should at the June 20
meeting and subsequent phone calls.  Those meetings in Las
Vegas were not the end of the road; they were the beginning of
it.  Code furthered the scheme by facilitating introductions to
coaches, coaches that were dirty, coaches that would openly
talk in the Las Vegas hotel room with guys they'd met for the
first time about what players they had and what these guys
could do for them: bribes.  So the fact that no money changed
hands in many of the Las Vegas meetings that Merl Code set up,
that ultimately is not a defense.  Merl Code furthered this
bribery conspiracy.  He made a handsome profit doing so by
getting Dawkins and his new business partners in front of
coaches that they could work with in the future and work with
by giving them money in return for players.

Ladies and gentlemen, finally, I'm just going to talk
very, very briefly about the cooperating witnesses.  Marty

1  Blazer, obviously, is a convicted fraudster, stole his clients'

2  money.  Munish Sood also has pled guilty, as you heard.  These

3  witnesses, as you heard from their testimony, have no incentive

4  to lie.  That was laid out in detail.  But this is the more

5  important point.  Everything they're talking about, everything

6  they told you from the witness stand, it's all in tapes, it's

7  all documented, it's all corroborated.  Pretty much everything

8  that the government laid out for you today is the defendants'

9  own words and actions.  So these cooperating witnesses, they

10  are completely backed up and corroborated by the other evidence

11  in the case.

12          So, ladies and gentlemen, I'm going to briefly speak

13  to you about the charges.  Judge Ramos gave you very detailed

14  instructions on the law.  I'm just going to highlight a couple

15  of things very briefly.

16          Defendants are charged with conspiracy, honest

17  services fraud, offering and pay bribes, conspiracy to violate

18  the Travel Act.  The heart of the charges is the *quid pro quo*

19  I've been talking about all afternoon.  When it comes to the

20  honest services fraud count, you heard that there needs to be

21  an interstate wire in furtherance of the scheme, and as Judge

22  Ramos told you, that can be a phone call or an email, and it

23  just needs to be between two states.  You heard lots of

24  evidence about how various members of this conspiracy resided

25  in different places.

1       As to the conspiracy counts, the question is was there

2  an unlawful agreement and they intentionally and voluntarily

3  joined the conspiracy?

4       As to the Travel Act, you heard that it is a federal

5  crime to travel in interstate commerce or use a facility of

6  interstate commerce, which includes emails, for the purpose of

7  carrying out unlawful activities.

8       Now, ladies and gentlemen, the last thing I'm going to

9  talk to you about is an instruction Judge Ramos gave you about

10 a term called "conscious avoidance." As Judge Ramos instructed

11 you this morning, if a defendant deliberately closes his eyes

12 to what otherwise would have been obvious to him, if he

13 willfully and intentionally tried to remain ignorant of a fact

14 that is material and important to his conduct in order to

15 escape the consequences of criminal law, that is still acting

16 knowingly.

17      Ladies and gentlemen, that instruction is particularly

18 relevant when you consider Merl Code, because in the context of

19 whether Merl Code joined the conspiracies that are charged, you

20 can and you should find beyond any reasonable doubt that, at a

21 minimum, he engaged in conscious avoidance because, based on

22 everything he knew about what Dawkins and D'Angelo were up to,

23 his knowledge that they had previously bribed coaches and had

24 every intention of continuing to do so, his advice to D'Angelo

25 to have conversations with these coaches about the ways that he

1    could give them money going forward, Code would have had to

2    deliberately close his eyes to what otherwise would have been

3    obvious, that Dawkins and D'Angelo were going to seek to bribe

4    coaches in the future, coaches that Merl Code was introducing

5    them to.  So you can find Merl Code guilty on that basis as

6    well.

7            Ladies and gentlemen, I'm about to sit down.  At the

8    beginning of this case, we told you to use your common sense.

9    I'm going to ask you to do that again, because if you use your

10   common sense, you will reach the only verdict that is

11   consistent with the law and with the evidence, that the

12   defendants are guilty.

13           THE COURT:  Thank you, Mr. Solowiejczyk.

14           Ladies and gentlemen, as was the case yesterday, we're

15   going to have to finish a little bit early.  We have some

16   additional arguments that are going to be presented to you.

17   We're not going to be done before 2:30, so we're going to break

18   now.  I think Ms. Rivera may have some administrative stuff for

19   you folks to work on just now, so you may not be able to leave

20   right away, but we will see you bright and early Monday

21   morning.  Please be prepared so we can come out at 9:30.

22           Until then, please do not read anything you may see

23   about this case.  Please do not watch anything you may see in

24   the media about this case.  Have a very pleasant weekend, and

25   we'll see you soon.  Don't discuss the case.

1          (Jury excused)

2          THE COURT:  Everyone can be seated.

3          I take it folks are standing by their predictions of

4     yesterday, so about an hour and 15, Mr. Haney?

5          MR. HANEY:  Perhaps an hour and a half, your Honor.

6     No longer.

7          THE COURT:  OK.

8          MR. MOORE:  Given today, 45 minutes to an hour, Judge.

9          THE COURT:  OK.  Who's doing the --

10          MR. BOONE:  I am.  Probably around 45 minutes.

11          THE COURT:  Or less?

12          MR. BOONE:  Or less.

13          THE COURT:  OK.  Anything else?

14          MR. MOORE:  Just one question, your Honor.  When they

15     get the case on Monday, what are their hours?  Are you going to

16     let them set their hours?  Are they going to make --

17          THE COURT:  I will give them the option of staying

18     with the schedule or staying later.  I always say, look, if you

19     think you're getting close to a verdict and you think you

20     may -- you want to stay an extra hour, we're not going to get

21     in your way.  We'll work 9:30 to 2:30 or longer if you wish.

22          MR. MOORE:  Yes, sir.

23          MR. HANEY:  Thank you, your Honor.

24          THE COURT:  Have a good weekend, folks.

25          (Adjourned to May 6, 2019, at 9:00 a.m.)