J56HDaw1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                            17 CR 684 (ER)

CHRISTIAN DAWKINS AND MERL
CODE ,
                                   Trial
          Defendants.
------------------------------x

                            New York, N.Y.
                            May 6, 2019
                            9:00 a.m.

Before:

                HON. EDGARDO RAMOS

                            District Judge

                   APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
ROBERT L. BOONE
NOAH D. SOLOWIEJCZYK
ELI J. MARK
     Assistant United States Attorneys

HANEY LAW GROUP PLLC
     Attorney for Defendant Dawkins
BY:  STEVEN A. HANEY, SR.

CHANEY LEGAL SERVICES, LLC
BY:  DAVID A. CHANEY, JR.
            -and-
NEXSEN PRUET, LLC
BY:  ANDREW A. MATHIAS
     MARK C. MOORE
     Attorneys for Defendant Code

ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
              YOLANDA BUSTILLO, Paralegal Specialist USAO
              EMILY GOLDMAN, Paralegal Specialist USAO

J56HDaw1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  It's after 9 o'clock.  Did either side
 3    wish to bring up anything?
 4              MR. MARK:  Not from the government, your Honor.
 5              MR. SOLOWIEJCZYK:  No, your Honor.
 6              MR. MOORE:  Your Honor, we were just talking for a
 7    moment about closing arguments, and I assume that if the
 8    government has an issue, they'll let us know about some things
 9    we just told them.  I just want to make sure, having never done
10    a summation before your Honor, I know that your Honor's
11    instructions are the instructions on the law, and I'm assuming
12    that I can talk about those instructions --
13              THE COURT:  You may, absolutely.
14              MR. MOORE:  -- correct?
15              THE COURT:  Yes.
16              MR. MOORE:  I've clipped portions of them.
17              THE COURT:  OK.
18              MR. MOORE:  I'm not going to go much beyond that.  I'm
19    also assuming I can talk about reasonable doubt?
20              THE COURT:  Yes.
21              MR. MOORE:  I just wanted to be sure because in the
22    Fourth Circuit where I'm from, you really can't talk about it
23    much at all.
24              THE COURT:  So what do you do?
25              MR. MOORE:  Well, you talk about -- you can't define
```

J56HDaw1

| | |
|---|---|
| 1 | it; the Court can't define it. |
| 2 | THE COURT:  The Court doesn't define it? |
| 3 | MR. MOORE:  The Court does not define it, and some |
| 4 | might say that's good for the government.  Some might say that. |
| 5 | So the Court doesn't define it, and you talk about these are |
| 6 | reasonable doubts, and they should understand what the meaning |
| 7 | of the word "reasonable doubt" is and you go. |
| 8 | MR. SOLOWIEJCZYK:  To be clear, we're not going to |
| 9 | have an objection as long as whatever he's saying about |
| 10 | reasonable doubt is consistent with the instructions the Court |
| 11 | has given. |
| 12 | MR. MOORE:  It is consistent with your Honor's |
| 13 | instructions. |
| 14 | THE COURT:  I assume so. |
| 15 | MR. MOORE:  I made sure of that. |
| 16 | THE COURT:  That was my working assumption. |
| 17 | MR. SOLOWIEJCZYK:  OK. |
| 18 | MR. CHANEY:  We decided to revise the definition. |
| 19 | (Recess) |
| 20 | THE COURT:  We're waiting on two jurors, but we will |
| 21 | start as soon as they get here. |
| 22 | (Recess) |
| 23 | THE COURT:  OK.  The jury's here, ladies and |
| 24 | gentlemen. |
| 25 | (Jury present) |

J56HDaw1                     Summation - Mr. Haney

```
 1              THE COURT:  Everyone, please be seated.
 2              Good morning, ladies and gentlemen.  I hope that you
 3     were able to enjoy some part of the weekend despite the rain.
 4     And I apologize for the bottleneck downstairs.  Apparently,
 5     we're starting eight trials today.  There are a lot of new
 6     potential jurors coming in.  Do bear that in mind as we go
 7     through the week.  There will be substantially some additional
 8     traffic coming in.  So bake that into your estimate as to when
 9     to get here.
10              We will now continue with summations.  At this point
11     the defense will go.  Mr. Haney, do you wish to sum up?
12              MR. HANEY:  Thank you, your Honor.
13              Good morning.  Hope you had a great weekend.
14              Now, before I begin, on behalf of my client, Christian
15     Dawkins, and myself, I want to deeply thank you all for your
16     patience, your attentiveness, your punctuality, and the
17     sacrifices you all made by being here to give Christian Dawkins
18     his day in court.
19              As I watched you all over the last two weeks dutifully
20     filing in one by one to take your respective chairs in the jury
21     box, it really struck me, maybe for the first time in 20 years,
22     how profoundly much and deep the sacrifices that you make when
23     you leave your lives, you leave your families, you leave your
24     loved ones to be jurors, and you're doing so because this is a
25     very important moment for Christian Dawkins.  Christian Dawkins
```

J56HDaw1                    Summation - Mr. Haney

is in a fight for his life, and he's still in that fight right now to clear his name, to fight for his freedom and his liberty.

          Now, I would be remiss if I didn't also comment on and compliment the efforts of the government in this case and their team of fine young lawyers: Mr. Boone, Mr. Mark, Mr. Solowiejczyk, Ms. Bustillo.  I don't agree with much of anything that they presented during the course of this trial, but I respect their positions and the jobs that they did, and I listened intently to their closing argument, as I hope you do to mine.

          Ladies and gentlemen, despite the missteps and mistakes that Christian Dawkins has made in his 26 years of life, and he's made many, I submit to you that those missteps, those mistakes, and the characters that he met along the way, some of those that you saw come in this courtroom and testify against him, men that were twice his age, did not warrant the gravity of these federal crimes that were brought against him.

          Now, hopefully together these discussions that we'll have will be helpful to you in arriving at a decision in this case where you don't compromise, you don't sacrifice your beliefs, you don't betray your individual conscience, but you instead do the right thing.  And you, ladies and gentlemen, are the ones who are empowered in determining what is the right thing.  And it's a great and mighty privilege that you have,

and perhaps a burden, to hold a young man's future in your

hands and be the purveyors of justice and, ultimately, make the

decision, the difficult decision, has this case really made any

sense to you, if this case is worthy of condemning a man for

the actions in this case that seem so uncertain and conflicting

at times.

So the defendant Christian Dawkins is now afforded his

time to argue the case, if you will, but I'm not going to argue

with you.  What I'm going to do is try and discuss the

reasonable inferences which I submit that you can draw from the

evidence in this case and try to make sense of what I submit at

times was nonsensical, find reason within the unreasonable, and

explain much of the inexplicable of this case that was brought

against Christian Dawkins.

Ultimately, it is what you determine to be the facts

is what is going to be important, and all of us can live with

that and we will because you all took an oath as jurors, and

we're mindful of the oath you took.  We have confidence you

will fulfill that oath and keep the promises that you made when

you took that oath as jurors.  Simply put, you are fair people.

We are confident in you that you will arrive at a fair and just

outcome, not for just the government, not just for the defense,

but for both sides, because that's what fair people do.

Now, after several weeks of often admitted tedious

moments, you are now empowered to administer justice as the

1    jury.  That's your job.  No more lawyer arguments.  No more

2    trips to the sidebar that you saw frequently occur.  You are

3    now empowered to ensure that this great system of a jury

4    process works, greatest system in the world.  The ball is in

5    your court, and I submit you have the opportunity, it seems to

6    me, to now be participants in that administration of justice.

7    For, ladies and gentlemen, as you will see, as perhaps you have

8    seen for the last two weeks, I submit the government took this

9    case of a lot of talk, a lot of transcript Scrabble, a lot of

10   NCAA rule-breaking, and effectively legislated and turned those

11   violations into federal law.  I don't know why they did.  I

12   can't answer that question.  But what I do know is that on

13   Friday, the government started their closing argument wanting

14   to talk about lies.  Well, I want to talk about the truth.

15          A poet by the name of William Blake, and I want you to

16   remember this quote that he had, William Blake, said, "A truth

17   that's told with bad intent beats all the lies you can invent."

18   So let's talk about the government's truth that they told you

19   and the intentions of what were told.

20          Mr. Boone on Thursday stood before you all and in his

21   line of questioning of Christian Dawkins accused him, no other

22   word of it, of stealing an ASM client's credit card so, as

23   Mr. Boone alleged, Christian Dawkins could embark upon 1,860

24   proverbial Uber joyrides in year.  I wrote down the number so I

25   wouldn't forget it.  I wish you do it too as well.  That means

J56HDaw1                    Summation - Mr. Haney

1    in one year Christian Dawkins would have had to have

2    necessarily gone on five Uber rides every single day, including

3    holidays, including weekends, and every other single day.

4    Meaning, necessarily, let's say he missed a day, he would have

5    to make up for that day to go on ten rides the next day or

6    perhaps even 15 rides if you miss two days.  Robert Boone knew

7    that wasn't possible when he presented that to you all during

8    the course of that questioning.  So what were his intentions

9    with that line of questioning to you?

10        How about Mr. Solowiejczyk on Friday during his

11   closing argument when he said with great conviction and great

12   passion:  There's no evidence that Christian Dawkins ever

13   hustled the FBI out of their money.  Instead, claiming that

14   Christian Dawkins and the defense —— that would be me; I'm the

15   only one sitting over here —— hustled you and lied to you.  But

16   conveniently during that closing argument, he concealed the

17   fact that there was an ATM bank deposit on August 31, 2017, in

18   Inglewood, California, knowing that the exact same day there

19   was an $11,900 deposit in an ATM machine literally right down

20   the street from the LAX Hyatt Hotel where Christian Dawkins

21   received the cash from undercover agent Jeff, Jill Bailey.  Why

22   would he hide that from you?

23        How about Mr. Solowiejczyk on Friday spending two

24   hours of your time giving you bits and pieces of conversations,

25   highlighting some words and not others, representing that those

J56HDaw1                        Summation - Mr. Haney

chopped-up little conversations could be representative of what
people were talking about?  Like reading a fairy tale or a
book, it was like watching a madman pulling pages out of a book
and chapters, keeping only those in that fit the narrative of
this prosecution, leaving out others.  You saw them do it.
They did it the whole trial.  Leaving out recordings, leaving
out bank records that, if included in the book, would destroy
the entire theory of the case.  You all know you can't read a
book with missing pages, and that's what the government did.
They wanted you to read a book with missing pages and have no
reasonable -- have no doubt at all.

          How about the government presenting a case speaking
through a known thief on the witness stand like Marty Blazer
and allowing him to look you in the eyes as he was testifying
and saying that the two-story yacht in this disaster of an
investigation was being primarily used for marketing purposes?
Remember when Marty Blazer told you all that when he testified
under oath?  When he was telling that bald-faced lie, I was
watching the government.  They just sat there with their hands
folded, staring straight ahead, letting him continue to lie to
you, knowing that that wasn't true -- and you all know that
wasn't true -- hoping you would believe it.  And they want to
talk about the truth?

          How about the government luring a 22-year-old kid from
what the testimony was a poor, a poor and economically

J56HDaw1                          Summation - Mr. Haney

1  depressed town --

2           MR. BOONE:  Objection.

3           MR. HANEY:  -- like Saginaw Michigan --

4           THE COURT:  Sustained.

5           MR. HANEY:  -- on a yacht, fancy food, expensive

6  alcohol, tens of thousands of dollars in cash, a false

7  shareholders agreement that they never intended on honoring?

8  They had the nerve to suggest there was anything at all honest

9  about that or anything you've heard for the last two weeks.

10          I could give you 15 more examples, ladies and

11 gentlemen, of how, I submit to you, the prosecution in this

12 case did not represent the facts accurately and misled things,

13 but I'm not going to do that.  I'm on the clock right now, and

14 I'm not going to waste your time, and my client's freedom is on

15 the clock too.  But you are all reasonable people, you all know

16 that after two weeks of your lifetime spent in this courtroom,

17 something doesn't feel right about this.  You know something's

18 wrong here.

19          You saw Mr. Boone on Thursday chewing on the

20 microphone, barking at Christian Dawkins when he was on the

21 witness stand like he was a drill sergeant dressing down a

22 corporal.  You saw a grown man on Friday stand up during his

23 closing argument and engage in name-calling, insults, offering

24 liar, liar pants on fire argument, a U.S. Attorney.  You saw

25 Munish Sood, facing up to 35 years in a federal penitentiary,

1    betray a close friend of half his age.  Munish Sood, a man who

2    essentially signed up for a second voyage on the Titanic by

3    going into business again with Marty Blazer after he knew two

4    years earlier Marty Blazer had stolen $2 million of his

5    client's money.  Munish Sood, the founder and former CEO of a

6    billion-dollar bank with no less than four securities licenses,

7    multiple college degrees from some of the finest schools in

8    America, and he testified he got his business lessons from

9    Christian Dawkins.  Is that the truth?

10          Ladies and gentlemen, I submit to you all this case

11   has no soul.  It didn't when the government made it up, which

12   they did, didn't for the last two weeks, and it never will.

13   Unlike any criminal case I've seen in my career, which includes

14   time as a prosecutor and attorney general, I have never seen a

15   case that was so literally manufactured.

16          MR. BOONE:  Objection.

17          THE COURT:  Sustained.

18          MR. HANEY:  There is nothing natural or organic about

19   this case.  This case was just as fake as the names of Jeff

20   D'Angelo, Jill Bailey, who, unlike my client, never took the

21   witness stand in this case to testify.  The very origin of this

22   case was derived from the habitual dishonesty, thievery, and

23   morally bankrupt soul of Marty Blazer, a pathetic excuse of a

24   fraudster who wasn't even good at stealing.  And when he was

25   facing 67 years in a federal penitentiary, he answered the

J56HDaw1                    Summation - Mr. Haney

government's call to get himself out of trouble, to help
concoct this college basketball bribery case.

I submit to you all, ladies and gentlemen, we're here
because of the reality that a 22-year-old kid at that time took
the FBI on a wild ride that ended with everyone on board the
proverbial team bus being driven right off the cliff by Marty
Blazer.

So let's revisit the evidence in this case.  I submit,
as we do, you will leave empty of any sensible explanation as
to what possible theory the government has established proving
this case beyond a reasonable doubt and that Christian Dawkins
could be guilty of the laundry list of federal crimes,
including bribing college basketball coaches.

Now, you heard on Friday from the government this is a
bribery case, and it is, among other things.  And your jury
instructions that you'll be able to review when you deliberate
specifically state that in order to satisfy the burden of proof
on a bribery theory, the government must prove that Christian
Dawkins intended to engage, as the government said on Friday,
in a *quid pro quo*, which means a this for that, specifically,
that Christian Dawkins gave, offered, or agreed to give a thing
of value to a men's basketball coach, in this case Lamont Evans
and Book Richardson, for a promise or performance of an act in
connection with some business of the university that employed
that coach or, in the alternative, the government must show

1    beyond a reasonable doubt under a gratuity theory that

2    Christian Dawkins gave, offered, or agreed to give a thing of

3    value to either Lamont Evans or Book Richardson, and there was

4    a link between that payment and a specific act taken or to be

5    taken by the coach.

6          So let's explore now how I submit to you the

7    government has failed to meet that burden of proving this

8    allegation, and we're going to start with the Coach Lamont

9    Evans.

10         First, we know, absolutely certain from the evidence,

11   that there was no evidence ever presented in this trial that

12   Christian Dawkins ever paid Lamont Evans anything other than

13   the $2,500 he testified to have paid nearly four years ago back

14   in 2000 -- 2015 and '16 at the direction of his boss, Andy

15   Miller.  No evidence at all ever.  The evidence showed that the

16   money was not paid to Lamont Evans by Christian Dawkins but by

17   his boss at ASM so he, Andy Miller, could hopefully sign one

18   day a player, as you heard, by the name of PJ Dozier.  You

19   heard testimony not just from Christian Dawkins but everybody

20   who testified in this courtroom, Christian Dawkins couldn't

21   sign anybody.  He was not a licensed player agent.  He was just

22   a runner for Andy Miller who was the licensed agent.  And the

23   money that was paid for his boss, not to influence Lamont Evans

24   but for Lamont Evans to give to PJ Dozier who, you heard from

25   the evidence, needed money when he moved onto campus at the

J56HDaw1                          Summation - Mr. Haney

1    University of South Carolina so that Andy Miller, not Christian
2    Dawkins, could make a good impression on the family of PJ
3    Dozier.  So, ladies and gentlemen, Andy Miller, not my client,
4    could one day make money if PJ Dozier ever made it to the NBA,
5    which, by the way, he didn't.
6              Essentially, all this really sounds like is a bunch of
7    NCAA rules violations.  But what was most absurd about the
8    notion of going after Christian Dawkins for Andy Miller's NCAA
9    rules misdeeds is that whatever money was provided to Lamont
10   Evans, the government never showed during the course of this
11   trial a single shred of evidence that Christian Dawkins ever
12   gave or offered or agreed to give Lamont Evans a thing of value
13   in exchange for a promise of anything at all or that there was
14   ever a link between the payment and a specific act or to be
15   taken by Lamont Evans.  Where is the evidence of a *quid pro quo*
16   for bribery?  Where is the promise that Lamont Evans was going
17   to return a favor to Christian Dawkins?  Where is the "this for
18   that"?  Where is the evidence of a gratuity theory that Lamont
19   Evans was ever provided with anything from Christian Dawkins or
20   there was a link between any payment and a specific act to be
21   taken by Lamont Evans as a reward for some future action?
22   Absolutely nothing.  Literally not one shred of evidence
23   presented by the government.  Just a lot of talk, a lot of guys
24   back and forth, a lot of transcript Scrabble, and a lot of
25   rules violations.

J56HDaw1                         Summation - Mr. Haney

1              The judge has instructed you on uncalled witnesses,

2    and you'll have that instruction.  You can review.  Was Lamont

3    Evans called as a witness?  No.  Did the government have the

4    opportunity to call him as a witness?  Of course they did.  Was

5    Jeff D'Angelo ever called as a witness at trial?  No.  Did the

6    government have the opportunity?  Of course they did.  Was Jill

7    Bailey --

8              MR. BOONE:  Objection.

9              THE COURT:  Sustained.

10             MR. HANEY:  These folks were not called and the

11   government chose not to.  You're never going to know what any

12   of them had to say.

13             MR. BOONE:  Objection.

14             THE COURT:  Sustained.

15             MR. HANEY:  All the wiretaps, all the text messages,

16   all the secretly recorded meetings, testimony from two

17   cooperating government witnesses, and there is no evidence,

18   ladies and gentlemen, that you can look at that Christian

19   Dawkins ever gave, offered, or agreed to give Lamont Evans a

20   thing of value in exchange for the promise of anything at all,

21   nothing.  All we do know absolutely certain about Lamont Evans

22   is that after March 3, 2016, the only ones who were paying

23   Lamont Evans any money at all was Marty Blazer and Munish Sood,

24   a couple of guys who Christian Dawkins as a favor to his boss

25   at ASM -- and that's where he was working in March of 2016 --

1    wanted to take Lamont Evans off their books and push him onto

2    somebody else because as Christian Dawkins testified, PJ Dozier

3    wasn't working out.

4            All the government showed you during the course of

5    this trial was that Marty Blazer and Munish Sood were down in

6    Miami tripping all over each other to find out how they could

7    not pay Lamont Evans because, as you heard, Lamont Evans was

8    screwing everybody over.  He had no promises being fulfilled.

9    Even the government's own cooperating witnesses who testified

10   in this case, both of them facing, as they told you, over 100

11   years potentially in prison, offered their services to the

12   government in hopes of not going to prison, told you on direct

13   examination they could not recall any occasion where Christian

14   Dawkins ever paid Lamont Evans a single dime.

15           And they also told you in June of 2017 they, and only

16   they, were the ones dealing with Lamont Evans and not Christian

17   Dawkins.  Even if you are buying at this point what the

18   government is selling as it comes to Lamont Evans, Lamont Evans

19   was receiving money from Marty Blazer and Munish Sood.  Where

20   was the evidence that any such payments from those two related

21   to any future benefit of Christian Dawkins, when both witnesses

22   told you under oath they were trying to use Lamont Evans to get

23   future financial planning clients that had nothing to do with

24   Christian Dawkins?  And the government cannot show you any

25   proof at all to the contrary.  Reasonable doubt?

1              Now let's talk about Book Richardson.  Now we know

2     from the evidence in this case for absolute certain Christian

3     Dawkins never paid Book Richardson, the associate head

4     basketball coach at the University of Arizona, a single penny.

5     We know that because the government's own witnesses told you

6     that when Book Richardson was paid a $5,000 payment and later a

7     $15,000 payment, Christian Dawkins was not there.

8              But if that is not enough reasonable doubt for you,

9     let's really close the book on Book Richardson and talk about

10    what we actually know that cannot be argued or contested by

11    anyone who listened to the evidence in this case.  We know

12    undeniably from the evidence that that Christian Dawkins and

13    Book Richardson were close friends.  We know undeniably from

14    the evidence in this case that on the date of June 20, 2017,

15    Book Richardson was in New York taking a cab to go to a 10 a.m.

16    meeting with Jeff D'Angelo.  And when on the way to that

17    meeting, Christian Dawkins and Book Richardson had a

18    conversation that was captured on a wiretap phone call.

19             Think about the logic of this, ladies and gentlemen.

20    If you are captured on a wiretap phone call and nobody knows

21    that, you don't know you're being recorded, you are going to be

22    in your truest moments at that point in time.  So we know what

23    Book Richardson and Christian Dawkins were saying.  We don't

24    need anybody to interpret that.  We don't need the government

25    to put up a transcript.  We don't need Marty Blazer to tell him

J56HDaw1                    Summation - Mr. Haney

1    what he understood them to mean.  We know what that

2    conversation consisted of on June 20, 2017, between Christian

3    Dawkins and Book Richardson.

4           I want to play that briefly, if we can.  This is

5    Government Exhibit 101.

6           (Audio played)

7           MR. HANEY:  Now, that was Christian Dawkins and Book

8    Richardson.  That doesn't need any interpretation.  We know

9    undeniably from what you just heard, Christian Dawkins is

10   telling Book Richardson as he's on his way to meet Jeff

11   D'Angelo what the play should be.  And maybe the government

12   doesn't know what that means.  You all are allowed to rely on

13   your individual experiences and common sense.  If somebody

14   says, this is what the play is going to be, I submit to you

15   that means this is what the hustle is going to be.  And we know

16   undeniably from what you just heard, Christian Dawkins

17   literally gave Book Richardson a script of what to tell Jeff

18   D'Angelo to hustle that money out of -- I'm sorry, to tell Book

19   Richardson what to hustle out of Jeff D'Angelo.  And we know

20   undeniably from what you just heard that Christian Dawkins told

21   Book Richardson that he had hyped him up to Jeff D'Angelo, and

22   he could probably get more money out of him.

23          And what we undeniably know, from what you just heard,

24   is when Christian Dawkins told his buddy Book, when he was

25   hooking him up on this free cash out of Jeff D'Angelo, Book

J56HDaw1                    Summation - Mr. Haney

1    Richardson says to Christian Dawkins:  "But what can I do to

2    make sure you and I are good?"  Remember that, ladies and

3    gentlemen, how important that statement is from Book

4    Richardson, "what can I do to make sure you and I are good?"

5           Remember the government talking about the *quid pro

6    quo*, this for that, ladies and gentlemen, this is the time

7    when, if Christian Dawkins was bribing Book Richardson, he

8    would have said:  We can be good if you send me some players

9    from Arizona.  He doesn't say that.  What does Christian

10   Dawkins say?  I'm Gucci.  I'm good.  He even proceeds to tell

11   Book Richardson:  Do whatever you want with the money or just

12   go on vacation with it.  Who cares?

13          Bribery?  Christian Dawkins says:  You know, Sean is

14   already paying for Rawle and them.  He's referring to Sean

15   Miller paying Rawle Alkins and the other players at Arizona, so

16   Christian Dawkins has no reason or motive to give Book

17   Richardson any money.  Does that give you reasonable doubt of

18   whether or not there was a bribe?  I don't know how it

19   couldn't, ladies and gentlemen.  I would submit to you that

20   that perhaps is a rarity where on a wiretap phone call you have

21   direct evidence that a bribe didn't happen.  Then we do know

22   undeniably from the evidence in this case that on the date of

23   June 20, 2017, when Book Richardson received that $5,000 cash

24   from Jeff D'Angelo, Christian Dawkins wasn't even there.

25          We also know undeniably from the evidence that after

J56HDaw1                        Summation - Mr. Haney

1    this meeting on June 20, 2017, the same day Christian Dawkins

2    calls his business partner Munish Sood, and this is what they

3    say.

4              (Audio played)

5              MR. HANEY:  Christian Dawkins, you just heard, asked

6    Munish Sood:  How did it go with Book?

7              And Munish Sood said:  It went great.  Jeff left with

8    a gift.  The gift, obviously, was the $5,000 that Jeff D'Angelo

9    gave Book Richardson.

10             And we know from the evidence, and you could hear the

11   tone of voice, the sarcasm from Christian Dawkins saying:  Did

12   Jeff feel good right now?

13             Munish Sood says:  Dude is like fucking high.  You

14   made his whole thing he's so happy.

15             Then on the wiretap you hear Christian Dawkins

16   laughing.  He's saying, incredulously:  I mean, what does Jeff

17   think Book can do for him?  Is he just a fan?  A fan, Christian

18   Dawkins told you, in his opinion, was a basketball fan, a jock

19   sniffer, a guy who likes to be around the athletes.

20             And Munish Sood says:  I don't know.  I think Book

21   thinks the business is going to grow and send us some kids.

22             And Christian Dawkins responds:  Well, guys like Book

23   are going to send me kids anyway.  Doesn't he understand that?

24             It's important, the transcripts don't provide you with

25   context of the sarcasm and the laughter and the humor, what

J56HDaw1                    Summation - Mr. Haney

1    these guys are really thinking.

2            Munish Sood says:  No, he's like dying man.  He's

3    dying.  Don't wake him up.  That's what Munish Sood says, don't

4    wake Jeff D'Angelo up.

5            Christian Dawkins says:  I know.  Trust me, I'm not

6    gonna say anything.

7            Then, ladies and gentlemen, Munish Sood says perhaps

8    one of the more profound lines of the trial as it relates to

9    Book Richardson.  If you don't already have reasonable doubt,

10   Munish Sood says:  If Jeff wants to give Book 20 grand and we

11   get the same result, but we can leverage Book for some other

12   stuff, fine.

13           Ladies and gentlemen, Munish Sood, the government's

14   own witness is saying that Jeff D'Angelo, and only Jeff

15   D'Angelo, not Christian Dawkins, is giving Book Richardson

16   $20,000, the same amount the government alleges Christian

17   Dawkins paid to Book Richardson as a bribe.  And both Christian

18   Dawkins and Munish Sood are laughing at how pointless that

19   payment is to Book Richardson, and we know undeniably from the

20   government's own witness, Munish Sood, he says, "Jeff just

21   wants to do a bunch of coaches," which is later learned so that

22   he could advance this theory of this bribery case of bribing

23   coaches.

24           Ladies and gentlemen, a young man's life is on the

25   line here.  I urge you and implore you, even though you've

J56HDaw1                    Summation - Mr. Haney

heard that call a couple of times already, when you deliberate, take one minute and 52 seconds of your life and play Government Exhibit 104 when you deliberate.  Listen to the tone of voice of Christian Dawkins, the unmitigated joy and laughter of both Christian Dawkins and Munish Sood mocking the whole idiocy of the FBI agent Jeff D'Angelo giving Book Richardson not a $5,000 gift but a $20,000 gift when, as their own witness said, we're going to get the same result anyway; when Christian Dawkins said, he's going to send me players anyway; when Christian Dawkins said, I don't need anything, I'm Gucci.  And we know from the evidence at a later point, good old Book Richardson, he goes back to the well again and extracts another $15,000 out of Jeff D'Angelo because, as Munish Sood told you, Jeff D'Angelo held all the purse strings.  And the 20 grand, as Munish Sood called it, was paid just like the $5,000 was, for absolutely no reason that either Christian Dawkins or Munish Sood could understand and they both found humorous.

          Bribery?  You got to be kidding me.  I will say it again, if Jeff wants to give 20 grand to Book and we get the same result, but you can leverage Book for some other stuff, fine.  Munish Sood wanted NBA veterans because Book Richardson knew them.  That's not illegal for Book Richardson to refer a guy playing in the NBA over to Munish Sood for financial planning services.  But despite this being the evidence, the government needed to do something, so they played transcript

J56HDaw1                    Summation - Mr. Haney

Scrabble, and they suggested to you that this money, despite

what you heard on the audiotapes, was paid for the recruiting

purpose of a player by the name of Jahvon Quinerly.  And the

government did so, just like they did in their closing

argument, by piecing together bits and pieces of conversations,

only partially representing what was said.

         But you want to find that a credible way to be

convinced of something beyond a reasonable doubt?  I submit,

ladies and gentlemen, that is embarrassing.  I further submit

that if anyone's honesty should be questioned, perhaps then

this case should look in the mirror.  There's nothing honest

about anything in this case.  Use your own common sense and

life experiences.  Don't let yourselves get lost in this

fantasy land.  Ask yourselves -- Christian Dawkins testified he

had known Book Richardson for years; they were friends.  In

fact, the whole time he worked at ASM, one of the biggest, most

powerful sports agencies in basketball, an agency breaking the

NCAA rules, paying whoever they could possibly pay to get

players, and Christian Dawkins testified that Arizona had NBA

talent, they had first round draft picks, they had the type of

talent that ASM so desperately wanted and would cheat to get.

But despite this fact and presumably the blank check that

Christian Dawkins had from his boss Andy Miller, Christian

Dawkins testified never, not one time, did he ever pay Book

Richardson a dime to get a player at Arizona, just like he said

J56HDaw1                        Summation - Mr. Haney

1    to Munish Sood.

2              One word about this whole thing that you saw with Book

3    Richardson, it's ridiculous.  And based on this overwhelming

4    evidence, understanding the defense doesn't have to prove

5    anything in a criminal case, that burden of proof rests

6    squarely on the shoulders of the government, I submit to you

7    there is no possible way in the furthest reaches of your mind

8    that you could conclude that that $20,000 paid to Book

9    Richardson by Jeff D'Angelo was in any way ever a legitimate

10   bribe or gratuity by Christian Dawkins for some future favor to

11   be returned by a guy who Christian Dawkins said was going to

12   send him players anyway.

13             And just as ridiculous as it would be to suggest that

14   that money was ever paid to Book Richardson by Christian

15   Dawkins with some corrupt intent would be to suggest that,

16   based on that evidence, Christian Dawkins engaged in a scheme

17   to defraud the University of Arizona in connection with this

18   scheme to deprive the University of Arizona of its intangible

19   rights to the honest services of Book Richardson.  In fact, did

20   anyone from the University of Arizona even testify in this

21   case?  Ladies and gentlemen, simply put, there is no possible

22   way from what the evidence in this case is, and not chopped-up

23   transcripts, the audio evidence in this case, that Christian

24   Dawkins committed any crimes associated at all with Book

25   Richardson.  Ask yourselves, after hearing that evidence and

J56HDaw1                      Summation - Mr. Haney

1     that chronology and those pages of the book that the government

2     pulled out, how you could have any reasonable doubt as to the

3     intentions of what Jeff D'Angelo did with Book Richardson.

4            If you listen to that call, ladies and gentlemen,

5     again, that Government Exhibit 104, and if you give Christian

6     Dawkins one minute and 52 seconds of your life, the defining

7     reasonable doubt, I submit, will be unnecessary because I

8     submit to you there has never been a more obvious answer than

9     what is represented by the evidence that you hear on that

10    wiretap phone call as to my client's intent and the charges as

11    they related to Book Richardson.

12           Now, we hear from the evidence in this case the same

13    day that Book Richardson went over to meet with Jeff D'Angelo

14    on June 20, Christian Dawkins calls up his good friend,

15    Mr. Code.  He tells Mr. Code exactly the same thing he tells

16    Book Richardson.  He tells him what the play is going to be,

17    and they're laughing about how they're going to hustle money

18    out of the undercover agent Jeff D'Angelo.  Just like with

19    Book, on the way over to that meeting with Jeff D'Angelo,

20    there's a recording of it.

21           Let's hear Government Exhibit 103.

22           (Audio played)

23           MR. HANEY:  Again, that doesn't need any

24    interpretation.  I don't need Marty Blazer to say what that

25    meant.  I don't need a transcript with portions of it omitted

J56HDaw1                       Summation - Mr. Haney

1    for you to understand what those guys were talking about.  We

2    know undeniably from what we just heard that Christian Dawkins

3    is telling Merl Code as he's on the way to go meet with Jeff

4    D'Angelo that there's nothing really complicated about the

5    situation.  Just bring up some names of some kids that you

6    think you can get involved with.  Merl says:  Who, like who

7    should I mention?

8          And Christian Dawkins says:  They're not going to know

9    who the fuck, Merl.  You can say anybody.  I mean, I'm not

10   trying to be funny here.  You're not dealing with Sonny

11   Vaccaro.  Again, making fun of Jeff D'Angelo.

12         In response you hear Merl Code laugh.  Again, you can

13   listen to it when you deliberate.  Laughter doesn't show up on

14   a transcript, ladies and gentlemen.  Merl laughs and says:

15   Well, I could say Zion Williamson knowing good and goddamn well

16   not going to get him.

17         Why are they laughing?  Why just tell Jeff D'Angelo

18   any old name?  Because this FBI agent in charge of this massive

19   federal college basketball case apparently doesn't know

20   anything about basketball, and Merl Code can tell him literally

21   any name, and he won't know, as you heard from the call.

22         And then Christian Dawkins says, I just want to get

23   some money in your pocket, just like he just wanted to get some

24   money in the pocket of his friend Book Richardson.  Does that

25   give you reasonable doubt?

J56HDaw1                    Summation - Mr. Haney

1           You then hear Christian Dawkins and Merl Code laughing
2      of how they can get Jeff D'Angelo over to a Knicks game and
3      introduce him to some NBA players and impress him some more so
4      they can hustle more money out of him.  Ladies and gentlemen, I
5      submit to you, understanding the burden of proof, and the
6      defense has no burden, but you must be moved beyond a
7      reasonable doubt.  You can listen to these two calls between
8      Christian's two friends, Book Richardson and Merl Code, and you
9      can't arrive at any other decision or determination of what
10     their intentions were.

11          The government asked you in their opening statement to
12     use your common sense.  Well, listen to the calls.  Listen to
13     the laughter.  Listen to the mockery.  Listen to the sarcasm.
14     Is this embarrassing to the government?  You bet it is.  You
15     can tell it is because the government didn't want you to hear
16     those calls.  Christian Dawkins and Merl Code conspiring to
17     bribe, scheming to defraud, violating federal crimes?  You got
18     to be joking.  The evidence is overwhelming.  And though the
19     defense has no burden of proof, there is no question the
20     intentions of Christian Dawkins, Merl Code, and Book Richardson
21     on June 20, 2017, were they were going to go along with
22     Christian Dawkins' play on a young dude with the bread and take
23     his money, period.  That's the evidence in this case, and the
24     government has not and cannot show otherwise, and they never
25     will.

J56HDaw1                     Summation - Mr. Haney

1          When you listen to these calls and you hear the
2    laughter, does it give you doubt?  The government wants you to
3    believe, as they've said during the course of this trial and in
4    their closing argument, that Christian and Merl were being
5    clandestine and paranoid and they were sneaking around, and
6    that's an admission of their guilt.  I guess we finally do
7    agree on something.  Christian Dawkins and Merl Code were
8    clandestine and paranoid and sneaking around.  Why?  Because
9    they didn't want the NCAA to find out what they were doing.
10   Again, use your common sense.  The government wants to trick
11   you and find buzz words like "federal" and "indicted," but you
12   know better.
13             MR. BOONE:  Objection.
14             THE COURT:  Sustained.
15             MR. HANEY:  This has nothing to do with a possible
16   belief that any of what they were doing could be considered a
17   federal crime.  You heard testimony from the University of
18   South Carolina, the first witness who testified in this case,
19   Chance Miller, who used to work for the NCAA.  He's an attorney
20   at the University of South Carolina.  When I asked him in his
21   experience as a lawyer for South Carolina and the NCAA, if he
22   considered this conduct to be --
23             MR. BOONE:  Objection.
24             MR. HANEY:  -- a federal crime -- it was testimony,
25   your Honor.

J56HDaw1                    Summation - Mr. Haney

1              THE COURT:  Go ahead.

2              MR. HANEY:  I asked him would he consider this conduct

3     to be a federal crime.  He said no.  So if the attorney from

4     the University of South Carolina, who's a trained lawyer, used

5     to work for the NCAA, didn't feel this was a federal crime, why

6     would Christian Dawkins and Merl Code or, for that matter, you?

7              MR. BOONE:  Objection.

8              THE COURT:  Sustained.

9              MR. HANEY:  Now, we all know from the evidence, with

10    no doubt or opposition, on the date of June 26, 2017, six days

11    after Christian Dawkins told his good friends Merl Code and

12    Book Richardson what the play should be to hustle money out of

13    Jeff D'Angelo, Christian Dawkins calls Jeff D'Angelo, and they

14    disagree about the merits of Jeff D'Angelo's coaches' model.

15    And you can listen to that call.  It's admitted into evidence

16    as Defense Exhibit 3, which is unequivocal that during that

17    call Christian Dawkins tells Jeff D'Angelo:  "I don't even

18    think you can do that, Jeff.  I think what you do -- see, this

19    is the thing, if you think about it -- I look at it from a

20    business perspective where I've been, before getting into shit

21    and just fucking raining money, it doesn't make common sense."

22             On this call, I submit Christian Dawkins is begging

23    Jeff D'Angelo to listen to him, explaining how the model of

24    paying college basketball coaches simply makes no business

25    sense.  It's on the phone call; it's on the wiretap.  He even

J56HDaw1                      Summation - Mr. Haney

1   uses the words to Jeff D'Angelo, "it doesn't make common

2   sense."  And the government wants you to forgot this evidence.

3   They want you to discount it and say that what it really sounds

4   like is he would rather have Marty Blazer and Munish Sood

5   interpret for you what such obvious plain English means.

6          You heard, when Christian Dawkins testified, he tried

7   every possible way to get Jeff D'Angelo off the idea of paying

8   coaches.  It was, as Christian Dawkins called it, it wasn't the

9   end-all, be-all.  And even the government's own cooperating

10  witness Munish Sood, testifying for the government in hopes of

11  avoiding potentially 35 years in prison, he said, "Jeff just

12  wants to do a bunch of coaches."

13         Then only two days later, ladies and gentlemen, on the

14  date of June 28, 2017, just as I promised in my opening

15  statement, we saw the seminal moment between Christian Dawkins

16  and this young, socially awkward business partner named Jeff

17  D'Angelo, the dude who wasn't smooth, the kid who sat across

18  the table from the cool kids at lunch, as Christian Dawkins

19  said, and the government concealed this call from you during

20  this closing argument.

21         MR. BOONE:  Objection.

22         THE COURT:  Sustained.

23         MR. HANEY:  The government didn't want you to think

24  that this --

25         MR. BOONE:  Objection.

1          THE COURT:  Overruled.

2          MR. HANEY:  In fact, on June 28, 2017, ladies and

3   gentlemen, I submit that this conversation with Christian

4   Dawkins speaks for the case entirely.  On that date on June 28,

5   2017, listen to the call.  You can literally hear the anxiety

6   and panic in Jeff D'Angelo's voice.  When you deliberate, you

7   can request to hear that call admitted as Defense Exhibit 5,

8   and the transcript of that call is Government Exhibit 108T.

9   Listen to the utter panic in Jeff D'Angelo's voice.  As I

10  submit to you, at that point on June 28 he is realizing the

11  entire government coaches bribery case is about to fly out the

12  window.  Listen to Jeff D'Angelo as we did in the courtroom

13  when that portion of the call is played during the trial.

14  Ladies and gentlemen, when Jeff D'Angelo realizes this

15  20-something-year-old kid with no apparent moral compass, a kid

16  who openly pays college basketball players and their families

17  because, in his opinion, they deserve it, a kid spawned

18  literally from the cesspool of athlete agency corruption, ASM,

19  this kid in the middle of this massive, costly, federal

20  investigation with yachts, envelopes of cash, undercover

21  agents, fancy hotel suites, and expensive liquor is on a

22  wiretap recording literally making the argument they should not

23  pay coaches.  At this point I submit to you if you listen to

24  that call, ladies and gentlemen, you will come to the

25  realization at that moment, as I called it, that seminal moment

J56HDaw1                    Summation - Mr. Haney

on June 28, Jeff D'Angelo comes to the realization that

Christian Dawkins is about to blow this entire undercover

operation.

          When you look at the evidence and the transcripts that

are reflected by Government Exhibit 108T, you will find that

Christian Dawkins says, the coach's model has been given to

you, not that he gave D'Angelo the coach's model.  He's telling

Jeff D'Angelo:  "The coach's model has been given to you and I

think you have to see past it just a little bit, because it's

not the end-all, be-all, in my opinion."

          And then Christian Dawkins says on page 6, line 10

through 12, and you can watch -- look at the transcript, he

says:  "And, listen, if you wanna -- all your own coaches, God

bless you.  I would recommend to go"...

          And then Christian Dawkins on page 8, line 20 through

25, Christian Dawkins says:  "So the model can work, but you

can't harp on the someone introducing me to coaches, because

that isn't always the best.  If that's the point, we can just

honestly save the fucking money.  I mean, honestly, it doesn't

make sense to spend it."  This is Christian Dawkins telling

Jeff D'Angelo, don't spend money on coaches.

          And then on page 9, line 2 through 6, Christian

Dawkins says:  "It just doesn't -- now, if you just want to --

like I said, if you just want to be Santa Claus and give people

money, well, fuck, let's just take that money and let's just go

J56HDaw1                    Summation - Mr. Haney

1    to the strip club and buy hookers."

2              And then on page 9, lines 12 through 16, Christian

3    Dawkins says:  "But just to put guys -- just to put guys --

4    just to pay guys just for the sake of paying the guy because

5    he's at a school, that doesn't make common sense to me."

6    Christian Dawkins is trying to talk Jeff D'Angelo out of

7    bribing coaches.

8              Then on page 11, line 6 through 9, I submit to you the

9    most important evidence in the trial, and it's a transcript,

10   but I'm not playing Scrabble.  You can listen to what he said,

11   and you can listen to the panic in his voice.  You can listen

12   to him stuttering and stammering as he's trying to spit out

13   what he says on page 11, line 6 through 9.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J569DAW2                    Summation - Mr. Haney

1           MR. HANEY:  (Continuing) Jeff D'Angelo says to

2   Christian Dawkins:  I'm with you but here's the model.  The

3   coaches' model.  Like we're gonna, we're -- I'm funding you,

4   your side of the business, and I'm staying out of your way and

5   you're gonna do that.  You're gonna pay those college coaches

6   and I'm funding you.

7           That's the evidence in this case, ladies and

8   gentlemen.

9           Now, from the evidence and the testimony, that's plain

10  English.  That doesn't need any interpretation.  Jeff D'Angelo

11  has threatened to quit funding Christian Dawkins if he does not

12  pay college coaches, period.

13          My client testified, as did the government's own

14  witnesses, and their own exhibit, that Christian Dawkins was

15  supposedly the majority shareholder of Loyd Management.

16          We all know that Jeff D'Angelo and the FBI set that up

17  too.  It was all a lie.  They teased Christian Dawkins, with

18  bottles of Scotch, a shareholder agreement that wasn't real,

19  got him on a yacht, flashed him some cash, dangled the money in

20  front of his face and then, on June 28, 2017, told him:  I'm

21  funding you, your side of the business.  I'm staying out of

22  your way and you're gonna do that.

23          How does that make you feel?  It shouldn't make you

24  feel real good, I submit.  And whether or not you choose to

25  endorse that manipulation is a decision you all are going to

J569DAW2                    Summation - Mr. Haney

1      have when you deliberate.

2                MR. BOONE:  Objection.

3                THE COURT:  Sustained.

4                MR. HANEY:  And what we do know is that on this date,

5      the same exact day, June 28, that Jeff D'Angelo threatened

6      Christian Dawkins with his funding, Christian Dawkins calls up

7      his good friend, Merl Code, and this is what he told Merl Code.

8                (Audio played)

9                There it is.  Does that need interpretation?

10     Reasonable doubt.  You just heard Christian Dawkins say to Jeff

11     D'Angelo -- I'm sorry, to Merl Code:  I'm not introducing him

12     to no coaches.

13               You just heard Christian Dawkins tell Merl Code:  To

14     me the whole coaches' model doesn't make sense.

15               And then Christian Dawkins says:  I know what I'm

16     gonna do -- Merl Code, finishes his thoughts, because they're

17     friends -- we're gonna take these fools' money.

18               What do you think they're talking about, ladies and

19     gentlemen?

20               Then Christian Dawkins says:  Exactly, exactly,

21     because it doesn't make sense to me, Merl, the coaches' model.

22     I'm trying to explain that.  I've tried to explain that to him

23     multiple times.  This is not what you want to do.  This is not

24     the way you want to go, the coaches' model.  Christian Dawkins

25     tells Merl Code, that's a lot of money for no reason.

J569DAW2                    Summation - Mr. Haney

1              And then later in that call, I'm going to play a

2     little small portion of that call where Christian Dawkins tells

3     Merl Code, on page 8, line 11 through 14.

4              (Audio played)

5              Let me tell you this bro, at the end of the day I

6     always try and do stuff the right way.

7              Now for Christian Dawkins the right way, paying the

8     family, playing the players, like he did at ASM in college.

9     Maybe that's not the right way.  But that's what he means.

10    Those are his intentions.  And he says it:  They're not gonna

11    listen, fuck intake their money.  That doesn't need any

12    interpretation of what his intentions were, which is not

13    bribing coaches.

14             Ladies and gentlemen, I don't know in all my years of

15    being a lawyer, three decades, I've ever been a part of a case

16    where the defendant is on a wiretap phonecall unequivocally

17    literally saying they are not going to do.

18             MR. BOONE:  Objection --

19             THE COURT:  Overruled.

20             MR. HANEY:  -- what they are charged with conspiring

21    to do.  He interrupted me.  I'm going to say it again.

22             In all my years of being a lawyer, I have never been a

23    part of a case where defendants were on trial and on wiretaps

24    unequivocally literally saying they're not gonna do what they

25    are charged with conspiring to do.

J569DAW2                     Summation - Mr. Haney

1            Reasonable doubt?

2            How can those words be interpreted to mean anything

3       other than what they just said?

4            This call alone, I submit to you, doesn't give you

5       reasonable doubt, it makes this entire case undoubtedly

6       unreasonable.

7            It's really, in fact, mind blowing how, based on what

8       these two guys are saying on these phonecalls, the government

9       could play that game of transcript scrabble and suggest to you

10      through witnesses facing, collectively, as they told you, a

11      hundred years potentially in a prison cell that they meant

12      anything other than what they could say.

13           And then 31 days later Christian Dawkins goes to Las

14      Vegas and he does exactly what he told Merl Code he was going

15      to do.  Christian Dawkins hustles Jeff D'Angelo again.  And the

16      government is mad about it.  Embarrassed about it.

17           MR. BOONE:  Objection.

18           THE COURT:  Sustained.

19           MR. HANEY:  Now they're saying he's lying about it.

20           So what happens after that, well, I don't want to get

21      lost in the governmental woods, ladies and gentlemen, it's a

22      dark and confusing place.  Instead I'm going to simply tell you

23      all what the evidence is going to show and not force feed you

24      all into believing a particular narrative by pulling out pages

25      of the book.

J569DAW2                          Summation - Mr. Haney

1          So, here it is.  Here's a summary of the bank records.

2     And I'm not going to go through this and make all kinds of

3     argument because this is the evidence in the case, ladies and

4     gentlemen.  Simply the evidence.

5          We know that based on what the government and the star

6     witness, Marty Blazer, told you on the date of July 28, 2017

7     both Preston Murphy and Corey Barker were the recipients of six

8     thousand dollar cash bribes.

9          Now, we know that when Christian Dawkins testified he

10    told you he and Preston Murphy made up a name of a player.  It

11    was not an NBA draft prospect.  And their intentions when they

12    did so was to give Marty Blazer and Jeff D'Angelo any old name

13    they could to hype them up just like they did Book Richardson

14    and Merl Code.  The fact that two years later Christian Dawkins

15    doesn't remember every detail of what occurred is, I submit to

16    you, a desperate attempt of the government to throw mud on the

17    wall and see if it will stick.

18         Don't fall for that.  You as jurors are allowed and

19    encouraged to use your common sense, your life experience, your

20    own personal knowledge as you determine credibility and

21    determine and weigh the evidence in this case.

22         And I know we got sports fans on this jury.  So I

23    submit that you all know who may have that personal knowledge

24    how ridiculous it would be to suggest that anyone ever would

25    pay a cash bribe to a coach at Creighton or a coach at

J569DAW2                    Summation - Mr. Haney

1    Cleveland State or Christian Dawkins' father.  And in order to

2    do so, for Preston Murphy to get that money, Christian Dawkins

3    did and Preston Murphy did make up a name of a player they knew

4    was never going to play in the NBA.

5          Now we know also the government told you on the date

6    of July 29, 2017 coach Tony Bland allegedly was the recipient

7    of a $13,000 cash bribe.  We also know, based on the evidence

8    in this case, on the date of August 31, 2017 undercover FBI

9    agent Jill Bailey, while at the LAX Hyatt Hotel gave Christian

10   Dawkins $5,000 in an envelope for a cash bribe to be paid to

11   the uncle of a recruit from USC.  You see under the bank

12   records, cash payments, that would be David Elliot.

13         Ladies and gentlemen, all you have to do is look at

14   the bank records and note that's a $28,500 amount.  All you

15   have to do is look at the bank records in evidence and you can

16   see the exact same day Preston Murphy and Corey Barker were

17   paid there was a $5,000 deposit made at the Bank of America.

18         And if we could insert slide 1401E.

19

20         The exact same day Tony Bland was allegedly bribed,

21   there was also a deposit made at a Las Vegas ATM machine in the

22   amount of $8,900.

23         Can you blow that up.  Thank you.

24         The exact same day FBI agent Jill Bailey told

25   Christian Dawkins to pay a cash bribe to the uncle of the USC

J569DAW2                       Summation - Mr. Haney

1    recruit there was a deposit made at an Englewood ATM right down

2    the street in the amount of $11,400, you can see it right

3    there, on August 31, 2017.

4                So, ladies and gentlemen, there is the math.

5                If we can go back to the bank summary, if we could.

6                Did Munish Sood tell you he made those deposits when

7    he testified?  No.

8                Did Jeff D'Angelo tell you he made those deposits?

9    Did Marty Blazer who had no access to the bank records, did he

10   make those deposits?  No.

11               Did Jill Bailey?  Did she testify she made those bank

12   deposits?  No.

13               They didn't because the government knows Christian

14   Dawkins made those bank deposits and there's proof of it.  And

15   that destroys their entire case:  The bank records and

16   Christian Dawkins telling Merl Code 31 days earlier:  I ain't

17   paying no coaches; they don't listen to me, I'm gonna take

18   their money

19               In fact, the government did show, with the Princeton

20   Advisory Group deposit on August 3, 2017.  If there was a

21   counterdeposit made with a check, then there would be an image

22   of that check, as they showed you.

23               Christian Dawkins, ladies and gentlemen, did exactly

24   what he said he was gonna do.  They don't like it.  They

25   shouldn't.

J569DAW2                    Summation - Mr. Haney

1              But don't fall for the games, ladies and gentlemen.

2              Yes.  Christian Dawkins said his only source of income

3       he had was through Loyd Management.

4              Yes.  That did include from time to time other people

5       dropping dirty money on occasion into that account too.

6              But I'm sorry, ladies and gentlemen, the egg is not

7       coming off the face.  It's been there too long.  I would

8       suggest you simply look at the mountain of evidence that

9       concludes that Christian Dawkins did not bribe coaches.  He did

10      exactly what he said he was going to do on June 28, after Jeff

11      D'Angelo threatened to put him out on the streets.  And whether

12      the government likes it or not, those bank records prove it or

13      at the very least raise substantial doubt, let alone reasonable

14      doubt, of the government's claims of what occurred.

15             Ladies and gentlemen, what we saw from the government

16      was exactly what we expected.  I submit exceedingly predictable

17      and I also submit exceedingly underwhelming.  The government

18      inundated you with weeks of phonecalls, transcripts, e-mails,

19      and text messages, showing rampant NCAA rules violations.  They

20      played grainy videos of hotel meetings, wiretaps of guys using

21      bad language talking breaking rules, just like we told you they

22      would.

23             And very shortly you're going to go into that room,

24      and you're going to go into that room, but this time it's going

25      to be a little different.  This time you're going to enter that

J569DAW2                    Summation - Mr. Haney

1   room and make one of the most important decisions of your life.

2   I don't know you all.  I know you've made some big decisions on

3   who to marry, perhaps, children, houses to buy.  But this is a

4   little different this time, ladies and gentlemen.  Because this

5   decision will affect another human being's life.  Simply put,

6   another life hangs in the balance on the decision you will

7   make.

8           Don't forget the law is your guide and this is a

9   nation of laws.  And all citizens, everyone, including you, are

10  protected by those laws.  And all citizens facing a criminal

11  prosecution are presumed innocent until the government can

12  prove their case beyond a reasonable doubt.

13          And as you deliberate and ponder this case you will

14  have the jury instructions.  And I submit with all the doubt in

15  your mind you have at this moment, remember a jury instruction

16  that was read to you, ladies and gentlemen, that a violation of

17  a NCAA rule is not a violation of law.  And the fact that a

18  coach's conduct violates the rules, policies, or codes of the

19  NCAA or his employer, does not necessarily mean there is a

20  scheme to defraud.  That's in your instructions.

21          This is not a case, as I told you in my opening

22  statement, of whether Christian Dawkins was wrong about what he

23  did to the FBI.  This is a case of whether or not Christian

24  Dawkins paid cash bribes to the college coaches alleged in the

25  indictment and thereby caused them to violate the honest

1   services that they owed to their respective universities.  And,

2   most importantly, this is a case if, based on what you've heard

3   over the last two weeks you are convinced beyond a reasonable

4   doubt that he is a guilty man.

5          I will end with this, ladies and gentlemen.  For as

6   you have seen, we're at a point in time now where the

7   government is asking you to participate in this prosecution.

8   They can't do it on their own.  They need you to finish it up

9   for them.

10          MR. BOONE:  Objection.

11          THE COURT:  Overruled.

12          MR. HANEY:  They need you all to finish out this

13   prosecution.  They need you all to get on the yacht right now

14   with Jeff, Jill, and Marty, asking you all to set sail.

15   Believe for a minute that this massive FBI investigation, the

16   yachts, hotels, expensive liquor, turncoat government

17   informants could possibly be worth the ask of convicting

18   Christian Dawkins.

19          I submit this is your time, now, to stay on the dock

20   and don't make the same mistake Christian Dawkins did.  Tell

21   the government no, thank you.  Tell the government bon voyage,

22   Jeff D'Angelo; anchors up, Ms. Bailey; Marty Blazer, anchors up

23   and, ladies and gentlemen, find Christian Dawkins not guilty.

24          Thank you.

25          THE COURT:  Thank you, Mr. Haney.

J569DAW2

1          MR. HANEY:  Thank you, your Honor.

2          THE COURT:  Ladies and gentlemen I'm going to take a

3  ten-minute break.  So please be prepared to come back out at

4  five minutes after the hour.

5          Please watch your step as you're stepping out.  I

6  understand there's a new wire there.

7          Don't discuss the case.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J569DAW2

1          (Jury not present)

2          THE COURT:  Everyone please be seated.  Don't be late.

3          MR. MOORE:  Your Honor, could I mention one point.

4    Without sounding like a broken record, but I guess I need to

5    make a record.  I was watching juror number three again because

6    I can't help it, she's directly in my line of sight.  I noticed

7    on least three occasions during Mr. Haney's closing, I don't

8    think she was closing her eyes because her eyes were closed

9    more often than not, it seems; but her head dropping and

10   nodding.  And I pointed it out to Mr. Chaney who noticed it as

11   well.

12         I have to renew my request to excuse her and replace

13   her with an alternate who is obviously paying attention.

14   Defense closing arguments are -- every phase of this trial is

15   very important but defense closing arguments are very

16   important.

17         MR. SOLOWIEJCZYK:  Your Honor, we did not observe

18   that.  I was actually trying to look at her repeatedly as, I

19   think, my colleagues were.  That's not what we observed.

20         So I mean Mr. Moore is just not seeing what we're

21   seeing.  Your Honor has a better vantage point.

22         THE COURT:  I didn't see that either.  And, again, the

23   screens are below eye level and Mr. Haney used a lot of

24   transcripts, etc., and so eyesight was necessarily directed

25   downwards and so the objection -- I mean she will not be

J569DAW2

removed, at least not at this point.

          MR. CHANEY:  Your Honor, just to supplement, Mr. Moore
did speak for me.  I did notice her head falling as well.

          MR. SOLOWIEJCZYK:  Your Honor, before Mr. Moore's
closing there were two things that Mr. Haney said, a number of
things we found highly objectionable.  There were two that we
think may require a curative instruction.  The first is -- and,
you know, that's why we asked Mr. Haney what he was going to
say specifically about uncalled witnesses.  But the argument
that was made, it was left in the jury's mind that the fact
they didn't hear from these witnesses that they could actually
infer something from it.  So we have a proposed curative on
that.

          And then the even more objectionable argument was that
they could somehow conclude something based on what the
University of South Carolina representative testified as to
whether he believed this constituted a federal crime or not.
That's the ultimate issue in the case.  And, obviously, they
should not be able to take the testimony from that
representative and somehow use it to let them conclude what the
proper conclusion here is as to the application of the law to
the facts.

          MR. HANEY:  May I respond briefly?

          THE COURT:  Sure.

          MR. HANEY:  Your Honor, I did nothing other than state

J569DAW2

1  what his testimony represented and that's the evidence in this

2  case.  That's what he said.  They objected when I asked him the

3  question.

4            THE COURT:  You didn't just say what he said.  You

5  then went on to argue:  If he didn't think that that was a

6  crime, then how can you, basically.  I'm paraphrasing.

7            MR. HANEY:  I understand that.  It is closing

8  argument, your Honor.  I'm not used to being objected to

9  multiple times during closing argument.

10            THE COURT:  They were sustained 98 percent of the time

11  too, Mr. Haney.

12            MR. HANEY:  I understand.  I tried to stay away from

13  what I promised them I would stay away from.  It was a long

14  closing argument.  But I believe at least in good faith told

15  them I would steer clear from the things that they really had

16  an issue and I believe I did.

17            MR. SOLOWIEJCZYK:  Your Honor, if I could read the two

18  proposed curatives for your Honor's consideration.

19            THE COURT:  Do you have them?

20            MR. SOLOWIEJCZYK:  I only have them on my phone right

21  now.

22            THE COURT:  Can you provide a hard copy?  But what are

23  they?

24            MR. SOLOWIEJCZYK:  You heard certain arguments from

25  Mr. Haney about certain witnesses that were or were not called.

J569DAW2

1    I want to remind you that the individuals that were referred to

2    by Mr. Haney were equally available to all parties and it is of

3    no concern of yours why certain witnesses were or were not

4    called.  Your only concern is whether the evidence you heard in

5    this trial establishes each element of the offenses you are

6    considering beyond a reasonable doubt.

7              THE COURT:  OK.

8              MR. SOLOWIEJCZYK:  The second one is.

9              You heard arguments from Mr. Haney regarding the

10   testimony of a representative from the University of South

11   Carolina about whether that witness believed -- actually one

12   moment, your Honor.

13             (Counsel confer)

14             MR. CHANEY:  Your Honor, on that issue I believe

15   Mr. Haney did use that argument for a permissible purpose,

16   which was for the jury to consider that fact in assessing

17   whether or not consciousness of guilt had come before them with

18   respect to whether Mr. Code or Mr. Dawkins believed that their

19   conduct was, in fact, a violation of NCAA violations and would

20   behave a certain way because of that but that that was not

21   coextensive with them believing that their conduct violated

22   federal law.  So there was a permissible reason to make the

23   argument, regardless of whether or not Mr. Haney took the next

24   step.

25             MR. SOLOWIEJCZYK:  I mean we can tweak this but the

J569DAW2

1     upshot was whether the witness believed certain conduct was or

2     was not criminal is how I heard Mr. Haney at least referencing

3     it.  And that witness was not called as an expert.  His views

4     on legal issues are not entitled to any particular weight.

5     You're not permitted to infer based on his personal views any

6     particular knowledge or mind-set of any person including the

7     defendants.  The determination of whether the government has

8     established beyond a reasonable doubt that these defendants

9     committed the offenses which they are charged with is solely up

10    to you.

11            So I think the point is, and we can tweak the

12    language.  They can't infer anything from whether or not this

13    witness ever thought of this conduct as a federal crime or not.

14            MR. MOORE:  Your Honor, what I would say is I would

15    ask your Honor to wait until all of the summations today

16    because we may be objecting to Mr. Boone and we may be asking

17    for curative instructions from Mr. Boone.  And perhaps

18    Mr. Boone, of course, gets the last word and he can make

19    comments based on what your Honor's earlier instructions are.

20            Your Honor gave a missing witness instruction.  The

21    jury has that missing witness instruction.  Why you need to

22    remind them of that I don't know at this stage.

23            I'm going to be talking about that issue too.  But I'm

24    going to use your instruction.

25            THE COURT:  OK.  Why don't you e-mail me that language

J569DAW2

1    to chambers, Mr. Solowiejczyk.

2              MR. SOLOWIEJCZYK:  OK.  Thank you.

3              THE COURT:  I won't give it now.

4              MR. SOLOWIEJCZYK:  OK.

5              THE COURT:  OK.  You've got three minutes.

6              (Recess)

7              THE COURT:  About 45 minutes, Mr. Moore?

8              MR. MOORE:  I think it's going to be an hour, your

9    Honor.  But I am going to try, I think, very much to stay under

10   it.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J569DAW2                    Summation - Mr. Moore

1                (Jury present).

2                THE COURT:  Ladies and gentlemen, at this time we will

3      continue with the summation on behalf of Mr. Code.

4                Mr. Moore.

5                MR. MOORE:  Thank you, your Honor.

6                May it please the Court, counsel, ladies and gentlemen

7      of the jury, in order to prove Merl Code guilty of conspiring

8      to do any of the crimes alleged in this indictment but

9      particularly to bribe college coaches the government has to

10     prove beyond a reasonable doubt that he knowingly and willfully

11     joined the alleged conspiracy for the specific purpose of

12     paying these coaches, getting them to do something that their

13     employment agreements forbid them from doing.

14               And to do that and to prove the other crime alleged in

15     the instant here, which is the 666 violation, which I'll talk

16     about in a minute, they have to get into his mind and prove his

17     intent.  Because the essence of a conspiracy charge is an

18     agreement.  And they primarily rest their case on snippets of

19     conversations from the June 20, 2017 meeting at the Conrad

20     Hilton and speculatively and conveniently and eerily similar

21     pro government interpretations of that meeting, not from an FBI

22     agent, but from two convicted fraudsters and admitted liars.

23               Well, ladies and gentlemen, you heard during the

24     defense case for the first time that after this meeting on

25     June 26 and June 28 Christian Dawkins and Jeff D'Angelo had

J569DAW2                    Summation - Mr. Moore

spirited discussions about what role, if any, Merl Code was
going to play in Loyd Management.  And Jeff D'Angelo, the guy
whose job it is to try to get Merl Code to say incriminating
things, had some very specific comments about what he thought
Merl Code's agreement was or was not.  And so, ladies and
gentlemen, if Christian and Mr. D'Angelo were arguing about the
role of Merl Code on June 26 and 28, how did Merl Code reach an
agreement with anybody to do anything that the law forbids
that's alleged in this case on June 20?

          Now, as I said before, the first time you heard about
these calls was over a week into this trial.  Any mention or
discussion of these calls was glaringly absent from the
government's case as it was glaringly absent from
Mr. Solowiejczyk's summation, just as Mr. D'Angelo was
glaringly absent from the government's case.  And instead of
having you see and hear Mr. D'Angelo, the government brought
you two serial fraudsters and admitted liars to interpret
recordings for you in an effort to convince you that Merl Code
is guilty.  And, ladies and gentlemen, I submit that is not
proof beyond a reasonable doubt.

          One of the things that Mr. Solowiejczyk mentioned sort
of near the end of his closing argument was this theory of
conscious avoidance, willful blindness.  Well, ladies and
gentlemen, if that's what they rest their case against Merl
Code on -- and we're going to talk about that in a few

J569DAW2                    Summation - Mr. Moore

1    minutes -- I submit to you that the government's argument to

2    you last week and their entire case with respect to Merl Code

3    is based on a consciousness of doubt, their own doubt about the

4    strength of this evidence.

5          Now, ladies and gentlemen, his Honor, who is the judge

6    of the law in this case, told you, both at the beginning of

7    this case and at the jury charges at the end that Mr. Code is

8    presumed innocent and the government bears the burden of

9    proving him guilty beyond a reasonable doubt.  He has no

10   burden.

11         This is a criminal case.  It's not a civil case.

12   We're not here for a contract dispute.  And because this is a

13   criminal case, before the government can take away Merl Code's

14   good name and perhaps his freedom, they have to prove to each

15   and every one of you beyond a reasonable doubt that he

16   committed the crimes charged.

17         And ladies and gentlemen, based on the evidence that

18   you heard in this case, but also based on the evidence that you

19   didn't hear from the government, I submit that this case is

20   riddled with reasonable doubt with respect to Mr. Code.

21         Now, in a few minutes I'm going to talk to you a

22   little bit about the evidence in this case and I'm going to

23   first discuss the evidence and the law that were absent from

24   Mr. Solowiejczyk's summation.

25         And I'm going to ask you, each of you, ladies and

J569DAW2                    Summation - Mr. Moore

1    gentlemen, when you go back to this jury room and you think

2    about the evidence, when you think about evidence that casts

3    doubt, reasonable doubt on the government's case, ask yourself

4    why it's the first time you heard that during defense

5    presentations.

6            Now, as I said, the burden is on the government to

7    prove beyond a reasonable doubt that Mr. Code committed the

8    crimes he's charged with.  He does not have to explain away

9    every piece of evidence that the government contends points to

10   guilt.  However, the government does have to account for every

11   piece of doubt-producing evidence.

12           Did they do that?  Ladies and gentlemen, we submit the

13   answer is no.

14           Can they do that?  Ladies and gentlemen, we submit the

15   answer is no.

16           There is evidence in this case that the government

17   simply cannot explain away, evidence that in no uncertain terms

18   could cause not only reasonable doubt but permanent doubt.

19           Now, you met me a couple of weeks ago in this

20   courtroom when Judge Ramos introduced me.  My name is Mark

21   Moore.  I'm a lawyer from South Carolina.  I'm here with two

22   other lawyers from South Carolina, Mr. Chaney and Mr. Mathias,

23   whom you met.

24           You might be happy to remember that you didn't hear

25   from me at all during the first week of this trial.  I sat

J569DAW2                    Summation - Mr. Moore

1    patiently in my chair because during the first week of this

2    trial you didn't hear a whole lot about Merl Code, OK.  And for

3    substantial time periods during this two-week trial you just

4    didn't hear much about Merl Code.

5              But I'm here to address the evidence here.  And, like

6    Mr. Code, I live in South Carolina.  And I practice law in

7    Columbia, where I myself had the honor of representing the

8    United States for 23 years.

9              Now, Mr. Solowiejczyk, in his closing, spent a minute

10   or two on his burden of proof.  He acknowledged that he had

11   one.  Didn't spend a whole lot of time talking about what a

12   substantial burden it was.

13             And as Judge Ramos told you in his remarks to you, the

14   government is a party here and because they are a party here

15   they are not entitled to any greater or any lesser

16   consideration.

17             But they are hardly an ordinary litigant.  They

18   represent the citizens of the United States of America.  All of

19   us.  And because they do, their job is to seek justice, not

20   just convictions.

21             They have tremendous resources.  And you heard a lot

22   about the resources they used in this investigation.  Two

23   undercovers in New York here on a yacht; and at the Conrad

24   Hilton in Las Vegas, at the Cosmo Hotel; in Arizona; and South

25   Carolina, my hometown of Columbia; and Los Angeles.  But there

J569DAW2                      Summation - Mr. Moore

1    is no evidence, however, that they used a routine evidence

2    gathering technique called surveillance to document exactly

3    what happened after Mr. Blazer, Mr. Sood, and UC1 and UC2 did

4    the things you heard about on direct.

5            And while, as Judge Ramos has told you, the government

6    is not on trial here and there is no requirement that they use

7    a particular investigative technique, you can consider not only

8    evidence that you heard but what you didn't hear in reaching

9    your verdict and in using your own good, common sense and your

10   own collective judgment and your life experiences.

11           I mentioned resources for a reason.  We're here in

12   New York, OK.  The Big Apple.  And I'm reminded of a line from

13   a comic book that I used to read as a child, Spider-Man, where

14   Peter Parker, a fictional New Yorker, is told by his Uncle Ben

15   that with great power comes great responsibility.  It's

16   absolutely accurate.  And among the responsibilities the

17   government has here to prove their case by the highest level of

18   proof known in our system, beyond a reasonable doubt.

19           You will recall Judge Ramos told you during his charge

20   to you that a reasonable doubt is something, and you will have

21   your instructions, but my recollection is what he told you is

22   that a reasonable doubt is something that would cause a

23   reasonable person to hesitate to act in an important affair.

24           Now, the drafters of our Constitution imposed juries

25   for a reason, because before the government can take away a

1   person's good name and his or her liberty, it's not enough, as

2   they used to do back in England, for the king to make an

3   accusation and somebody to say guilty, off to jail.

4          Here, before the government can take that away from a

5   person you, ladies and gentlemen, have to decide that they have

6   proven their case beyond a reasonable doubt.

7          In the English and Scottish systems there are three

8   verdicts:  Guilty, not guilty, and not proven.  In our system,

9   not guilty and not proven are the same thing.  Not guilty means

10  not proven.

11         And the government, again, must exclude each and every

12  reasonable doubt in each and every one of your minds before you

13  can find Mr. Code guilty.

14         And at the end of this case if you're left wondering

15  why Mr. Code did something, what was in his head, if the

16  government doesn't prove to you with the evidence they brought

17  to you beyond a reasonable doubt what was in his head, then you

18  have to acquit him because, as Judge Ramos told you early in

19  this case, and at the end of this case -- there are multiple

20  judges in this courtroom.  He is the judge of the law but you,

21  ladies and gentlemen, are the judges of the facts.  And as the

22  judges of the facts, you're not accountable to anyone for your

23  verdict except perhaps your own conscience.

24         Mr. Code thanks you for being a fair and impartial

25  juror.  Like Mr. Haney, I've watched you because I have a

J569DAW2                    Summation - Mr. Moore

1    vantage point that lets me look straight at you.  And please

2    understand that we know the sacrifices that you made and we

3    appreciate very much your time, your careful consideration and

4    the fairness and impartiality that you bring to a decision that

5    will affect him and his family forever.

6           No, I'm going to talk about the evidence in a moment.

7    But when we talk about the evidence I'd like you or I'd ask you

8    to remember this one quote from Ralph Waldo Emerson who said,

9    "What you do speaks so loud that I cannot hear what you say."

10   That phrase has been interpreted or turned on its head perhaps

11   to say sometimes, "Actions speak louder than words."  We've all

12   heard that phrase, have we not, ladies and gentlemen?

13          Because every single charge against Mr. Code requires

14   the government to prove beyond a reasonable doubt that he

15   corruptly intended for college basketball coaches to receive

16   payment in exchange for favors.  You not only have to look at

17   the words and, as the government would have you do, the

18   interpretation of those words from two convicted fraudsters and

19   admitted liars, you have to look at the conduct.

20          Now, so what does Merl Code's conduct reveal?  Ladies

21   and gentlemen, we submit to you it reveals an absolute lack of

22   intent to cause coaches to receive payments in exchange for or

23   to reward or influence their decision with respect to a matter

24   that affected their performance as university employees.

25          To begin with, ladies and gentlemen, you heard no

J569DAW2                    Summation - Mr. Moore

1    evidence that Mr. Code personally paid any coach.  There was no
2    evidence that Mr. Code was present when any coach was paid.
3          Third, I remind the government, they did not introduce
4    that Mr. Code did not introduce a single coach to Mr. D'Angelo
5    and his coterie of folks who actually received and accepted
6    money in exchange for anything.  None of the coaches that Merl
7    Code introduced ever took a single solitary dime.
8          Now, Mr. Solowiejczyk in his closing, despite that
9    fact, called folks like Steve Smith, who never took a dime,
10   corrupt.  Remember that.  Mr. Solowiejczyk says that if you
11   meet somebody in a hotel room and you engage in a discussion
12   that might talk about the fact that players might get paid, you
13   are corrupt.
14         If Merl Code intended for any coaches to be paid,
15   don't you think he would have at least done one single thing in
16   the several months he's alleged to have been on the paying
17   coaches team to accomplish that desire?  But he didn't.  He
18   didn't go to Miami.  He didn't go to Tucson.  He didn't go to
19   Atlanta.  He didn't go to Los Angeles.  He didn't go to
20   Morgantown, some -- West Virginia, some of the places that we
21   visited over the last two weeks through evidence.  And he
22   didn't go to Columbia, South Carolina, my hometown, a place
23   that's less than a two-hour drive from his hometown, to attend
24   the PJ Dozier draft party a couple of days after the June 20
25   meeting.

J569DAW2                    Summation - Mr. Moore

1              Now, if Merl Code entered into an agreement to pay

2      college coaches and one of those coaches was Lamont Evans and

3      Mr. Code was all in on that plan, as was suggested, then why

4      wasn't he at the PJ Dozier draft party because, as the

5      government contends, because he knew, perhaps, that someone had

6      paid Lamont Evans in the past, he's a coconspirator.

7              Well, ladies and gentlemen, let me hit that square

8      head on.  Just because you know that somebody may have done

9      something in the past or someone is doing something now doesn't

10     make you guilty.  It doesn't make you a coconspirator.

11             The United States of America has to prove beyond a

12     reasonable doubt that Mr. Code knowingly and willfully entered

13     into an agreement and with respect to the 666 count which is

14     Count Two, which says that he was involved in bribe payments

15     from at least 2016 up to, including in or about September 2017.

16     He made bribe payments or he assisted in making bribe payments

17     to an unspecified coach.  I guess we're left to consider and

18     conjecture, as we've been left to consider and conjecture much

19     about the government's case, which coaches the government is

20     talking about with respect to Mr. Code.

21             Merl Code didn't go to Las Vegas.  So coaches that he

22     introduced to these folks went to Las Vegas.  He wasn't there.

23     And not a single one of them took money.  If this was so

24     important, OK, and Mr. Code was all in on this plan to bribe

25     coaches, then why wasn't he in Las Vegas instead of being at a

1    family vacation with his family in Orlando?  That was a whole

2    lot more important to him than being in Las Vegas.

3         And Mr. Solowiejczyk told you that our argument was

4    that Merl Code was just paid to make introductions and that

5    making introductions is still a crime.

6         Think about that for a minute.  Making introductions

7    is a crime?  Making introductions for the specific purpose of

8    having those coaches accept bribes might be a crime but there

9    is no, zero -- no evidence of that.

10         Mr. Solowiejczyk and his team cannot prove that Merl

11   Code did anything to arrange or facilitate an agreement to a

12   payment.

13         Now, whether the payments that occurred are, in fact,

14   bribes is a question you need to resolve more for Mr. Dawkins

15   than for Mr. Code, but the bottomline is the folks who received

16   money were Lamont Evans, Book Richardson, Tony Bland, Corey

17   Barker, and Preston Murphy.

18         And you've heard Mr. Dawkins tell you what happened

19   with respect to the money that was paid in Las Vegas.  You

20   haven't heard a single piece of evidence that contradicts it,

21   ladies and gentlemen.

22         OK.  Merl Code didn't arrange a meeting with Lamont

23   Evans, OK.  And these meetings with Lamont Evans happened long

24   before the June 20 meeting.  Merl Code didn't arrange a meeting

25   with Book Richardson.  He didn't arrange a meeting with Tony

J569DAW2                    Summation - Mr. Moore

1    Bland.  He didn't arrange a meeting with Corey Barker and he

2    didn't arrange a meeting with Preston Murphy.

3           Every witness in this case brought by the government

4    and the defense has testified unequivocally that those coaches

5    who took money were brought into the mix by Mr. Dawkins.

6           Of course, I submit that there is no evidence that

7    those coaches who took money did so for -- with the intent of

8    doing what the government says they did.  And I would notice

9    you haven't heard from any of those coaches about their intent.

10   And I will say this.  His Honor gave you a missing witness

11   instruction, OK.  A missing witness instruction says that these

12   witnesses are equally available to both sides, OK.  Well, think

13   about why -- whether the defendants would even think about

14   calling Jeff D'Angelo.

15          And remember this.  We, Mr. Code and Mr. Dawkins, have

16   no burden of proof.  The United States of America has the

17   burden of proof and they didn't bring Jeff D'Angelo before you.

18          (Continued on next page)

19

20

21

22

23

24

25

1              MR. MOORE:   (Continuing) Ask yourself why.

2         I'm not going, because I know that I'm sure the last

3    thing you want to do is hear me drone on and on about the

4    pieces of evidence that Mr. Haney has already talked about, so

5    I'll simply mention a couple of points.

6         You remember the comment about "take these fools'

7    money"?  Well, if there was an agreement between Mr. Dawkins

8    and Mr. Code to do anything, it was to listen to Jeff D'Angelo,

9    to try to make this business succeed, but make this business

10   succeed without paying coaches and to make Jeff D'Angelo think

11   that everything was hunky dory, OK.  That, ladies and

12   gentlemen, is not illegal.  It is not, it is not, what these

13   gentlemen have charged.

14        You remember the comment about he's sleeping, don't

15   wake him up, and you remember the comments on the recordings

16   about Merl Code's actual value?  What was Merl Code's value?

17   His value was in introducing young, grassroots players well

18   before they got acquainted with any college coach because he

19   managed grassroots basketball for Nike and then later Adidas,

20   and his value was also, as you heard, in his connections with

21   the NBA.  Because Loyd Management was formed not just to get

22   relationships with college players, it was formed so that the

23   folks who were involved in Loyd Management could make some

24   money off signing NBA players.  What better value is someone

25   than a person who has contacts in NBA front offices and with

J56HDaw3                    Summation - Mr. Moore

1    players?

2              While Mr. D'Angelo pushed Mr. Code in meetings and

3    pushed through Mr. Dawkins to get Merl Code to do what he

4    wanted him to do because, of course, Mr. D'Angelo's job is to

5    get Mr. Code to say anything that might let someone decide he

6    was down with the plan to pay coaches, the evidence in this

7    case shows that no matter how hard Jeff D'Angelo pushed, Merl

8    Code didn't bite.  And the only comments that you heard on that

9    June 20 meeting which the government played for you, remember

10   what Mr. Dawkins told Mr. Code was the play going into that

11   meeting.  Say what you need to say, OK, so that you can

12   demonstrate that you have some value, and we can hook you up to

13   be paid as a consultant.  That, ladies and gentlemen, is not a

14   violation of the law.

15             And remember the comment that Munish Sood made after

16   this "Jeff is so happy, don't wake him up" call?  In talking

17   about Mr. Richardson, and because I'm sure the government is

18   going to make much of the fact that Mr. Code was in the suite

19   at the Conrad Hilton the same day that Mr. Richardson was in

20   the suite at the Conrad Hilton -- of course, they weren't at

21   the same meeting, Mr. Code didn't see any money change hands,

22   Mr. Code didn't participate in an agreement with

23   Mr. Richardson -- but remember that there were two calls that

24   day, one between Mr. Dawkins and Mr. Richardson describing the

25   play and one between Mr. Code and Mr. Dawkins describing the

J56HDaw3                     Summation - Mr. Moore

play.  And that informs what you hear on that June 20 –– the
snippets of the conversations that the government played for
you from that June 20 meeting.

Now, but I go back to the "don't wake him up" call.
Mr. Sood says, don't wake him up, says, I'm going to use Book
to get veterans.  And you heard what that meant.  A veteran is
an NBA player.  And you heard evidence that there was no need
to pay Mr. Richardson to bring players to this group from
Arizona because Mr. Dawkins already had a relationship, a
friendship, a strong friendship, with the most important man at
Arizona, the head coach who was going to steer players to him
anyway.  No reason to pay Mr. Richardson except because of his
contacts with people at the NBA.  That, ladies and gentlemen,
is something that has gone pretty much completely uncommented
on by the government during this entire trial for a reason is a
reasonable doubt.

Now, was there an agreement?  The government looks at
the June 20, 2017, meeting and tells you that Merl Code joined
an agreement to pay coaches.  An agreement with who?  As Judge
Ramos told you, you can only conspire with a true conspirator.
You can't conspire with Jeff D'Angelo.  You can't hold Mr. Code
accountable for conspiring with Jeff D'Angelo.  You can't hold
him guilty of conspiring with Marty Blazer because he's not a
true conspirator.  He is, in essence, an undercover operative.
The rule of law must inform the way you look at the evidence in

1     this case.  And while the government's made a lot of those

2     comments on June 20 -- and we've talked about the comments

3     before, OK, the two meetings before, and we're going to talk

4     again about the comments after that really inform that

5     meeting -- that meeting does not demonstrate an agreement

6     between Merl Code and anybody who's an alleged conspirator to

7     do anything that violates the law, OK?

8              Now, let's spend a few minutes talking about

9     agreements, if any, existed between Merl Code and Dawkins and

10    Sood, the alleged coconspirators.  On Friday, Mr. Solowiejczyk

11    told you that Dawkins brought in Code to get coaches to Las

12    Vegas.  Over and over again on wiretap phone calls and from the

13    witness stand, Christian Dawkins told you that he already knows

14    all of the assistant coaches.  He did not need Merl Code to

15    bring him a single assistant coach.  He didn't need help in

16    making introductions because that was not Merl Code's value.

17    And you'll recall the conversation where Mr. Dawkins tells

18    Mr. D'Angelo on 6/28 that any coach that someone's going to

19    introduce you to, I can F'ing introduce you, OK?

20             Christian Dawkins is crystal clear about what role and

21    what value Mr. Code should play at Loyd Inc.  And he talks

22    about the fact that if Merl can give him access to players and

23    players' parents and stuff that no one in the business can get,

24    then that's OK, because you have all the people with

25    relationships from the Nike perspective.  Let's not confuse

J56HDaw3                      Summation - Mr. Moore

1     this, ladies and gentlemen.  This case is not about paying

2     players and not about paying families, OK.  This case is about

3     an alleged agreement to pay coaches.  Let's not take our eye

4     off the ball, as the government would have you do, and have you

5     confuse paying players with paying coaches.  Whatever you think

6     about paying players, that's not what this case is about.  And

7     I won't repeat what Mr. Haney mentioned about Mr. Miller's

8     statement about that.

9            Mr. Dawkins says:  Like, that's not why you pay Merl,

10    for coaches.  You pay Merl for players, for access, for F'ing

11    information.  You pay him not for F'ing someone to be a conduit

12    between himself and the coaches.

13           And he says to Mr. D'Angelo:  If you're looking at

14    paying Merl from a standpoint of what coaches he can refer you

15    to -- that's -- that's not a smart investment.  That's why

16    you're doing it, to build the business, not to F'ing introduce

17    the coaches.

18           And despite the fact that Mr. D'Angelo tried to push

19    and push and push and prod to get Merl Code convicted, Merl

20    Code did not bite and neither did Christian Dawkins.

21           Did Merl conspire with Munish Sood?  Munish Sood

22    testified to two incompatible claims.  That he and Merl Code

23    agreed on June 20 in New York that Merl would help him recruit

24    and pay college coaches and that Merl Code told him on a phone

25    call after June 20 not to pay coaches.  I guess that 30 times

J56HDaw3                     Summation - Mr. Moore

of meetings with the government to get him ready for -- to get

his facts straight didn't completely help him in that regard,

did it, ladies and gentlemen?

         Reasons why you shouldn't credit Mr. Sood's or

Blazer's claim that Mr. Code entered into an agreement to pay

coaches on 6/20.  That testimony was bought and paid for by the

government.  And I'm going to talk about those cooperators

again in a few more minutes because I'll remind you that

Mr. Solowiejczyk spent about two minutes in a two-hour closing

talking about their credibility.  Think about that for a

minute.  Mr. Sood, who told you that trusting Marty Blazer was

the biggest mistake of my life, OK, don't make that same

mistake, ladies and gentlemen, because look at where it got

Mr. Sood, OK?  Marty Blazer, the single most untrustworthy

snake that I submit you or I will ever see.  Now, a man who

tells the truth when he says he doesn't have a reason to lie.

Well, he had a reason last week, a very strong reason, and he's

been lying all of his life.  Why would you think that he's now

changing his stripes?

         No evidence corroborating an agreement between Merl

and Sood.  There's -- again, we talked about the veterans.

Merl actually did something to help in that regard, did

something to help Mr. Sood recruit veterans because he made

phone calls, as you heard, and he tracked down information to

help Mr. Sood land Andre Robertson from the Oklahoma City

J56HDaw3                    Summation - Mr. Moore

1   Thunder as a client.  So he had value there.  It was not

2   illegal, and he did it, OK.  There is no evidence that he did

3   anything to help further an agreement to pay a coach.

4          And you have to interpret the 6/20 meeting at the

5   Conrad hotel through the lens of Merl and Christian's phone

6   calls right before the meeting, and Mr. Haney played those

7   calls.  You're going to have that call in your jury room.  So

8   I'm simply going to remind you that Mr. Dawkins says these

9   people don't know what you're talking about.  They're not Sonny

10  Vaccaro.  You can just say anything to them, OK.  And that is

11  what Mr. Code does.  He says something to them to convince them

12  of his value, but he never, ever reaches an agreement to pay

13  coaches.

14         And on the 6/28 and -- 6/26 and 6/28 phone calls

15  between Jeff and Christian, those are incompatible with the

16  testimony that Mr. Code joined an agreement on June 20.  Listen

17  closely to those calls in the jury room if you have any

18  questions, because it's clear that Jeff desperately wants Merl

19  in that capacity, but he recognizes there's been no such

20  agreement when he says:  We kind of talked about it, but we

21  never really, I think, came to a good agreement.  Again, I'll

22  remind you, first time you heard about that was from the

23  defense.

24         Also, think about this:  Remember, one of the first

25  things that you heard in this case was a stipulation read, I

J56HDaw3                      Summation - Mr. Moore

1     think, by Mr. Mark about various items or pieces of evidence.

2     There was a stipulation read to you about wiretap calls and

3     dates of wiretap calls on people's phones.  Look at that

4     stipulation, ladies and gentlemen, when you go back to your

5     jury room because it talks about these long periods of calls,

6     these long periods of wiretaps on Mr. Sood's phone, talks about

7     this long period of a consensual wiretap on Mr. Blazer's phone

8     and undercover officer's phone, talks about a period of

9     wiretaps on Mr. Dawkins' phone.  Mr. Code allegedly entered

10    into this agreement at least by June 20, 2017, according to the

11    government.  According to the stipulation, they didn't get a

12    wiretap on his phone until September 7, 2017.  Think about that

13    for a minute, ladies and gentlemen.  If Mr. Code had reached an

14    agreement on June 20, 2017 --

15             MR. BOONE:  Objection.

16             THE COURT:  Overruled.

17             MR. MOORE:  -- to bring in these players, excuse me,

18    these coaches, and they were going to take payments from

19    someone, wouldn't you want to know what -- how Mr. Code is

20    talking to these coaches between that time and the meeting in

21    Las Vegas, OK?  You didn't hear any of that evidence, did you,

22    ladies and gentlemen?  Because the government didn't have a

23    wiretap on his phone at that time.  That is a reasonable doubt.

24             Separate agreements.  Two calls -- I'm going to move

25    on.

J56HDaw3                    Summation - Mr. Moore

1            A close read of Mr. D'Angelo's statements on June 28

2       acknowledges that he and Christian are on entirely different

3       pages when it comes to what Merl was doing, and Jeff goes so

4       far as to specifically acknowledge that he and Christian will

5       have separate agreements with Merl about Merl's role, OK.

6            Now, Mr. Solowiejczyk talked about certain pieces of

7       evidence.  I'm going to simply talk about them quickly.  At the

8       June 20, 2017, meeting, Mr. Code made comments like, the

9       coaches route is great, I'll help you figure out who's worth

10      paying and who's not, and money's not necessarily coaches but

11      can be used for that recruiting, and talk about getting fired.

12      OK.  In isolation, in isolation, and that's what the government

13      wants you to do, that might kind of sort of look like an

14      agreement, maybe, OK.  But you got to put it in context, and

15      you got to remember the phone calls that preceded it and the

16      phone calls that came after it because you have to look, ladies

17      and gentlemen, at the evidence as a whole, not in bits and

18      pieces and snippets and selections, as the government would

19      have you do.

20           Knowledge of Mr. Evans and Mr. Richardson getting

21      paid.  Mr. Solowiejczyk talked about a call on September 11,

22      2017, where Merl tells Mr. Sood that Christian was paying

23      Lamont and Merl says don't pay Lamont, and the government

24      argues that's because PJ Dozier didn't pan out.  And on the

25      June 20, 2017, meeting where Christian tells Merl that Book got

J56HDaw3                    Summation - Mr. Moore

1    $5,000.  Now, Judge Ramos told you and asked you to remember

2    this.  Knowledge that somebody else might be doing something

3    else that's illegal doesn't make you guilty, at least not in

4    America, not in this country.  Knowledge that somebody else

5    might be doing something wrong isn't enough, OK?  You have to

6    act with specific intent to violate the law, and there is no

7    evidence that Mr. Code acted with specific intent to violate

8    the law.  And, instead, the evidence here, when you look at it

9    as a whole, is riddled with reasonable doubt.

10            Now, there's a text message where Mr. Code sends a

11   list of coaches that he could possibly introduce, and that list

12   includes Mr. Bland and Preston Murphy.  Well, the evidence was,

13   and Mr. Dawkins told you this, Tony Bland and Preston Murphy

14   were the people that he brought in, not Mr. Code.  And

15   Mr. Dawkins has told you what really happened between Mr. Bland

16   and Mr. Murphy.  But, of course, we don't have a surveillance

17   team to contradict Mr. Dawkins and his testimony, do we, ladies

18   and gentlemen?

19            And the government makes a whole lot about this

20   uneasiness between where Christian and Mr. D'Angelo discuss

21   Merl's uneasiness with D'Angelo about putting "25" in a text

22   message and this conversation between Mr. Dawkins and Mr. Code

23   where they're talking about you don't need to get -- you don't

24   need to get wrapped up in any BS.  Let's check out Jill and her

25   family, OK?  Well, it's always smart to figure out who's paying

J56HDaw3                     Summation - Mr. Moore

you money because there are a whole lot of unscrupulous

operatives out there, not just the FBI, OK.

It's also clear and the evidence shows that

Mr. Dawkins and Mr. Code were paying some players.  They were,

OK.  Just as reasonable for you to conclude that any uneasiness

is about getting caught by the NCAA in paying players or

worrying about what the true source of your money is and

whether or not if you're getting it from somebody who really is

involved in some illegal activity, who's just laundering, using

that mode as a front to get you into some sort of trouble that

you don't want to be involved in, some BS, as Mr. Code says.

Now, you heard some things about -- and I want to talk

for a few minutes here about the credibility and believability

of Mr. Sood and Mr. Blazer again, OK.  They both have plea

agreements.  They both have incentives to lie.  The government

will tell you that those plea agreements are incentives for

them to tell you the truth.  Well, if those plea agreements are

incentives for them to tell you the truth, then why would

Mr. Blazer need to meet with the government 50 times and

Mr. Sood need to meet with the government 30 times?  And they

both tell you repeatedly that they're just here to tell the

truth, almost like every time you ask a question:  I'm just

here to tell the truth.  I'm here to tell the truth.  I'm here

to accept responsibility.

My dad was not a very educated man, but he told me

1   once a long time ago that when somebody tells you repeatedly

2   that they're just telling you the truth, OK, that's the person

3   that you have to look out for because that's the person who's

4   going to lie to you, OK.

5           And my father also had a corollary to that Emerson

6   statement about what you say speaks louder than you hear

7   because he used to tell me this:  Don't just listen to what

8   people say.  Listen to what they do.  Mr. Sood told you that

9   he -- all he wanted to do was accept responsibility for his

10  crimes.  Mr. Blazer told you that he was here to tell the truth

11  and that he wasn't really concerned about the effect that his

12  testimony here today was going to have on his plea agreement.

13  Did you believe that?

14          Mr. Blazer told you that he pled guilty back in 2017.

15  He has not been sentenced yet.  His sentencing has been

16  deferred until after he delivers the performance of his life

17  here today.  And he has the gall to sit on that witness stand

18  and look you in the eye and tell you he's not really thinking

19  about that because all he's here to do is tell the truth.  He

20  also told you when he got questioned by the defense that his

21  agreement -- that one of the crimes that was charged here was

22  aggravated identity theft, and it carried a two-year mandatory

23  minimum sentence, which meant that all those millions that he

24  stole, OK, the law required him to get at least two years, at

25  least two years, unless there's a government motion to get him

J56HDaw3                    Summation - Mr. Moore

 1    under.  You didn't hear about that government motion to get him

 2    under during the government's direct examination of Mr. Blazer.

 3    And you don't think that Mr. Blazer isn't thinking that I'm

 4    going to come in here, satisfy these gentlemen, say what I know

 5    they want me to say so I could get away from that two-year

 6    mandatory minimum and that judge who's been waiting now for

 7    almost 18 months can sentence me as the government desires?

 8            Mr. Sood said on cross-examination two completely

 9    inconsistent things.  He first told Mr. Haney that he had no

10    deal with the government despite his testimony on direct

11    examination, and then later in that same cross-examination, he

12    said, well, my deal is X.  You remember that game show "Deal or

13    No Deal"?  Munish Sood, deal or no deal Sood, which is it, OK?

14    Which is it?  It's clearly a deal.  It's clearly a deal.  He,

15    like Mr. Blazer, is hoping to stay out of jail, and their

16    testimony was bought and paid for.  I've been around

17    cooperating folks my entire life.  I don't know if any of you

18    felt the need to go take a shower after spending a few hours --

19            MR. BOONE:  Objection.

20            MR. MOORE:  -- in the company of Mr. Blazer --

21            THE COURT:  Overruled.

22            MR. MOORE:  -- but I suggest that would be something

23    that one might have thought about and want to consider.  And

24    that's the man that the government, after stealing $2.3 million

25    from his clients and putting an innocent woman in harm's way to

get her to tell his lies to the SEC, OK, that's the man that

the government wants you to hang your verdict on with his

interpretation of that June 20 meeting.

Now, I skipped over this, and I'm going to go back for

just a minute because I'm sure we might hear -- we might hear

this in the government's summation, the sort of Ricky Robertson

check, this $25,000 to Loyd Inc., and the picture of a deposit

slip texted from Merl to Christian.  You heard about that

during the cross-examination of Mr. Dawkins.  There's

absolutely no evidence that that check had anything to do with

this case or paying any coach.  Maybe players, not coaches.

Now I'm going to talk for a few minutes about

Mr. Dawkins, because Friday Mr. Solowiejczyk in his closing

argument did an extraordinary thing.  For the first 20 minutes,

rather than talk about the evidence that he presented, he

delivered a 20-minute attack on Christian Dawkins.  Well,

ladies and gentlemen, there was reasonable doubt in this case

before Christian Dawkins testified to you.  There is clearly

reasonable doubt after, because what Mr. Dawkins explained to

you happened and what he did not only matches the evidence in

this case -- and when I say "the evidence," I mean all of the

evidence, including the phone calls that were played for you

not by the government but by the defense -- but it also makes

good common sense.

I am reminded of a statement from another famous

J56HDaw3                    Summation - Mr. Moore

1  writer, William Shakespeare, because the government's attack on

2  Christian Dawkins makes me think of the statement, methinks

3  they doth protest too much.  Methinks the government doth

4  protest too much about Christian Dawkins.  They didn't like

5  what he said.  And what they really didn't like -- remember the

6  "Wizard of Oz," the great and powerful Oz who speaks?  Well,

7  what happens at the end of the story when the dog goes back and

8  rips away the curtain?  Christian Dawkins was the little dog

9  that ripped away the curtain, and he saw that behind the great

10  and powerful Oz here was this prosecution team.  Of course, we

11  don't see Jeff D'Angelo here behind the curtain today, ladies

12  and gentlemen.

13          MR. BOONE:  Objection.

14          THE COURT:  Overruled.

15          MR. MOORE:  But I ask you to think about why they

16  would go after Mr. Dawkins so hard.  It's because he showed you

17  what was behind the curtain.

18          Now, with respect to conspiracy, again, the government

19  has to -- and they've charged Mr. Code with three separate

20  conspiracies here.  I guess one isn't good enough.  We have to

21  try to get him any way we can.

22          MR. BOONE:  Objection.

23          THE COURT:  Sustained.

24          MR. MOORE:  They have to prove in each of those cases

25  that Mr. Code knowingly and willfully joined a conspiracy with

1    the specific intent to make the purpose of that conspiracy

2    succeed, to pay a coach, to do something that is in violation

3    of his or her job or his or her employment agreement with the

4    college, OK.

5          With respect to the Travel Act, they have to prove

6    that Mr. Code joined the conspiracy trying to make someone

7    travel so that they would commit a violation of one of the

8    state commercial bribery statutes.  They have no evidence that

9    Mr. Code knowingly and willfully joined any conspiracy with the

10   intent to violate any of those laws.

11         And with respect to the 666 count and the payments of

12   bribes and gratuities to an agent of a federally funded

13   organization, which then doesn't go on to specify which

14   federally funded organization, which coach, OK, sort of another

15   sort of catchall, throw it all on the wall and hope it sticks,

16   OK, there's no evidence that Mr. Code helped pay or aided and

17   abetted the payment of money to any of the folks from any of

18   the schools.

19         I ask you to think about this.  We'll go back to

20   Mr. Richardson and the veteran comment for a minute.  You

21   didn't hear anybody from the University of Arizona, did we?  We

22   didn't see an employment agreement for Mr. Richardson, did we?

23   We didn't hear any testimony that Mr. Richardson couldn't be

24   paid to bring in veterans, did we?  Think about that, please,

25   ladies and gentlemen.

J56HDaw3                    Summation - Mr. Moore

1           I go back to the fact that the government has the
2    audacity to come in here and argue that you should convict Merl
3    Code because of his conscious avoidance of the facts going on
4    around him.  That's a pretty weak -- it's a theory that's
5    permissible by the law.  It's a pretty weak theory
6    particularly, but I guess here, if that's all you got, that's
7    what the government's going to use.  Their case, however,
8    doesn't prove conscious avoidance, OK.  The weakness in their
9    case shows all about their consciousness of reasonable doubt
10   and their efforts to try to cover it up and to hide from you,
11   ladies and gentlemen, in your consideration the evidence that
12   doesn't support their theory, evidence that you heard from the
13   defendants.
14          I'm close to wrapping up, OK, and I'm sure you're all
15   happy about that.  But I only have one chance to talk to you
16   for my client, and it's a very, very important day for him,
17   very important.  So I'd ask you to consider some -- and this is
18   not an all-exclusive list -- of the reasonable doubts that you
19   should be left with in considering the evidence against Merl
20   Code.
21          The evidence in this case dates back to 2015, but
22   Mr. Code doesn't show up until June of 2017.  There's no
23   evidence connecting him to Lamont Evans.  Knowledge doesn't
24   equal participation.  There's no evidence connecting him to
25   Book Richardson and to Book Richardson's alleged -- and I put

J56HDaw3                    Summation - Mr. Moore

1    "alleged" in quotes because they haven't proven it, OK --

2    alleged acceptance of any money for a specific purpose.

3    Mr. D'Angelo doesn't think that Mr. Code had an agreement on

4    June 28, 2017, when he's arguing with --

5            MR. BOONE:  Objection.

6            MR. MOORE:  -- Christian Dawkins about it.

7            THE COURT:  Overruled.

8            MR. MOORE:  Mr. D'Angelo tells Mr. Dawkins that he has

9    an agreement with Merl to get players, NBA and grassroots, but

10   he wants an agreement with Merl for introduction to coaches.

11           Another reasonable doubt, the pre-meeting calls

12   between Mr. Dawkins and Mr. Richardson and Mr. Code.  The fact

13   that Christian, Sood, Blazer, D'Angelo, and Bailey are

14   constantly traveling, meeting, and paying and Merl's never

15   anywhere to be seen.  Days after that New York meeting,

16   Mr. Code doesn't even drive a hundred miles to Columbia for the

17   PJ Dozier party.  There's no evidence that Merl paid anybody,

18   no evidence that Merl was in the room when anybody got paid.

19   Blazer testified that Christian organized the meetings with

20   Bland and Preston, not Merl.  Please remember that.

21           Mr. Sood testified that Christian organized the

22   meetings with Bland and Preston.  Mr. Dawkins told you he

23   organized the meetings with Bland and Preston.  There's no

24   evidence that Merl even knows Corey Barker, OK.  And the

25   coaches that Merl Code sent did not take any money, despite the

J56HDaw3                      Summation - Mr. Moore

1    fact that Mr. Solowiejczyk wants to stand up in a courtroom and

2    call them corrupt.

3           And that Merl had an agreement, another reasonable

4    doubt, Merl had an agreement with Mr. Sood to recruit NBA

5    veterans.  No recording of Merl talking to a single college

6    coach, not one, for a bribe payment.  No wiretap on Merl Code's

7    phone until September and no calls of him talking to any of the

8    coaches he asked to meet with Mr. D'Angelo in Las Vegas.

9           Now I'm going to briefly go over, with Mr. Chaney's

10   help, a couple of snippets of phone calls.  When I say

11   "snippets," I don't have two weeks to talk to you.  You can

12   listen to these calls and you can listen to every bit of every

13   call that's been introduced into evidence in this case, OK,

14   when you go back for deliberations in your jury room.  I ask

15   you, if you have any question here about Mr. Code, then you

16   should listen to every single call you want to listen to.

17          All right.  Let's play that for a moment, please.

18          (Audio played)

19          MR. MOORE:  Could you pause it, Mr. Chaney.

20          OK.  "I'm just trying to get you money in your

21   pocket," a call the government didn't bother to bring you, OK.

22          Let's look next at the 6/26 call, Mr. Chaney.

23          (Audio played)

24          MR. MOORE:  Let's play the June 28 call.  I'm sorry.

25          (Audio played)

1              MR. MOORE:  What Mr. Dawkins is telling Mr. D'Angelo,

2      who doesn't want to listen because he's got another purpose in

3      mind, which is to set these guys up, OK, what Mr. Dawkins is

4      telling Mr. D'Angelo is you don't need Book.  Anybody that Book

5      can introduce you to, so can Merl.  And when you pay Merl, you

6      ain't paying the college coach, and that ain't a violation of

7      the law.  But because of that, that's not what Mr. D'Angelo

8      wants to hear, and he says, I don't think we came to a good

9      agreement.  I still want to pay these coaches.  Come on, we've

10     got to get them to do it.

11             Next.

12             (Audio played)

13             MR. MOORE:  Think about the message here and think

14     about these calls that were withheld from you during the

15     government's presentation, and also think about this, remember

16     this:  Munish Sood admitted, not on direct examination, of

17     course, but on cross-examination that Merl Code told him not to

18     pay coaches, OK.  You didn't hear any redirect examination from

19     the government of Mr. Sood when Mr. Sood said that.  Why?

20     Because there's not a whole lot you can do about that, is

21     there, ladies and gentlemen?  And there's no redirect

22     examination because perhaps Mr. Solowiejczyk was a little

23     concerned that if he attempted to redirect, might get worse for

24     him, and Lord knows we can't have that because we only want to

25     put forward our theory of the case.

1          (Audio played)

2          MR. MOORE:  Ladies and gentlemen -- please continue.

3          (Audio played)

4          MR. MOORE:  "What he does for the coach thing ain't

5   got nothing to do with you."  Doesn't get much more direct,

6   does it, ladies and gentlemen?

7          Before I move on to my really concluding remarks, I

8   need to mention something that Mr. Solowiejczyk said in his

9   closing because he did a whole lot of talking about they,

10  Mr. Dawkins and Mr. Code, when he was actually referring to

11  something that Mr. Dawkins may have said on the one side or

12  Mr. Code may have said on the other.  And he said they didn't

13  care about paying players or they didn't care about --

14  Mr. Solowiejczyk said these defendants did not care about the

15  players, OK.  Well, ladies and gentlemen, the evidence in this

16  case shows that if there's anybody who cared about the players,

17  it's Mr. Dawkins and Mr. Code, not the government, not the

18  alleged victim schools, and certainly not the NCAA.

19         Now, as I told you at the beginning, this case is

20  about reasonable doubt.  The government bears the burden of

21  proving its case beyond a reasonable doubt.  There's a sign --

22  it's not really a sign so much as an inscription in the

23  Attorney General's rotunda in Washington, D.C., which says that

24  the United States wins its case when justice is done to one of

25  its citizens in its court.  The government, the government, we

J56HDaw3                    Summation - Mr. Moore

the people, because we are the government, OK, we don't win

when the government gets a conviction.  We win when justice is

done.  And you, ladies and gentlemen, each of you took an oath

to judge this case fairly and impartially, without prejudice,

without sympathy, bringing your own good common sense and your

own open mind, and agreeing that you would abide by His Honor's

instructions.  And His Honor's instructions were that you

cannot convict a defendant unless the government removes each

and every reasonable doubt from each and every one of your

minds.  High burden, high responsibility.  Not one that was met

in this case because there is no evidence that Mr. Code

intended to commit any crime that's charged here or that he

did, despite the fact that Jeff D'Angelo and Jill Bailey and

their good buddy Marty Blazer were trying so hard to force them

to do it.  I ask you to remember, again, listen not only to

what people say but listen to what they do, OK?

In a few minutes, the government is going to come back

and they're going to have a chance to talk to you at the

conclusion of this case because they have the burden of proof,

and that means they start first, and they get to go last.  But

remember that they have a burden of proof.  And I challenge the

government in its final summation to stand here and address

each and every one of the reasonable doubts that exist in this

case and explain to you why they didn't call Jeff D'Angelo

because --

J56HDaw3                    Summation - Mr. Moore

1          MR. BOONE:  Objection.

2          MR. MOORE:  -- what Judge Ramos told you --

3          THE COURT:  Sustained.

4          MR. MOORE:  Judge Ramos told you these witnesses are

5     equally available to either party.  The defendants have no

6     burden, OK.  They do not have to prove anything.

7          Now, imagine, if you will, that someone gave you a

8     free trip to what's supposed to be your dream destination.  Get

9     hotels, meals, airfare, local transportation -- everything

10    comped.  Sounds like an awesome thing, doesn't it?  It really

11    sounds like an awesome thing.  But you've read on the Internet

12    that, you know, there's some people out there who scam folks

13    and that some of these resorts that look all pretty in the

14    picture aren't exactly what they're cracked up to be, and that

15    causes you to go, hmm, this is too good to be true, but you

16    still thinking, you know, it's free, OK.  Why not?  Then you

17    get to the airport to board the charter jet and you look

18    outside the window and you see smoke coming out of the engine

19    of the plane, and the pilot and the stewardess tells you, don't

20    worry about that.  I mean, you see that smoke?  We're trying

21    to -- we're trying to fix it.  We're trying to fix it.  You

22    know, don't worry about that.  Just get on the plane, OK?

23         Ladies and gentlemen, they're not just -- if this is a

24    plane, they're aren't just a few whiffs of smoke here; there's

25    smoke coming from all parts of the plane.  And you know that

J56HDaw3

```
1    the smart thing to do is to hesitate to act in an important
2    matter and not get on that plane, because if you get on that
3    plane and something happens, you don't get a do-over, OK.  If
4    you choose to let the government convince you to convict Merl
5    Code based on the case it put on and the case it didn't and all
6    of these reasonable doubts, you won't be able to take that
7    back.  And I ask you, when you hesitate to think, there's not
8    just one reasonable doubt here, this case is riddled with
9    reasonable doubts.
10            Ladies and gentlemen, thank you for your time and
11   attention.
12            Prosecution team, your prospective passengers await.
13            THE COURT:  Thank you, Mr. Moore.
14            Ladies and gentlemen, we're going to take another
15   ten-minute break.  Please be prepared to come out at 25 after
16   the hour.
17            (Jury excused)
18            THE COURT:  Everyone be seated.
19            So I received proposed instructions from the
20   government.  I don't know if the defense has had an opportunity
21   to review them and digest them.
22            MR. MOORE:  I could tell you that I haven't, your
23   Honor, and so what I would ask is if you give us an opportunity
24   to do that while Mr. Boone is making his remarks and --
25            THE COURT:  Very well.
```

J56HDaw3                    Rebuttal - Mr. Boone

1              MR. MOORE:  I would appreciate that, thank you,

2     because it may be that if Mr. Boone has objectionable things,

3     he's going to get an objection, and we'll have to deal with the

4     same issue.

5              THE COURT:  Very well.  About how long, Mr. Boone?  Do

6     you know?

7              MR. BOONE:  I'm going to try for 45 minutes, your

8     Honor.

9              THE COURT:  OK.

10             (Recess)

11             (Jury present)

12             THE COURT:  Everyone, please be seated.

13             Ladies and gentlemen, at this time the government will

14    have an opportunity to present its rebuttal summation.

15             Mr. Boone.

16             MR. BOONE:  Thank you, your Honor.

17             Good afternoon.  I understand that I'm sort of the

18    last argument before you get to deliberate, and you've already

19    heard a decent amount of argument this morning, so I'm going to

20    try to be as brief as I can.  But as Mr. Moore said earlier,

21    it's the government's burden to prove its case.  We embrace

22    that burden, so I must take some time to respond to some of the

23    arguments you've heard.  I'm not going to respond to all of

24    them because we don't have time for that.  I'm going to respond

25    to a few that I want you to think about a little more

1    carefully.

2            Now, where I want to begin is basically where

3    Mr. Moore, Merl Code's attorney, left off.  He said something

4    that I really liked, which was actions speak louder than words.

5    That's a phrase that we're all familiar with.  That's a phrase

6    that exists in essentially every culture, and we know what that

7    means and why that's such a popular phrase, because it's true.

8    Your actions do speak louder than your words.  People say a lot

9    of things, but it's what they do that makes them who they are.

10    People are a culmination of their actions.

11            Now, throughout this trial, you've had an opportunity

12    to listen to a lot of recordings.  You've had a lot of

13    opportunity to listen to or see, rather, some text messages and

14    some email exchanges, and you've had an opportunity to look at

15    some videos.  And you have seen in those videos what the

16    government has argued throughout this case.  It is painfully

17    clear that the defendants paid bribes.  It is literally on

18    tape.  You literally watched thousands of dollars exchange

19    hands between the defendant Christian Dawkins; Jeff, the

20    undercover; and various basketball coaches.

21            Now, like I said at the outset, it's the government's

22    burden to prove its case, but it is interesting and you are

23    allowed to question and analyze arguments that are made by

24    defense counsel and analyze arguments that are made both in

25    their closing statements and in the questions they asked on

cross-examination.  There is very little time spent on that
fact in either of defense closings, and you know why that is.
That's a completely damning piece of evidence.

Now, there are conversations and there was a lot of
time spent on, I think it was, Government Exhibit 109.  This is
a conversation that Christian Dawkins had with Jeff, the
undercover.  And the defense argued, essentially, that this
call shows that there wasn't really an agreement to pay bribes
because Christian Dawkins really didn't want to pay bribes.
Keep in mind the date of that call.  That call is almost a
month before Christian Dawkins actually pays a bribe multiple
times on camera.  His actions spoke louder than his previous
words.

Now I want to give you an example of how this plays
out in maybe real life.  Now my colleague, Eli Mark, in his
opening statement, he said that your common sense is the most
important asset you can bring to this process, and I want to
reiterate that.  Your common sense is all you need to do your
job as jurors.  You don't need to know anything about
basketball or grassroots or sports agencies or the best way to
recruit talent.  All you need is your common sense.  All you
need is what you already have, which is your ability to
understand the truth and your ability to determine when
something you hear sounds like the truth and when something you
hear sounds like something other than the truth.

J569DAW4                    Rebuttal - Mr. Boone

1            MR. BOONE:  (Continuing)  And one characteristic

2      you've probably learned throughout your life is at the end of

3      the day the truth is ultimately very simple.  What's

4      complicated tend to be lies.  Lies cause you to have to

5      remember a lot of facts that don't seem to fit with each other.

6      Lies cause you to have to remember things that don't seem to

7      fit with your natural instincts of how the world makes sense.

8            So I want you to keep that in mind as we go over some

9      of defense counsel's arguments.  What makes sense?  Based on

10     how you've lived your life, what you've learned through those

11     personal lessons, what makes sense?  And is what I'm hearing

12     making sense or does it sound like something other than the

13     truth?

14            I want you to imagine a scenario in which you're in a

15     relationship.  You have a girlfriend.  You have a boyfriend.

16     Maybe you're even engaged.  And in the past few weeks you

17     started to have that strange feeling that your boyfriend is

18     cheating on you.

19            So you decide you're going to do a little

20     investigative work.  You're going to start maybe listening in

21     on some of the phonecalls he's having.  You're going to start

22     reviewing some of the text messages.  Maybe even set up a

23     little video camera in his apartment so you can see who is

24     going in and out of that apartment.

25            After a few weeks you review all the evidence.  You

J569DAW4                    Rebuttal - Mr. Boone

1   listen to the phonecalls.  You look at the text messages.  You

2   look at the video camera.  And it becomes crystal clear to you

3   that, in fact, your boyfriend, Christopher, is cheating on you.

4           And so you decide you're going to confront him.

5   You're going to go to his apartment.  You're going to let him

6   know that he's caught and you're going to let him know that

7   it's over.  And so you do that.

8           You go to his apartment.  And you say:  Christopher, I

9   know you're cheating.  I've listened to your phonecalls where

10  you're constantly talking about cheating.  I've reviewed your

11  text messages where you're setting up times to cheat.  I've

12  looked at video footage that shows people coming in and out of

13  your apartment like they're going for a job interview.  You're

14  caught and it's over.

15          And what does Christopher say in response?  He says:

16  Listen, I know you've listened to hours of phone conversations

17  in which I'm talking about cheating, and I know you've actually

18  looked at text messages where I am literally setting up

19  appointments to cheat, and I know you've actually seen a video

20  that makes it crystal clear that I'm cheating.  But what you

21  don't know, what you may not have heard is that before I

22  cheated I had some real concerns.  In fact, I thought it was a

23  bad idea.  And I called up my buddy Mervin and we discussed it

24  and we talked about you know what I don't think this is the

25  best model, this isn't the best way to end one relationship and

J569DAW4                          Rebuttal - Mr. Boone

1   start another.  We're really concerned about this.  So just

2   keep that in mind before you make any rash decisions.

3            What would your response be to that statement?  What

4   would any reasonable person's response be to that statement?

5            So what?  What difference does it make that you have

6   some concerns about cheating?  What difference does it make if

7   you and Melvin talked about maybe this isn't a good idea?

8            At the end of the day, you cheated.  That's what

9   matters.  Your actions are what matters.  It doesn't matter

10   what conversation we're having beforehand.  What matters is

11   what did you do on the day in question.  And you know from

12   looking at the videotape that bribes were paid.

13            Now, I want to move on to something that I believe

14   Merl Code's attorney argued and that was, well, essentially

15   even though certain coaches received money in Vegas -- and I

16   know Dawkins has an argument relating to that and we'll get to

17   that later -- but even though coaches received some money in

18   Vegas, the coaches that Merl Code is alleged to have gone to

19   Vegas didn't receive any money and that somehow means that he

20   didn't agree to pay college coaches because if you look at what

21   happened ultimately at the end of the day the coaches that he

22   sent to Vegas didn't actually accept any money and that further

23   shows that he did not have an agreement to pay college coaches.

24            First of all, by now we know who Merl Code is.  Merl

25   Code is an extremely connected person in the basketball space.

1    From the June 20 meeting he basically spent hours going over

2    his resume.  He talked about the fact he worked at Nike for 14

3    years.  He had connections both at the college level, the high

4    school level, the NBA level.  He talked about how at the time

5    of the recording he was at Adidas and had been there for two

6    years.  Merl Code is someone who it is fair to say is very

7    experienced in the basketball world.

8           And Merl Code, based from that experience, told you

9    what the best way is to pay bribes.  Merl Code did not think it

10   was a great idea to simply have a bunch of coaches meet some

11   random guy they have never met in their entire life who

12   Christian Dawkins barely knows at this point has maybe met

13   three times and have them take envelopes of cash.  Of course,

14   he didn't think that was a great way to have a successful

15   bribery scheme.

16          He said what you need to do in Vegas is you need to

17   make it clear to the coaches that if you need something we're

18   here to help.  Just let them know that.  Just make it clear.

19   We can be a resource.  If you need something, we're here to

20   help.  You just don't go out giving them thousands of dollars

21   in cash in the very first meeting in the hotel suite in front

22   of a guy they've never met before.

23          And you know why Code said that.  He explained this in

24   the June 20 meeting in the New York.  He said coaches are very

25   nervous.  Very reluctant.  Very hesitant to talk to anyone who

J569DAW4                        Rebuttal - Mr. Boone

1   is not in the basketball space.

2           He's obviously talking about people who are going to

3   pay them bribes.  He's not talking about them being reluctant

4   to talk to mailmen or the person who delivers their milk.

5   There is no reason to be nervous about that.

6           They're nervous about talking about people -- talking

7   to people, rather, who are about to pay them bribes.  Because

8   he knows that's what they're talking about in the June 20

9   meeting.

10          And he explains to Christian Dawkins, and you can

11  check Government Exhibit 116T, he explains to Christian Dawkins

12  that at the meetings in Vegas he doesn't want Jeff just handing

13  out money to his guys.  He just wants it to be made clear that

14  they, if they need something, they're there to help.

15          He is agreeing to pay bribes.  He is agreeing to pay

16  bribes, frankly in a much smarter way than Jeff D'Angelo wanted

17  to pay bribes.  He is agreeing to pay bribes in the future.

18  And he wants to make that clear to the coaches.

19          And you saw the video.  That's exactly what happened.

20  Think about the guys who are Merl Code's guys.  You have Steve

21  Smith.  He's the Clemson coach who went on and on about Zion

22  Williamson and how he's having a meeting with the step-dad next

23  day and how he's going to get back to them on what the needs

24  are.

25          Steve Smith knew what was going on.  He knew that the

J569DAW4                        Rebuttal - Mr. Boone

1    point of this meeting was to meet with these guys who had

2    resources, who had money, who had availability to help get --

3    help him with a recruit.

4            I want to be very clear about this point.  Giving a

5    coach money for him in turn to use to recruit is a bribe.

6    Period.  There is no question about that.  You don't get off

7    the hook because you want to use the money to recruit players.

8    That's not some -- that's not a safety for you.

9            Now Steve Smith said that.  And he wasn't the only

10   one.

11           You had another coach, Yasir Rosemond, from Alabama

12   who was practically falling over himself with the opportunity

13   to meet people who had resources.  And he talked about how he's

14   at Alabama and how recruiting is so difficult, and how he

15   hasn't actually used resources in Alabama, and he's excited for

16   this opportunity.  He says:  I'll do whatever you need me to

17   do.  I'll put you in front of a player.  He clearly had been

18   told what this meeting was about.  And he even talked about how

19   he has no dog in the fight.  He wants everyone to succeed.  He

20   just wants to be a head coach one day.

21           Who else did they meet with who was Code's guys?  The

22   coach from UConn.  Raphael Chillious.  You can review all these

23   recordings.  Raphael Chillious, in their conversations, Dawkins

24   says to him:  We're here to give you the ammunition you need.

25   The ammunition you need.  Money.

J569DAW4                        Rebuttal - Mr. Boone

1            And what does Chillious say?  He doesn't say,

2    Ammunition you need, what are you talking about?  I don't

3    participate in a bribery scheme.  That's illegal.  No.  He

4    says, Yeah, and we need it.

5            They coaches, as Marty Blazer told you, were there

6    because they wanted the help.  And Merl Code had instructed

7    them to go about it in a smart way.  To take their time.  To

8    get to know the coaches.  To build a rapport.

9            And you know why it is.  Common sense tells you.  If

10   you have a coach -- first of all, you heard from compliance

11   officers from the University of South Carolina and University

12   of Southern California.  They made it very clear.  Taking a

13   bribe can get you fired as a head coach.  It's one of the

14   biggest deals that could happen.  If you have a head coach go

15   to a hotel suite in Vegas, which already seems suspect, to meet

16   with a guy they've never met before, who is going to hand them

17   on the spot thousands of dollars in cash, obviously some

18   coaches are going to get spooked.  They're going to realize

19   this is strange.  They're not going to take the money.  Their

20   plan is not going to work.  Or if they take the money, they may

21   be too afraid to actually do what they're supposed to do in

22   terms of steering you players.

23           Code wanted the scheme to work in a smart way.  And

24   the smart way is maybe you actually say hello to the guy first

25   and meet him before you just take cash to him and you build --

1    to build a rapport.  That's all Code was arguing.

2          He wasn't arguing he didn't want to pay coaches ever.

3    Check all the transcripts.  Check all the recordings.  You will

4    not find a single sentence in which Code says don't pay my guys

5    in Vegas and don't pay them ever, I don't want to do this.  He

6    never says that because that's not true.

7          He wanted to pay them.  He just wanted to pay them an

8    approach that was different than the UC, than Jeff D'Angelo.

9    Jeff D'Angelo does not know how to pay bribes in the basketball

10   space.  Obviously.  He's an undercover law enforcement officer.

11   He's not in the basketball world.  He didn't work 14 years at

12   Nike.  He didn't work two years at Adidas.  He doesn't have

13   experience in this arena.  He's offering a very brazen way,

14   frankly, to pay a bribe.  Code is offering a much smarter,

15   likely more effective way to pay a bribe, which is you take

16   your time, but you make it clear, you make it known that you

17   are ready for business, you have the resources when the coaches

18   need it.

19          Now, I want to move on to some arguments made by

20   Christian Dawkins's attorney and one of the arguments is that

21   Jeff D'Angelo gave Christian Dawkins essentially an ultimatum.

22   And I believe defense counsel referred to Defendant's Exhibit 5

23   which I think is Government Exhibit 108T as well.  And he

24   pointed to this call between Jeff D'Angelo and Dawkins and he

25   said:  In this call it's clear that Jeff D'Angelo was saying

J569DAW4                        Rebuttal - Mr. Boone

1    that if you don't pay bribes to coaches I'm not giving you

2    money.

3            Interesting enough, given how important this call is,

4    defense counsel didn't actually play the call.  But, again,

5    it's the government's burden and we accept that burden.  What I

6    encourage you to do is to play the call for yourself.

7            In fact, for all of these calls, I would encourage

8    you -- I agree with Mr. Haney on this point -- play the calls

9    because when you play the calls you can pick up things that you

10   can't pick up from just reading a piece of paper.  You can pick

11   up tone and you can pick up meaning of what is happening.  And

12   if you play that call it will be very clear to you Jeff

13   D'Angelo never gave any ultimatum.  There is no ultimatum

14   given.  If you review every call that has been put forward in

15   this case by the defense and by the government, you will not

16   find a single call where Jeff D'Angelo said:  If you don't pay

17   coaches I'm not funding you.

18           First of all, by the time get the call he already

19   funded him, he gave him $25,000 on June 6 on the boat.  He

20   already had the money.  Sood testified to that.  You literally

21   saw him pull out $25,000 in cash and put it on the table.  When

22   he put it on the table, he didn't say:  Before I put this on

23   the table you got to make sure you pay college coaches.  He

24   never said that.

25           And interesting enough, defense counsel pointed to

J569DAW4                         Rebuttal - Mr. Boone

1    zero other recordings that they even claim Jeff D'Angelo gave

2    an ultimatum.

3            And when Dawkins was asked about it on the stand, he

4    said:  Well it was my interpretation that that's what he said.

5    My interpretation was that was an ultimatum.  Obviously, that's

6    an extremely convenient interpretation when you're on trial for

7    paying coaches in a bribery case.

8            Listen to that call yourself.  Listen to all the

9    calls.  You will see there is no ultimate given at any point in

10   time.

11           Now, defense counsel also used that call to suggest --

12   and other calls like it to suggest that Dawkins really didn't

13   want to pay college coaches just like Merl Code.  He wasn't a

14   fan of paying college coaches.  He testified -- he is a fan of

15   paying moms and dads and uncles and aunts and high school

16   coaches, except when the high school coach becomes a college

17   coach and he stops paying them, but college coaches, he doesn't

18   pay them.

19           First of all, that's blatantly not true.  You know

20   what happened to Lamont Evans.  We're going to try to spend a

21   little bit of time on it.  It was a three-hour journey to South

22   Carolina where Christian Dawkins explained in very interesting,

23   frankly, detail exactly why you pay college coaches.  That trip

24   wasn't addressed by defense counsel.

25           Again, it's our burden.  But when they make arguments

J569DAW4                        Rebuttal - Mr. Boone

1   you are entitled to scrutinize their arguments.  That is your

2   job as jurors.

3          And it was very clear through that three-hour journey

4   that Christian Dawkins paid college coaches.  There was an

5   argument that, well, for Lamont Evans he really only made one

6   check for $2500.

7          That's not what Christian Dawkins said.  In that

8   recording he literally said I paid him $2500 monthly.  And even

9   talked in detail how he did it.  He said well we do the drop in

10  ATL sometimes, in Atlanta when Lamont is down there for

11  recruiting I go to the ATM and I just give him cash.

12         That wasn't a one-time thing.  He obviously confessed

13  to Marty Blazer and Munish Sood that he paid Dawkins on a

14  monthly basis.  And the entire point of their trip to going to

15  South Carolina was so that Marty Blazer and Munish Sood could

16  take over the payments for him.

17         That was the whole purpose of the trip.  He never met

18  Sood before in his entire life.  He met Marty Blazer maybe once

19  or twice.  He traveled with these two men he barely knows to

20  South Carolina which is not -- which is not close to Atlanta.

21  And the entire time they talk about paying college coaches and

22  he's schooling them on why you do it.  And why you don't pay

23  the head coaches.  And what the advantage is.  And they're

24  going to be with the kid everyday and you've got them by the

25  balls and they can lose their job.  That's Christian Dawkins

J569DAW4                          Rebuttal - Mr. Boone

1    who now claims he doesn't pay college coaches.

2                But, again, I want to get back to his argument that

3    there are calls where he suggested some doubt about paying

4    coaches.  Talked to Jeff D'Angelo and he tried to essentially

5    sort of get him off of the idea of paying college coaches.  The

6    first meeting of Loyd Management where they sign the

7    shareholder agreement you know was the boat meeting.  That was

8    June 6.  And in that meeting they talk about paying college

9    coaches.  They talked about the coaches' model, which you've

10   heard about.

11               And what does Dawkins say in that meeting?  He doesn't

12   say don't pay college coaches.  He says:  Here's a smart way to

13   go about it.  Why don't we pay them when they need it.  Why

14   don't we pay them when they need it as opposed to giving every

15   coach under the sun money.

16               That's what he wanted to do.  He wanted to pay college

17   coaches.  He just wanted to be smart about it.  He doesn't want

18   to throw all the money around.

19               Same thing that Code said.  They both have the same

20   idea.  Be smart about it.  Pay the coaches when they need it.

21               Now, Dawkins did say for the elite, elite coaches you

22   can pay them.  Book Richardson, who got paid, obviously.  We've

23   talked about that.  The fifteen grand he came to pick up in

24   New York.  The other five grand he got in New York at a

25   previous trip.  He talked about paying the elite, elite

J569DAW4                        Rebuttal - Mr. Boone

1    coaches, the coaches at the top programs who will produce NBA

2    draft picks every year.  But for everyone else just be smart.

3    Don't just hand out the money.

4            Think.  Why would Christian Dawkins say this?  Why

5    would Christian Dawkins say this?  Is it possible he said this

6    because he's getting paid by Jeff D'Angelo and he wouldn't like

7    all of his money to go to college coaches.  He is living off of

8    this money.  This is his job, his source of income is Jeff

9    D'Angelo.  Do you think maybe he had a reason to try to keep

10   the costs somewhat reasonable so that he could get paid at the

11   end of the day and not have it just go all to college coaches?

12   Think about that.  Again, use your common sense.

13           Now, I want to go back, just because this is an

14   important point and this is a point defense counsel hit on.  I

15   want to focus just briefly before we move on to the idea that

16   Christian Dawkins and Merl Code agreed to pay college coaches

17   that they had, in fact, just a smarter way to go about it than

18   the undercover did.

19           I want you to imagine the scenario in which you and

20   your friends decide you're going to form a bank robbing crew.

21   You're going to rob banks.

22           MR. HANEY:  Objection, your Honor.

23           THE COURT:  Overruled.

24           MR. BOONE:  You and your friends decide you're going

25   to form a bank robbing crew.  You're going to go around and

J569DAW4                    Rebuttal - Mr. Boone

1   you're going to rob banks.  And your friend, Jeff Bellagio

2   says:  Listen, this is what we're going to do.  First, we're

3   going to get matching jumpsuits, maybe some like navy velour

4   jumpsuits where everyone knows that we're a crew.  Then we're

5   going to get individual name tags.  Mine will say Jay Smooth,

6   yours will say Nelly Mel, so people will know, even though

7   we're a crew, we're still individuals with a personality.

8        Then we're going to go to the bank.  We're going to go

9   in the middle of the day, a little bit of a crowd, a little of

10  a scene.  We're going to pull out our guns and before we rob

11  the bank we're going to go around the circle and we're going to

12  each say a little bit about ourselves and maybe what we want to

13  do with the money when we rob it.

14       Then we're going to rob the bank and we're going to

15  leave a little card and the card is going to have a little

16  symbol on it, and that's going to be the symbol of our crew so

17  that everyone knows it's our crew who did that robbery.

18       Now after your friend Jeff Bellagio tells this

19  suggestion, your friend Melvin speaks up.  And he says:  Jeff,

20  that is the most idiotic idea I have ever heard.  That makes

21  absolutely no sense.  We are not doing that.  I'm telling you

22  that right now.  I'm telling everyone in the crew we are not

23  doing what Jeff just said.  Instead, we're going to rob the

24  bank at night when no one is there.  We're going to wear masks.

25  We're going to quietly go in and take the money and we most

J569DAW4                          Rebuttal - Mr. Boone

1    definitely are not leaving a business card.

2             If your friend Melvin said that, would there be any

3    doubt in your mind that Melvin agreed to rob a bank?  No.

4    Obviously, he agreed to rob a bank.  He just wanted to go about

5    it in a smarter way.  He wanted to go about it in a more

6    successful way.  But at no point in time did he give any

7    suggestion that he did not agree to rob a bank.

8             That's no different than what's happening here.

9    Dawkins and Code wanted to go about this in a smarter way than

10   what Jeff D'Ang -- now I'm confusing the Jeffs, but Jeff, the

11   undercover, suggested who obviously doesn't know how this works

12   in the basketball space; he's an undercover FBI agent.

13            Now, I want to now jump forward a bit and talk about

14   Las Vegas.  Now, as I said in the beginning, it could not be

15   more clear that bribes were paid in Las Vegas.  In some sense,

16   defense counsel concedes that at least it looks like bribes

17   were paid in Las Vegas.  Christian Dawkins, as you know, at

18   this point, offered another version of events.  And his version

19   of events is that although it looks like there's thousands of

20   dollars in cash being handed to college coaches, the reality is

21   it was all just pretend.  It was a prank.  Because I had talked

22   to them, the college coaches beforehand, and I actually told

23   them:  Hey, I got this guy Jeff; he's funding this company I'm

24   starting; for some reason he wants to see me pay a college

25   coach.  So could you just come and pretend that you're taking a

J569DAW4                      Rebuttal - Mr. Boone

1    bribe and then you can go about your business, I'll take the

2    money back and we'll all be good.  That's essentially Dawkins'

3    version of events.  That's what he told you on the witness

4    stand.

5            Now, ladies and gentlemen, we all have friends.  Some

6    of us are likely fortunate enough to have friends who we

7    consider family, people we would do anything for.  You may be

8    that friend to other people.

9            Ask yourself:  Would you risk your entire career for

10   free, before Dawkins has even given me money, for trouble?

11   Would you risk your entire career --

12           MR. HANEY:  Object, your Honor.

13           THE COURT:  Overruled.

14           MR. BOONE:  -- for free to help a friend pull off a

15   prank?  Obviously, you wouldn't do that.  No one would do that.

16   That makes no sense.

17           These coaches worked hard to get to where they are.

18   They are coaches at major Division I universities.  They know

19   you can get in serious trouble for taking a bribe, for giving

20   the appearance that you were taking a bribe.

21           You heard testimony from the compliance officers at

22   universities who testified to that.  This is a huge, huge deal.

23   This is a career-ender.  Does it sound reasonable to you that

24   someone in that position would risk their entire career for a

25   five-minute prank for Christian Dawkins?  No.  Obviously, no

J569DAW4                              Rebuttal - Mr. Boone

1    one would do that.  It makes absolutely no sense.  That's

2    ridiculous.

3           And another reason you know it's ridiculous is because

4    after this bribe payment was paid the coaches worked very hard

5    to steer players to Christian Dawkins.

6           You heard about Tony Bland.  Tony Bland set up a

7    meeting in L.A. with a handler for an incoming player.  Jill

8    Bailey, Munish Sood, Christian Dawkins were there for that.

9           Book Richardson set up a meeting with a handler in

10   Arizona.  Munish Sood, Jill Bailey, Dawkins were there for

11   that.

12          Corey Barker was on a phonecall after this meeting,

13   after the bribe payments were paid talking about how he had a

14   player who was going to be a layup for Dawkins, how he was

15   going to be a for sure second rounder.

16          Now, Dawkins argues well they're my friends they did

17   this to me -- they did it for me because they're my friends.

18          First, of all, he testified none of these people have

19   ever given him a player before.  The entire time he worked at

20   ASM he did not have one single player from USC as a result of

21   his connection to Tony Bland.  He did not have one player at

22   Arizona as a result of his connection to Book Richardson.  He

23   did not have one player at TCU as a result of his connection to

24   Corey Barker.  That never happened.  It was only after he paid

25   them bribes, now all of a sudden everyone is setting up

J569DAW4                        Rebuttal – Mr. Boone

1    meetings and they're flying around the country and trying to

2    make sure he gets to meet all these people.

3            Second, think about Book Richardson.  Book Richardson

4    set up a meeting for Dawkins, Jill Bailey, Munish Sood, in

5    Arizona.  And the meeting was with a handler for a player Rawle

6    Alkins.  And after that meeting Jill Bailey and Book Richardson

7    talk.  And she essentially thanks him for setting up that

8    meeting.  And what does he say in response?  He says I just did

9    my job.  Not I did a favor.  I just did my job.

10           Think about your own experiences.  If you have a

11   friend who says:  Hey, I'm coming to New York.  I just want to

12   stay with you a couple days.  Is that all right?  You say:

13   Sure, I'm just doing my job.

14           No one says that.  Unless they're getting paid for a

15   job.  He said he did his job because it was, in fact, a job.

16   He got paid for it.  It wasn't a favor.  He wasn't doing it

17   because he likes Christian Dawkins.  He was doing it because

18   his understanding was that the money he received was in

19   exchange for him steering players.  And he clearly just steered

20   a player by setting up a meeting with a handler for an Arizona

21   player, Rawle Alkins, and the people from Loyd Management.

22           Now, I want to stick with Vegas for a little bit

23   longer.

24           Defense, and particularly Dawkins, argues in part of

25   this story this is sort of wrapped up in his story that it was

J569DAW4                        Rebuttal - Mr. Boone

1   all pretend and he actually got the money back and then he put

2   it in his bank account.  I just want to make this very clear.

3           First of all, defense counsel showed you a slide.  And

4   I think the purpose was to suggest that the money that was paid

5   as bribes in Las Vegas actually was deposited back into Loyd

6   Management.

7           First of all, what that slide failed to show you was

8   all the payments that were made in Vegas.  You can review the

9   testimony of Marty Blazer.  He told you all the payments.

10  Defense counsel didn't even touch those payments.

11          Those payments were over $11,000 to Brad Augustine,

12  Marty Blazer said, for Jordan Fair, a coach at the University

13  of Louisville.

14          $4,500 was paid to Lamont Evans, who we know by know

15  was a coach at Oklahoma State and a formerly a coach at the

16  University of South Carolina.  Defense counsel didn't mention

17  that.

18          $13,000 was given to Tony Bland.

19          $6,000 was given to Preston Murphy.

20          $6,000 was given to Corey Barker.

21          That's, obviously, more than $25,000.  So don't be

22  confused and distracted by this idea that all of the money that

23  was paid was actually put back.  Clearly it wasn't.  They're

24  not even accounting for the money that was paid.  They're

25  trying to make the story fit because the puzzles don't fit,

1    because the story makes no sense.

2           Now, I've touched on Lamont Evans a little bit.  As

3    you know, just check the South Carolina meeting.  It's very

4    clear that Dawkins said in his own words, and we showed this to

5    him in his testimony when he was on the stand he confirmed that

6    he, in fact, said he did pay Lamont Evans $2,500 monthly.

7           Now he, obviously, has a different story.  Look at

8    what he said at the time when he did not know he was being

9    recorded and he was going to one day be on trial for making

10   those payments.

11          I want to touch very briefly on Book Richardson.

12   First of all, I think Mr. Moore said the government did not put

13   into evidence Book Richardson's contract.  I'm going to assume

14   he just misspoke.  We clearly do have in evidence Book

15   Richardson's contract from the University of Arizona.  If you

16   want to see it, you can ask for it.  It clearly says you are to

17   follow NCAA rules like all of these contracts say.

18          Now, very briefly while we're still on Arizona, there

19   was discussion about Book Richardson getting money and the

20   argument was made that essentially he was just given money

21   because he was a friend of Christian Dawkins and they didn't

22   really know what they were giving him money for but as a good

23   friend Dawkins was helping him out, getting $20,000.

24          First of all, I want you to pay attention to a call.

25   This is Government Exhibit 142T.  This is a call between

J569DAW4                        Rebuttal - Mr. Boone

1    Christian Dawkins and Munish Sood.  And in this call Christian

2    Dawkins is complaining about the fact that Jeff D'Angelo is

3    taking his time paying Book Richardson $15,000.  He's upset.

4    And he explains to Sood that the fact that Jeff is taking his

5    time is ridiculous because the money is needed immediately to

6    pay for Jahvon Quinerly, a recruit to the University of

7    Arizona, and that Book needs this money to seal that deal.

8    That's what the $15,000 was for.  And he needed it so badly

9    that Book Richardson flew all the way to New Jersey to pick up

10   the $15,000.

11            So it's clear when you read that transcript that money

12   wasn't given to Book Richardson just because he's a nice guy or

13   because Christian Dawkins wanted to give him some money.  Book

14   Richardson's understanding was that the money was for Quinerly.

15   Book Richardson's understanding was that the money was in

16   exchange for steering players and that it was his job to do so.

17   And Dawkins himself said in that phonecall specifically what

18   that money was for.  It was not to go on a vacation or go out

19   to eat dinner.  It was to help him with -- do what the ultimate

20   goal of the conspiracy is:  Get Loyd Management players.

21            Now, I'm getting ready to sit down.  Before I sit

22   down, I just want to say a few more words.  We spent a lot of

23   time during this trial talking about the choices that the

24   defendants made.  And keep in mind, without stating the

25   obvious, these are grown men who made their own decisions.  No

J569DAW4                         Rebuttal - Mr. Boone

1    one forced them to go in any meetings.  No one forced them to

2    say the words they said.  No one grabbed Christian Dawkins'

3    hand and forced him to put thousands of dollars in the hand of

4    a coach.

5           They made their own decisions.  They made the

6    decisions to get involved with Jeff D'Angelo.  They made

7    decisions to accept his money.  They made decisions to set up

8    meetings in Vegas with various college coaches.  And they made

9    decisions to pay those coaches and to inform other coaches that

10   they were essentially open for business and they will pay them

11   in the future if they needed.

12          What we have not spent a lot of time talking about is

13   the fact that there are several people in this case who didn't

14   get a choice to make decisions.

15          Jeffrey Carroll, player at Oklahoma State University.

16          Rawle Alkins, the player at the University of Arizona.

17          Taeshon Cherry, a player who was going to U.S.C.

18          Those players did not know what was happening behind

19   the scenes.  They did not know that the defendants and their

20   coconspirators --

21          MR. HANEY:  Objection, your Honor.

22          THE COURT:  Sustained.

23          MR. BOONE:  You heard testimony -- you heard

24   recordings, Book Richardson, in particular, talking about how

25   you can't give players choices.  It's like taking them to a

J569DAW4

1    Benz dealership, a BMW dealership and a Porche dealership.

2    They like them all.  You got to tell them what to do.

3           You heard Tony Bland discuss in Vegas how there's some

4    players I can tell them exactly this is what you're doing and

5    there are other players where I'm just going to have to work

6    them a little bit to get them to that point.

7           You heard Christian Dawkins himself talking about

8    Rawle Alkins, a player at Arizona, like he's a child, like he's

9    a three-year-old.  You have to break it down for him.

10          My point is this:  What this case is about is the fact

11   that the defendants, for their own greed, took advantage --

12          MR. HANEY:  Objection, your Honor.

13          THE COURT:  Overruled.

14          MR. BOONE:  -- took advantage of these players.  Their

15   goal was to eliminate their opportunity to choose on their own

16   who they wanted to represent them, who had their best interests

17   at heart.  Instead, they made that decision for them.

18          If you review the evidence in this case, you will

19   reach the only verdict that's consistent with that evidence, is

20   that Christian Dawkins and Merl Code are guilty.

21          THE COURT:  Thank you, Mr. Boone.

22          Ladies and gentlemen, we're going to take another

23   ten-minute break so please be prepared to come back out at 17

24   after the hour.  Don't discuss the case.

25          (Continued on next page)

J569DAW4

```
 1         (Jury not present)

 2         THE COURT:  Everyone be seated.

 3         Anyone on the defense team wish to comment on the

 4  government's proposed instructions?

 5         MR. CHANEY:  Your Honor, we have read through those

 6  instructions.  I acknowledge for the Court that these -- the

 7  substance of those -- of the proposed curative instructions

 8  have already been charged to the jury in the Court's jury

 9  charges.

10         Furthermore, the jury has been told repeatedly by the

11  Court that the law comes from your Honor and that the facts are

12  for the jury to decide for themselves.

13         They've been repeatedly instructed that the summations

14  are not themselves evidence.

15         Certainly, Mr. Boone had an opportunity in his

16  rebuttal to state any mischaracterizations that he believed the

17  defense articulated with respect to the law with the jury and

18  chose not to do so.

19         I don't think repeating instructions that have already

20  been delivered to these jurors would be appropriate at this

21  point.  I think it would be largely cumulative and I think it

22  would unnecessarily draw their minds to particular arguments.

23         Further, I would simply note that Mr. Boone's last

24  argument to the jury was exclusively to inflame the passion of

25  the jury with respect to any harm that resulted from these
```

J569DAW4

1    alleged bribery charges, has nothing to do with the actual

2    evidence in the case and the defense is not asking for a

3    curative instruction with respect to that because for the same

4    reasons, they've already been told what the law is and what

5    their role is.

6            THE COURT:  Mr. Haney, did you wish to add?

7            MR. HANEY:  I would only note that the jury has

8    already been instructed on the matter regarding unavailability

9    of witnesses, which I understand that's the instruction, but I

10   would, on the record, just want to offer that I have a really

11   hard time with now instructing them further that the defense

12   lawyers had the equal availability to call certain witnesses,

13   including the FBI agents.  We all know that's not true, your

14   Honor.

15           Now that's an instruction they were being instructed

16   on already, and I would submit we don't rub salt in the wounds

17   of the reality that that's not true or else those FBI agents

18   would have been on this witness stand and by doing that I would

19   submit that is really overemphasizing something that in and of

20   itself, I would submit to the Court, isn't really accurate.

21           MR. MOORE:  I would only add one point.  Mr. Haney

22   made an objection to Mr. Boone's closing remarks because he

23   referred to facts which were not in evidence.  If we're going

24   to give a curative instruction and if we're going to call the

25   defense out as Mr. Solowiejczyk suggests, then I think that

J569DAW4

1   your Honor also needs, and we will be happy to provide you with

2   a curative instruction that says that Mr. Boone referred --

3   referenced facts not in evidence and instruct you, you are not

4   to think about facts not in evidence; your sole job is to focus

5   on the evidence that was presented.

6          And so for all those reasons I would suggest that your

7   Honor simply remind that -- you bring them in and say I

8   previously instructed you on the law.  You have my written

9   instructions.  If you have any questions about those

10  instructions, please send me a note during deliberations and

11  give them your concluding charge and not single out the parts

12  that the government would like you to single out.

13         I also believe that I did call attention to the

14  specific provisions of your instructions when I talked about

15  the missing witnesses.  And I turned it on the issue of the

16  government has no burden -- the government has a burden and we

17  don't.

18         MR. SOLOWIEJCZYK:  Your Honor --

19         THE COURT:  I'm sorry.

20         MR. SOLOWIEJCZYK:  Just briefly, there was one

21  argument made that since we didn't address the law in rebuttal

22  that somehow that meant that we didn't take it seriously or

23  that we somehow waived that opportunity.

24         It's the Court's job to instruct the jury on the law.

25  It's not our job.  We don't presume to do that.

J569DAW4

1          I think, particularly given that we all had these jury

2    instructions in advance of these summations, that the jury has

3    been instructed, if you read what these defense lawyers said,

4    which is why we put it in our e-mail to your Honor, they just

5    fly in the face of what the Court instructed the jury on and

6    they should be reminded of the fact that whether a witness was

7    or wasn't called, they're not to infer anything from that.

8    It's very important, especially given the amount of emphasis

9    each of them placed on it.  And that was their choice.  It

10   wasn't the government's choice.  And that's going to, in our

11   opinion, should lead to a curative.

12         And the same goes to the testimony of Chance Miller,

13   the compliance officer.  Because now the thought has been put

14   in the jury's mind:  Well, since he's a lawyer, he doesn't

15   think this is a crime, well then how could you possibly think

16   that Christian Dawkins and Merl Code think that?  That's

17   obviously a completely improper argument.

18         And then the final thing I'd note is, your Honor, I'm

19   not sure what the suggestion is that we're -- that the

20   government somehow was arguing from things not in evidence.

21   But Mr. Boone quoted multiple meetings where defendants were

22   saying things to indicate that they were going to make the

23   choices for these kids.  That was the point.  So the notion

24   that we're arguing from things not in evidence I don't think is

25   accurate.

J569DAW4

1          THE COURT:  I understood the point but the argument

2     that was made was that those individuals did not know and

3     that's why the objection was sustained.

4          OK.  Over the defense objections I will give both of

5     the curative instructions.  I will take out defense lawyers

6     names and simply refer to them as defense lawyers.

7          MR. MOORE:  Would your Honor also consider reminding

8     the jury that to the extent that they heard the government

9     argue facts not in evidence that they are not to consider that.

10          THE COURT:  No.  Because the -- as Mr. Solowiejczyk

11     indicated or suggested, the emphasis that was placed on the

12     particular arguments is the reason why I ultimately believe

13     that these instructions are appropriate.

14          Mr. Boone started going down a particular avenue.  An

15     objection was made.  The objection was sustained.  I don't

16     think that that requires a curative instruction.

17          MR. MOORE:  Yes, sir.

18          THE COURT:  OK.  So you have two minutes.  And what

19     I'm going to do, just so everyone is aware, I'm just going to

20     read the last -- I'll read the curative instructions.  I'll

21     read the last couple of pages beginning at page 60 of the jury

22     instructions.  I'll have them, the jury, go back into the jury

23     room.  I actually will swear the CSO, who I believe is here.

24     I'll have the jury, including the alternates, go back into the

25     jury room, direct the alternates to gather their belongings and

J569DAW4

1    leave and direct the others not to begin deliberations until

2    they alone, the twelve of them alone, are in the jury room.

3    OK.

4            MR. MOORE:  Is your Honor going to ask -- are we going

5    to know what the schedule is going to be or how are you going

6    to do that?

7            THE COURT:  What I will tell them is that at this

8    point the schedule is in their hands.  If they want to stay

9    later, they are free to stay later.  If they want to maintain

10   the schedule, they may maintain the schedule.  I'm going to

11   tell them that I'm going to give you guys an hour for lunch and

12   so that if they want -- if they have a question between say

13   12:30 and 1:30 that it may take a little longer to get them an

14   answer.  Of course, when I tell them that it will be a lie.  So

15   if we get any note in from them, we should be prepared within

16   five minutes to come to order and prepare a response.

17           MR. SOLOWIEJCZYK:  Just very briefly on the

18   alternates.  I'm sure your Honor has already thought of this

19   and I apologize in advance for presuming something that you

20   already know.  I assume your Honor is going to instruct them

21   not to read anything in the news -- to continue that on an

22   ongoing basis just in case --

23           THE COURT:  Yes.  That's in the instructions.

24           MR. MOORE:  Is your Honor going to ask them, all

25   twelve of you feel good, feel healthy, feel like you can go the

J569DAW4

1  duration before sending the alternates home?

2          THE COURT:  I've never heard that.

3          MR. MOORE:  Again, I'm have from a different place,

4  your Honor.  That's somewhat standard in my home turf.

5          THE COURT:  OK.

6          MR. MOORE:  Because I understand that there's one

7  juror who has some sort of preplanned thing for Wednesday, I

8  think, at this point.

9          THE COURT:  I understand.  I have not heard anything

10  else from that juror.  So I try not to kick hives or whatever

11  that phrase is.  OK.  So we'll bring them out in another couple

12  of minutes.

13          (Recess)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J569DAW4

1           (Jury present)

2           THE COURT:  Ladies and gentlemen, thank you, as

3    always, for your patience and shuttling back and forth.

4    Obviously, this is all very important stuff and we just need to

5    make sure that everyone is as alert as possible so that they

6    can be as attentive as possible.

7           I'm going to give you some final instructions, and

8    then you'll begin your deliberations in just a few minutes.

9           First, and this is not one that's in your jury

10   binders.  We're going to start on page 60, by the way, of the

11   jury instructions.

12          First, let me instruct you as follows.  Ladies and

13   gentlemen, you have heard certain arguments by the defense

14   lawyers this morning about certain witnesses that were not --

15   that were or were not called.  I want to remind you that the

16   individuals the defense lawyers referred to were equally

17   available to all parties and it is no concern of yours why

18   certain witnesses were or were not called.  Your only concern

19   is whether the evidence you heard in this trial establishes

20   each element of the offense you are considering beyond a

21   reasonable doubt.

22          Secondly, you also heard testimony, there were certain

23   arguments by the defense lawyers referring to certain testimony

24   from Chance Miller, a representative of the University of South

25   Carolina, as to whether he considered certain conduct to be a

1    federal crime.  As an initial matter, it is your recollection

2    of the events that governs and not those of the defense

3    lawyers.  Further, the defense lawyers asked you to make

4    certain inferences based on that witness's views and, in

5    particular, based on the fact that that witness was a trained

6    attorney.

7            Ladies and gentlemen, that particular witness was not

8    called as an expert and his views on legal issues are not

9    entitled to any particular weight, nor are you permitted to

10   infer, based on his personal views, any particular knowledge or

11   mind-set of any other person, including the defendants.  The

12   determination of whether the government has established beyond

13   a reasonable doubt that the defendants committed the offenses

14   charged is solely up to you.

15           Now I will give you some final instructions concerning

16   your deliberations.

17           You will now retire to decide the case.  It is your

18   duty as jurors to consult with one another and to deliberate

19   with a view to reaching an agreement.  Each of you must decide

20   the case for yourself.  But you should do so only after

21   consideration of the case with your fellow jurors.

22           Your verdict and the answers to each question on the

23   verdict form must be unanimous.  Discuss and weigh your

24   respective opinions dispassionately, without sympathy,

25   prejudice or favor toward either party and adopt that

J569DAW4                        Charge

1    conclusion which in your good conscience appears to be in

2    accordance with the truth.

3           As you deliberate, please listen to the opinions of

4    your fellow jurors and ask for an opportunity to express your

5    own views.  Every juror should be heard.  No one juror should

6    hold center stage in the jury room and no one juror should

7    control or monopolize the deliberations.  You should all listen

8    to one another with courtesy and respect.  And if, after

9    stating your own view, and if, after listening to your fellow

10   jurors, you become convinced that your view is wrong, do not

11   hesitate because of stubbornness or pride to change your view.

12   On the other hand, do not surrender your honest convictions and

13   beliefs concerning the weight or effect of the evidence solely

14   because of the opinions of your fellow jurors or because you

15   are outnumbered or for the mere purpose of returning a verdict.

16   Your final vote must reflect your conscientious belief as to

17   how the issues should be decided.  Your verdict must be

18   unanimous.

19          You are not to discuss the case until all jurors are

20   present.  Nine or ten or even eleven jurors together is only a

21   gathering of individuals.  Only when all the jurors are present

22   do you constitute a jury and only then may you deliberate.

23          If any of you took notes during the course of the

24   trial, you should not show your notes to or discuss your notes

25   with any other juror during your deliberations.  Any notes you

1    have taken are to be used solely to assist you and are not a

2    substitute for the transcript of the testimony which has been

3    taken down verbatim by the court reporter.  The fact that a

4    particular juror has taken notes entitles that juror's views to

5    no greater weight than those of any other juror.  And please

6    remember that if notes were taken during the lawyers' arguments

7    the lawyers' arguments are not evidence.

8            Now the documentary but not physical or audio visual

9    exhibits will be sent to you in the jury room.  If you want any

10   of the testimony read back to you, that can be arranged.

11   Please appreciate that it is not always easy to locate the

12   testimony that you might want so be as specific as possible

13   when -- as to what witness and to what portion of that

14   witness's testimony you would like to hear.

15           Any communication with the Court should be made in

16   writing, signed by your foreperson and given to the marshal who

17   will be outside the jury room while you deliberate.

18           I will respond to any questions or requests you have

19   as promptly as possible, either in writing or by having you

20   return to the courtroom so I can speak with you in person.  In

21   any event, do not tell me or anyone else how the jury stands on

22   any issue until after a unanimous verdict is reached.  So do

23   not ever indicate in a note or otherwise what the vote is or

24   which way the majority is leaning or anything like that.

25           Your first task when you retire to deliberate is to

J569DAW4                          Charge

1    select by your own vote one of you to sit as your foreperson.

2    You are free to select any foreperson you like.  The foreperson

3    does not have anymore power or authority than any other juror

4    and his or her vote does not count for anymore than any other

5    juror's vote or opinion.  The foreperson is merely your

6    spokesperson to the Court.  The foreperson will preside over

7    your deliberations and will be your spokesperson here in court.

8    He or she will send out any notes and when the jury has reached

9    a verdict, he or she will notify the marshal that the jury has

10   reached a verdict and he or she will come into open court and

11   give the verdict.

12        Your deliberations -- during your deliberations,

13   please communicate with the Court only in writing and only

14   through your foreperson.

15        And by the way, ladies and gentlemen, if you do not

16   send out any other note, you will send out a note when you are

17   done that says as follows:  The jury has reached a unanimous

18   verdict, without indicating what the verdict is.

19        Each of you has a verdict form in your binders.  The

20   foreperson will receive the verdict form.  It lists the

21   questions you must resolve based on the evidence and the

22   instructions that I have given you.  When the foreperson has

23   completed the form he or she must sign his or her name and the

24   form will be marked as a court exhibit.

25        All of you have a copy of the form.  You need only

J569DAW4                          Charge

1   submit one or fill out one at the conclusion of your

2   deliberations.

3          Now the most important part of this case, Members of

4   the Jury, is that part you as jurors are about to play as you

5   deliberate on the issues of fact.  It is for you and you alone

6   to decide whether the government has proved beyond a reasonable

7   doubt each of the essential elements of the crimes with which

8   the defendants are charged.  If the government has succeeded on

9   a particular count with regard to a particular defendant, your

10  verdict should be guilty as to that count.  If it has failed,

11  your verdict should be not guilty.

12         I know you will try the issues that have been

13  presented to you according to the oath that you have taken as

14  jurors.  In that oath you promised that you would well and

15  truly try the issues in this case and render a true verdict

16  according to the law and the evidence impartially and fairly

17  without prejudice or sympathy.

18         (Continued on next page)

19

20

21

22

23

24

25

J56HDaw5                          Charge

1          THE COURT:  (Continuing) Your function is to weigh the

2     evidence in the case and to determine whether the government

3     has proved beyond a reasonable doubt the guilt of each

4     defendant of the crimes charged in the indictment.  As I

5     previously stated, your verdict must be unanimous.  If at any

6     time you are not in agreement, you are not to reveal the

7     standing of the jurors, that is, the split of the vote to

8     anyone, including me, at in any time during your deliberations.

9          Ladies and gentlemen, you also have a copy of the

10    indictment in the binder.  It is immediately after the jury

11    instructions.  The verdict form is the very last document in

12    your binder.  I'll remind you that the indictment is evidence

13    of nothing.  It is merely an accusation, and I provide it to

14    you simply that it may assist you during the course of your

15    deliberations.

16         I also want you to know that while you deliberate, the

17    schedule now is entirely in your hands.  If you wish, you can

18    stay later than 2:30.  If you wish, we can maintain the

19    schedule that we currently have and that we've been working

20    with for the last couple weeks.  It is entirely in your hands.

21    We will be here as long as you wish.

22         The other thing that I wanted you to know is to the

23    extent you have any note, we will get to them as soon as we

24    possibly can.  However, I will give the lawyers a lunch hour,

25    so if you give a note between 12:30 and 1:30, it may take us a

little longer to get back with you, but please be advised that

we are working as efficiently as we can to get you the

information that you want.

Now, at this time the regular jurors will soon begin

their deliberations in the case.  Nevertheless, the alternate

jurors are not quite excused.  While the jury conducts its

deliberations, you do not have to be in court, but you should

give Ms. Rivera phone numbers where you can be reached because

it is possible that one or more of you could be needed to

deliberate if a regular juror is unable to continue.

Ms. Rivera will call you if deliberations are

completed without our needing you so that you will know when

you are completely finished.  Between now and then, you must

continue to observe all the restrictions I have instructed you

on throughout the trial.  That is, you must not discuss this

case with anyone, including your fellow alternate jurors, the

regular jurors, other people involved in the trial, members of

your family, friends, coworkers, or anyone else.  You may not

communicate with anyone about the case on your cell phone,

through email, text messaging, or by way of other social

networking websites, including Facebook and LinkedIn.  Do not

speak at all with any of the parties, the witnesses, or the

attorneys.  Do not permit anyone to discuss this case with you.

Do not "friend" or "follow" one another or any participant in

this trial on Facebook, Twitter, LinkedIn, or any other social

J56HDaw5                         Charge

1    networking website.  Do not even remain in the presence of

2    anyone discussing the case.  If anyone approaches you and tries

3    to talk to you about the case, please report that to me through

4    Ms. Rivera immediately.

5              Do not listen to or watch or read any reports

6    concerning this trial, if there were to be any, and do not do

7    any research on the Internet or otherwise.  Do not visit any

8    places mentioned during the trial or conduct any kind of

9    investigation on your own, including on social media.  Should

10   you be asked to participate in reaching a verdict in this case,

11   the only information you will be allowed to consider in

12   deciding this case is what you learn in this courtroom during

13   the trial.

14             I'm very sorry that you will probably miss the

15   experience of deliberating with the jury, but the law provides

16   for a jury of 12 persons in this case.  So before the rest of

17   the jury retires into the jury room, if you have any clothing

18   or objects, what we'll do is you'll leave with the rest of the

19   jury.  The jury should not begin deliberations until the

20   alternate jurors have retrieved their items and left the room.

21   So you'll be asked to pick them up and to withdraw before the

22   deliberations start.

23             Is the court security officer present?  Sir, would you

24   please step forward.

25             THE DEPUTY CLERK:  Please raise your right hand.

1           (Marshal sworn)

2           THE COURT:  Now, ladies and gentlemen, I will bring

3    you out at 2:30 so you can advise me as to whether or not you

4    want to continue.

5           Apparently you're going to stay until 4 o'clock today,

6    but we'll bring you out at 4 o'clock unless you need to speak

7    with us earlier, OK.

8           Yes, you can take the jury binders, not the

9    transcripts but the jury binders and your notebooks, if you

10   have them.

11          (At 1:33 p.m., the jury retired to deliberate)

12          THE COURT:  Please be seated.

13          Ms. Rivera handed me a note which apparently they

14   communicated to her they've already decided to stay today until

15   4 o'clock.  So unless there's any other note from them, we'll

16   bring them out at 4 o'clock and get a sense from them what

17   schedule they wish to keep.  In the meantime, you should all be

18   close.

19          Does Ms. Rivera know how to get ahold -- do we have

20   your cell phone number so you can be back in five minutes if we

21   need you?

22          MR. MARK:  We will.

23          THE COURT:  OK.  We're done for now.

24          (Recess pending verdict)

25

J569DAW6

1           (Jury note received; time noted:  2:50 p.m.)

2           THE COURT:  Let me just ask.  We're all gathered back.

3   We do have a note.  It's been marked Court Exhibit No. 1.  Are

4   the defendants here?

5           MR. CHANEY:  We instructed them both to come up here.

6   I think for future purposes we can -- I don't know if the Court

7   has a position on whether or not the Court wants our defendants

8   here.

9           THE COURT:  I think it's the better course to have

10  them here.  This happens to be a fairly ministerial note as to

11  which I believe there is no dispute.  So let me just read the

12  note into the record.

13          It reads, "We would like to request the transcript

14  binders so we can each have a copy to review, signed by the

15  foreperson, who is juror no. 1, Ms. Demrovsky.

16          I understand that the parties have provided the jury

17  with one binder.  Is there any objection to providing the jury

18  with the other eleven binders?

19          MR. HANEY:  We have none.

20          MR. MOORE:  No, your Honor.

21          MR. MARK:  No, your Honor.

22          THE COURT:  So as soon as that can be put together,

23  take it back in to the jury.

24          How much do you think that would take?

25          MR. SOLOWIEJCZYK:  Fifteen minutes at most.  We're

J569DAW6

1    just checking them over because, as you remember, there were a

2    couple that had missing exhibits.  We want to make sure they're

3    all complete.

4              THE COURT:  Even if you don't have like eleven, get in

5    as many as you can and then we can fix the ones that need

6    fixing.

7              MR. CHANEY:  Do they have the defense transcripts in

8    there as well?

9              MR. SOLOWIEJCZYK:  Defense is asking that their

10   transcripts be sent back there.

11             THE COURT:  If we have copies of your transcripts

12   obviously they should go back there as well.

13             MR. MOORE:  Yes, sir.

14             THE COURT:  And if you don't have copies, I'm sure

15   that the government will be more than happy to help you out

16   with their facilities.

17             MR. SOLOWIEJCZYK:  We're going to make copies for

18   them.

19             MR. MOORE:  The government has them and so they've

20   agreed to make copies.

21             THE COURT:  So then I don't think there's -- there's

22   certainly no need to bring them out.

23             MR. SOLOWIEJCZYK:  No.

24             MR. MOORE:  Correct.

25             THE COURT:  So I will leave it to the parties to

J569DAW6

 1    promptly pull together those materials and get it back to the

 2    jury.  OK.

 3              Again, I think it's the better practice to have the

 4    defendants here for any jury notes.  They can be very

 5    substantive and I wouldn't want any objection later on.  OK,

 6    folks.

 7              (Recess pending verdict)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J56HDaw7

1           (Jury not present)

2           THE COURT:  OK.  We have a court reporter.  I'm going

3   to bring the jury out, and I'm just going to tell them my

4   understanding is that they want to stay until 5:00 tomorrow,

5   but I'll confirm that.  I'll let them know that we're here at

6   their pleasure and remind them again not to talk about the case

7   once they leave and not to deliberate until all 12 are in the

8   room.

9           MR. BOONE:  Your Honor, just one sort of question for

10  tomorrow.  Is your plan to have the jury report and immediately

11  start deliberating?  What time -- do the attorneys need to be

12  here at a certain time?

13          THE COURT:  9:30.

14          MR. BOONE:  In the courtroom or just available or five

15  minutes away?

16          THE COURT:  Yes.

17          MR. BOONE:  OK.

18          (Jury present)

19          THE COURT:  Everyone, please be seated.

20          Ladies and gentlemen, I'm not going to keep you long.

21  The purpose for my bringing you out was just to give you some

22  instructions, just so that we all know where we are.

23          As I understand it, you all will be coming back

24  tomorrow morning at 9:30.  Please be on time.  However, you

25  cannot begin deliberations until all 12 of you are in the room,

J56HDaw7

1   so do bear that in mind.  You should still also bear in mind

2   the fact that you should not discuss the case once you're out

3   of the jury room with anyone and you should not read anything

4   about the case should you come across it or watch anything

5   about the case should you come across that in the media.

6          Tomorrow we will have lunch for you, so there will be

7   breakfast in the morning, and then lunch will be brought at

8   around 12:00 or 12:30 so you don't have to make plans to do

9   that.  That way you're able to work through the day.

10          I do have your note.  I will read it.  We will not

11   discuss it in your presence, however.  So when I read it, you

12   may leave.  I am also told that you are willing to work

13   tomorrow until 5 o'clock.

14          JUROR:  4:30.

15          THE COURT:  4:30?  I just want to make sure I do have

16   the lawyers.  4:00?

17          JUROR:  4:30.

18          THE COURT:  4:30.

19          OK.  I have your note.  It will be marked Court

20   Exhibit No. 2.  It was handed to Ms. Rivera by your foreperson,

21   Ms. Demrovsky.  However, it's not signed by Ms. Demrovsky.  I

22   will read it and then I will excuse you.

23          "Can a university be deprived of the honest services

24   of a coach if the university expected or was willfully ignorant

25   that the coach would violate NCAA rules or the employment

J56HDaw7

1   agreement in performance of their duties?"

2          We will have an answer for you tomorrow, or as best of

3   an answer as we can provide.  And when we do, we will either

4   bring you out to give you the answer or we will provide the

5   answer in writing, OK?

6          Until then, safe home.  Don't discuss the case until

7   you're all 12 in the room.  Have a very good night.

8          (Jury not present)

9          THE COURT:  Everyone can be seated.

10          We will get you a copy of this.  I would ask that the

11   parties discuss it, try to come up with a response on consent

12   this evening, if possible.  If not, then be here at the usual

13   9 o'clock tomorrow morning, OK, with your proposed answer.

14          MR. MOORE:  Yes, sir.

15          THE COURT:  So we'll get you a copy of this.  If there

16   is consent, please email it to my chambers this evening.  Until

17   then -- actually, you can be seated.

18          Mr. Moore, are you going to be with us?

19          MR. MOORE:  I'm not, your Honor.  I'm leaving this

20   evening.

21          THE COURT:  Well, safe travels, and you are welcome to

22   *pro hac vice* here anytime.

23          MR. MOORE:  Thank you, your Honor.  It's been a

24   pleasure being in your courtroom.

25          (Adjourned to May 7, 2019, at 9:00 a.m.)