J579DAW1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

         v.                              17 CR 684 (ER)

CHRISTIAN DAWKINS AND MERL
CODE,

            Defendants.
------------------------------x

                           New York, N.Y.
                           May 7, 2019
                           9:00 a.m.

Before:

                  HON. EDGARDO RAMOS

                           District Judge

                    APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
ROBERT L. BOONE
NOAH D. SOLOWIEJCZYK
ELI J. MARK
     Assistant United States Attorneys

HANEY LAW GROUP PLLC
     Attorney for Defendant Dawkins
BY:  STEVEN A. HANEY

CHANEY LEGAL SERVICES, LLC
BY:  DAVID A. CHANEY, JR.
             -and-
NEXSEN PRUET, LLC
BY:  ANDREW A. MATHIAS
     Attorneys for Defendant Code

ALSO PRESENT:  JOHN VOURDERIS, Special Agent FBI
YOLANDA BUSTILLO, Paralegal Specialist USAO
EMILY GOLDMAN, Paralegal Specialist USAO

J579DAW1

1          (Jury not present)

2          THE COURT:  OK, folks.  Is everyone here that we're

3    expecting?

4          MR. MARK:  Yes, your Honor.

5          MR. CHANEY:  Yes, sir.

6          THE COURT:  I received the parties' responses or

7    proposed instruction response to the jury's question which, as

8    I understand it, is:  Can the university be deprived of the

9    honest services of a coach if it knew or should have known that

10   the coach violated NCAA rules or their contract.

11         The government's submission asks me to instruct the

12   jury that it is irrelevant if the university itself was

13   negligent or gullable.  And the defense points out correctly, I

14   think, that that's not really responsive to the jury's request;

15   the jury is not asking should the university have done more;

16   the jury is asking if the university knew it was defrauded.

17         So, Mr. Mark.

18         MR. MARK:  Your Honor, the reason we requested for

19   those additional instructions is I think the defense sort of

20   misreads the note in the most helpful fashion for themselves.

21         First, the note, as your Honor probably recognizes, it

22   uses a legal term that was not at issue at all in the jury

23   instructions, the arguments of counsel or anybody else,

24   "willfully ignorant," which actually is a more complicated

25   legal term.

J579DAW1

1        The crux of the note is really, as it says, is whether

2    a university can be deprived of the coaches' honest services if

3    they knew or if they were expecting the coach was willfully

4    violated NCAA rules -- broadly, right -- or violated their

5    employment agreement, broadly.  These are very broad terms.

6        The defense sort of interprets that as knew about the

7    alleged conduct here, which would be concealed bribes.  There's

8    absolutely no record evidence at all in this case about the

9    universities knowing, under whatever level of knowledge you

10   want about concealed bribes.  The defense obviously contested

11   those are bribes.  But to the extent that, as we argue, they

12   are bribes, there is no evidence at all to support knowledge of

13   the universities.

14       So the question really is, is -- they're trying to say

15   that they -- the question is about the alleged conduct here but

16   that's not what note says.  It's just about violations of NCAA

17   rules.  And the short answer to that, candidly, is, yes,

18   clearly they can -- the university can.  They read it as no but

19   yes.

20            THE COURT:  Yes what?

21            MR. MARK:  Yes, a university can be deprived of its

22   honest services even if they expect or willfully knew that a

23   coach would violate the NCAA rules or their employment

24   agreement.

25            THE COURT:  So why can't we just tell the jury that?

J579DAW1

1           MR. MARK:  Your Honor, I think we can just tell them

2    just that short answer and probably we can just refer them back

3    to your instructions that define that element as well.

4           We proposed this additional instruction just to try to

5    be a little more responsive to what was going on there.  But I

6    think then we can just go with the short answer; just yes, and

7    sort of stem off this sort of side issue that there is no

8    record evidence.

9           THE COURT:  Actually let me ask about that.  Is there

10   no record evidence that the universities knew or did not know?

11          MR. MARK:  About what is charged here?  We're talking

12   about the bribes?

13          There's no record evidence that the universities knew

14   about the bribes here.  To the contrary, obviously there's

15   plenty of evidence the defendants took elaborate steps to try

16   to conceal this evidence.

17          THE COURT:  Before the defense stands up, what about

18   the testimony concerning -- I don't know whether it was Wade or

19   Miller and the things that they were making.  Assuming that

20   that's true, assuming that that -- that's before the jury, how

21   do we -- what am I to make of that?

22          MR. MARK:  You're to make of that two things.  One,

23   payments to players are a little bit separate; two is whether

24   that individual actually stands for the university is a

25   complicated issue.  This actually was very heavily litigated in

J579DAW1

the Gatto case, right, which is when a particular individual,

an authorized representative of the university, as relevant to

whether that university can be defrauded.  That was the subject

of significant instructions in the Gatto case.  And goes to

essentially whether that individual is unconflicted.  There's a

multipart test United States v. D'Amato, a Second Circuit case,

that goes to whether an unconflicted representative -- whether

that representative here, you know, say Sean Miller; in the

Gatto case, say Rick Pitino, the head coach of Louisville

really is somebody who is unconflicted.  And we probably

suggest that we don't go sort of down that path because that

really isn't at issue here.  And if we do -- I mean we can

obviously propose language to your Honor that would be taken

from D'Amato and taken from Judge Kaplan's charge in Gatto that

could layout that.

MR. HANEY:  Your Honor, I'm going to go first and then

Mr. Allen wants to speak as well -- Mr. Chaney, I'm sorry.

The jury is doing what the jury should be doing.  The

jury is engaging in discourse.  They are a smart jury, as the

Court has noted.  They have a lot of experience, I believe, in

the athletic space in terms of what their general knowledge is

of what these schools do.

Obviously, they're having conversation right now about

what they know to be the willful ignorance and the plausible

deniability of these schools that are making hundreds of

J579DAW1

1    millions of dollars off of this type of conduct.  And they are

2    asking a very legitimate question that has nothing to do with

3    gullibility.  They're asking question -- I believe they're

4    having a conversation about whether or not these schools should

5    be perceived as a victim in some manner because they are being

6    willfully ignorant to the conduct that the coaches are engaged

7    in, which is bringing in elite level recruits so they can make

8    hundreds of millions of dollars at the university.

9            So I would ask the Court allow them to talk this

10   through the themselves.  They are a smart jury.  They have the

11   instructions.  They have the law.  They have their facts.  The

12   athletic -- associate athletic director from South Carolina, he

13   testified, part of compliance, his job, his job and being with

14   the NCAA is to monitor these coaches, monitor their cellphones,

15   read their text messages during the live recruiting period.

16           So I think they're having the conversation that they

17   should have and that a jury should engage in as they're

18   deliberating.  And the government wants to use perhaps what

19   happened at the Gatto case or try to narrow that conversation

20   and not allow them to have that more global discourse of

21   whether or not these schools could somehow be defrauded when

22   some of them don't feel that they can based on what their

23   understanding is.

24           THE COURT:  Mr. Haney, you just engaged in 98 percent

25   speculation as to what the jury is discussing, what they are

J579DAW1

1    considering and you suggested that they should be allowed to

2    decide this case based on evidence not in the case.

3           So my question to you is why isn't the answer to their

4    precise question:  Yes, the university can be defrauded even if

5    at the very highest levels of the university they knew or

6    suspected that their coaches weren't following NCAA rules?

7           MR. CHANEY:  Your Honor, I think the case law cited in

8    our proposed answer comes out exactly simply the answer is no,

9    they cannot be defrauded.  To be defrauded means you've been

10   deceived.  If you get exactly what you expected you have not

11   been defrauded.  And the case law is pretty clear on that.  And

12   that really just comports with common sense as well.  How

13   can -- and the jury -- and this precisely the point that the

14   jury is asking about.  If we believe that a university got from

15   their employees exactly what they expected to get from their

16   employees, have they been the victims of a fraud?

17          THE COURT:  Yeah, but the question for me in my mind

18   that I'm trying to work through is:  The university is the

19   university.  And individuals, no matter how high they may be up

20   in the university, are not the university.  So let's say, for

21   example, to put it in its starkest terms, which is what I'm

22   trying to do.  If the president of the university, whether it's

23   Arizona or USC or South Carolina -- this is just by way of

24   hypothetical, I'm not suggesting that this happened -- if the

25   president of the university or the head coach of the university

J579DAW1

when they hired Mr. Richardson or Mr. Bland, etc., said to

them:  Look, you're going to have to sign these contracts,

these employment agreements, that say you can't violate these

rules.  But you know and I know that what you need to do is

that you make sure to identify and recruit and land the very

best high school students to come to our university.  Even if

that happened, isn't the university itself defrauded?

         MR. CHANEY:  I don't know what the entity the

university is outside of the people that it's composed of.  So

to the degree that the case law routinely sort of discusses an

employer/employee relationship and whether or not the employer,

generally speaking, received what it expected from its employee

or not what it expected from its employee, and whether or not

that sort of failure of expectation was the result of fraud or

deceit I think is directly relevant -- I'm sure directly at

issue in this case.  The Court -- I'm sorry, Mr. Haney properly

pointed out the testimony of Chance Miller who was in charge

with -- in charge of overseeing, sort of broadly speaking, NCAA

compliance at the University of South Carolina.  The evidence

came out that he was monitoring cellphones, exactly the same

way that the FBI was monitoring cellphones.  So, presumably,

the jury has heard information that the same text messages,

phonecalls, information that was presented to this jury by the

government was also available to Chance Miller.  And they all

heard testimony that Chance Miller did nothing about it, that

J579DAW1

1    he never alerted the NCAA or the FBI about potential recruiting

2    violations.

3            THE COURT:  Except that you're jumping to a conclusion

4    there that Mr. Miller did overhear potential violations of NCAA

5    rules.

6            MR. CHANEY:  I'm simply pointing out that the jury is

7    able not just to hear direct facts and use those but all

8    reasonable inferences drawn therefrom and I think a reasonable

9    inference from Mr. Miller's testimony is that he received

10   information of recruiting violations and rather than bring it

11   to anybody's attention, I think based on the question, the jury

12   is saying well did -- was he receiving, was the University of

13   South Carolina in the case of Lamont Evans receiving exactly

14   what they expected from their employee?  And if that's the

15   case, they simply have not been defrauded.

16           MR. MARK:  I mean Mr. Chaney's reasonable inference

17   based on Mr. Miller's testimony is actually rank speculation,

18   completely contrary to his testimony.

19           THE COURT:  Let's just say that Miller did overhear

20   something.

21           MR. MARK:  OK.  Let's say that Miller did.  This is

22   then, once again, I want to try to take us back to the note a

23   little bit, like which is, it says let's say Miller is

24   monitoring phonecalls.  Continue with our hypothetical, right.

25   And one of the things they monitor phonecalls is for contacts

J579DAW1

between coaches and recruits.  We've heard testimony that it's

one of the things that universities do, right, because

Mr. Dawkins talked about how he tried to avoid that detection.

          And let's say there's a violation of those rules,

right.  So the university knows that there's contact between

the university through, you know, a representative like Chance

Miller knows that there's contact between a recruit and a

coach.  The rules are being violated, right.  NCAA rules are

being violated.

          Can they be deprived of their honest services by a

concealed bribe?  Yes.  They can.  End of story.  Like we don't

need to go along these expansive hypotheticals.  That answer

clearly is yes, they can.  And that's the problem with this

sort of broad view of like a violation of NCAA rules.  So

that's one thing.

          Then too, to your hypothetical of:  Well what if

Mr. Miller, compliance officer, knew, completely contrary to

his testimony which said he didn't know, and that person would

have been fired.  Continuing along that way.  Then the question

becomes:  Is he an actual agent of the university?  That

question is:  Is he unconflicted?  Are his interests completely

aligned with the university?  And there it would be definitely:

No, he isn't.  So that even if we go along that hypothetical we

still, you know, the defense's requested answer still falls.

          THE COURT:  What about if it's the head coach of

J579DAW1

1    Nevada?

2              MR. MARK:  Same answer, your Honor.

3              THE COURT:  What about the president of Nevada?

4              MR. MARK:  I think it would largely -- corporate

5    forums differ a bit.  A lot of these schools, it's not in

6    evidence, have boards.  So there is no evidence about

7    presidents knowing or boards know.  I'm not a corporate lawyer

8    but I think it would probably then go a little bit to the

9    corporate forum and whether that person is sufficiently high up

10   such they're aligned with the university and they're

11   unconflicted.

12             THE COURT:  I think that's right.  I think -- which is

13   why putting the hypothetical as I did, which, again, I just

14   want to sort of get to the bottom of this, even if the

15   president knew and engaged in activity that violated rules and

16   hired someone with that understanding that that individual

17   would not only flout those rules but use -- otherwise meet the

18   evidence of the federal bribery statute or honest services

19   fraud statute, I think the president's hiring of that

20   individual does not absolve the individual.

21             MR. MARK:  Yes, your Honor.

22             THE COURT:  Mr. Chaney or Mr. Haney.

23             MR. CHANEY:  Your Honor, I -- that seems to defy what

24   it means to be the victim of a fraud.  Reading from Finnerty,

25   if consumers in that case are getting exactly what they expect,

J579DAW1

1    then the conduct is neither deceptive nor fraudulent.

2              Reading from the Court's own jury charges, the

3    employer is not -- thus, the employer is not receiving what it

4    expects and is entitled to, namely, the right of the employee's

5    honest and faithful services, once again coming back to what

6    the employer expected, and that the crux of the bribe being

7    them receiving not what they expected but something they did

8    not expect.

9              THE COURT:  That's precisely the point, right.  It

10   begs the question:  Who is the employer?  If I own a business

11   and it's my business personally and I hire someone and I

12   understand that my employee is doing something that he or she

13   ought not do and that in some way benefits my company but in

14   some way is deceptive and in a way that would fit within the

15   definition of honest services fraud, I can't then, as an

16   individual, then cry foul, right?

17             But if you're a corporation and the CEO is the

18   employer or the ultimate person in charge of the organization

19   or the executive in charge of the organization, and the CEO

20   knows that activity is taking place that violates the various

21   statutes that are at play here, is it a defense that the CEO

22   knew what I was doing?

23             MR. CHANEY:  So I think there's two -- there's two

24   separate elements of the fraud charge that are at issue here.

25   And one that has not been discussed is the specific intent to

J579DAW1

1    defraud.  And so I think -- the common understanding of what it

2    means to deceive a university, to deprive them of what they

3    expected, the common lay understanding of what that would be

4    would come into play when we're assessing somebody's specific

5    intent.  If the information available to the actors, to the

6    defendants in this case, is that universities expected these

7    coaches to engage in sort of rampant NCAA violations and that

8    they would, in fact, be fired if they did not violate NCAA

9    rules in the recruiting practice insofar as they would not be

10   getting players, then those defendants could not, under that

11   understanding, engage in a scheme to defraud the university

12   because what they're -- the conduct they're engaging in is

13   giving the universities' employees that are behaving exactly as

14   the universities expected.  So the sort of agent who can speak

15   for the university sort of rabbit hole that we're going down I

16   think is not necessarily -- I think the common, the lay

17   understanding of what it means for the university to get

18   exactly what they expected, exactly what they intended to get

19   out of their employees, in this case their basketball coaches,

20   is what the jury is asking about.  And I think that the

21   defense's answer that puts basically the fact that if an

22   employer is receiving exactly what it expected from its

23   employees it's not been defrauded is the simplest and most

24   direct answer to the jury's question.

25               To the degree that there is a complete lack of

J579DAW1

1  consensus and both parties believe that the Court has read the

2  applicable law already to the jury in terms of their decision

3  in this case, then I think our alternate proposed answer would

4  simply be for the Court to tell the jury that they have

5  received all of the law applicable in this case and that they

6  are to use their reason and common sense in coming to a

7  decision.

8          MR. HANEY:  Your Honor, I would add too that defining

9  who is the university is a very difficult thing to do, as we've

10  just noted.  The government hasn't done it.  We haven't done

11  it.  I don't think anyone has really defined who is the

12  university.  Is it the president?  Is it the head basketball

13  coach?  I don't believe we're going to be able to accomplish

14  that at this juncture.

15          But certainly the difference between being gullable

16  and being willfully ignorant, I would submit are completely two

17  different things.  The question the jury is asking, without

18  getting lost in the woods here, is whether the university can

19  be defrauded if they're willfully ignorant.

20          And we're not going to define who the university is.

21  That's not something we can accomplish right now.  Certainly we

22  as a group can understand the difference between a jury asking

23  about willful ignorance and then trying to muddy the waters by

24  saying maybe they meant gullibility.

25          THE COURT:  I agree with that.

J579DAW1

1          MR. HANEY:  Thank you, your Honor.

2          MR. MARK:  Your Honor, I think in light of this

3    conversation, I think what our proposal would be is a short

4    answer of yes and then a referral back to the jury instructions

5    here on the first element of a scheme to defraud, which is

6    defined over the course of four pages.  So I think that would

7    probably answer them, their direct question and refocus them on

8    the jury instructions that they have.

9          MR. HANEY:  We would agree a hundred percent but say

10   no and refer them exactly in the manner Mr. Mark suggested.

11         THE COURT:  Except I think that's wrong as a matter of

12   law.

13         MR. HANEY:  Thank you.

14         MR. CHANEY:  They're not asking who the university is.

15   They're assuming that it is the university, whatever it is,

16   whatever the entity the university is, which is the alleged

17   victim in this case, the victim of the fraud.

18         Their question presumes -- assumes that that

19   university, whatever that entity is, is what expected this

20   conduct from their -- they're not asking the Court the question

21   that we've been arguing about.  They're assuming that the

22   answer -- they're assuming that the knowledge, the willful

23   ignorance is on the part of whatever the entity university is.

24   And so I think because that's the case the answer is no, they

25   cannot be defrauded if they expected this conduct from their

J579DAW1

1    employer.

2              THE COURT:  Mr. Mark.

3              MR. MARK:  I mean I think Mr. Chaney just said he

4    assumed what the question is and then assuming what the

5    question is wanted to give an answer that's beneficial to him.

6    I think we should respond to the actual note and what it says.

7              MR. CHANEY:  I can read it into the record if Mr. Mark

8    thinks I'm mischaracterizing it.

9              THE COURT:  No need.

10             You had an alternate approach, Mr. Chaney?

11             MR. CHANEY:  Yes, your Honor.  I think that to the

12   degree that the parties, one proposes the answer is yes and the

13   other proposes the answer is no, and so that the appellate

14   record is clear our proposed answer is what we submitted to the

15   Court, but if the Court is unwilling to give our proposed

16   answer, I think it would also be appropriate for the Court

17   simply to instruct the jury that they have received all of the

18   law that is applicable to this case and it is for them to use

19   their reason and common sense in applying that law to the facts

20   as they have received them.

21             THE COURT:  What about the idea that there is no

22   record evidence in this case about what the universities knew

23   or did not know?

24             MR. CHANEY:  Your Honor there is -- I think there's

25   two broad lines of testimony that the jury has received that

J579DAW1

1    they could be relying upon in asking this question.  One sort

2    of broad category are the several references to Sean Miller at

3    the University of Arizona as a head coach, whether or not he

4    was part of it, whether or not he was Book Richardson's boss,

5    his superior, sort of kind of -- whether or not he's the

6    university or not.  They could be talking about it that way.

7    And that would be sort of one broad category of testimony they

8    could be relying upon for going down this line of questioning.

9            I think the other would be the testimony of Chance

10   Miller insofar as he testified about his role at the University

11   of South Carolina in ensuring compliance, particularly for NCAA

12   men's basketball at the University of South Carolina.

13           He testified to the various ways in which he, while at

14   the University of South Carolina monitored the compliance with

15   NCAA rules by their college basketball coaches which would have

16   included Lamont Evans, that included listening to phonecalls,

17   reviewing text messages, and included checking their vehicles,

18   their houses, making sure that they weren't contacting recruits

19   during dead periods.  And so because Mr. Miller testified that

20   he would have been reviewing in real time the contact that

21   Mr. Evans was having with recruits, including on the phone,

22   which would have overlapped with the time of PJ Dozier, it all

23   overlaps with the evidence they heard in this case about these

24   defendants, then they -- and it's true.  He testified that he

25   didn't know that Lamont Evans was doing this with PJ Dozier.  I

J579DAW1

1    would submit to the Court that that was a fairly self-serving

2    declaration by Mr. Miller and the jury would be free to reject

3    that claim by Mr. Miller if they believed that the facts did

4    not support it.

5          MR. MARK:  I don't really necessarily think it's

6    productive for me to sort of get into an argument about what

7    Chance Miller said or didn't say but, just briefly, I don't

8    think there's any record evidence that he was -- had a wiretap

9    on Mr. Evans' phone or was reviewing in real time his calls or

10   his text messages.

11         I think to the extent your Honor is considering an

12   instruction that talks about them, to focus them on the

13   evidence, I think given this nature of this question, I think

14   it's also important to refocus them on that their obligations

15   are to disregard anything you may have seen or heard about this

16   case outside the courtroom.  That's not evidence.  And so a lot

17   of I think what Mr. Haney was arguing earlier about how to

18   interpret this note really goes into the things of I think his

19   interpretation based on his knowledge, his experience about

20   college basketball.  And we obviously --

21         THE COURT:  And arguments that were made.

22         MR. MARK:  Also arguments that were made.

23         And we have a jury.  We all sort of understood that we

24   have a jury with a number of jurors who do have some

25   experience.  And they all said they were going to be able to

J579DAW1

set that aside, their views of the NCAA rules, their own

experience, and evaluate this case based on the evidence

presented.

So to the extent your Honor is considering a note that

sort of deals with some of that, I would also request that it

encourage the jury and refocus them just to consider their --

in evaluating their determinations just by the evidence here in

this court and arguments that were made.

MR. HANEY:  I would just briefly add there was record

evidence that the head coach at the University of Arizona was

not just aware but was complicit in much of what was occurring

at Arizona with respect to paying players and violating NCAA

rules which then turns us back to:  Who is the university?

Now I'm not suggesting that Sean Miller is the

University of Arizona by any means.  But this was not a case

about some fraud going on at the chemistry lab.  This is a case

that was about basketball at Arizona and he was the leader of

that particular portion of the university.  Certainly, he was

not willfully ignorant.  He was an active participant in much

of the conduct that there is a lot of record evidence that

exists in the case.

I just would ask that the Court, as Mr. Chaney noted,

let the jury figure this out.  They're a smart jury.  They have

the rules.  They have the instructions and they listened very

intently to the case and they are very familiar with the facts

J579DAW1

1    of the case.

2          But, again, I don't think we can narrowly define to

3    the government's satisfaction that the university in no manner

4    could include those that there's record evidence were complicit

5    in everything that happened in this case including the head

6    basketball coach.

7          Thank you.

8          MR. MARK:  Just since Mr. Haney brought up Sean

9    Miller.  As we talked about and I think as he acknowledged,

10   Mr. Sean Miller is not the university here.  So sort of going

11   down that road obviously then puts into play a whole host of

12   other things about who is the university and when can an agent

13   bind the university.

14         We're not proposing that language here because we

15   don't really think that this is responsive or really the crux

16   of what the jury is looking at.

17         But, as I said, if your Honor thinks that's something

18   that you want, we obviously can propose language to that

19   effect.

20         THE COURT:  OK.  So I guess what I am at this juncture

21   intending to do is to instruct them as Mr. Chaney's alternate

22   recommendation, that you have received all the law applicable

23   to this case and it is for you to apply that law to the facts

24   as you determine them to be.  And I think I might also say that

25   they should base this case based on the evidence that's been

J579DAW1

1    presented at trial.

2             MR. HANEY:  Seems fair, your Honor.  Thank you.

3             MR. MARK:  I mean, your Honor, I don't disagree that

4    the substance is accurate but remember how we sort of started

5    this is like we were trying to be responsive to the question.

6    That's not actually responsive to the question.  So we would

7    encourage your Honor to respond to the question yes, and then

8    we can add on the additional language that Mr. Chaney has

9    proposed with your Honor's modifications.  I think that would

10   both answer the direct question and refocus them on the

11   particular law that they're supposed to apply and the evidence

12   that they're supposed to consider, which is really their

13   obligations here.  So we can respond to the question and then

14   refocus them on the law and the evidence.  We would propose

15   that -- that would be the best course, your Honor.

16            MR. CHANEY:  Your Honor, this question does not ask

17   who the university is.  If we take that question out, who is

18   the university, and simply answer the question that they ask,

19   the answer is no.  Straightforward.  The answer is no.

20            And so to the degree that Mr. Mark and I disagree 180

21   degrees about what the answer is, I don't think it would be

22   appropriate for the Court to use the defense's alternate

23   instruction and then append either to the front or the back

24   Mr. Mark's conclusion.

25            MR. MARK:  Your Honor, I think the fact of the matter

J579DAW1

1    is -- I mean I know we're going to keep disagreeing about the

2    answer.  The way they propose their short answer is the

3    particular conduct alleged in the indictment.  So their

4    particular focus of their answer is not on the question.

5             But putting that aside, as I think we've already made

6    our point, like the answer is yes.  So we would propose that

7    there is a simple short answer to this, that we answer them

8    that way, and then if they have more notes we can try to

9    respond to the additional notes as necessary.

10            THE COURT:  I have to say, Mr. Chaney, I disagree with

11   your reading of the note.  I think the answer to the question

12   is clearly yes.  Obviously, the university can only make

13   determinations and engage in expectations through the

14   individuals that run the university.  And that doesn't mean

15   that the individuals who engage in wrongdoing are thereafter

16   free to do what they want.  I mean it's -- I mean I know that

17   this sounds familiar but it's not as if -- if the president

18   say, of the university, were to say -- were to tell someone to

19   do something, it doesn't become legal because the president

20   tells them to do it.  So I do think the straight answer is yes.

21   And the university itself can notwithstanding buy in at the

22   very highest levels of the university be defrauded.

23            Give me five minutes.

24            (Recess)

25            THE COURT:  So this is what I'm going to do.  I'm

J579DAW1

1      going to give the alternate version suggested by Mr. Chaney and

2      indicate to them that obviously they are required to decide

3      this case based solely on the evidence that's been presented

4      here at trial without telling them yes or no.  And if they want

5      any further explanation, they are actually quite prolific.

6      We've got another two notes.  Neither substantive.  They'll let

7      us know.

8                  MR. HANEY:  Thank you, your Honor.

9                  THE COURT:  And they want an answer now.  So we're

10     going to bring them out.

11                 So the other two notes which I'll read into the record

12     is one they want white board markers and they want to know when

13     we're going to give them an answer to yesterday's note.

14                 MR. CHANEY:  It's been eating at them all night.

15                 MR. MARK:  Your Honor, I know this is probably a lost

16     cause but I always think particularly at the beginning of a

17     trial sort of tough when we don't sort of directly respond to

18     their note and this is clearly a hypothetical note.  I mean it

19     starts out "can something" and --

20                 (Jury present)

21                 THE COURT:  Everyone please be seated.

22                 Good morning, ladies and gentlemen.  I trust you all

23     had a pleasant evening.

24                 We have received your two notes from this morning.  Be

25     assured that we are working on getting you those markers and we

J579DAW1

1    are going to answer your question from yesterday now.  I

2    discussed this with the parties and it this is what the Court

3    has determined to provide you.

4              And it is this:  You have received all law applicable

5    and it is for you to apply that law to the facts as you have

6    determined them to be and in that regard you are also reminded

7    that you are to decide this case based solely on the evidence

8    or lack of evidence that was presented to you during the course

9    of the trial.

10             OK.  If you have any subsequent questions we'll be

11   happy to address them as soon as possible.

12             All rise.

13             I apologize that we don't have an escort.

14             (Jury not present)

15             THE COURT:  OK.  Be available.  I think we're going to

16   get some more notes.

17             (Recess pending verdict)

18             (In open court; jury not present; time noted:  4:25)

19             THE COURT:  I have another note.  It reads as follows.

20   We have a hard stop of 4:40 including coming back into the

21   courtroom.  It is unlikely that we will reach a verdict today

22   so an alternate needs to be called.

23             OK.  So let's bring out Mr. Stix in the first

24   instance.

25             Court Exhibit 5?

J579DAW1

1           THE DEPUTY CLERK:  Yes.

2           MR. MARK:  Your Honor, I just thought of one thing and

3   I don't know, and I haven't researched this issue at all, but

4   I'm just going to raise one thing to you which is I know that

5   now we're going to be down to one alternate.  I've never had a

6   situation where an alternate was excused for a brief travel

7   period.  But I'm just wondering --

8           (Juror present)

9           THE COURT:  Mr. Stix, could you please step forward

10  and sit in seat number one here, OK.

11          JUROR:  OK.

12          THE COURT:  Everyone can be seated.

13          Mr. Stix, we've been made aware that you have some

14  travel plans that are -- that you've made some time ago; is

15  that correct?

16          JUROR:  Yes.

17          THE COURT:  And I take it that you are not able to

18  change these plans?

19          JUROR:  No, I am not.

20          THE COURT:  So, Mr. Stix, we're going to have to

21  excuse you.  I'm very, very sorry that you're not going to be

22  able to complete this process.  I know that I've been watching

23  you.  You've been paying a great deal of attention and I'm sure

24  that you would have wanted to go through with this if you

25  could.  So I want to thank you on behalf of the parties for

J579DAW1

1    your service and you are excused.

2              JUROR:  Thank you.

3              (Juror excused)

4              MR. MARK:  Your Honor, just before he --

5              THE COURT:  OK.  Jazmin.

6              MR. MARK:  Your Honor, can we just have a brief

7    sidebar.

8              THE COURT:  Don't bring him out just yet.

9              MR. MARK:  I just want to put this on the record right

10   now which is that I know we're down -- going to be down to one

11   alternate and I know the jurors collectively had an expectation

12   of two weeks and I don't know if we're going to run into other

13   people's plans that are sort of immoveable.

14             What I wanted to raise, and I don't know what

15   defense's position is on this and I've never had this come up

16   which is, obviously, he's only to be excused for his

17   unavailability for a prior travel arrangement.  But I wonder --

18   and I've never had this happen before -- which is whether if he

19   essentially can sort of be as a standby alternate if we have

20   problems with -- as I said, I haven't researched this and it

21   was just something that we were thinking about if that came up

22   to the situation.

23             THE COURT:  The answer is no.  OK.

24             So let's -- so what I'm going to do is I'm simply

25   going to tell the jury that Mr. Stix has been replaced.  He'll

J579DAW1

```
1    be replaced by juror no. one.  We're going to contact her.
2    Hopefully she'll be here tomorrow morning.  I would expect all
3    of them to be here tomorrow morning by 9:30 but they should not
4    begin deliberations until she is in the room and that
5    deliberations start essentially from the beginning.  OK.  Let's
6    bring them out.
7              Mr. Stix has a question as to whether he is free to
8    discuss the case with his wife and family.  My instinct is to
9    tell him no until we contact him and let him know that the case
10   is finally over.
11             MR. MARK:  We think that's the best course, your
12   Honor.
13             MR. HANEY:  That's fine, your Honor.
14             MR. CHANEY:  I don't have a position.
15             THE COURT:  OK.  So we can bring him out also.  So he
16   can come out with the rest of the jury.
17             Since he has deliberated with the jury there is a
18   substantial -- well, it may be the case that if he discusses
19   it, it may get out and people will know where the jury stands.
20             (Jury present)
21             THE COURT:  Everyone be seated.
22             Ladies and gentlemen, I do have another note from the
23   jury.  It reads as follows.  How do we treat our deliberations
24   in light of the alternate juror coming in?
25             Excellent question.
```

J579DAW1

1          First of all, to answer Mr. Stix's question that he

2     put to us through Ms. Rivera.  Mr. Stix, I will direct you

3     not -- to continue not to discuss this case even with your

4     family or with your wife until you have been advised by us that

5     it is finally complete.  The fear is that there is a risk that

6     if you do discuss it, it may get out and individuals other than

7     the jury may find out how the jury stands.  So I would ask and

8     I will direct you to continue to abide my instructions not to

9     discuss the case.

10          With respect to the balance of the jurors, an

11    alternate will be called.  Hopefully she will be here and will

12    be able to join us by no later than 9:30.  I will ask you to be

13    here by 9:30.  However, you may not deliberate until the

14    alternate arrives.  And once the alternate arrives you are to

15    treat deliberations as though they are beginning from the

16    start.  OK.  Now, obviously, you've all had discussions but you

17    will treat the alternate juror as, obviously, a full juror and

18    treat the discussions as though they are at the beginning.  OK.

19          And with that, I am mindful of your hard stop.  So

20    please have a wonderful evening.  Do not discuss the case.  Do

21    not read anything about the case.  And please try to get here

22    by 9:30 a.m. and we will make sure that we can get the

23    alternate here by 9:30 as well.

24          Have a wonderful evening.

25          (Jury not present)

J579DAW1

1            THE COURT:  OK.  Anything else?

2            MR. MARK:  No, your Honor.

3            MR. HANEY:  No, your Honor.

4            MR. CHANEY:  No, your Honor.

5            THE COURT:  Have a wonderful evening everyone.  We'll

6    get you copies of the notes.

7            (Adjourned to May 8, 2019)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25