## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA    :

   :

v.    :

   :    Case No. 17-cr-00684-ER

CHRISTIAN DAWKINS, and    :

MERL CODE,    :

   :

      Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### SENTENCING MEMORANDUM
### ON BEHALF OF MERL CODE

**NEXSEN PRUET, LLC**
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211

**OGLETREE DEAKINS NASH**
**SMOAK & STEWART, P.C.**
Merl F. Code
300 N Main St, Suite 500
Greenville, South Carolina 29601
(864) 271-1300

*Attorneys for Defendant Merl Code*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

APPLICABLE LAW ....................................................................................................... 4

THE APPROPRIATE SENTENCE ................................................................................. 8

    I.           CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A
                LENIENT SENTENCE.............................................................................. 8

        A.    Mr. Code's History and Character. .................................................. 8

        B.    The Nature and Circumstances of the Offense................................. 16

        C.    There is No Need to Protect the Public From Further Crimes. .......... 16

        D.    The Kinds of Sentences Available. .................................................. 17

        E.    In Order to Avoid Unwarranted Sentencing Disparities, a Non-Custodial
             Sentence is Appropriate. .................................................................. 17

        F.    A Non-Custodial Sentence is Sufficient to Deter Others.................. 18

        G.    There is No Need for Restitution. .................................................... 19

    II.          THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE......... 19

        A.    Mr. Code's Base Offense Level. ..................................................... 20

        B.    Minor Participant........................................................................... 20

        C.    Criminal History............................................................................ 20

        D.    Guidelines Range. .......................................................................... 22

    III.        THE PSR'S ASSERTION THAT THIS CASE IS NOT RELEVANT
                CONDUCT FOR PURPOSES OF § 1B1.3, § 5G13 CONCURRENT
                SENTENCING IS INCORRECT................................................................... 22

CONCLUSION.............................................................................................................. 22

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)..................................................................... 4

*Blakely v. Washington,* 124 S. Ct. 2531 (2004) ................................................................. 4

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................... 5, 19

*Rita v. United States*, 551 U.S. 338 (2007)....................................................................... 5

*United States v. Booker*, 125 S. Ct. 738 (2005) ............................................................ 1, 4

*United States v. Denardi*, 892 F.2d 269 (3d Cir. 1989) ................................................... 8

*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1998) ................................................. 7

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................................... 6

*United States v. Hampton*, 441 F.3d 284 (4th Cir. 2006) ............................................... 7

*United States v. Jaber*, 362 F. Supp. 2d 365 (D. Mass. 2005)........................................ 7

*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) ................................................... 7

*United States v. Quinteri*, 306 F.3d 1217 (2d Cir. 2002)................................................. 7

*United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wisc. 2005) .................................. 7

## <u>Statutes</u>

18 U.S.C. § 3553(a) ............................................................................... 1, 4, 5, 6, 17

18 U.S.C. § 3553(a)(2) ...................................................................................... 5

18 U.S.C. § 3553(a)(4) (Supp. 2004)................................................................. 4

18 U.S.C. § 3553(b)(1) ..................................................................................... 4

18 U.S.C. § 3582............................................................................................... 6

18 U.S.C. § 3661............................................................................................... 6

18 U.S.C. § 3742(e) .......................................................................................... 4

## <u>Other Authorities</u>

USSG § 5Hl ...................................................................................................... 6

USSG at §5C1.1 cmt. n.4................................................................................. 22

USSG § 1B1.3(a)(1).......................................................................................... 21

USSG § 4A1.2 Application Note 1 ................................................................... 21

USSG § 4A1.2(a)(1) ............................................................................................................... 20

USSG §3B1.2.......................................................................................................................... 20

Defendant Merl Code ("Mr. Code") respectfully submits this memorandum in advance of his October 4, 2019 sentencing, to provide information and aid the Court in fashioning a sentence that is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

## INTRODUCTION

The Court presided over the two-plus week trial in this matter, so the Court is familiar with the nature and circumstances of the offense for which Mr. Code will be sentenced. There is far more to Mr. Code as a person, however, than the evidence at trial revealed—and the 3553(a) factors require a focus not only on the offense, but also on the offender. For the reasons discussed below, Mr. Code respectfully requests that this Court impose a probationary sentence because any sentence within the advisory Guidelines range is – given the particular nature of both the offense and the offender – greater than necessary to comply with the statutory purposes of sentencing.

Mr. Code deserves both mercy and leniency. Because of his convictions in this case and in *United States v. Gatto et al.*, Case No. 17-cr-00686-LAK ("*Gatto*"), Mr. Code's career, at least with respect to college basketball, is finished. He is currently unemployed with a wife and two young children—including a 14-month-old infant son who had a very difficult entry into this world several months before Mr. Code was twice put on trial.  These cases have left Mr. Code financially devastated, his reputation significantly damaged, and without an ability to continue pursuing a career in the field he loves. No term of imprisonment is necessary to deter Mr. Code from committing crimes, nor is a term of imprisonment necessary to achieve a just punishment.

1

Mr. Code has an incredibly loving and supporting family. So supporting, as the Court is aware, that Mr. Code's father, who is an attorney, placed everything in his life "on hold" to assist in his son's representation. Mr. Code's wife, Candance, is the love of his life; and his two sons, Lleyton (age 8) and August (14 months), are his pride and joy. Candance, Lleyton, and August depend on Mr. Code to provide for them on a daily basis, both financially and emotionally. Moreover, because Lleyton and August are both in their formative years, they also depend on Mr. Code to play a primary role in their upbringing, guidance and development. To incarcerate Mr. Code at this stage of their lives would thrust upon his innocent sons the exact type of "extraordinary destruction" that the Second Circuit seeks to avoid.

Furthermore, numerous individuals have written letters to the Court on Mr. Code's behalf. As you will see, the writers of these letters plead for this Court's mercy and compassion as they describe the Merl Code they know as a man with impeccable family values, high integrity, and pristine character. Moreover, many of these letters attest to the substantial punishment that Mr. Code and his family have already suffered because of this case, while also detailing the sheer devastation that a prison sentence would have on his wife and children.

Finally, a probationary sentence would be consistent with the sentence received by Mr. Code's co-defendant, Anthony Bland ("Mr. Bland"), and would not be a substantial deviation from the 12 months and one day recommendation by the United States Probation Office ("USPO"). Mr. Code very much appreciates careful, thoughtful analysis engaged in by the USPO in preparing his Presentence Investigation Report ("PSR"). However, he respectfully submits that, notwithstanding this recommendation, a probationary sentence with whatever conditions the Court deems appropriate fully accords with Mr. Code's individual characteristics and circumstances, the offense at issue, and the goals of sentencing.

## BACKGROUND

Mr. Code is a 45-year old resident of Greenville, South Carolina. He is a husband, a father of two young boys, and former college basketball star at Clemson University. After college, he spent most of his career working for Nike, working first in Chicago and then Portland. Mr. Code was very successful at Nike, rising to the position of Director of Elite Youth Basketball.  However, in the late summer of 2014, Mr. Code quit his job at Nike and moved back home to South Carolina to care for his ailing father, who had recently suffered heart attack, was undergoing treatment for prostate cancer, and recovering from a knee replacement. After Mr. Code returned to South Carolina, he used the relationships he had developed through basketball to work a variety of jobs at Bernhard Energy, Willis Insurance, Gold Coast Wealth Management, SSM Agency, and an apparel company named "Let It Fly" before ultimately accepting a consulting position for Adidas in approximately October of 2016.[1] After Mr. Code was arrested on these charges in 2017 (based in substantial part on conduct encouraged by and undertaken for the benefit of Adidas), he was cut off by Adidas—*i.e.*, Adidas refused to pay him the amount owed on his contract and refused to indemnify him.

As the Court well knows, the charges against Mr. Code arose out of an arrangement in which payments were made to NCAA men's basketball coaches in exchange for those coaches influencing their athletes to use, among others, co-defendant Christian Dawkins' ("Mr. Dawkins") services if they later became professional basketball players. However, when viewing the evidence in the light most favorable to the Government, it shows that Mr. Code's involvement in the charged scheme was extremely limited, and was certainly more limited than

---

[1]      As part of its marketing efforts, Adidas sponsors various college basketball programs.

3

any other defendant in this case. Indeed, at the conclusion of trial, the jury's decision – which Mr. Code respectfully disagrees with – to convict Mr. Code of only one charge (conspiracy to commit bribery) reflects how limited his involvement was.

Mr. Code is a family man, not someone who ever contemplated that anyone would view his conduct as criminal in nature. Indeed, Mr. Code has no criminal history and, before these cases, he had never been charged with a crime. Like many others, he understood that he was violating the NCAA's rules—but unfortunately, he and his co-defendants are the first to have been convicted of federal crimes based on the theory of prosecution pursued in this case. For these actions – which he deeply regrets – he has already been severely punished.

## APPLICABLE LAW

In 2005, the Supreme Court ruled that its Sixth Amendment holdings in *Blakely v. Washington,* 124 S. Ct. 2531 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) apply to the federal Sentencing Guidelines. *Booker*, 125 S. Ct. at 756. Based on this conclusion, the Court further found those provisions of the federal Sentencing Reform Act of 1984 ("Sentencing Reform Act") that make the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), or which rely upon the Guidelines' mandatory nature, 18 U.S.C. § 3742(e), incompatible with its Sixth Amendment holding. *Id*. Accordingly, the Court severed and excised those provisions, making the Guidelines effectively advisory. *Id.* at 757.

The Sentencing Reform Act, as revised by *Booker*, requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C. § 3553(a)(4) (Supp. 2004), but also permits the court to tailor the sentence in light of other statutory concerns. *See* 18 U.S.C. § 3553(a); *see also Booker*, 125 S. Ct. at 757.

4

District courts are required to properly calculate and consider the Guidelines when sentencing, even though the Guidelines are advisory in nature. *Rita v. United States*, 551 U.S. 338 (2007) (stating that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range); *see also Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). The Court, in determining the appropriate sentence in a particular case, therefore, must consider the properly calculated Guideline range, the grounds for departure provided in the policy statements, and then the factors under 18 U.S.C. § 3553(a). *Rita*, 551 U.S. at 351.

Under *Booker*, sentencing courts must treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). The primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the following purposes:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2). In addition, when determining a minimally sufficient sentence, Section 3553(a) further directs sentencing courts to consider the following factors:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
. . .
(3)     the kinds of sentences available;
. . .

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

Other statutory sections also give the district court direction in sentencing.  Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Under 18 U.S.C. § 3661, no limitation shall be placed on the information concerning the background, character, and conduct of the defendant, which a court may receive and consider for the purpose of imposing an appropriate sentence. *See also United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (explaining that although a sentencing court is required to "correctly calculat[e] the applicable Guidelines range," that calculation falls "second" to "the bedrock" of federal sentencing, 18 U.S.C. § 3553(a), which "requires a court to take account of a defendant's character in imposing sentence."). This statutory language certainly overrides the (now-advisory) policy statements in Part H of the Sentencing Guidelines, which list as not ordinarily relevant to sentencing, a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* USSG § 5H1.

The directives of *Booker* and Section 3553(a) make clear that courts should no longer uncritically apply the Guidelines.  Such an approach would be inconsistent with the holdings of the merits majority in *Booker*, which rejected mandatory Guideline sentences based on judicial fact-finding, and the remedial majority in *Booker*, which directed courts to consider all of the Section 3353(a) factors, many of which the Guidelines either reject or ignore.  *United States v.*

6

*Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. 2005).  As another district court judge has correctly observed, any approach which automatically gives heavy weight to the Guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*." *United States v. Jaber*, 362 F. Supp. 2d 365, 371 (D. Mass. 2005); *see also United States v. Hampton*, 441 F.3d 284, 289 (4th Cir. 2006) ("[I]n fashioning a reasonable sentence, district courts must properly calculate the advisory guideline range and then must determine what sentence—one within the advisory range or outside of it—most effectively meets the factors set forth § 3553(a).").

Moreover, a sentencing court should consider a defendant's family circumstances in fashioning an appropriate sentence. Indeed, the Second Circuit has upheld downward departures where the defendants' family circumstances warranted the departure. *See United States v. Johnson*, 964 F.2d 124, 129-30 (2d Cir. 1992) (upholding a downward departure where a mother was the sole caretaker of her children and stating, "[t]he rationale for [the] downward departure . . . [was] not that Johnson's family circumstances decrease[d] her culpability, but that [the court was] reluctant to wreak extraordinary destruction on [her] dependents who rel[ied] solely on the defendant for their upbringing"); *see also United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1998) (upholding a downward departure where the defendant, whose wife spoke little English and had a limited earning capacity, played a primary role in the education, upbringing and support of two young children); *United States v. Quinteri*, 306 F.3d 1217, 1230 (2d Cir. 2002) ("we do not doubt" that a defendant could seek a downward departure based on extraordinary family circumstances if she was the sole caregiver to young children).

In sum, in every case, a sentencing court should not merely consider the Guidelines. Rather, the court should consider all of the Section 3553(a) factors, including any extraordinary family circumstances, in determining a sentence that is sufficient, but not greater than necessary,

to meet the goals of sentencing.  And, where the Guidelines conflict with other sentencing factors set forth in Section 3553(a), these statutory sentencing factors should generally take precedence over the Guidelines.  *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since § 3553(a) requires that a sentence be no greater than necessary to meet the four purposes of sentencing set forth in subsection 3553(a)(2), the imposition of sentence greater than necessary to meet those purposes violates the statute and is reversible, even if within Guideline range).

## THE APPROPRIATE SENTENCE

### I.  CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A LENIENT SENTENCE.

In light of the foregoing, and based on the following analysis of the applicable Section 3553(a) factors, Mr. Code respectfully submits that a probationary sentence is sufficient to comply with the statutory purposes of sentencing.

#### A.  <u>Mr. Code's History and Character.</u>

Mr. Code has a strong support system of family and friends, 26 of which have written this Court to explain that the Merl Code they know is someone who is a valuable contributor to his community and worthy of the Court's mercy. (*See Ex. A* (Letters to Judge Ramos).) These letters describe Mr. Code as a family man, with a good heart, who has always strived to provide for and guide those who are less fortunate. In the words of Mr. Code's wife, Candance, "Merl and I were both taught that having moral values, integrity, and being a person of our word produces good human character. We were also taught to love God, to put family first, that education is the key, and that whenever and however we should always be willing to assist those less fortunate." (Candance Code Ltr.)

To Candance, Mr. Code is a man who has "dedicated his whole adult life to helping young people succeed" and "gives so much to others that he has little left for himself." (*Id.*) Indeed, Candance can recall countless parents telling her, "[Mr. Code] helped my child when no one else would, no one else believed, or many had given up." (*Id.*) Mr. Code is also a great father and "the ultimate boy's dad." (*Id.*) His two boys look up to him, the oldest of which thinks Mr. Code "has pure magic and the powers of a super hero." (*Id.*) And, although Mr. Code's youngest son is too young to know yet what magic or super heroes are, he "lights up with wide bright eyes and laughter when [Mr. Code] enters a room." (*Id.*) Moreover, as detailed further below, while it is obvious that Mr. Code cares deeply for his immediate family, he cares just as much for his extended family. (*See id.*)

In the words of Mr. Code's mother, Denise, Mr. Code is an "honorable individual," a "valuable member of [the] community," and "a wonderful human being." (Denise Code Ltr.) Mr. Code was raised to respect those who were less fortunate, and "has always been the type of person that wanted to help people with whatever the need." (*Id.*) With respect to his two boys, Mr. Code is an "exceptional father." (*Id.*) Indeed, Mr. Code's "greatest fear is not being able to be with his children to help mold their lives" in a way that only their father can. (*Id.*) Moreover, as Ms. Code has observed first-hand, this "long and hard journey" has caused Mr. Code and his family to suffer tremendously. (*Id.*)

Mr. Code's mother-in-law, Blondell Tutwiler, is a retired teacher who spent over 30 years teaching children in the Mississippi public school system. (Tutwiler Ltr.) One of her first memories of Mr. Code was when he had the opportunity to play in a basketball game with the then President of the United States, Barack Obama. (*Id.*) To Ms. Tutwiler, simply having the opportunity to play in such a game with the President "spoke volumes about [Mr. Code's]

9

character and integrity." (*Id.*) While living with Mr. Code and Candance for the past year, Ms.
Tutwiler has observed Mr. Code be "a great family man" who loves his wife, children, family,
and community. (*Id.*) And, while she has observed Mr. Code positively shape and mold the lives
of countless young men, she now sees that he is most concerned about the two young men that
mean the most to him, Lleyton and August. (*Id.*) Indeed, as Ms. Tutwiler has attested, to
incarcerate Mr. Code at this stage would have a "lasting" and "devastating" effect on his wife
and children.[2]

Mr. Code's father-in-law, Robert Jobe, has known him for ten years and describes him as
a "trustworthy" and humble man who "has always exemplified great character." (Jobe Ltr.)
Moreover, Mr. Code is a "selfless, altruistic, and hard-working" man who "is a pillar in his local
community." (*Id.*) Like many other members of the family, Mr. Jobe has observed Mr. Code be
the "provider and spiritual leader of his household who teaches his sons the importance of good
character." (*Id.*) Lastly, Mr. Jobe knows Mr. Code as a man who is "compassionate and
incapable of deliberately taking advantage of people." (*Id.*)

Mr. Code's sister, Whitney, has been "in awe" of her brother since she was a child.
(Whitney Code Ltr.) Whitney knows Mr. Code as the type of man who respects others and
"connect[s] with people because of his sincerity and decency." (*Id.*) To Whitney, one of Mr.
Code's best qualities is his ability to lead others by example. (*Id.*) He has always been the type to
work harder, stay later, and fight through adversity. (*Id.*) These qualities allowed Mr. Code not
only to teach young athletes basketball, but also to teach them life lessons in the process. (*Id.*)
Throughout this difficult time, Whitney has seen a man "driven by faith, compassion, respect,

---

[2]     Notably, because she was not allowed to testify in this case, Ms. Tutwiler also notes through her letter that
in the summer of 2017, she heard Mr. Code tell numerous coaches via telephone "please do not take any money or
anything from anybody." (*Id.*)

and love"—love which Mr. Code's sons "deserve to experience in abundance during their childhood years." (*Id.*)

Mr. Code's brother-in-law, Kelavor Lewis, has known him since 2010. (Lewis Ltr.) To Mr. Lewis, Mr. Code as "an upstanding citizen, [a] loyal friend, [a] family man and truly passionate about helping our youth have a better future." (*Id.*) Mr. Lewis has also observed Mr. Code be "a mentor, [a] devoted and loving husband . . . and [an] awesome father." (*Id.*) Indeed, Mr. Code is a "constant source of strength and support" for his family. (*Id.*) And, like the rest of Mr. Code's family, Mr. Lewis specifically recognizes the devastating effect that incarceration would have on Mr. Code's wife and children, particularly when considering the fact that Lleyton and August are in their "formative years and need their father." (*Id.*)

Adam Harper is Mr. Code's cousin and a member of the New York Bar. (Harper Ltr.) Mr. Harper has always known Mr. Code "to put others before himself[,]" a character trait which Mr. Harper believes allowed Mr. Code to achieve so much success in his career. (*Id.*) Outside of his career, Mr. Harper knows Mr. Code as a "devoted family man" of the "highest character" and "an integral member" of the Greenville, South Carolina community. (*Id.*) Indeed, for the last 55 years, the Code's extended family has had a family reunion every August, complete with fun, laughter, and a family Board of Directors. (*Id.*) Notably, in 2014, Mr. Code was elected as the fifth President of the Code family. (*Id.*)

Many of Mr. Code's friends echo the sentiments of his family members. One of Mr. Code's groomsmen, Phillip Styles, stressed the impact that Mr. Code has had in his life as well as everyone else around him. (Styles Ltr.) Mr. Styles, who has known Mr. Code for nearly 15 years, describes him as a man of "great character," who has "a passion for giving back to the community," and who is "a very loving and supportive father, son and friend." (*Id.*) As Mr.

11

Styles recognizes, separating Mr. Code from his family, friends, and community "would do more harm than good." (*Id.*)

Randi Howard, who has known Mr. Code for approximately 34 years, considers him "a dear friend and respectable young man that many look to for inspiration." (Howard Ltr.) Ms. Howard has always known Mr. Code to be a man of "great moral character," a "wonderful husband," and a "fantastic father." (*Id.*) In addition, Ms. Howard notes that Mr. Code is a "community advocate and mentor to other young men" who "wants nothing more than to take his gifts and talents to make the lives of other better." (*Id.*) Similarly, Major Williamson, who was both "troubled and surprised" to hear about this case, has considered Mr. Code a good friend for over 15 years. (Williamson Ltr.) Over those 15 years, Mr. Code has always been a role model in the community and, on a more personal level, has always been there for Mr. Williamson, especially when Mr. Williamson was in need. (*Id.*)

To Pastor Charles Cureton, who has known Mr. Code to be an "upstanding member" of the community for over 30 years, Mr. Code embodies "all of what [he] tr[ies] to preach, teach and live as a Pastor." (Cureton Ltr.) Pastor Cureton has "always found [Mr. Code] to be a hardworking individual" who is "always willing to go above and beyond what is expected of him." (*Id.*) Moreover, Pastor Cureton knows Mr. Code as a man who is "passionately committed to his faith, his family and the future of his children."

Taylor Eskridge Bachelor, an attorney in Tennessee, has considered Mr. Code "a friend who is like family for nearly a decade." (Eskridge Bachelor Ltr.) To Ms. Eskridge Bachelor, Mr. Code is a "gentleman, an excellent father, [and] a loyal husband[.]" (*Id.*) Ms. Eskridge Bachelor further describes Mr. Code as a "man of valor," which is supported by a story she recounts whereby Mr. Code saved a mutual friend's life during a ski trip to Breckenridge, Colorado. (*Id.*)

12

Furthermore, as Ms. Eskridge Bachelor aptly opines, "the damage to [Mr. Code's] reputation in the community, his status as a felon, the loss of his career," and, among other things, "the embarrassment to his family" should constitute "just punishment." (*Id.*)

Terry Finger, a member of the South Carolina Bar, has known Mr. Code since Mr. Code was seven years old. (Finger Ltr.) Like many others, Mr. Finger knows Mr. Code to be a "fundamentally good, honest and decent person" who is a good husband and father. (*Id.*) In addition, although Mr. Finger knows Mr. Code to be a "hard worker," he recognizes that Mr. Code "now finds himself unemployable in his given occupation and has exhausted his personal assets" because of this case.

Adrian Granderson has considered Mr. Code a "dear friend" for nearly eight years, and has always considered him to be a man of "faith, valor and honor." (Adrian Granderson Ltr.) Moreover, Mr. Granderson considers Mr. Code to be a "wonderful example of a father," and "a loving husband, brother, uncle, and son to his family." (*Id.*) Indeed, "[t]he world is a better with people like [Mr. Code]." (*Id.*) Damon Haley, who has known Mr. Code since 2002, describes him as a "caring soul" and a "giver" who has always "utilized his professional and civic roles to care for" those in need. (Haley Ltr.) As Mr. Haley makes clear, Mr. Code's presence is vital to his family, community, and friends; and to separate him from those individuals for an extended period of time would cause significant harm. (*Id.*)

Robert Graham has known Mr. Code for over 20 years. (Graham Ltr.) Mr. Graham has witnessed Mr. Code be "a foundational building block for the community in which he worked and lived," and knows him to be "a humble man" who will always help those who are in need, especially the less fortunate. (*Id.*) Furthermore, Mr. Graham recalls spending time with Mr. Code in Chicago, during which they mentored young men in an effort to keep them off the streets. (*Id.*)

13

Indeed, like many others, Mr. Graham describes Mr. Code as "a good man, a great father and [a great] husband." (*Id.*)

To Warren Broughton, who has considered Mr. Code to be like a brother since 2013, Mr. Code is "a selfless individual who is always willing to give you the clothes off his back." (Warren Broughton Ltr.) Indeed, Mr. Code "is the true definition of a friend" and "a [true] example of a great father." (*Id.*) And, consistent with many others, Mr. Broughton attests to how "counterproductive" it would be to the development of Mr. Code's family if he were to be incarcerated for an extended period of time. (*Id.*)[3] Similarly, Adrienne Broughton describes Mr. Code as "one of the most caring individuals [she] know[s]." (Adrienne Broughton Ltr.) Ms. Broughton has always known Mr. Code to be "moral, trustworthy, and . . . consistently act[ing] with integrity." (*Id.*) Moreover, Ms. Broughton further describes Mr. Code as "a stellar father . . . and a loving husband" who "has positively affected the lives of many young men." (*Id.*)

Keoki Allen has considered Mr. Code "family" for nearly 20 years. (Allen Ltr.) Throughout their time together, Mr. Code has "proven to be of good moral character and not one lacking in ethics." Furthermore, Mr. Code is the "kindest man" Mr. Allen knows. (*Id.*) Indeed, Mr. Allen has witnessed Mr. Code speak to and mentor underprivileged children in Chicago in an effort to keep them out of gangs. (*Id.*) And, where circumstances were not as fortunate, Mr. Allen has also witnessed Mr. Code assist with the funeral arrangements of a young man "who died senselessly on the inner city streets." (*Id.*) Similarly, Sherri Smith has known Mr. Code for over 20 years and thinks of him as her own son. (Smith Ltr.) Ms. Smith described Mr. Code as an honest, well-rounded person who has always been well-mannered and compassionate. (*Id.*)

---

[3]     Like Ms. Tutwiler, Mr. Broughton also wanted to use his letter to recount three instances where he recalled hearing Mr. Code tell coaches via telephone, "do not take any money from them." (*Id.*)

To Amaris Johnson, who first met Mr. Code when he started dating Candance more than ten years ago, a particular quote from Martin Luther King, Jr. embodies the Merl Code she knows: "The ultimate measure of a man is not where he stands in moments of comfort and convenience, but where he stands at times of challenge and controversy." (Johnson Ltr.) The Merl Code Ms. Johnson knows is a man of "strong Christian faith" who is "selfless in his commitment to his wife and children." (*Id.*) Throughout this case, and despite his own personal circumstances, Ms. Johnson has observed Mr. Code's "unwavering" commitment to his family and community. To take Mr. Code from them would create a "void" that would be difficult to fill. (*Id.*)

Vince Leigh, who has known Mr. Code for more than ten years, describes him as an "honorable" and "upstanding" man, a "loyal friend," and a "strong contributor to his community." (Leigh Ltr.) Similarly, Shammond Williams, who has known Mr. Code for 39 years, describes him as a "great person," an "outstanding individual in [the] community," and "an example for our youth." (Williams Ltr.) Gale Pruitt has known Mr. Code for five years and describes him as "kind, dependable, and well regarded among his peers and community." (Pruitt Ltr.) Moreover, "the love he has for his family is immeasurable." (*Id.*) Ms. Pruitt has also witnessed Mr. Code "suffer[] tremendously" as a result of this case, and recognizes the "detrimental" impact that would result to his family if he was taken away from them. (*Id.*)

Lastly, Leah Granderson, who first met Mr. Code when he and Candance began dating, describes Mr. Code as "unwavering" in the support of his two sons. (Leah Granderson Ltr.) Notably, Ms. Granderson recognizes the "importance of a present father in a young [man's] life," which both of Mr. Code's sons are blessed with. (*Id.*) Indeed, Ms. Granderson also recognizes how debilitating the absence of Mr. Code would be for Lleyton and August, especially during

this "pivotal and impressionable time in both of their lives." (*Id.*) Ms. Granderson's concerns are echoed by Venice Haynes, who has considered Mr. Code a close friend since 2011. (Haynes Ltr.) Ms. Haynes has always known Mr. Code to be an "upstanding member of the community," and realizes that Mr. Code is "integral to so many lives," particularly to those of Lleyton and August. (*Id.*) To Ms. Haynes, Mr. Code is "a loving husband, [a] devoted father, and [a] special friend" who "has contributed a great deal to his community." (*Id.*) For those reasons, Ms. Haynes urges the court to "consider [Mr. Code's] two very young sons . . . who need their father, a wife that needs her husband, and a family and community that needs his steady presence . . . ." (*Id.*)

Because of this case, Mr. Code will never be able to work again in the field he loves. All he has left is his family, and he is "undoubtedly the glue that holds [it] together." (Candance Code Ltr.) His wife loves him dearly. And his innocent sons, both of whom "are at a very critical and impressionable stage in life where they need their father[,]" do not deserve to have Mr. Code ripped away from them under these circumstances. (*Id.*)

### B.   The Nature and Circumstances of the Offense.

As mentioned above, this Court presided over the two-plus week trial in this matter and is, therefore, extremely familiar with the nature and circumstances of the offense for which Mr. Code will be sentenced. Rather than be repetitive, we would reiterate that Mr. Code's involvement in the charged scheme was far more limited than any other defendant in this case. Accordingly, we respectfully submit that the nature and circumstances of this offense do not warrant a custodial sentence.

### C.   There is No Need to Protect the Public From Further Crimes.

Prior to these cases, Mr. Code had no criminal history and had never been charged with a crime. Based on those facts, combined with the non-violent nature of the charges in this case, there is nothing to suggest that Mr. Code is a danger to the public.

### D.     The Kinds of Sentences Available.

Under *Booker* and its progeny, the Court is empowered to consider all sentences that fall within the statutory range for the offense and satisfy the requirements of Section 3553(a), both within and outside of the calculated Guidelines range. Here, a probationary sentence is available and will satisfy the statutory purposes of sentencing.

### E.     In Order to Avoid Unwarranted Sentencing Disparities, a Non-Custodial Sentence is Appropriate.

It is well established that a defendant's sentence should be considered in light of the need to avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a); *Gupta*, 904 F. Supp. 2d 349 (discussing the importance of avoiding unwarranted sentencing disparities in federal sentencing). As the PSR correctly recognizes, (*see* PSR at ¶¶ 11-13), three of Mr. Code's co-defendants pleaded guilty to the same count (Count One) that Mr. Code was convicted of. Specifically, Lamont Evans ("Mr. Evans") and Emanuel "Book" Richardson ("Mr. Richardson") each received sentences of three months' imprisonment followed by two years' supervised release, whereas Mr. Bland received a sentence of two years' probation. *Id.* Again, when viewing the evidence at trial in the light most favorable to the Government, Mr. Code's involvement in this scheme was minimal. Indeed, it was clearly less significant than that of Mr. Bland, and far less significant than that of Mr. Evans and Mr. Richardson.[4] (*See* PSR at p. 31 ("[I]t is important to note that [Mr. Code] does not appear to be at the top of the decision-making tree for this larger scheme.")) As such, we respectfully submit that Mr. Code – like Mr. Bland – should receive a probationary sentence. However, if the Court is inclined to impose a custodial sentence, then Mr.

---

[4]     In addition, although Mr. Dawkins has not yet been sentenced, Mr. Code's involvement was likewise far less significant than that of Mr. Dawkins.

Code's custodial sentence should not be greater than the three months received by Mr. Evans and Mr. Richardson, and should run concurrent with the sentence imposed in *Gatto*.

In addition, while Mr. Code fully understands the seriousness of the Government's charges, we must note the unfortunate truth that the conduct charged in this case is commonplace in NCAA athletics. (*See* PSR at pp. 31-32 ("In fact, by many accounts, this and similar schemes have been and continue to occur at multiple other schools.")) Indeed, a host of individuals who engaged in identical conduct have gone and will continue to go unpunished.  Under Section § 3553(a), Mr. Code's sentence – like the sentence of his co-defendants – should reflect this disparity, especially when considering that Mr. Code has always been a law-abiding citizen, a devoted husband, and a loving father to two young children.

> **F.      A Non-Custodial Sentence is Sufficient to Deter Others.**

As detailed above, Mr. Code's entire life and career as he knew them have been turned upside down and reduced to ashes. Indeed, even without a custodial sentence, Mr. Code has been punished substantially. Specifically, despite Mr. Code's request, Adidas refused to fund his defense in these cases in whole or in part—despite the fact that many of the actions that brought Mr. Code before this Court were both directed and encouraged by Adidas. In addition, Adidas also terminated his employment contract without good cause and has refused to make payments under that contract since the time of his arrest. As a result, Mr. Code and his parents had to fund his own defense, which financially crippled not only Mr. Code, but has put a strain on the rest of his family.

The Court should also be aware that, also as a direct result of the *Gatto* case, Mr. Code is now forced to defend a civil RICO lawsuit in the District of South Carolina. (*See Brian Bowen II v. Adidas America Inc., et al.*, C/A No. 3:18-cv-03118-JFA.) Mr. Code's co-defendants, Adidas and at least one Adidas executive who has not been charged in connection with this

investigation, are also named defendants in that case—and Adidas has specifically refused to cover Mr. Code's defense of that civil action as well. If anything at all is presently certain in Mr. Code's life, it is that these cases have left him completely ruined. Moreover, the possibility of complete and utter financial ruin resulting from the offense engaged in here is certainly sufficient to deter others from committing similar offenses.

> **G.      There is No Need for Restitution.**

The PSR indicates that restitution is to be determined. (PSR at p. 31.) However, neither Mr. Evans, Mr. Richardson, nor Mr. Bland was required to pay restitution. (*See* ECF Nos. 281-283.) Rather, they were simply ordered to forfeit the payments they received. (*Id.*) Furthermore, viewing the evidence in the light most favorable to the Government, any payments that Mr. Code was involved in facilitating have already been returned to the Government via the aforementioned forfeitures. These facts, combined with the fact that these cases have left Mr. Code financially devastated, demonstrate that there is no need for Mr. Code to pay any restitution.

## II.     THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE.

Although a sentencing court does not need to follow the Sentencing Guidelines, it is required to "correctly calculate[e] the applicable Guidelines range" before imposing a sentence. *Gall*, 552 U.S. at 49-50. Here, Mr. Code's PSR, dated August 29, 2019, (*see* ECF No. 300), calculated a total offense level of 20 and a criminal history category of II, which equates to a guideline imprisonment range of 37 to 46 months. (PSR at ¶ 152.) However, the USPO itself concluded that a variance below the Guidelines was appropriate here and recommended a sentence of 12 months and one day. (PSR at p. 31.)

While Mr. Code is grateful for the Probation Office's recommendation of a sentence below the Guidelines range, he respectfully disagrees with the calculation of the applicable

Guidelines range found in the PSR. When calculated correctly, the Guidelines result in a total offense level of 10 and a criminal history category of I, which carries a Guidelines range of 6-12 months.

### A.    Mr. Code's Base Offense Level.

Mr. Code's base offense level is 12.  (PSR at ¶ 101.)  The PSR first calculates a 2-level enhancement to that offense level based on "more than one bribe [being] involved in the offense." (PSR at ¶ 102.) Next, the PSR calculates a 6-level enhancement based on the finding that the value of Mr. Code's bribe payments exceeded $6,500.00. (PSR at ¶ 103.)  However, Mr. Code objects to both of these enhancements because the USPO's findings in support of them run contrary to the factual record. Indeed, the evidence at trial – viewed in the light most favorable to the Government – established that, at most, Mr. Code only had knowledge of *one* actual bribe payment, which was a $5,000.00 payment made to Mr. Richardson. Accordingly, because Mr. Code was only involved in *one* bribe, and the value of that bribe was less than $6,500.00, neither the 2-level enhancement nor the 6-level enhancement is warranted.

### B.    Minor Participant.

The evidence at trial, again viewed in the light most favorable to the Government, established that Mr. Code was a minor participant with minimal involvement in the charged scheme. Therefore, we respectfully submit that Mr. Code should have received at least a 2-level reduction under USSG §3B1.2, thus resulting in a total offense level of 10.

### C.    Criminal History.

According to the PSR, Mr. Code's criminal history score is two, which establishes a criminal history category of II. (PSR at ¶¶ 112-114.) However, under the Guidelines, "[t]he term 'prior sentence' means any sentence previously imposed . . . for conduct *not part of the instant offense*." (USSG § 4A1.2(a)(1) (emphasis added)). The Application Notes to USSG § 4A1.2

state that "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 . . . ." (USSG § 4A1.2 Application Note 1). Notably, USSG § 1B1.3(a)(1) provides the following regarding relevant conduct:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, and
>
> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that ***occurred during the commission of the offense of conviction, in preparation for that offense***, or in the course of attempting to avoid detection or responsibility for that offense[.]

(emphasis added).

The conduct for which Mr. Code was convicted in *Gatto* is related to and clearly relevant conduct to the instant offense under USSG § 1B1.3(a)(1). Indeed, the conduct at issue in each of the two cases involved the ***exact same federal investigation***, many of the same cooperating witnesses, and ***most*** of the same ***evidence***. The fact that the Government chose to charge these two cases separately does not mean that Mr. Code's prior conviction (a conviction that he is appealing) is not part of the instant offense. Therefore, we respectfully submit that when properly calculated, Mr. Code's criminal history score should be zero, which would establish a criminal history category of I.

### D. __Guidelines Range.__

Based on the foregoing, we respectfully submit that a proper calculation under the Guidelines results in a total offense level of 10 and a criminal history category of I. Accordingly, Mr. Code's guideline imprisonment range should be 6-12 months.

In addition, as a first-time offender,[5] the imposition of a non-custodial sentence is appropriate for Mr. Code. *See* USSG. at §5C1.1 cmt. n.4 (if a defendant is a "nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment.").

## III. THE PSR'S ASSERTION THAT THIS CASE IS NOT RELEVANT CONDUCT FOR PURPOSES OF § 1B1.3, § 5G13 CONCURRENT SENTENCING IS INCORRECT.

Prior to submitting this sentencing memorandum, we have reviewed the sentencing memorandum prepared by Mr. Code's co-defendant, Mr. Dawkins. Accordingly, in order to avoid repetition, we expressly join in Mr. Dawkins' argument and incorporate by reference his arguments concerning a concurrent sentence because such arguments apply with equal force to Mr. Code. (*See* Sent. Submission of C. Dawkins, at § III.)   Based on these arguments, we respectfully submit that any custodial sentence received by Mr. Code should run concurrently with Mr. Code's 6-month sentence in *Gatto*.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a probationary sentence, which is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing. If, however, the Court is inclined to impose a custodial sentence, we respectfully request that the Court impose a sentence of three months, which is the same sentence received by

---

[5]     Because Mr. Code's prior conviction in *Gatto* should be considered as part of the instant offense, Mr. Code should still be considered a first-time offender, as he has no criminal history whatsoever prior to these cases.

Mr. Evans and Mr. Richardson, both of whom were far more involved in the scheme at issue

than Mr. Code. In addition, we would also respectfully request that any custodial sentence run

concurrently with Mr. Code's 6-month sentence in *Gatto*.


Dated:  New York, New York
       September 20, 2019


**NEXSEN PRUET, LLC**

By: /s/ Mark. C. Moore
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211

**OGLETREE DEAKINS NASH
SMOAK & STEWART, P.C.**
Merl F. Code
300 N Main St, Suite 500
Greenville, South Carolina 29601
(864) 271-1300

*Attorneys for Defendant Merl Code*